**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRITANNICA CAPITAL MANAGEMENT LIMITED, BRITANNICA CAPITAL LLC, and SANJAY GUPTA Plaintiffs, v. TOPWATER STONEFLY FUND LLC; TOPWATER MAYFLY FUND LLC; TOPWATER PARTNERS LLC; TOPWATER MASTER FUND LTD.; LEUCADIA ASSET MANAGEMENT LLC; JEFFERIES FINANCIAL GROUP INC.; JEFFERIES LLC; GOLDMAN SACHS & CO. LLC; BRYAN D. BORGIA; BLAKE WIECZOREK; DAVE DAMM; JEFF O'HARA; TRAVIS TAYLOR; BRIAN LONG; SUSAN RUBIN; NICK DARAVIRAS; RICHARD HANDLER; BRIAN P. FRIEDMAN; JASON ECK; BETTY TRAN; DEAN C. BACKER; BRIAN ROBINSON; ANDREW ROTHE; YIYU CHEN; and JOHN AND JANE DOES 1-20, Defendants. | Case No. 1:26-cv-6711  **JURY TRIAL**  **DEMANDED** |

**COMPLAINT**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................ 5

THE PARTIES.............................................................................................................. 18

    Plaintiffs................................................................................................................ 18

    The Topwater and Leucadia Defendants .............................................................. 19

    The Jefferies Broker-Dealer Defendant ............................................................... 23

    The Goldman Sachs Defendant ............................................................................ 24

    The Goldman Sachs Individual Defendants ......................................................... 25

    The Individual Defendants.................................................................................... 28

JURISDICTION AND VENUE ..................................................................................... 39

The Securities Transactions Are Domestic.................................................................... 43

FACTUAL ALLEGATIONS ......................................................................................... 45

    A. The First-Loss Structure and Who Bears the Risk............................................ 45

    B. The Solicitation and the Representations (2019 to 2021) .................................. 51

    C. Defendants' Loaned Funds at Usurious Rates, Hidden Behind a Complicated Set of Agreements to Obscure Their True Purpose.......................................................... 54

    D. The Commitment Came First; the Disclosures Came After ............................... 87

1

E. Growth on Performance; Amendment No. 3 Takes the Layer to $2.5 Million ................. 103

F. The Course of Dealing: When a Threshold Loomed, Topwater Warned and Britannica Cured ........................................................................................................................ 107

G. Shifting Constraints Imposed After the Capital Was Committed ..................................... 117

H. 2024: The Cost Disputes, the Admitted Credit, and the Broken Data .............................. 127

I. June and July 2024: Jefferies Steps In and the Termination Machinery Is Rebuilt ........... 140

J. August 1 to 4, 2024: A Sound Book Meets a Breaking Market ......................................... 151

K. August 5, 2024: The Liquidation, Minute by Minute ....................................................... 154

L. August 7 to 14, 2024: The Paper Trail Built After the Fact .............................................. 172

M. The Additional Kept Money ............................................................................................. 179

N. Notice, Demand, and Defendants' Conduct After Notice ................................................. 195

O. Britannica's Trade Secrets and Defendants' Acquisition, Disclosure and Use ................ 202

P. The Platform-Wide August 5 Event, the Differential Treatment, and the Enterprise ........ 213

STANDING AND THE DIRECT AND PERSONAL NATURE OF PLAINTIFFS' INJURY  224

TOLLING AND TIMELINESS ................................................................................................ 227

CLAIMS FOR RELIEF ........................................................................................................... 232

COUNT I .................................................................................................................................. 233

Violation of Section 10(b) of the Exchange Act and Rule 10b-5 ........................................... 233

COUNT II ................................................................................................................................. 252

Control Person Liability Under Section 20(a) of the Exchange Act ...................................... 252

COUNT III ................................................................................................................................ 255

Misappropriation of Trade Secrets Under the Defend Trade Secrets Act, 18 U.S.C. § 1836  255

COUNT IV ................................................................................................................................ 260

Breach of Contract: the Stonefly AIAA ................................................................................. 260

COUNT V .................................................................................................................................. 265

Breach of Contract: the Mayfly AIAA ................................................................................... 266

COUNT VI ................................................................................................................................ 267

Breach of Contract: the Subscription Agreement and Operating Documents ........................ 267

COUNT VII ............................................................................................................................... 269

Breach of the Implied Covenant of Good Faith and Fair Dealing ......................................... 269

COUNT VIII .............................................................................................................................. 272

Breach of Fiduciary Duty ....................................................................................................... 272

COUNT IX ................................................................................................................................ 276

Fraud ...................................................................................................................................... 276

COUNT X .................................................................................................................................. 282

Fraudulent Concealment .................................................................................................... 282

COUNT XI .......................................................................................................................... 285

Conversion ........................................................................................................................ 285

COUNT XII ......................................................................................................................... 288

Money Had and Received ................................................................................................. 288

COUNT XIII ........................................................................................................................ 289

Accounting ........................................................................................................................ 289

COUNT XIV ........................................................................................................................ 290

Unjust Enrichment ............................................................................................................ 290

COUNT XV ......................................................................................................................... 293

Tortious Interference with Prospective Business Relations and Prospective Economic
Advantage ......................................................................................................................... 293

COUNT XVI ........................................................................................................................ 302

Aiding and Abetting Breach of Fiduciary Duty and Fraud ............................................. 302

COUNT XVII ....................................................................................................................... 307

Civil Conspiracy in Connection with the Foregoing Torts .............................................. 307

COUNT XVIII ..................................................................................................................... 314

Violation of Section 4o of the Commodity Exchange Act, 7 U.S.C. § 6o, with a Private Right
of Action Under Section 22, 7 U.S.C. § 25 ....................................................................... 314

COUNT XIX ........................................................................................................................ 320

Promissory Estoppel and, in the Alternative, Implied Agreement: the Credit-Interest
Commitment ...................................................................................................................... 320

COUNT XX ......................................................................................................................... 323

Economic Duress: Voidability of Extracted Terms and Declaratory Relief, Pleaded in the
Alternative ......................................................................................................................... 323

COUNT XXI ........................................................................................................................ 329

Contractual Indemnification and Declaratory Judgment Under Section 11(a) of the Advisory
Agreements, Pleaded in the Alternative and Contingent Upon Final Judicial Determination 329

COUNT XXII ....................................................................................................................... 331

Violation of 18 U.S.C. § 1962(c), Civil RICO .................................................................. 331

COUNT XXIII ...................................................................................................................... 339

Conspiracy to Violate 18 U.S.C. § 1962(c), in Violation of 18 U.S.C. § 1962(d) ................ 339

COUNT XXIV ...................................................................................................................... 341

Misappropriation of Trade Secrets and Unfair Competition Under New York Common Law
............................................................................................................................................ 341

COUNT XXV ....................................................................................................................... 343

Negligent Misrepresentation, Pleaded in the Alternative to Counts IX and X ....................... 343

COUNT XXVI ................................................................................................................... 345

Declaratory Judgment: Recharacterization and Voidness of Extracted Financing Terms Under New York Usury Law, Pleaded in the Alternative ................................................................ 345

COUNT XXVII ................................................................................................................. 348

Rescission and Restitution Under Section 215(b) of the Investment Advisers Act, 15 U.S.C. § 80b-15(b), Pleaded in the Alternative .................................................................................. 348

COUNT XXVIII ................................................................................................................ 352

Rescission and Restitution Under Section 29(b) of the Exchange Act, 15 U.S.C. § 78cc(b), Pleaded in the Alternative ................................................................................................... 352

COUNT XXIX ................................................................................................................... 356

Fraudulent Accounting and Failure to Account ................................................................. 356

COUNT XXX ..................................................................................................................... 359

Promissory Estoppel: the Committed-Capital Promise ........................................................ 359

COUNT XXXI ................................................................................................................... 361

Violation of the Connecticut Uniform Securities Act, Conn. Gen. Stat. § 36b-29 ................. 361

DAMAGES ........................................................................................................................ 363

PRAYER FOR RELIEF ...................................................................................................... 374

JURY DEMAND ................................................................................................................ 379

## PRELIMINARY STATEMENT

1.      This is a case of securities fraud, theft, and cover-up arising from a first-loss extraction scheme marketed as a capital partnership. Leucadia Asset Management LLC's ("LAM") Topwater Capital division ("Topwater"), owned and controlled by Jefferies Financial Group Inc. ("Jefferies"), sold a security called a First-Loss Interest to Britannica Capital LLC ("BC LLC"), a quantitative macro fund. As sold and as written, BC LLC would post roughly ten percent of the account's stated value, Topwater would commit the remaining ninety percent as trading capital, and BC LLC's ten percent, as the "first loss member," would absorb every trading loss first. The account containing 100% of the stated capital would be managed by BC LLC's affiliate, Britannica Capital Management Limited ("BCML"). In return, Topwater and its investors would take a bit less than half of every gain, stand behind the account with their committed capital, and bear every loss exceeding BC LLC's first-loss layer. As actually operated, and concealed from Britannica, Defendants bore no losses at all: Topwater never provided the committed capital, Defendants set the termination trigger to fire before any loss could reach Topwater's layer, and Topwater took its share of the gains out every month while every loss remained on Britannica's capital. Topwater induced BC LLC to purchase the First-Loss Interest through representations that Topwater's own records and filings with the Securities and Exchange Commission prove false, and executed the scheme with and through Goldman Sachs & Co. LLC ("Goldman Sachs"). On the morning of August 5, 2024, Defendants declared that trading losses had consumed Britannica's capital to its contractual floor and that both accounts had automatically terminated in the same single minute. That was false. No termination event had occurred, and Britannica's capital had not been consumed. Defendants seized the capital anyway, fabricated their purported proof three days later, and kept and used the

proprietary trading strategies that Britannica and Gupta had spent more than two decades building.

2.      Defendants also misrepresented the nature of the consideration they promised. They sold Britannica real, loss-bearing capital and assets under management that Britannica would manage for fees and investment returns; on Plaintiffs' allegations, Defendants instead supplied revocable, senior, collateralized buying power drawn from a pooled margin structure, charged Britannica for using it, and structured the relationship so that Defendants' purported capital would be withdrawn or the accounts terminated before it sustained loss. That distinction is central to the contract and fraud claims because it identifies what Defendants promised, what they failed to deliver, and the trading capacity, fees, returns, costs, infrastructure, track record, and enterprise value Plaintiffs lost. The Federal Reserve Board's interpretation in 12 C.F.R. § 221.111 is pleaded as objective support for that economic characterization and for discovery into Defendants' platform structure, not as a standalone cause of action or independent source of damages under Regulation U.

3.      The Plaintiffs are two Britannica entities and their founder. Britannica Capital LLC purchased the First-Loss Interest and committed the capital that Defendants seized. Britannica Capital Management Limited, its affiliate, served as the Account Adviser and directed the trading (the entities collectively will be referred to as "Britannica"). Sanjay Gupta, Britannica's founder and Chief Investment Officer, built the strategies and systems Defendants took and keep, and seeks the return and compensation for the theft of the intellectual property he created and owns and for the further personal claims pleaded below.

4.      Two accounts sit at the center of this case, and their arithmetic is simple. Topwater's Stonefly Fund LLC ("Stonefly") opened in 2021 at Goldman Sachs, sold as a

6

$10,000,000 trading account built from two parts: Britannica's $1,000,000 first-loss layer, absorbing trading losses first, and $9,000,000 Topwater promised as genuine invested capital standing second in line, at risk like any investor's money once the first layer was gone. Stonefly's broker, Goldman Sachs, had a host of serious issues including but not limited to the fact that it charged Britannica excessive commissions several times above the market rate, and provided a broken product and service. Topwater's Mayfly Fund LLC ("Mayfly") was the escape from Goldman: opened at Interactive Brokers in July 2024, three weeks before the seizure by Defendants, built the same way, $1,500,000 from Britannica inside a stated $15,000,000 account. Each contract carried an automatic termination line at one percent of stated value: $100,000 for Stonefly, $150,000 for Mayfly. Defendants' claim is that if losses ever ate Britannica's money below that line, the accounts purportedly terminated by themselves.

5.      The sale ran on specific promises.  On solicitation calls in early 2021, in 2019 and before, Topwater's founders and officers represented that every manager who participated in its first loss program, by acquiring and managing first loss interests, ran on one uniform structure paying fifty-five percent of profits on the total capital they were given to manage by Topwater; that competitors such as Prelude and Boothbay charge managers a cost of capital while Topwater provides real committed capital and charges none; and that any risk breach would be handled by dialogue and cure, never automatic liquidation. Then came the switch: the contract Topwater sent, described as the standard everyone signed, paid fifty percent, and once Britannica had committed its capital and its strategies, Defendants rewrote the deal again and again under express threats of termination, imposing the very cost-of-capital charge their solicitation had disclaimed.

6.      The machine then ran on Britannica's money alone. Topwater and Leucadia Asset Management ("LAM") placed every dollar of loss on Britannica, took half of every monthly gain as their price for the ninety percent they promised and never provided, charged financing on that phantom capital as if it were a loan, and kept the interest and short-rebate income that was contractually due on Britannica's cash and credit balances. And they made themselves the judge of their own prize: LAM valued the termination trigger on its own numbers, under no disclosed rule or methodology. The cost-of-capital charge, first-loss deposit, margin-style replenishment requirements, and Defendants' continuing control over the pooled supporting capital demonstrate that the stated Investment Account Value functioned as priced trading capacity or leveraged financing, undisclosed, rather than actual investor capital allocated and provided to Britannica as assets under management.

7.      At least two more parties were integral. Above Topwater stood Jefferies Financial Group Inc. ("Jefferies Financial", or "Jefferies"), the parent in control, whose affiliated and principal money made up approximately sixty percent of the capital Britannica's layer shielded, a conflict that was never disclosed. By Defendants' own marketing deck, Jefferies' Chief Executive Officer, Richard Handler, its President, Brian P. Friedman, and Leucadia's leadership sat on the Investment Committee that held power over every account on the platform and made the decisions this Complaint pleads, while Jefferies' own risk chief approved the accounts' risk parameters. The people protected by Britannica's capital were the people deciding its fate.

8.      Beside them stood Goldman Sachs & Co. LLC ("Goldman"), and the two firms ran concealed arrangements between themselves: Goldman referred managers like Plaintiffs to Topwater's platform, Topwater required those managers to send all of their trading to Goldman, and Goldman billed that captive trading at up to five times the market rate. Those commissions

8

alone cost more than half of Britannica's entire original equity capital base every year, on trading that FINRA's own rules required Goldman to price fairly and execute on the most favorable terms reasonably available, duties Goldman inverted into a harvest. The payment ran upward as well: Goldman delivered investment-banking business to Topwater's parent, collecting placement fees for the fund complex it fed with managers and sharing underwriting economics with Jefferies through the present, including as joint lead bookrunners on a $1.5 billion initial public offering completed in February 2026. Neither firm told Britannica that its broker had been paid for delivering it, or that its trades were the currency. The executed Stonefly Appendix A leaves Prime Broker blank. Goldman was never contractually designated. It was imposed.

9. The relationship they trapped Britannica inside was broken, and Defendants knew it: for three years Goldman misstated Britannica's positions and profits, and Topwater's own officer agreed in writing in the account's first year that Goldman appeared inadequately attentive and named a better broker himself; Defendants Topwater, LAM and Jefferies kept Britannica locked at Goldman regardless, further described below. However, whenever Britannica asked in writing to move most of its capital to another broker, Topwater officer O'Hara's invented account position breach accusations and termination threats arrived the next day.

10. The termination was not an event; it was orchestrated by the Investment Committee described above. On information and belief, stated on the bases pleaded below, Goldman Sachs advised that Committee and bodies like it across Jefferies, LAM, and Topwater, supplied the data their decisions ran on, and profited improperly from what Handler, Daraviras, Friedman, Tran, Robinson, Travis, Borgia, Rubin and other Defendants decided. The Committee had shown its method in March 2023, convening over a modest drawdown that Defendants' own gain-sweeping design had created and that was normal, and sending its ultimatum through

9

Defendant Jeff O'Hara: pay a new charge for the very capital Defendants had promised and never provided, or receive a termination notice. In July 2024, the Committee's members installed the cross-default chaining Britannica's two accounts together, on information and belief, stated on the sequence pleaded in this Complaint, already intending to improperly use it to terminate Britannica accounts. The opportunity came about thirty-three days later.

11.     Unknown to Plaintiffs, Defendants had promised the same capital to all of the different entities it had engaged in this deal with.  It did not have that amount of capital - it over promised, and when the market under-performed one day, its capital was called and found to be short. It came on Monday, August 5, 2024, on a global shock that had nothing to do with Britannica: a weekend panic in the yen carry trade sent Japan's Nikkei index down 12.4 percent, its worst single day since the crash of 1987, with United States stock futures down roughly six percent before New York opened. Clearinghouses and prime brokers demanded sharply more collateral, and the truth Defendants had concealed for three years arrived at once: behind all of the platform's managers stood not the committed capital Defendants had sold but one shared pool of margin, and the pool could not cover the demands on all of Defendants' managers at once. The crisis was Defendants' own.

12.     Britannica's book was built for that morning: defensive by design, constructed to profit from precisely this kind of violent, once-in-a-decade repricing, and O'Hara himself had told Britannica's Chief Investment Officer Gupta that Britannica was the only manager on the platform without a long bias. Britannica Chief Compliance Officer Madej was listening to the same calls. On the ordinary-course figures Britannica stood nowhere near any breach, and with the overdue credits Defendants had confirmed in writing five days earlier counted, as the contracts required, the accounts stood in significant profit. August 5 should have been the best

10

day in Britannica's history. Defendants made it the day they improperly declared a default and took Britannica's assets, precisely because Britannica's capital was intact.

13.    Defendants seized the accounts despite the lack of default, and every reason they gave pointed the same way: the margin hole in their shared pool needed capital, and Britannica's intact layer was capital in Defendants' own hands; the protected second layer, substantially Defendants' and their principals' own money, ran on the zero-loss mandate O'Hara had already stated; Britannica had just moved its trading to a new broker, taking the order flow that paid Goldman and, through Goldman, the platform; the credits Defendants had confirmed in writing were coming due, and a terminated account, Defendants would claim, paid nothing; and a destroyed Britannica left Defendants the only holders of Gupta's successful trading strategies.

14.    Defendants say the termination was automatic. This is belied by the actual facts. Britannica's books held large positions in stock options, which do not trade until the market opens, so before the opening bell no price existed anywhere for the instruments Defendants claim to have valued to the dollar. And when the market opened, the screens stayed blank: August 5 was a nationwide market-data failure, Charles Schwab, Fidelity, Interactive Brokers, Vanguard, and other major platforms were reportedly down. The Financial Times reported the outages that morning, and in Britannica's own accounts the options pricing fields showed nothing, recorded in support tickets Britannica filed that morning. Defendants had no pricing data and performed no valuation; what they performed was a decision made before the market opened at all.

15.    What Defendants did have was a termination email, written in advance. On the morning call, O'Hara told Britannica's officers he had drafted the email long before the market opened and was waiting for the open to press send. He pressed send at 9:32 a.m., and the notice

11

claimed to report both accounts' values as of that very minute: the decision came first, and the paperwork was staged to appear to have occurred second. The notice gave Britannica five minutes to respond. On the same call, with Britannica's Chief Investment Officer and Chief Compliance Officer listening, O'Hara told them who had really decided, and that the decision had been "long made" at the "parent company and affiliates," far above him. Then came the threats: "I better see some covering, or it's going to get real ugly for you guys," and a liquidation run by Defendants themselves "would be really ugly." Under those threats, forbidden to hedge and forbidden to add capital, Britannica was forced to dismantle its own profitable book.

16.     For a termination to be based on purportedly falling below a predetermined amount, valuation has to be performed, and that requires knowing the account positions, prices and other assets and liabilities. Defendants did not know what was in the books they claim to have valued: their overnight position file had failed to arrive, and newly opened Mayfly was not yet connected to the platform's data systems, its positions that were supposed to arrive by real time automation arriving by manual email at the end of the day from Britannica itself. O'Hara's own writings that day prove he was guessing: at 2:25 p.m. he wrote that his data ran an hour behind; at 2:54 p.m. he wrote the platform's data vendor about a "gap in delivery"; at 10:35 that night he wrote Britannica that no afternoon data files had arrived, asked where the accounts stood, and asked Britannica to contact the vendor to learn "why files are not being delivered." The platform that declared two accounts automatically terminated that morning for purportedly falling below a predetermined amount spent the day not knowing what they held, and ended it asking its victim for the numbers. A genuine valuation would also have counted the credits described below; Defendants counted none.

17.    Defendants manufactured a breach by declaring an invented tiny $7,166 Stonefly shortfall to trigger a massive forfeiture, while actively withholding millions in contractually mandated, Long-confirmed account income - including interest and short rebates on a $7,500,000 positive cash balance - that easily exceeded the alleged breach.

18.    Defendants produced three irreconcilable arithmetic versions of the same event: a purported and fraudulent screenshot claiming a $907,166 loss engineered to force termination, O'Hara's four-days-later figure of only about $683,000 despite having undergone a forced, terrible, fire sale liquidation of a large options book in a non-working market with hardly any bid ask spreads, that legally terminates nothing, and the administrator's ordinary-course book recording a $637,793 loss (6.4%), which left Britannica's account safely above the required 9% cumulative loss threshold even before huge overdue credits held by Defendants were applied.

19.    A third-party accounting proved no termination event occurred, forcing Defendants - seven weeks after Britannica's forced sale and written demands - to return $532,710.95 (including $352,636 for Stonefly, over 3.5 times its floor and about 25 times the purported and fraudulently calculated, razor-thin breach of 7,166 immaterial dollars), though Defendants still withhold the remaining credits and refuse a proper accounting.

20.    Britannica's forced closure of Mayfly that day realized $180,074.78 in pure cash, exceeding Mayfly's termination floor and about 25 times the alleged Stonefly shortfall - proving standing capital existed, which Defendants refused to acknowledge despite Britannica's immediate pleas.

21.    Defendants' refusal to wait despite holding excess realized cash proves they knew the trigger was fabricated and that delay would expose the fraud, as they had already decided the accounts would not be allowed to survive.

22.     Defendants destroyed Mayfly by forcing its immediate liquidation into a broken market without ever providing a termination notice, calculation, or figure, fabricating its simultaneous failure three days later in O'Hara's August 8 writing.

23.     Mayfly's record disproves the manufactured claim four independent ways: the claimed loss failed to breach the last first loss layer and the second-loss capital layer as contractually required, the account lacked supporting data, Defendants ignored confirmed credits, and Defendants' own books showed Mayfly ended with its capital standing in cash above its floor, despite liquidation in the worst possible market.

24.     Defendants' contract provided no path to terminate Mayfly because O'Hara issued liquidation orders without a Mayfly figure.

25.     The two seizures independently fail and convict each other because Defendants executed them as a single, coordinated act, driven by one decision above O'Hara, a shared margin motive, identical timestamps, and a single unwinding remittance seven weeks later.

26.     Britannica immediately demanded written evidence, challenges, and reviews, while Defendants responded only with a manufactured screenshot, self-valuation admissions, and silence - exposing a motive to seize Britannica's capital to plug holes while facing $200 million in localized litigation and bankruptcy pressure.

27.     On August 8, 2024, Brian Long manufactured the proof by using Microsoft's "Print to PDF" to create screenshots with stripped image metadata and identical timestamps for two different brokers on un-synchronized systems, which O'Hara transmitted and counsel presented as bad-faith, contemporaneous evidence despite federal record-keeping laws and repeated demands for native source files.

28.     Defendants' contract required a termination based on the most recent valid trading information received but O'Hara admitted LAM relied on stale files from blind accounts, while missing native records and identical timestamps across incompatible systems prove Defendants manufactured data to justify a pre-determined termination.

29.     Defendants' counsel furthered the cover-up in an August 14, 2024 letter by withholding requested evidence, reasserting the fabricated same-minute claim, and intentionally misquoting Britannica's August 9, 2024 email - which called the losses speculative and invalid - by stripping out conditional language to falsely frame Britannica's denial as a confession.

30.     Defendants misappropriated Britannica's proprietary trading strategies despite termination, while O'Hara's remark that Britannica could "come back" confirms they intentionally seized the capital expecting Britannica to return and refill the pool.

31.     Despite legal notices to preserve evidence beginning December 23, 2024, Defendants suppressed native records using the same off-the-books communication channels for which the SEC and CFTC historically fined Jefferies and Goldman Sachs $280 million in combined record-keeping penalties on September 27, 2022.

32.     Individual defendants knowingly executed the fraud: Borgia, Wieczorek, Eck, Tran and others evidently made fraudulent marketing promises and representations; Rubin forced the cross-default mechanism; Taylor signed it; Damm and Long confirmed but withheld account income; O'Hara issued the pre-market termination notice; and Long subsequently fabricated the screenshot evidence.

33.     For over two decades, Topwater has systematically stripped hundreds of millions to billions of dollars from small managers by forcing their first-loss capital to absorb all losses

while shielding its own, a predatory scheme documented in Topwater's audited financial statements and exposed here by Britannica's records.

34. Goldman Sachs and Topwater senior officials engineered a scheme, beginning with an April 2019 meeting, to steer Britannica toward Topwater while concealing that Goldman, Topwater, LAM, and Jefferies were commercial partners using unrecorded channels to settle accounts.

35. Goldman fraudulently promised Britannica revenue-based capital introduction while secretly crediting its revenues to Topwater, LAM, and Jefferies and providing nothing.

36. On July 22, 2021, after obtaining Britannica's strategy and systems, Topwater conditioned approval on captive Goldman trading at Goldman-set commissions, reflecting the Committee's plan to pay Goldman through Britannica's trades.

37. Goldman extracted up to nearly $1 million annually based on annualized run rate from Britannica's captive flow while concealing the forced brokerage, reciprocal pricing, sham capital introduction, and refusal of cost-saving futures.

38. Goldman charged premium captive-brokerage fees while chronically corrupting Britannica's positions and P&L, understaffing the account, forcing Britannica to repair its errors, and soliciting more trading within weeks of the liquidation.

39. Goldman secretly credited Britannica's revenue to Topwater, LAM, and Jefferies, directing the resulting rewards away from Britannica and concealing the internal system that did so.

40. During solicitation and onboarding, Goldman and Topwater fraudulently promised institutional capital, firm allegiance, uniform two-and-twenty terms, no capital charge, broker choice, fair selection and valuation, capital introduction, and a quick launch. The

speakers, dates, falsity, and reliance are described below. Each promise concealed the reciprocity: Goldman was predetermined, Britannica was locked in, paid below the represented payout, received no outside capital or introductions that were promised, was charged for capital under threat of termination, and was liquidated using nonexistent data. Britannica committed its capital and proprietary strategy in reliance, and Defendants performed none of the promises.

41.     Britannica had instead been sold into an unlawful brokerage and lending operation. Unregistered LAM and Topwater controlled execution, custody, instruments, valuation, collateral, financing, and liquidation for transaction-based compensation.

42.     Defendants assumed broker and lender powers while avoiding the duties attached to them, then took half of Britannica's profits, retained interest on its cash and credits, secretly valued their own collateral trigger, and liquidated on their own declaration. They also banned stock-index futures that could reduce execution costs by up to 80 percent because the savings would reduce Goldman's revenue.

43.     Defendants' own books show that, even after charging Britannica with the forced liquidation and its resulting losses, the administrator recorded a $536,097 capital surplus for 2024. Adding back excessive commissions, liquidation and hedging-ban losses, and withheld credits shows that the accounts earned millions and would have earned more from the very dislocation Britannica's strategy was designed to exploit. Defendants looted a profitable book and called it a stop-out.

44.     Defendants' conduct violated Section 10(b), Rule 10b-5, Section 20(a), the Defend Trade Secrets Act, CEA Section 4o, and RICO; breached the governing agreements, implied covenant, and fiduciary duties; and constituted fraud, concealment, negligent misrepresentation, fraudulent accounting, conversion, conspiracy, tortious interference, trade-

17

secret misappropriation, unfair competition, aiding and abetting, unjust enrichment, and money had and received. Plaintiffs also seek rescission and restitution under Advisers Act Section 215(b) and Exchange Act Section 29(b), and plead promissory estoppel, implied agreement, economic duress, indemnification, and alternative usury theories. Relief includes return of capital and withheld income, accounting, compensatory, exemplary, treble, and punitive damages, disgorgement, declaratory relief, and all further relief pleaded below.

45.    BC LLC's rights also arise from the Subscription Agreement and its Appendix A designation. The rights of BC LLC and BCML are further confirmed by four years of performance, statements, K-1s, and fee payments directed to those entities.

**THE PARTIES**

**Plaintiffs**

46.    Plaintiff Britannica Capital Management Limited, or BCML, is a limited company incorporated under the laws of the British Virgin Islands on April 23, 2021, with its principal place of business at 2 Pomperaug Office Park, Suite 207, Southbury, Connecticut. During relevant periods, BCML also operated from 157 Columbus Avenue, Suite 510-A, New York, New York. BCML served as Account Adviser, directed the trading, supplied personnel, systems, and proprietary methods, earned the Account Adviser Fees and the other amounts owed under the agreements. BCML owns claims and injuries including the contract, business-destruction, systems loss, lost-profits, and withheld-income claims pleaded in this Complaint, including for the returns Britannica's strategy would have earned on the trading capital Defendants promised and never provided, $10,000,000 from 2021 through September 22, 2023 and $25,000,000 from September 22, 2023 through the present and continuing, at no less than New York's statutory nine percent per year and, on the record's own proof, at the far higher rates Britannica's strategy

18

generated; the amounts extracted through the unregistered brokerage and lending operation pleaded below; and the excessive broker charges extracted through the imposed Goldman Sachs relationship. The original Stonefly Account Investment Advisory Agreement, the "AIAA," used the name "Britannica Capital Limited"; Amendment No. 5 expressly corrected each reference to "Britannica Capital Management Limited," confirming BCML as the Account Adviser and rights holder under the Stonefly AIAA, a correction Defendants' own Tax member required and Defendants stipulated, as pleaded below. BCML is also the named Account Adviser under the Mayfly AIAA.

47.     Plaintiff Britannica Capital LLC, or BC LLC, is a Delaware limited liability company. BC LLC executed the Subscription Agreement for a First-Loss Interest in Topwater Partners LLC, was admitted as a First-Loss Member upon acceptance, and contributed the capital allocated to the Stonefly and Mayfly accounts. BC LLC owns the First-Loss Interests and all claims associated with them, including membership, capital-account, contractual, accounting, restitution, conversion, securities, and credit-related claims, and the right to seek reconciliation, return, and tracing of property in which it has a legally protected interest.

48.     Plaintiff Sanjay Gupta, Britannica's founder and Chief Investment Officer, served in that role at all relevant times and directed the strategy at issue.

49.     Gupta is the owner of the protected trade strategies that Defendants stole.

**The Topwater and Leucadia Defendants**

50.     Defendant Topwater Stonefly Fund LLC, or Stonefly, is a Delaware limited liability company and the Trading Master Fund under the Account Investment Advisory Agreement dated as of April 14, 2021, as amended. Stonefly held the managed account that traded through Goldman Sachs. Stonefly issued the August 5 liquidation direction through

19

O'Hara and is obligated to account for the Stonefly assets, losses, allocations, withdrawals, and transfers. The AIAA expressly identifies LAM as Stonefly's Manager, and LAM controls Stonefly's records and actions. Stonefly's complete membership citizenship is not publicly available and remains to be traced through discovery.

51.    Defendant Topwater Mayfly Fund LLC, or Mayfly, is a Delaware limited liability company and the Trading Master Fund under the Account Investment Advisory Agreement dated July 3, 2024. Mayfly held the managed account that traded through Interactive Brokers. Mayfly was the account in which Britannica was owed the income on its cash and on the credit balances generated by its securities sold short. Mayfly is obligated to account for the purported 9:32 stop-out, all Interactive Brokers marks, allocations, credits, liquidation activity, and the portion of capital returned on September 26. The AIAA expressly identifies LAM as Mayfly's Manager, and LAM controls Mayfly's records and actions. Mayfly's complete membership citizenship is not publicly available and remains to be traced through discovery.

52.    Defendant Topwater Partners LLC, or the Feeder Fund, is a Delaware limited liability company that issued BC LLC's First-Loss Interests and admitted BC LLC as a First-Loss Member. The Subscription Agreement describes the Feeder Fund as investing through Topwater Master Fund Ltd. into the Trading Master Funds. The Feeder Fund received or held BC LLC's contributed capital and issued the member statements and withdrawal accounting through its administrator. It is responsible for the complete capital ledger, allocations, credits, withdrawals, reserves, transfers, and return of property. Its complete membership citizenship is not publicly available and remains to be traced through discovery.

53.    Defendant Topwater Master Fund Ltd., or the Cayman Master Fund, is an exempted company organized under Cayman Islands law. The offering and subscription structure

20

places the Cayman Master Fund between the Feeder Fund and the Trading Master Funds, and in that chain the Cayman Master Fund received, held, pooled, allocated, transferred, or retained BC LLC's capital, profits, losses, and credits. It is liable for its own receipt, control, and retention of Plaintiffs' property, and is named for that conduct and so that the Court can order a complete accounting, tracing, restitution, declaratory relief, and return of property across the entities that held or controlled the funds.

54.     Defendant Leucadia Asset Management LLC, or LAM, is a Delaware limited liability company with its principal place of business in New York, New York. LAM was the Manager of Stonefly and Mayfly and acted through its Topwater Capital Division. LAM's Form ADV disclosures state that all Topwater personnel were subject to LAM's supervision and control. LAM controlled the valuation function, the Section 6(b)(ii) determination, the Investment Committee process, the liquidation, the fund entities, and the records needed to reconcile the accounts. O'Hara expressly stated that LAM, acting through Topwater as Manager, valued both accounts. LAM is a wholly owned subsidiary within the Jefferies group.

55.     LAM's own regulatory disclosures confirm that the Topwater Capital Division was not an autonomous legal person: LAM, acting through the division, served as Manager and investment adviser to the feeder, master, and Trading Master Funds. LAM controlled the division's risk, compliance, valuation, account-review, broker, committee, and recordkeeping functions and acted through the personnel identified below.

56.     The LAM-managed funds have already been adjudicated to be affiliates of the Jefferies Group. *See Chirico v. 352 Capital ABS Fund LLC,* 2025 NY Slip Op 50561(U), 2025 WL 1153824 at *7 (Sup. Ct., N.Y. Cnty. Apr. 9, 2025).

57.     The relevant entity functions were different. Stonefly and Mayfly were the Trading Master Funds and AIAA principals for their respective accounts. Topwater Partners LLC issued and maintained BC LLC's First-Loss Interests and capital account. Topwater Master Fund Ltd. sat in the investment and allocation chain. LAM managed and valued the accounts and directed the personnel and committees. Each entity is liable for its own contractual obligations, acts, receipt or control of property, and benefit, and for all conduct legally attributable to it, including through agency, control, conspiracy, aiding and abetting, and the other bases pleaded in this Complaint.

58.     Defendant Jefferies Financial Group Inc., or Jefferies, is a publicly traded New York corporation with its principal executive offices at 520 Madison Avenue, New York, New York. Jefferies wholly owns LAM and supplied platform infrastructure, risk, compliance, legal, operational, treasury, technology, and other support to LAM and Topwater. Jefferies' involvement was not passive ownership. Jefferies invested its own capital in the Topwater funds and announced publicly on May 11, 2021 that its investment, together with a large United States endowment's, had hard closed the funds; approximately sixty percent of Topwater's investor base, on Defendants' own deck, consisted of Jefferies and principal capital, so the layer Britannica's capital protected was substantially Jefferies' own; Defendants' own materials placed Jefferies personnel on the committees that governed accounts and risk; Topwater's Chief Compliance Officer Rubin documented that Jefferies Risk was reviewing Britannica's accounts before Amendment No. 5 was signed; and Jefferies Risk entered Britannica's accounts in June 2024, weeks before the seizure. On information and belief, based on that direct involvement, the ownership and control structure, the affiliate and revenue-sharing relationships LAM admitted in its own regulatory filings, the Goldman referral and required-broker record, and the approval

22

sequence, Jefferies personnel participated in or approved material decisions and received direct or indirect economic benefits associated with Britannica's accounts. The precise personnel, agreements, fee or referral arrangements, communications, benefits, and directives are within Jefferies' and its affiliates' control. Jefferies' attributable conduct, control, knowledge, and benefit are pleaded in the counts naming it, including the parent-level recordkeeping notice described below and the contemporaneous parent-level capital pressure described below.

**The Jefferies Broker-Dealer Defendant**

59.     Defendant Jefferies LLC is a Delaware limited liability company with its principal place of business at 520 Madison Avenue, New York, New York, a registered broker-dealer, and a wholly owned direct subsidiary of Jefferies Financial Group Inc. Jefferies LLC profited from the Topwater platform directly and in its own name: the fund complex's public Form D filings identify Jefferies LLC as placement agent for the Topwater funds, collecting placement fees from LAM, the Manager that directed Britannica's captivity at Goldman Sachs; Stonefly's own audited financial statements identify Jefferies LLC as a principal derivative counterparty of the very trading fund that held the managers' portfolios, placing Defendants' affiliated broker-dealer on the opposite side of the fund whose managers were told the platform could not trade against them; it shared fee-generating underwriting and advisory economics with Goldman Sachs on the same deals throughout the relevant period; and on September 27, 2022, while the Britannica agreements were in force, Jefferies LLC admitted willful, firm-wide violations of the federal recordkeeping laws for failing to preserve business communications conducted over unapproved channels, paying the SEC $50 million and the CFTC $30 million in coordinated sanctions. Jefferies LLC is named for its own conduct, receipt, control, and benefit as pleaded above, and for the accounting, tracing, restitution, and disgorgement required to

follow what it received. Its membership runs to Jefferies Financial Group Inc., a New York corporation. Jefferies LLC's attributable conduct is pleaded in the counts naming it.

**The Goldman Sachs Defendant**

60.     Defendant Goldman Sachs & Co. LLC, or Goldman Sachs, is a limited liability company with its principal place of business at 200 West Street, New York, New York. Goldman Sachs joined the scheme at its start and was paid at every stage of it. Goldman courted Britannica first: at the April 16, 2019 meeting at Goldman's offices pleaded below, Goldman's prime-brokerage leadership took in Britannica's strategy, and Goldman's Capital Introduction group received Britannica's materials that spring. On January 25, 2021, Goldman steered Britannica to Topwater by name in writing, while concealing that Goldman traded manager referrals against order flow and revenue with the very platform it recommended, a reciprocity Goldman's own account agreement priced in writing: the fees, commissions, and other revenues an account generates for Goldman "may be a significant factor" in whether a manager receives Goldman's capital-introduction services.

61.     Goldman then served as Stonefly's required prime broker and custodian and harvested the account it had been fed: it billed Britannica's captive trading at five times the market, sometimes approximately $5,000 in a single day and more than $70,000 in a single month, a harvest running toward $1,000,000 a year once financing and stock-lending revenue is added; it kept books that broke Britannica's positions for three years; it refused the futures onboarding whose economics Britannica quantified in writing at savings of as much as 80 percent of the relevant execution costs; it never delivered a single capital introduction across years of written requests and seven-figure flow; it held Britannica's confidential positions and strategy information; and, on information and belief, stated on the bases pleaded in this

24

Complaint, it advised and supplied data to the Investment Committee that destroyed Britannica's accounts and profited from what the Committee decided. Within weeks of the liquidation, Goldman's coverage was back soliciting Britannica's trading.

62.    None of this was brokerage. Executing and clearing a customer's orders is a service; what Goldman Sachs did was choose the customer's platform for a concealed price, condition the account on its own captivity, set the captive's rates at multiples of the market, ban the instrument that would have cut its take, price its promised introductions against the revenue it was harvesting, and keep the harvest running for three years.

63.    Each of those is an act of self-interested direction and extraction outside any service Goldman was retained to perform, and each is charged as Goldman's own deceptive and wrongful conduct, not as assistance to anyone else's.

**The Goldman Sachs Individual Defendants**

64.    Defendant Jason Eck is a natural person and, on information and belief, a resident of New York or its environs. Eck was, until his departure from Goldman Sachs, a Managing Director on Goldman Sachs' sales force covering Britannica. During the 2021 solicitation and onboarding, on calls with Britannica's Chief Investment Officer and its Chief Compliance Officer, Eck made the following specific representations: that Topwater and Jefferies invest their own capital in managers and actively allocate traditional capital at full institutional terms of two-and-twenty; that they hold practically limitless capital; that Goldman knows them very well; that they run well-defined and fair processes; that Goldman could have Britannica up and running quickly; that the relationship would pay Britannica for as long as the strategy performed; and that Goldman would help Britannica with capital introduction. Each of those representations was false when made, the falsity of each is proven by Goldman's and Topwater's own documents as

25

pleaded in this Complaint, and Britannica committed its capital and its strategy in reliance on them. On information and belief, Eck's compensation, bonus, and advancement depended in part on the revenue Britannica's captive account generated; the basis is Goldman's own written acknowledgment that account revenues drive its allocation of services, and the compensation records in Goldman's exclusive control. His personally attributed conduct is pleaded in the counts naming him.

65.     Defendant Betty Tran is a natural person and, on information and belief, a resident of New York or its environs. Tran was a Managing Director at Goldman Sachs and, following Eck's departure from Goldman Sachs, the account manager covering Britannica's prime-brokerage relationship. Tran represented in writing that Britannica's equity commission rate was consistent across Topwater accounts and directed Britannica to a Marquee rate of .0015 per share. Goldman's own personnel refuted her in writing: Andrew Kalafarski, with Tran copied, wrote that the rate did not sound right, appeared below Goldman's cost, and seemed to have been lost in translation with Topwater. When Britannica and SpiderRock, the third party execution and order management system recommended by Goldman itself, documented Goldman's trade breaks, wrong positions, false PnL missing data, and fractured reporting, Tran defended the broker's books in writing and went quiet when the mechanism was explained to her; and after Defendants seized the capital behind her account's commission stream, she kept pursuing that stream in the writings described below. On information and belief, Tran's compensation, bonus, and advancement depended in part on the revenue Britannica's account generated, on the basis pleaded above. Her personally attributed conduct is pleaded in the counts naming her.

66.     Defendant Dean C. Backer is a natural person and, on information and belief, a resident of New York or its environs. Backer was at all relevant times the head of Goldman Sachs' prime-brokerage business. Britannica's Chief Investment Officer and Chief Compliance Officer met Backer at Goldman's offices on April 16, 2019, where Backer and Goldman's capital-introduction personnel made the approximately-$1-million service representation described below, and on information and belief, Meyer sent the January 25, 2021 communications steering Britannica to Topwater at the direction of senior personnel including Backer. Backer headed the business whose own standard form priced capital-introduction services against the revenues an account generates, and the relationship-credit systems pleaded in this Complaint operated within the business Backer ran. On information and belief, stated on those documents, that structure, and his authority over the business, Backer knew of and participated in the steering, the reciprocity, and the revenue-driven allocation of Goldman's services away from the client whose trades paid for them. His personally attributed conduct is pleaded in the counts naming him.

67.     Defendant Brian Robinson is a natural person and, on information and belief, a resident of New York or its environs. Robinson was at all relevant times a partner in Goldman Sachs' Americas Prime Brokerage Sales force and met Britannica's Chief Investment Officer and Chief Compliance Officer, together with Backer, at Goldman's offices on April 16, 2019. On information and belief, Meyer sent the January 25, 2021 steering communications at the direction of senior personnel including Robinson, and Robinson participated in the sales-side execution of the steering and of the reciprocity pleaded in this Complaint; the basis is the documented April 2019 meeting with Backer, Robinson, and Meyer, Meyer's junior role and her direction by senior personnel, the revenue-factor form governing the business, and the coverage

27

and communication records in Goldman's exclusive control. His personally attributed conduct is pleaded in the counts naming him.

**The Individual Defendants**

68.     Defendant Bryan D. Borgia is a natural person who, on information and belief, resides in Connecticut. Borgia co-founded the Topwater business, served as Co-Head of LAM's Topwater Capital Division, and held authority over the first-loss program, manager selection, economics, risk governance, and the personnel who solicited and administered Britannica. Borgia personally participated in the solicitation and inducement of Britannica and, on information and belief based on his position and the approval structure, knew of or participated in the changed terms and termination decisions pleaded below. A Connecticut court previously recited allegations that Borgia and Travis Taylor sold the Topwater business to another firm with which they obtained employment and permitted an accounting and declaratory count to proceed against all defendants in that action, *Canada v. Topwater Exclusive Fund III, LLC*, 2019 Conn. Super. LEXIS 3441, at *3, *16-18 (Conn. Super. Ct. Dec. 24, 2019), a prior matter that placed Borgia on notice of the need for entity-specific accounting, redemption, and disclosure controls in the Topwater structure. Borgia architected the first-loss program, fronted its solicitation, and, on information and belief, designed, directed, and profited for more than two decades from each element of the concealed extractive design alleged throughout this Complaint. His personally attributed conduct is pleaded in the counts naming him.

69.     Defendant Blake Wieczorek is a natural person and, on information and belief, a resident of New York or Connecticut. Wieczorek was at all relevant times an officer or employee of LAM's Topwater Capital Division, and the record carries his conduct in his own writing at every stage: on April 22, 2019, he transmitted the Account Adviser Overview, the solicitation

28

document whose representations this Complaint pleads false one by one; on March 30, 2021, he pressed Britannica to execute the advisory agreement that week, invoking Topwater's planning of Q2 allocations to manufacture urgency; and he withheld the operating agreement that actually governed Britannica's investment behind the offshore fund's papers.

70.     Wieczorek manufactured that urgency in writing. On information and belief, no allocation process involving Britannica existed then or ever, and the allocation calendars and committee records for spring 2021 will show the stated reason was empty.

71.     On December 29, 2021, confronted with Britannica's written report that Goldman's books were changing positions and profit and loss with no trading behind the changes, Wieczorek agreed in writing that Goldman appeared inadequately attentive and himself named Interactive Brokers as potentially the best path forward; Defendants kept the door shut for three more years. In August 2023 he relayed in writing that "GS does not have an appetite for the additional business from Britannica," while Goldman's own coverage was courting Britannica's business in parallel; and the next morning, August 25, 2023, he committed in writing to make a BNP Paribas introduction shortly and to negotiate commission rates on what he called a viable path to migrating business or a second broker relationship, while Defendants held out J.P. Morgan the same way. On information and belief, the dangled introductions were a fraudulent delaying tactic with one purpose, keeping Britannica's order flow locked inside Goldman Sachs, as described below. His personally attributed conduct is pleaded in the counts naming him.

72.     Defendant Dave Damm is a natural person and, on information and belief, a resident of New York or Connecticut. Damm was at all relevant times a Vice President of LAM's Topwater Capital Division and ran the money machinery of the scheme. Damm wrote the April 16, 2024 falsehood at the center of the withheld-income allegations, misdescribing Defendants'

own restated Appendix C to justify keeping the income earned on Britannica's cash out of Britannica's accounts; admitted in writing, in the October 2023 exchange described below, that Topwater did not maintain uniform rates across managers, refuting the standard-and-uniform representations made to induce Britannica; kept Britannica on the failing broker Britannica had asked to leave, stating that changing the Stonefly broker would require an entire-account move and liquidation; brushed aside the recurring discrepancies Britannica documented between Defendants' account statements and Britannica's own records; and, when Britannica renewed its written futures request in April 2024, answered by asking whether the absence of futures was a deal breaker rather than fixing it. His personally attributed conduct is pleaded in the counts naming him.

73.     Defendant Jeff O'Hara is a natural person and, on information and belief, a resident of New York or Connecticut. O'Hara was at all relevant times an officer or employee of LAM's Topwater Capital Division, Britannica's primary point of contact, and the enforcer of each turn of the squeeze pleaded in this Complaint, in his own writings and statements described throughout this Complaint: he recorded in writing on April 30, 2021, before the account ever launched, that Topwater had only next-day Goldman reporting and still needed an intraday solution, the admission that the marketed real-time monitoring did not exist; he issued the April 2022 warning and accepted Britannica's $500,000 cure; he delivered the Investment Committee's March 2023 written ultimatum, accept a new financing charge or receive a termination notice; he put the May 2023 trap in writing, that withdrawal of Britannica's own added cure capital would itself cause an automatic termination; on August 5, 2024 he pressed send at 9:32 a.m. on the termination email he admitted drafting long before the market opened, told Britannica's officers the decision had been long made at the parent company and affiliates, imposed the verbal

30

prohibition on the protective trades, refused Britannica's offered capital, its requests for actual market prices, and its requests for escalation, threatened that it was going to get real ugly for Britannica, ordered most of the book liquidated within the hour, and admitted in writing that afternoon that his data ran an hour behind; days later he refused the two-week runoff of the nearly riskless remaining book; and on August 8, 2024 he transmitted the fabricated evidence package with the written admission that LAM had valued the accounts as its own Valuation Agent, asserting in writing, for the first time, that both accounts had independently failed in the same minute. His personally attributed conduct is pleaded in the counts naming him.

74.    Defendant Travis Taylor is a natural person and, on information and belief, a resident of Connecticut. Taylor was Co-Head and Managing Director of LAM's Topwater Capital Division and a member of the Investment Committee. He signed the July 3, 2024 Mayfly AIAA and Amendment No. 5 for Mayfly, Stonefly, and LAM, personally executing the instruments that installed the cross-default machinery; he held committee authority over the discretionary decisions of August 5, 2024; and he affirmed each pool's annual report accurate and complete under CFTC Regulation 4.7(b)(3)(i) for fiscal years 2021 through 2023. On information and belief, Taylor reviewed or approved the account and termination terms submitted to the Investment Committee and participated in the higher-level decisions concerning Britannica; the basis is his documented committee and co-head roles, his execution of the operative July instruments for all three principals, the committee's discretionary control over the liquidation, O'Hara's statement that the decision was made above him, and the decision and approval records controlled by LAM and Jefferies. Taylor co-founded the Topwater business with Borgia and ran it with him for more than two decades, and on information and belief, stated on those roles, his committee seat, his execution of the operative instruments, and the program's

uniform design across managers and years, Taylor, with Borgia, designed, directed, and profited for more than two decades from each element of the extractive scheme alleged throughout this Complaint. The *Canada v. Topwater* matter described above placed Taylor, no less than Borgia, on notice of the need for entity-specific accounting, redemption, and disclosure controls in the Topwater structure. His personally attributed conduct, control, and knowing assistance are pleaded in the counts naming him.

75.     Defendant Susan Rubin is a natural person and, on information and belief, a resident of Connecticut or New York. Rubin was at all relevant times Senior Vice President and Chief Compliance Officer of LAM's Topwater Capital Division, and she personally executed the acts that closed the trap at both ends of the relationship. On July 22, 2021, three months after BCML executed the Stonefly AIAA and after Britannica had delivered its strategy and systems, Rubin imposed the written condition that the Support Committee would approve Britannica's account provided that Britannica executed every trade through Goldman Sachs, obtained Britannica's confirmation within the hour, and answered, "Terrific, thanks!"; in that writing she exercised the very power LAM's filed Form ADV disclaimed to the SEC and imposed the broker whose referral reciprocity the same brochure confessed to the regulator and concealed from Britannica. Before the condition, Rubin ran the manufactured-selectivity chase and the pre-completed due-diligence questionnaire described below. In 2024 she administered the coerced amendment machinery, delivering counsel's cross-default on June 10, 2024 as the price of the broker exit, recording on June 18, 2024 that Jefferies Risk was engaged, and transmitting the executed papers, all without disclosing the purpose and scope of Jefferies Risk's engagement inside Britannica's accounts or any existing plan concerning them. On information and belief, Rubin knew the material facts her communications concealed; the basis is her compliance office

32

and its access, her authorship and control of the condition, chase, and approval communications, her documented seat between counsel, Jefferies Risk, and the committees, and Defendants' exclusive possession of her correspondence with each. The two-firm coordination that cleared Britannica's admission between the platform and the imposed broker is described below in Defendants' own words. Her personally attributed conduct is pleaded in the counts naming her.

76.　　Defendant Nick Daraviras is a natural person and, on information and belief, a resident of New York or Connecticut. Daraviras is a Managing Director of Jefferies, has been registered with Defendant Jefferies LLC since December 2002, and serves as Co-President of Leucadia Asset Management, responsible for the overall management of the LAM business. During the relevant period, LAM's own Account Adviser Overview identified him as a Jefferies Managing Director and Head of LAM and seated him on both the Investment Committee and the Support Committee, the bodies whose powers over every account on the platform, including the discretionary decisions of August 5, 2024, are described below. Daraviras lent the parent's voice to the platform's solicitation: in June 2021 he publicly promoted Topwater's endowment-backed hard close as a significant milestone under Borgia and Taylor, and in February 2020 he spoke publicly as Co-President for the platform's whole roster, naming LAM's multi-strategy relationships with Schonfeld, Weiss, and Topwater: public management of the very relationships at issue in this Complaint.

77.　　In 2024, as co-president of LAM Holdings, Daraviras submitted declarations in the Weiss bankruptcy while the Jefferies complex pursued approximately $100 million from a failed asset-management partner, the parent-level capital pressure described below, in the same weeks Jefferies Risk entered Britannica's accounts. On information and belief, Daraviras possessed and exercised the power to direct the management and policies of LAM and its

33

Topwater Capital Division, controlled or participated in the committee processes affecting Britannica, and participated in or approved the higher-level determinations that O'Hara told Britannica had been long made above him, including the August 5, 2024 decisions; the basis is the deck's committee rosters and leadership description, his dual Jefferies-LAM roles and current co-presidency, the escalation above O'Hara on August 5, his contemporaneous parent-level capital-pressure role, and the committee, approval, and parent records in LAM's and Jefferies' exclusive control. On information and belief, stated on that same record, Daraviras directed, approved, and profited from the operation of the platform's design at the platform level, including the unregistered brokerage and lending operation, the Goldman reciprocity, and the extraction of managers' capital and strategies pleaded in this Complaint. Defendants' own publications supply the control record: the deck's statement that the risk parameters and investment guidelines are approved by the head of risk for Jefferies Financial, the architecture Daraviras helped run; LAM's published biography placing him on the boards of several public and private investments of Jefferies Financial Group and its affiliates; and the May 11, 2021 press release quoting Daraviras by name for the platform. Daraviras is liable as a control person under Section 20(a) of the Exchange Act and Section 13(b) of the Commodity Exchange Act, and his personally attributed conduct, control, and culpable participation are pleaded in the counts naming him.

78.     Defendant Brian Long is a natural person and, on information and belief, a resident of Connecticut or New York. Long manufactured the retrospective evidence at the center of this Complaint's cover-up allegations, and he ran Topwater's administrative and accounting functions. He received accounting issues, confirmed in writing on July 31, 2024 the standing requirement to credit Britannica for the positive cash carry it maintained, on balances

34

standing at $7,500,000 that very night, addressed remaining positions on August 7, and created the retrospective PDF on August 8 using Microsoft Print to PDF. On information and belief, Long knew that the PDF was created after the asserted August 5 event and participated in presenting or enabling its presentation as contemporaneous proof. The basis is the creation metadata, the absence of native source calculations and image metadata, the package's account and arithmetic conflicts, O'Hara's transmittal and reliance on embedded timestamps, and the creation and instruction records controlled by Defendants. Long acted at the direction of, and for the benefit of, his superiors: O'Hara, who transmitted the package, and the Committee whose decision it papered. His personally attributed conduct is pleaded in the counts naming him.

79.     Defendant Andrew Rothe is a natural person and, on information and belief, a resident of New York. Rothe was at all relevant times an Associate in LAM's Topwater Capital Division, holds FINRA's Securities Industry Essentials qualification, and holds himself out publicly as personnel of both Topwater and Leucadia Asset Management. In a division of roughly ten to twenty-five people, Rothe performed the account-level functions of his role across the managed accounts, including Britannica's: on information and belief, stated on his role, the Division's size, its documented working practices, and the email record, he assisted in risk calculations, breach determinations, trade-break processing, interest-credit calculations, manager risk-profile rankings, and the checking of accounting and other account reports, and he received Britannica's confidential position and strategy information on an ongoing basis through the Division's account distributions. He is named on the delivery record of the August 5, 2024 termination thread through August 13. The functions he performed are the functions this Complaint indicts: the risk determinations, break handling, credit accounting, and report checking through which the Division ran, and ended, Britannica's accounts. His acts were

35

performed at the direction of and for the benefit of his superiors, and his personally attributed conduct is pleaded in the counts naming him.

80.    Defendant Yiyu Chen is a natural person and, on information and belief, a resident of Hong Kong or, during the relevant period, of Connecticut or New York. Chen was at all relevant times a Risk Associate in LAM's Topwater Capital Division and holds himself out publicly as personnel of both Topwater and Leucadia Asset Management. His function was the risk machinery itself: on information and belief, stated on his role, the Division's size, its documented working practices, and the email record, Chen performed the Division's risk-monitoring functions across the managed accounts, including risk calculations, breach determinations, margin surveillance, manager risk-profile rankings, and the review of account risk reporting, and he received Britannica's confidential position and strategy information on an ongoing basis. On information and belief, stated on his risk function, the Division's twenty-four-hour, six-day monitoring claims, and the pre-open decision pleaded in this Complaint, Chen participated in the overnight and pre-open risk monitoring, reporting, and communications through which the Division assessed the August 4 to 5 dislocation, platform margin stress, and manager positions before O'Hara's pre-drafted notice went out at 9:32 a.m. He is named on the delivery record of the termination thread through August 13. His acts were performed at the direction of and for the benefit of his superiors, and his personally attributed conduct is pleaded in the counts naming him.

81.    Defendant Richard Handler is the Chief Executive Officer of Jefferies Financial Group. Defendants' own solicitation deck seats Handler on the Investment Committee of the Topwater program, the body that reviewed manager accounts at undisclosed drawdown levels, extracted the March 2023 financing amendment under threat of termination, and made or

approved the August 5, 2024 termination decision that O'Hara attributed above his own level to the parent company. The parent's own filed annual reports and current marketing state the design Handler ran, its capital placed as an initial or major investor in the platform's vehicles with a revenue share of the manager economics besides, as described below: the capital that Britannica's first-loss layer stood in front of, and that the termination trigger protected, included the parent's own money by corporate design. On information and belief, Handler's personal capital stood within the "Jefferies & Principal Capital" that Defendants' deck identifies as approximately sixty percent of Topwater's investor base, the capital standing in the protected layer; the basis is the deck's own label, Handler's committee seat, and the subscription records in Defendants' control. On information and belief, stated on that same record, Handler presided over, approved, and profited from the design this Complaint pleads: a program that took smaller managers' capital as the only capital at risk, ran an unregistered brokerage and lending operation against it, and protected the parent's and its principals' money, including his own, from ever absorbing a loss. Handler is named in Counts II, XIV, XVII, and XVIII.

82.    Defendant Brian P. Friedman is the President of Jefferies Financial Group. Defendants' deck seats Friedman on the same Investment Committee, and the same corporate design, the same committee conduct, and the same "Jefferies & Principal Capital" layer are attributed to him on the same bases stated above. Friedman is named in Counts II, XIV, XVII, and XVIII.

83.    The decisions this Complaint pleads were committee decisions, and Defendants' own documents name the deciders. The solicitation deck seats the Investment Committee and the Support Committee over every account on the platform, names Handler, Friedman, Daraviras, Taylor, and Borgia among their members, and states that the risk parameters and investment

guidelines are approved by the head of risk for Jefferies Financial. On information and belief, every member of both committees during the relevant period, including each additional member whom the deck, LAM's filings, and the committees' own records identify, participated in or received the March 2023 repricing ultimatum, the June and July 2024 cross-default machinery, and the August 5, 2024 termination and liquidation decisions; the basis is the deck's committee rosters and stated functions, the Division's ten-to-twenty-five-person scale described above, O'Hara's statement that the decision had been long made above him at the parent company and its affiliates, and the minutes, agendas, votes, and distribution lists in Defendants' exclusive control, which name every participant in every decision. On information and belief, the head of risk for Jefferies Financial who approved those parameters, received or participated in the June through August 2024 risk escalations concerning Britannica's accounts.

84.    Goldman personnel Andrew Kalafarski, Isabella Meyer, and Eileen Jannetti performed the Goldman acts specifically attributed to them in this Complaint and are material witnesses. Kalafarski's own writing, with Tran copied, refutes in Goldman's own words Tran's representation that the rate was consistent across Topwater accounts. Meyer sent the January 25, 2021 steering communications, on information and belief at the direction of Backer and Robinson as pleaded above.

85.    Defendants John and Jane Does 1-20 are the presently unidentified officers, committee members, employees, and agents of LAM, Jefferies, the Topwater entities, or their affiliates who participated in, directed, approved, or ratified the decisions and acts alleged in this Complaint, including the pre-data decision made above O'Hara, the Investment Committee and parent-level determinations of August 5, 2024, the valuation and liquidation instructions, and the retention and use of Britannica's capital, credits, and confidential information. Their identities are

38

recorded in committee minutes, communications, approval records, and personnel files in Defendants' exclusive control. Plaintiffs will amend to name them when discovery reveals their identities.

86.     As used in this Complaint, the Individual Defendants are Borgia, Wieczorek, Damm, O'Hara, Taylor, Long, Rubin, Daraviras, Eck, Tran, Backer, Robinson, Rothe, and Chen.

87.     Each Individual Defendant is liable for the acts he or she personally committed, directed, participated in, or knowingly assisted.

88.     Defendants' own final Schedule K-1 records BC LLC at its Southbury, Connecticut offices.

## JURISDICTION AND VENUE

89.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs assert claims arising under federal law, including Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5; Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a); the Defend Trade Secrets Act, 18 U.S.C. § 1836; Section 4o of the Commodity Exchange Act and its private-right provision, 7 U.S.C. §§ 6o and 25; and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962 and 1964(c).

90.     This Court has exclusive jurisdiction over the Exchange Act claims under 15 U.S.C. § 78aa and over the Commodity Exchange Act private action under 7 U.S.C. § 25(c), and original jurisdiction over the DTSA claim under 18 U.S.C. § 1836(c).

91.     This Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(a) because those claims are so related to the federal claims that they form part of the same case or controversy.

92.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and the federal statutes invoked, and supplemental jurisdiction under 28 U.S.C. § 1367.

93.     This Court has personal jurisdiction over every Defendant.

94.     Section 27 of the Exchange Act, 15 U.S.C. § 78aa, vests this Court with exclusive jurisdiction over the Exchange Act claims and authorizes service on any Defendant in any district where the Defendant is found. Section 22(c) of the Commodity Exchange Act, 7 U.S.C. § 25(c), authorizes service in any district of which the Defendant is an inhabitant or wherever the Defendant may be found for the private action pleaded in Count XVIII. Section 1965 of the RICO statute, 18 U.S.C. § 1965, authorizes nationwide service for the claims pleaded in Counts XXII and XXIII, LAM being at home in this District as the anchor Defendant. Where a federal statute authorizes nationwide service, Federal Rule of Civil Procedure 4(k)(1)(C) makes the constitutional inquiry the Defendant's contacts with the United States as a whole rather than with any single State.

95.     Every Defendant named in the Exchange Act claims is subject to this Court's jurisdiction through Section 27's nationwide service and the national-contacts standard it triggers. Count I is asserted against LAM, Topwater Partners LLC, Goldman Sachs, Borgia, Wieczorek, Damm, O'Hara, Taylor, Rubin, Eck, Tran, Backer, and Robinson. Count II is asserted against Jefferies, LAM, Borgia, Taylor, Daraviras, Handler, and Friedman. Each is a United States resident, is organized or headquartered in the United States, or directed the conduct alleged from within the United States, and each therefore has continuous and substantial contacts with the United States.

96.     The Commodity Exchange Act and RICO service provisions independently reach the Defendants named in those Counts. Count XVIII reaches the Defendants identified in its

heading under 7 U.S.C. § 25(c). Counts XXII and XXIII reach the Defendants identified in their respective headings under 18 U.S.C. § 1965. Each named Defendant is alleged above to be a United States person or to have contacts with the United States sufficient to satisfy due process.

97.     Personal jurisdiction obtained over these Defendants through a federal claim authorizing nationwide service extends to the remaining federal and state-law claims against the same Defendants, including the Defend Trade Secrets Act claim in Count III, because those claims arise from a common nucleus of operative fact: the single first-loss relationship, the same governing instruments, the same August 5, 2024 liquidation, and the same course of conduct before and after it.

98.     Additionally, four entity Defendants are at home in New York and are subject to this Court's jurisdiction on any claim. Jefferies Financial Group Inc. is a New York corporation with its principal executive offices at 520 Madison Avenue, New York, New York. Jefferies LLC maintains its principal place of business at 520 Madison Avenue, New York, New York. LAM maintains its principal place of business in New York, New York. Goldman Sachs maintains its principal place of business at 200 West Street, New York, New York. The Individual Defendants domiciled in New York are likewise subject to general jurisdiction here.

99.     The contracting Defendants separately consented to this forum. Goldman Sachs consented to this Court by its own standard form: Section 30 of the Goldman New Account Agreement provides that, for any dispute arising out of, relating to, or having any connection with that agreement, each party irrevocably submits to the exclusive jurisdiction of the New York state courts and the United States District Court located in the Borough of Manhattan, and waives the right to object that the court lacks jurisdiction over it. Stonefly, Mayfly, and LAM consented in Section 13(f) of each AIAA to the jurisdiction of the state courts of New York and

any federal court sitting in New York County. Independently of consent, each of Stonefly, Mayfly, Topwater Partners LLC, Goldman Sachs, and each Individual Defendant transacted business within New York, contracted to supply or receive services here, or committed tortious acts directed at and causing injury within New York within the meaning of N.Y. C.P.L.R. 301 and 302, because the accounts were operated, valued, monitored, financed, terminated, and liquidated through New York, the prime brokerage was provided from New York, and the parent risk, legal, committee, and approval functions were directed from New York. Each purposefully availed itself of this forum, and the claims arise directly from that forum-directed conduct.

100.     Two Defendants require a further path, and each is subject to this Court's jurisdiction. Topwater Master Fund Ltd. is a Cayman Islands company that placed itself, through its own offering and subscription structure, in the chain through which BC LLC's United States capital was received, pooled, allocated, and in part returned, a chain managed and directed by LAM from New York; its United States-directed operation and its receipt and control of property traceable to this District support specific jurisdiction, and it is liable for its own receipt, control, and retention of Plaintiffs' property and is named for that conduct and for the complete accounting, tracing, and return of property the relief requires. Yiyu Chen, though on information and belief presently in Hong Kong, performed the conduct attributed to him during the relevant period from LAM's Topwater Capital Division and directed that conduct at the New York-centered accounts, valuation, and liquidation alleged here; his relevant-period United States locus and his purposeful direction of tortious conduct causing injury in New York support specific jurisdiction, and his present foreign residence bears on the mechanics of service, not on this Court's power over his relevant-period conduct. As to each of these Defendants and any Defendant not subject to the general jurisdiction of any single State, Federal Rule of Civil

42

Procedure 4(k)(2) supplies jurisdiction on the federal claims. Plaintiffs will take jurisdictional discovery as to any Defendant that contests these bases.

101.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2), Section 27 of the Exchange Act, 15 U.S.C. § 78aa, Section 22(c) of the Commodity Exchange Act, 7 U.S.C. § 25(c), Section 1965(a) of the RICO statute, 18 U.S.C. § 1965(a), and the forum clauses of the governing instruments, including Goldman Sachs' own Section 30 consent and venue waiver. A substantial part of the events giving rise to the claims occurred in or was directed into this District: the solicitation, subscription, account operation, prime brokerage, monitoring, valuation, financing, amendment, termination, liquidation, nondisclosure, and injury. BCML operated from its New York office during relevant periods and identified New York, New York as its principal place of business in the Goldman agency paper it executed on September 9, 2021. Goldman Sachs provided Stonefly prime brokerage from New York. LAM and Jefferies directed material management, risk, legal, committee, and approval functions from New York. For the Exchange Act, Commodity Exchange Act, and RICO claims, venue also lies in any district where a defendant is found or transacts business and where any act or transaction constituting the violation occurred, each satisfied here.

102.    The Subscription Agreement fixes its own governing law and its own forum, which confirm that this is the proper court for this proceeding. Section VII(B) provides that the Subscription Agreement "shall be governed, construed, and enforced in accordance with the laws of the State of Delaware."

**The Securities Transactions Are Domestic**

103.    The First-Loss Interest purchase underlying the Exchange Act claims was a domestic transaction. BC LLC executed the Subscription Agreement on June 28, 2021. The

43

Fund's acceptance page records that BC LLC's subscription was accepted and that it was admitted as a First-Loss Member on November 19, 2021, and the subscription papers were fully executed as of December 9, 2021. The Subscription Agreement made the subscription irrevocable subject to acceptance. LAM's Topwater personnel negotiated and processed the subscription from United States offices, accepted it for the Delaware Feeder Fund in the United States, and received capital through United States banking channels. BC LLC therefore incurred irrevocable liability and obtained title to the First-Loss Interest in the United States. These facts satisfy the *Morrison* and *Absolute Activist* standards independently of the location of any downstream portfolio trade.

104.    The additional First-Loss Interest transactions were domestic as well. In April 2022, O'Hara approved an additional $500,000 contribution, sent United States wire instructions and an additional-subscription document, and conditioned crediting on Topwater's receipt of funds. The 2023 increase to $2,500,000 and the 2024 allocation of capital between Stonefly and Mayfly were negotiated and administered through the parties' United States offices and accounts. On information and belief, the Fund accepted each additional subscription and recorded the corresponding membership and capital-account rights in the United States. That inference rests on the Topwater office, the contemporaneous emails, the executed amendments, the United States payment instructions, the Delaware Feeder Fund, and LAM's exclusive possession of the countersignature, acceptance, and member-ledger records.

105.    All conditions precedent to this action have been performed, have occurred, or have been waived. Plaintiffs disputed the purported stop-outs immediately and later sent detailed demands. Defendants denied liability, refused to supply the native proof and accounting

44

requested, and stated that they would not correspond further. Any further demand would have been futile.

106.    BCML executed the Advisory Agreements and performed under them for years. BC LLC subscribed, funded, and held the First-Loss Interests. Goldman onboarded Britannica onto its own systems, dealt with Britannica's principals directly for years, executed and cleared the trading Britannica directed, took approximately $400,000 per year in commissions from that flow, and delivered account services, data, and statements into Britannica's hands. The Plaintiffs opened accounts, paid, delivered collateral, gave instructions, and received services, and each stood in fact in the protected relationship each claim names as to the Defendant it names.

## FACTUAL ALLEGATIONS

### A. The First-Loss Structure and Who Bears the Risk

107.    Topwater ran a first-loss extraction scheme marketed as a capital partnership. As sold and as written, the asset manager's own money absorbed losses first; Topwater and its investors took half of every gain, stood behind the account with committed trading capital, and bore every loss beyond the manager's layer. As operated, and concealed from Britannica, Defendants bore no losses at all: they never provided the committed capital, they set the termination trigger to fire before any loss could reach their layer, and they took their share of the gains out every month while every loss stayed on the manager's capital.

108.    From no later than April 2019 through the present, Defendants executed the scheme through false statements, half-truths, and active concealment, in the solicitation and sale of the First-Loss Interest and in the operation and seizure of the two accounts it secured.

109.    On or around April 22, 2019, Wieczorek transmitted the Account Adviser Overview, a solicitation document that contained clearly defined and consistent terms, a choice

among major prime brokers, protection of manager trading data, and 24/6 real-time risk monitoring.

110.    On calls and in the written messages around January and February 2021, Borgia and Wieczorek represented to Britannica's Chief Investment Officer and its Chief Compliance Officer that Topwater would provide real committed trading capital of $10,000,000, a uniform 55 percent payout for every manager, and no cost of capital, ever, as compared to named competitors who they said charged one.

111.    On April 8, 2021, based on these representations, the parties executed the Stonefly AIAA, dated as of April 14, 2021, an instrument Defendants drafted.

112.    Section 1(a) of the AIAA stated that the Trading Master Fund "shall provide the Account Adviser with an initial account value as set forth in Appendix A," and Appendix A stated $10,000,000 (the "Investment Account Value").

113.    The executed papers set BCML's Account Adviser Fee at 50% of Remaining Investment Gains, but the emails that followed stated a 55% payout. Defendants represented that the 50% contractual fee was only one component of the agreed economics and that additional credits applied through the valuation and accounting process would produce a payout of not less than 55%.

114.    Defendants further represented that Topwater used the same standard structure for its advisers and that the valuation agent, administrator, and account statements would reflect the full payout.

115.    After the AIAA was executed, Defendant O'Hara confirmed in writing by email that BCML's payout was 55 percent. No provision of the AIAA specifically disclaimed reliance

46

on representations concerning the additional credits, the accounting mechanism, or a payout of not less than 55%.

116.    Section 6(b)(ii), as Defendants drafted it, provided for automatic termination if the remaining First-Loss capital fell below one percent of the Investment Account Value, the account's total stated value, before the first-loss layer was fully exhausted, measured on the most recent trading information received through the hourly reporting process, and Defendants made LAM, the party that profited from the trigger, its sole judge.

117.    BC LLC then subscribed for the First-Loss Interest associated with the managed account under the Subscription Agreement that Defendants drafted, accepted on November 19, 2021 and fully executed as of December 9, 2021.

118.    Under the Subscription Agreement, BC LLC supplied the capital, and BCML supplied the investment-management services, served as Account Adviser, and directed the trading. BC LLC's capital absorbed one hundred percent of Investment Losses, ahead of the Regular Members, the protected investor class holding the accounts' purported second-loss capital, in which Jefferies, LAM affiliates, and Topwater personnel held their own money. BCML received no management fee. Its compensation included the 50% Account Adviser Fee, among the other amounts, credits, and income owed to Britannica under the agreements, Defendants' written confirmations, and the conduct pleaded in this Complaint.

119.    Defendants represented that BCML would receive a payout of not less than 55% on the 90% second loss layer managed by Britannica, that the accounts would be supported by real committed trading capital initially stated at $10,000,000 and later increased to $25,000,000, and that BCML would bear no cost of capital. O'Hara confirmed the 55% payout in writing after execution.

47

120.   Defendants later failed to provide the represented capital support and imposed financing charges after Britannica's capital was locked into the program and withdrawal would trigger termination.

121.   Britannica also paid its own personnel, research, systems, data, infrastructure, and other operating expenses.

122.   The structure Defendants built therefore placed Britannica's capital, labor, technology, and strategy first in line to be consumed, in front of the capital protected for Stonefly, Mayfly, LAM, and the Regular Members.

123.   Defendants nominally tied BC LLC's First-Loss Interest to a managed account and assigned that account a stated Investment Account Value. The trading advisory agreement provided that Stonefly and Mayfly, the Trading Master Funds, would allocate capital to managed accounts, that Britannica would manage that capital, and the Defendants would provide the Investment Account Value.

124.   This promise was illusory.  Although Defendants separately tracked Britannica's positions and performance, BC LLC's capital remained in a pooled feeder structure subject to undisclosed shared and fluctuating margin, cross-account allocations, and other undisclosed and actively concealed limitations and conflicts, while the stated Investment Account Value was used to arbitrarily and improperly define Britannica's ever changing trading authority, measure aspects of performance and compensation, and determine BC LLC's first-loss exposure and losses.

125.   Never disclosed in any solicitation document or call or transaction documents, were central, material facts: that this was an undisclosed pool, a shared-margin structure and that the purported second-loss layer was neither dedicated nor reliably available to support

Britannica's managed accounts, and therefore did not constitute a genuine second-loss capital or actual assets under management.

126. Defendants disclosed this exposure to the SEC in their Form ADV while withholding it from Britannica and the managers they solicited, demonstrating that Defendants knew the exposure was material.

127. Although Defendants fraudulently characterized it as a third-loss exposure, they structured the pooled margin and loss-allocation mechanics so that losses and margin demands from unrelated accounts could reach BC LLC's First-Loss Interest before Defendants' purported second-loss capital bore those losses. And they did.

128. The supposed third-loss exposure therefore functioned as an additional first-loss risk to Britannica, rendering the represented second-loss protection illusory. BC LLC was subjected not only to the agreed first-loss risk from Britannica's trading, but also to a concealed pooled-allocation risk materially different from that the parties had agreed to, in which the manager receives investor capital to manage without placing its own capital first in line for the investor's and third party losses.

129. On information and belief, conditions in other managed accounts and the platform's pooled capital and margin needs drove Defendants' treatment of Britannica on August 5, 2024, and losses or margin burdens originating in other managers' accounts were allocated, in whole or in part, to Britannica.

130. On information and belief, Defendants had no reliable system to segregate, attribute, and value losses account by account in real time that morning, and the allocations they booked were made arbitrarily, negligently, or fraudulently, in whichever direction protected the Regular capital in which Defendants and their affiliates held their own economic interests,

conduct constituting accounting fraud, gross misconduct, and concealment. The basis for these inferences includes the pooled-allocation structure and inadequate capital base; the absence of any real second-loss capital; LAM's margin and liquidation calls to numerous managers that day; the admitted hour-behind data and failed file deliveries; the substantial affiliated Regular capital protected by first-loss accounts; Defendants' failure to produce an account-by-account allocation bridge or native contemporaneous calculation; and the administrator's month-end books, which did not support Defendants' termination arithmetic.

131.    On information and belief, the same pooled, inadequately financed margin machinery exposed Topwater's other first-loss managers as a class to the same undisclosed allocation risk, and the account, fund, margin, and allocation records that will establish each allocation are in Defendants' exclusive control.

132.    The same structure gave LAM a financial conflict at the point of valuation, and Defendants' papers concealed that conflict. The papers presented valuation as safeguarded and routine: an independent third-party administrator, UMB Fund Services, kept the accounts' official books, which fed the funds' audited financial statements, and broker reports were the purported stated informational basis. The papers never disclosed that Section 6(b)(ii) put the determination of the First-Loss Member's Capital Account, the running balance of BC LLC's first-loss capital, in the Manager's own hands, from the most recent trading information received under Section 4(d).  The Offering Memorandum reserved to the Manager the power to arbitrarily determine and assign any value when quoted prices were unavailable, so the entity protecting Regular capital controlled the calculation that could end BCML's appointment and allocate losses to BC LLC, on data running an hour or a day behind, bypassing the independent administrator whose month-end books never supported the termination arithmetic Defendants

later declared. Nothing in the disclosed design told Britannica that the interested party would sit as the sole and final judge of the number that ended the account.

133. Borgia architected the first-loss program and fronted its solicitation, selling alignment and institutional support while concealing the extractive design pleaded throughout this Complaint: the monthly stripping of gains, the concealed and deficient margin pool, the interested self-valued termination trigger, the broker reciprocity that traded managers' captive order flow for referrals and revenue, the unregistered brokerage and lending operation whose charges exceeded New York's criminal usury ceiling, the extraction and retention of managers' confidential strategies, and the two-decade pattern of stripping smaller managers' first-loss capital while the capital it shielded never absorbed a loss.

134. By December 31, 2023, BC LLC had contributed $2,500,000 and BCML was managing a stated $25,000,000 Investment Account Value that, as pleaded below, financed nothing. Each dollar of BC LLC's capital stood in front of a theoretical nine dollars of protected Regular capital, the fund-level second-loss layer. But, as it turned out, that was a layer that, as Defendants designed the structure and as O'Hara admitted in writing, could never absorb a loss. The economic dependence ran in one direction only: BCML received no fixed management fee and earned only when the account generated Remaining Investment Gains, while Defendants' charges ran regardless.

**B. The Solicitation and the Representations (2019 to 2021)**

135. The structure Defendants sold and the structure Defendants wrote were not the same structure. Defendants sold Stonefly as a $10,000,000 trading account built from two parts: Britannica's $1,000,000 first-loss layer and $9,000,000 that Topwater promised as real trading capital committed behind Britannica's strategy. The agreement Defendants then drafted planted a

trap at the bottom of the layer: Section 6(b)(ii) permitted termination once the Capital Account fell below $100,000, one percent of the $10,000,000 Investment Account Value. The mechanism therefore allowed termination after approximately $900,000 of losses, while approximately $100,000 of Britannica's first-loss capital remained and before any loss could reach Topwater's purported $9,000,000 second-loss layer.

136.    The same agreement made any withdrawal that would take the Capital Account below ten percent of Investment Account Value a Termination for Cause event under Section 6(b)(iii)(E), so once any loss occurred, Britannica's capital could not leave without destroying the account. This provision was not supposed to reach any additional capital added for purported margin calls. However, beginning in early 2022, Defendants created new rules and enforced them at will against Britannica to make sure their margin-providing capital was not at any second loss or other loss layer. O'Hara enforced the trap in writing in or around May 2023, asserting that Britannica could not redeem the additional capital it had added while the account stood below its high-water mark even though his falsely asserted event had passed, and he said that an attempted redemption "would cause an automatic termination event." Defendants held Britannica's capital under a design that coerced Britannica to add more capital under the pretext of new margin requirements, trading constraints, breach thresholds, and forbidding it to leave, and reserved to Defendants alone the decision to create new, ever-changing rules not in line with original representations and agreements.

137.    None of the machinery appeared in the solicitation. Defendants' adviser overview and other documents, which falsely described the terms as clearly defined and consistent, and misrepresented their risk processes as transparent and comprehensive, disclosed no termination

trigger, no withdrawal bar, no interested Valuation Agent, and no financing mechanics of any kind.

138.    Defendants' February 2, 2021 term sheet failed to disclose that the party declaring the trigger would also value it, on its own conflicted marks; that the data behind those marks ran hourly and lagged; that LAM would sit as sole judge; or that the represented second-loss capital that the trigger protected did not exist. No Defendant explained the trigger's real operation or its real significance on any call or in any writing before the AIAA arrived.  Concealed also was the valuation machinery, the additional trigger points and the threats, that surfaced only after the account was operational.

139.    From about May 2023 through the September 2024 remittance, Defendants withheld additional capital extracted from Britannica based on a false pretext of an imminent liquidation trigger and the Defendants paid nothing on it.  Instead of allowing Britannica the $1,000,000 first-loss layer, when the loss dipped into the $750,000 range, Defendants sent margin call notices to Britannica, threatening Britannica to send more money or face termination – despite not having hit the trigger threshold.  In effect, the real trigger was 7.5% - not the 10% promised.

140.    Topwater kept the additional $500,000 that it called as margin, without allocating any profit or interest to it, for months. Lawful profit and interest on that wrongfully withheld money for those sixteen months would have exceeded, several times over, the entire $7,166 purported shortfall that Defendants later claimed as their basis for seizing Stonefly.  The claimed shortfall exists only because Defendants held Britannica's own money interest-free under a condition the contract does not contain. On information and belief, Defendants' committee

minutes, notes, and emails concerning the refusal record how, by whom, and for whose benefit that decision was reached; those records sit in Defendants' exclusive control.

### C. Defendants' Loaned Funds at Usurious Rates, Hidden Behind a Complicated Set of Agreements to Obscure Their True Purpose

141.    Defendants improperly provided a mix of services that were designed to improperly circumvent usury laws and regulations on secured lending.  Defendants were taking 50% of Britannica's profit as interest for a loan.  They provided no true risk capital, and therefore it was not profit allocation – it was, instead, payment for margin provided on securities, in violation of New York State criminal usury laws and Regulation U.

142.    The Trading Advisory Agreement stated that the Trading Master Fund would allocate capital to Managed Accounts, that Britannica would manage only that portion of the Trading Master Fund's capital allocated to its Managed Account, and that the Trading Master Fund would "provide" the stated Investment Account Value. Those provisions represented an actual allocation of capital, not merely a notional trading limit or bookkeeping reference amount. Separate tracking of Britannica's positions and performance could make the trading sleeve separately managed, but did not make it separately capitalized or establish that capital equal to the stated Investment Account Value had been committed and made available. It had not been.

143.    LAM simultaneously advised and controlled pooled investment vehicles and solicited BC LLC as a First-Loss Member; Defendants extended callable buying power against BC LLC's cash and securities; treated and enforced BC LLC's contribution as collateral; arranged, directed, routed, carried, and caused securities and futures transactions through their imposed prime-broker structure; controlled the account, collateral, margin, valuation, trading restrictions, and liquidation; and received financing, performance, cash-income, brokerage, and execution-related compensation. Defendants' integrated conduct therefore subjected them

54

concurrently to multiple, overlapping regulatory regimes. To the extent the Court determines that any characterization is legally inconsistent with another, Plaintiffs plead those characterizations in the alternative.

144. Facts concerning Defendants' registrations and exemptions, regulatory filings, daily credit extensions, collateral and rehypothecation, trade routing, interaffiliate transfers, compensation sharing, internal valuations, risk models, and treatment of other managers are peculiarly within Defendants' possession and are pleaded upon information and belief based on the agreements, solicitation materials, Form ADV, debit charges, margin demands, administrator records, liquidation records, and Defendants' admissions described throughout this Complaint.

145. Those overlapping regimes also imposed or reflected objective margin and valuation standards established independently of the profit-taker and recognized curing deficiencies through additional collateral, reduced exposure, or risk-reducing hedges, including protective options, rather than leaving cure and liquidation to Defendants' unilateral and conflicted discretion.

146. Defendants' integrated product and conduct simultaneously constituted investment-advisory and pooled-fund activity, securities-credit and lending activity, secured-creditor activity, and broker-dealer activity. The Trading Advisory Agreement represented that the Trading Master Fund would allocate capital to Britannica's Managed Account and provide the stated Investment Account Value. Those provisions represented actual, loss-bearing capital allocated and available to Britannica, not merely a notional trading limit, pooled margin capacity, or bookkeeping reference amount. Defendants instead supplied callable buying power while exercising control over the collateral, financing, valuation, trading restrictions, and liquidation.

147.    Defendants' product possessed every material incident of a margined securities-credit account. BC LLC initially posted $1 million of first-loss cash and securities collateral; Defendants assigned a substantially larger Investment Account Value and extended buying power against that collateral; charged a fixed percentage on daily debit balances; extracted fifty percent of trading gains and one hundred percent of the account's cash income; imposed mandatory brokerage charges, at times approaching $5,000 per day and several times prevailing market charges; demanded additional collateral through margin-style calls and mandatory replenishment; and retained the unilateral power to reduce, withdraw, reallocate, or call the purported supporting capital and to terminate and liquidate the account. Defendants' repayment was senior, secured, callable, and independent of investment performance because cash and securities were liquidated to repay Defendants' capital and charges before any loss could reach their purported second-loss layer. Goldman Sachs, Interactive Brokers, and other brokers held the positions and collateral at the master-fund level, not in an account segregated and capitalized for BC LLC, while LAM and the Topwater funds pooled BC LLC's property with other managers' accounts and, upon information and belief, impaired positions or deficits of Defendants and their Jefferies affiliates.

148.    LAM's and Defendants' Form ADV and/or other documents confirmed the cross-account exposure by warning that a First-Loss Member "may be exposed to the third loss associated with the Funds' other Managed Accounts," but Defendants never furnished, explained, or highlighted that disclosure to Britannica. Because losses and margin demands from unrelated accounts could reach BC LLC before Defendants' purported second-loss layer bore loss, the described "third loss" operated in substance as an additional first-loss exposure. Defendants supplied no written margin methodology, collateral formula, valuation procedure,

cure protocol, hedging rule, withdrawal rule, or liquidation standard. Instead, Defendants acted as the interested and undisclosed Valuation Agent using data they admitted ran approximately one or more hours behind; accepted Britannica's proposed cure at least twice, but rejected substantially the same cure on August 5, 2024; prohibited hedging by verbal order; prohibited withdrawal of BC LLC's capital under threat of terminating the entire account; and imposed a prime-broker structure permitting Goldman Sachs to rehypothecate the margined securities.

149.    Defendants knew the regulated functions their product performed because their solicitation deck expressly stated that "Topwater does not operate a hedge fund hotel, prop desk, or broker dealer." That disclaimer did not alter the product's substance. As an adviser to pooled investment vehicles, LAM was subject to Sections 206(1), 206(2), and 206(4) of the Investment Advisers Act and Rule 206(4)-8, including the prohibitions against false or misleading statements to investors and undisclosed conflicts, cross-account risks, compensation, and allocation practices. Regulatory assets under management are determined from securities portfolios subject to continuous and regular management and valued by current market value, not from a nominal credit line or notional trading limit. Defendants nevertheless falsely represented callable and contingently available credit as an Investment Account Value and assets under management while concealing its pooled, senior, collateralized, and withdrawable character.

150.    Plaintiffs do not assert a standalone cause of action or seek damages under Section 7 of the Exchange Act or Regulation U. Regulation U and the Federal Reserve Board's interpretations are pleaded to identify the economic substance of Defendants' arrangement and to support the separately pleaded claims.

151.    The same conduct constituted purpose credit under Regulation U. In 12 C.F.R. § 221.111, the Federal Reserve Board determined that a nominal joint venture was an extension of

57

margin credit where one participant supplied most of the securities purchase price, received a fixed return plus a share of gains, could liquidate before its contribution was impaired, and was repaid first. Defendants' structure contained every one of those features and provided Defendants still greater protection through first-loss collateral, margin calls, mandatory replenishment, at-will termination, and liquidation before their capital bore loss. Upon information and belief, Defendants extended and maintained that credit in the ordinary course and exceeded Regulation U's registration thresholds. Regulation U required Form G-1 registration, annual Form G-4 reporting, a borrower-executed Form G-3 identifying the purpose and collateral, current collateral schedules for revolving or multiple-draw credit, compliance with maximum loan-value limitations, good-faith verification of the credit's purpose, and restrictions on withdrawals or substitutions that created or increased a collateral deficiency. 12 C.F.R. §§ 221.3, 221.7. Britannica was never given or asked to execute a Form G-3, and Defendants never disclosed any Regulation U registration, filing, collateral schedule, or compliance procedure.

152.    Defendants' arranging, directing, carrying, and effecting of transactions; control over account access, collateral, credit, trading restrictions, margin, and liquidation; and receipt, directly or through affiliates, of transaction-related compensation also constituted broker-dealer activity requiring registration under Exchange Act Section 15(a). The applicable broker-dealer framework required disclosure of the conditions, rates, computation methods, debit balances, additional charges, liens, and collateral terms governing the credit; transaction confirmations and periodic itemized statements; customer-protection and reserve safeguards; supervision; books and records; and best execution. See 17 C.F.R. §§ 240.10b-10, 240.10b-16, 240.15c3-3, 240.17a-3, 240.17a-4. At the carrying-broker level, Regulation T and FINRA Rule 4210 also required defined margin standards, current market valuation, written credit-risk procedures, and, for

portfolio-margin accounts, written risk disclosures and defined methods and periods for curing a deficiency through deposits of funds or securities, risk-reducing transactions, hedges, or limited liquidation. Defendants reproduced the powers and economics of those regulated accounts while withholding their disclosed margin rules, reviewable valuations, cure methods, hedging alternatives, custody safeguards, fair-charging protections, execution duties, supervision, and records.

153.    The futures component concurrently implicated Section 4d of the Commodity Exchange Act and 17 C.F.R. §§ 1.20 and 1.22 because BC LLC's property was accepted and controlled for the purpose of margining futures transactions. That regime required customer property to be segregated from proprietary property and prohibited using one customer's money, securities, or property to margin, secure, or extend credit to another customer's trades. Defendants instead exposed BC LLC's property to the pooled margin requirements and deficits of other managed accounts.

154.    Defendants also exercised the rights and remedies of secured creditors over BC LLC's cash and securities. New York UCC §§ 9-207, 9-610, 9-611, and 9-615 required reasonable care and identification of collateral, a commercially reasonable disposition in every respect, reasonable notification unless Defendants established a statutory exception, application of proceeds in the prescribed order, and an accounting and payment of any surplus. Defendants' undisclosed and conflicted valuation, arbitrary rejection of cure, intraday termination, seizure, liquidation, and seven-week retention of BC LLC's remaining capital violated those duties.

155.    The credit was also, upon information and belief, knowingly criminally usurious. The nominal Investment Account Value was not necessarily the amount of any loan or a binding written commitment to advance that amount. The actual daily debit extensions fluctuated, and

59

BC LLC's initial $1 million contribution was collateral, not proof of the loan principal. Defendants cannot deny that the stated Investment Account Value was committed and available capital while treating the same nominal amount as a binding written commitment exceeding $2.5 million solely to invoke a usury exemption. The amount of each extension, whether any extensions were properly aggregated under a binding written commitment, the capital actually available, and the value and recipients of Defendants' compensation are within Defendants' exclusive records. Upon information and belief, one or more loans or forbearances were below $2.5 million, and the fixed debit charge, fifty-percent profit participation, one-hundred-percent claim to cash income, mandatory and inflated brokerage charges retained, rebated, shared, or otherwise received directly or indirectly by Defendants or their affiliates, and all other consideration for the credit exceeded twenty-five percent per annum when valued against the credit actually extended or committed, and at times annualized to several hundred percent. New York law includes all direct and indirect consideration for a loan or forbearance within interest, and contingent economic benefits are not excluded merely because their value depends on future events. *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 336-42 (2021). Demand advances secured by securities remain subject to the criminal-usury ceiling under General Obligations Law § 5-523, while the specialized exemption under § 5-525 applies only to a registered broker-dealer and only within its specified rate limitation. Upon information and belief, Defendants also made more than five commercial-financing transactions during the applicable period and were not within a statutory financial-institution exemption. Each covered offer, increase, modification, or renewal of open-end financing of $2.5 million or less therefore required disclosure of the maximum credit and initial draw, finance charge, APR, total repayment amount, payment methodology, term, fees, and collateral requirements under New York Financial Services Law §§

801, 805, and 808. No such disclosure was made. These overlapping violations support Plaintiffs' pleaded statutory, contractual, common-law, and equitable claims and, to the extent any provision does not independently create a private damages remedy, establish the transaction's true substance and Defendants' falsity, material omissions, knowledge, intent, illegality, conflicts, and concealment.

156.    The one-percent termination trigger confirms that Defendants' represented second-loss layer was illusory. In the first-loss and second-loss structure Defendants sold, BC LLC's first-loss capital was represented as standing immediately before Defendants' real second-loss capital, which Defendants represented as actual assets under Britannica's management and at risk after BC LLC's layer was exhausted. Defendants' concealed structure made that represented sequence impossible. The termination mechanism described above automatically destroyed the accounts while millions of Britannica capital remained and approximately $532,710 of Britannica's capital was eventually returned, placing the purported $9 million second-loss layer behind a barrier calibrated to terminate and liquidate the account before that layer could sustain loss. Other early capital calls described here show a similar pattern.

157.    Defendants operated the structure consistently with that design. The administrator's books allocated the entire $683,163 cumulative loss during the relationship to Britannica's first-loss capital and allocated no loss to Defendants' layer. In August 2024, Defendants imposed intraday margin demands, seized and liquidated both accounts, and falsely asserted that Britannica's first-loss layer had been exhausted and that Defendants' second-loss layer had sustained significant losses. Defendants nevertheless returned $532,710.95 of BC LLC's capital a few months later, confirming that BC LLC's layer had not been exhausted and that Defendants' purported second-loss capital had borne no loss.

158.    O'Hara separately told Gupta and Madej that "we will never take a loss" and that "Leucadia investors are not the kind that take losses ever, only you ever will," without disclosing that the referenced investor capital was Jefferies' own or affiliated capital. Defendants issued margin demands when drawdowns approached approximately seven to eight percent, allowed only twenty-four hours to contribute additional capital, prohibited withdrawal of existing capital under threat of complete account termination, and required Britannica to recover the drawdown and generate additional profits for Defendants and their affiliates before any capital could exit. Capital could enter to protect Defendants, but could not leave unless Britannica first restored Defendants' economics.

159.    Upon information and belief, Defendants calibrated and operated the same machinery throughout their two-decade first-loss program so that solicited managers' capital would be depleted, seized, or forfeited before Defendants' or their affiliated investors' capital sustained loss. The purported second-loss commitment was therefore not genuine risk capital, but a marketing device used to inflate the represented Investment Account Value and assets under management while Defendants protected their own and affiliated capital through concealed pooled margin, conflicted and false valuations, cross-account allocations, trading and hedging restrictions, replenishment demands, termination rights, liquidation priority, and forfeiture of managers' remaining capital.

160.    On information and belief, the risk parameters that Defendants represented were approved by the head of risk for Jefferies Financial were built on models that treated the manager's first-loss capital as the sole loss buffer and assigned zero loss probability to any capital above it; the parent's own risk mathematics contradicted the capital commitment its platform was selling. The basis is the solicitation deck's own statement that Jefferies' head of risk

approved the risk parameters, the termination trigger set at one percent of stated value, firing before any loss could pass the manager's layer, the margin calls under threat of complete Britannica capital and business destruction well before that, and the zero-loss mandate pleaded in this Complaint; the parent's risk models, parameter files, and approval records are in Defendants' control.

161.    Britannica first contacted Topwater by email on or around April 16, 2019 concerning Topwater's first-loss capital program. Amanda Calabrese arranged calls with Defendant Bryan D. Borgia on or around April 22, 2019 and during those calls with Borgia, presented himself as Topwater's Chief Investment Officer and made a host of fraudulent representations to Gupta and Britannica officers.

162.    Goldman Sachs already knew both sides of the relationship. Britannica's Chief Investment Officer and Chief Compliance Officer met Goldman prime-brokerage personnel Dean C. Backer and Brian Robinson at Goldman's offices on or around April 16, 2019, and Goldman's Capital Introduction group reviewed Britannica materials that spring. During that conversation Backer and Robinson represented that Goldman liked Britannica's strategy and team and would be happy to assist with refining of its presentations, market approach as well as introduce Britannica to a host of capital allocators, open an account even if the capital was likely closer to low seven figures during early fundraising to start as Gupta and Madej disclosed. However, no capital introduction was made, no account was opened. No reasons were provided, but the assurances continued. On January 25, 2021, Goldman representative Isabella Meyer wrote that Goldman would be happy to make introductions to the first-loss providers with which it worked, identified Topwater as one of the proper targets, and described Topwater as a division of LAM managed by Borgia and Travis Taylor. Goldman knew, before Britannica's transaction,

that it covered Topwater as its own allocator relationship and was steering Britannica toward a platform with which Goldman had its own business relationship, and the securities laws required Goldman to disclose that conflict fully and without qualification, at that moment and continuously afterward. Goldman never did, in that email or any other, in any document or on any call. Meyer was a junior member of the Goldman prime-brokerage team and had been involved with the Britannica relationship since 2019; Britannica's Chief Investment Officer's August 2, 2021 email to Eck records that Britannica "met with Dean, Brian and Isabella." On information and belief, Meyer sent the first-loss steering communications at the direction of senior personnel, including Dean C. Backer, the head of Goldman's prime-brokerage business, and Brian Robinson, a partner in Americas Prime Brokerage Sales. Meyer has since left Goldman Sachs.

163. Goldman's own written record fixes the courtship to the day. On April 10, 2019, Backer offered the meeting times in writing and directed his office to schedule the introductory meeting. Meyer wrote Britannica's officers, copying Backer and Robinson, that Goldman's capital-introduction desk would review Britannica's marketing presentation in depth and would poll its team for early-stage investors that sounded like, in Meyer's words, an obvious target for your strategy, and Goldman's desk reviewed that presentation the following week. Those writings sit in Goldman's files and in Britannica's, they are among the earliest of the capital-introduction assurances this Complaint pleads, and Goldman never delivered one introduction under them.

164. Goldman's capital-introduction function took Britannica's materials in 2019 and, on information and belief, circulated or evaluated them internally without ever presenting Britannica to a single allocator.

165.    At the April 16, 2019 meeting at Goldman's offices, Dean Backer and Goldman's prime-services personnel discussed Britannica as a potential prime-brokerage client. Backer and the capital-introduction personnel explained to Britannica officers including Gupta and Madej that Goldman regularly served managers with even approximately $1 million of assets where the strategy justified the relationship, and that access was not determined by existing AUM alone; and in fact starting AUM was not relevant at all. Their colleague at Goldman, Isabella Meyer made the same material representations on a follow up phone call to Gupta and Madej after Britannica shared its strategy with the Goldman teams. The Goldman team went through the strategy and other documents, page by page over telephone, planning the next steps. Those representations were material and they mattered when, in January 2021, Goldman's Capital Introduction desk identified Topwater as one of the proper targets from its perspective and offered to make the introduction, and when later Tran refused to open a direct client relationship with Britannica based on explicitly stated reason that it was because the Goldman committee wanted more initial AUM on day one and so Britannica must continue to be at Goldman via Topwater entities.

166.    During the 2021 solicitation and onboarding, on calls and meetings with Britannica's Chief Investment Officer and its Chief Compliance Officer, Goldman Sachs Managing Director Jason Eck and others made the specific representations: that Topwater, LAM and Jefferies were great institutions, have enormous capital, take care of their managers, treat them well, will invest and back Britannica with their own capital and actively allocate traditional capital at full institutional terms of two-and-twenty if Britannica strategy performed well; that they hold practically limitless capital for such allocations; that Goldman knows them well; that they run well-defined and fair processes from manager selection through valuation, technology,

65

and back-end operations; that Goldman could have Britannica up and running quickly; that the relationship would pay Britannica for as long as the strategy performed; and that Goldman would help Britannica with capital introduction. Each of those representations was false when made, and the falsity of each is proven by Goldman's and Topwater's own documents as pleaded in this Complaint. Britannica committed its capital and its strategy in reliance on them, and no traditional allocation, fair process, or capital introduction ever arrived. Eck's approach is fixed in his own writings: his May 24, 2021 written solicitation of Britannica's officers, covering Goldman's Topwater allocator relationship; the August 3, 2021 call his own scheduling thread fixes to the day and hour; and his August 9, 2021 writing initiating Britannica's onboarding.

167.    On April 22, 2019, after Britannica's introductory call with Borgia, Wieczorek emailed Britannica the Topwater Account Adviser Overview, a LAM and Topwater solicitation document delivered in furtherance of the account-opening process. The Overview also represented that Topwater could not trade against a manager's portfolio.

168.    On information and belief, the Division ran its solicitation from standardized scripts and talking points, ten to twenty-five people delivering the same representations to managers as a class, and the pitch scripts, talking points, and training materials in Defendants' control will show the false statements in template form.

169.    The Overview represented that Topwater maintained a dedicated risk team that monitored each managed account across global markets on a 24/6 basis through direct account feeds permitting real-time capital-account monitoring. As applied to Britannica, Topwater knew before launch that the representation was materially false. On April 30, 2021, O'Hara wrote that Topwater then had only T+1 Goldman reporting and still needed an intraday solution. On August 5, 2024, he admitted that LAM's Goldman and SpiderRock data had completely failed and was

hours behind and that LAM's own file delivery had failed or gone missing. LAM operated that system. Wieczorek transmitted the contrary representation. Borgia had led the solicitation and was presented as the senior officer responsible for the platform. Their knowledge and adoption of the actual account capability are pleaded on information and belief from those roles and the documented implementation process.

170. On information and belief, LAM's own agreements with its data vendor specified the hourly or another interval, lagged file architecture it ran, so the fiduciary chose in writing the blindness it later ignored or blamed.

171. The broker-choice representation was false and materially misleading. The Overview represented a choice among major prime brokers, a roster of represented broker relationships from which the manager would choose. No such choice ever existed for Britannica. Britannica repeatedly disclosed, in writing and from the first negotiations, that its proprietary systems were coded to Interactive Brokers, and requested broker flexibility. Topwater nevertheless required every trade through Goldman Sachs: not through any account or relationship of Britannica's, but inside Topwater's own pre-existing Goldman relationship, in which Topwater, not Britannica, was Goldman's client of record on the account paper, while in conduct, as pleaded in this Complaint, Goldman onboarded Britannica onto its own systems, dealt with Britannica's principals directly for years, and took its commissions from Britannica's flow, and into that relationship Britannica's newly opened account was placed as captive order flow. Damm later admitted what the represented choice meant in operation: changing the Stonefly broker would require an entire-account move and liquidation. Defendants concealed before commitment the resulting data dependence, migration barrier, cost lock, and allocation of broker and referral economics that the imposed relationship served. Defendants' own February 2,

2021 term sheet additionally promised in writing that the "Account Adviser will have the ability to trade away" and listed the prime broker as "TBD." Five months later Rubin conditioned the account on Goldman Sachs alone, and Defendants held the exit shut for three years.

172. During most of the relationship, almost all of Britannica's reasonable and necessary prime broker product or services requests were denied by Jefferies, LAM, Topwater and Goldman, to improperly and fraudulently drain the account. Britannica asked for futures capability, and was refused, asked for market competitive rates and was refused; asked for the negotiation Topwater had promised managers held and was refused; asked for a different broker as was represented by Defendants before signing and was refused. When asked to switch brokers it was told the only exit ran through an entire-account liquidation into Defendants' new structure. Several different types of requests, repeated numerous times, over four years, one real answer that was material and contrary to what was represented and agreed, because the captivity was the product. Goldman and Jefferies were harvesting the Britannica equity at about 50% of the entire capital base each year. On a capital base of about $1 million, Goldman's extractive commissions approached half a million dollars each year on a run rate, while no promised benefits or cap intro were provided and the product itself was broken.

173. Topwater's marketing placed senior Jefferies personnel inside the program's governance. The Overview identified an Investment Committee that included Jefferies Chief Executive Officer Richard Handler, Jefferies President Brian Friedman, LAM head and Jefferies Managing Director Nick Daraviras, Borgia, and Travis Taylor. It also described a Support Committee that included Jefferies' General Counsel and Chief Risk Officer and was tasked with signing off on every new account and creating risk and compliance protocols. The 2024 record confirms that this was not merely an organizational chart: Rubin referred to committee

approvals, Jefferies Risk comments, and approval by Risk and Tax members before the Mayfly AIAA and Amendment No. 5 were executed.

174. Every conflict pleaded in this Complaint pointed the same direction, and LAM sat on all of them at once, among them: the valuer of the trigger profited from the trigger; the protector of the second layer owned the second layer; the selector of the broker was paid by the broker's relationships, and the broker paid for the selection with referrals and revenue; the holder of the credits owed the credits; and the body deciding Britannica's fate answered to the parent whose money Britannica's layer shielded. The law required each conflict to be eliminated or fully disclosed before a dollar of Britannica's capital was taken. None was.

175. On information and belief, LAM's disclosures to its other advisory clients and platform investors that were not ever shared with or disclosed to Britannica either describe the very conflicts it concealed from Britannica or conceal them identically. Either answer convicts: uniform concealment proves design, and selective disclosure proves knowledge. The other-client disclosure packages and investor letters in Defendants' control will show which.

176. The Overview marketed a 5.35 percent annualized net return for the Regular Member Class A from August 2013 through December 2018 and no material losses ever, as is consistent with their concealed design that purported second loss layer was never a real risk capital. It did not present and in fact concealed a separate record for the actually relevant First-Loss Members, although BC LLC was being solicited to enter that class and bear losses before the class whose return was advertised. On information and belief, the performance presentation was materially false and fraudulent, the basis being the audited class-level record showing First-Loss losses in the very years the Regular return was marketed, Defendants' self-prepared and unaudited figures, and Defendants' refusal to produce the underlying calculations; and whether

even the stated index comparison was mathematically accurate is testable against the primary index series and the calculation workbook in Defendants' control.

177.   The Overview also made a written confidentiality representation material to Gupta's and Britannica's disclosure of its technology and strategy. It stated that Topwater did not sell or license hedge-fund managers' trading data, afforded confidential treatment to manager identities and proprietary trade data, and did not use managers' trade data for its own trading. Britannica and Gupta thereafter transmitted strategy descriptions, sample portfolios with quantities, team materials, risk information, and live trade and position data to Topwater and Goldman for diligence, onboarding, monitoring, and operation of the accounts.

178.   The strategies, models, systems, and methods Britannica delivered under those protections were the personal creation and personal property of Britannica's founder, Plaintiff Sanjay Gupta. Gupta created them over more than two decades of research, at out-of-pocket cost running to millions of dollars, before and outside the Topwater relationship, and he owns them; no instrument ever assigned them to any entity, and BCML held and holds rights and license in them for use in its advisory business under Gupta's authorization. Defendants' representations, including the written confidentiality representations pleaded above, were made to Gupta directly on the solicitation and onboarding calls, and Gupta relied on them personally: in reliance, he authorized delivery of, personally delivered, and personally explained his strategies, systems, and methods into Defendants' platform, and committed years of his personal labor to the accounts. Absent those representations he would have delivered none of it. The taking and retention of that property injured Gupta directly, in property that was never any entity's capital contribution and never passed through BC LLC's subscription. Gupta's compensation for the use of his property was to come from the advisory economics it generated: BCML's fee income

70

funded, and was to fund, Gupta's compensation for the license and use of his strategies and systems. The same conduct that took Gupta's property also destroyed the income his license was to earn, because Defendants' fraud, breaches, and misappropriation eliminated the advisory economics from which his use-compensation was paid, stripped his property of the exclusivity in which its licensing value resided, and left Defendants holding and using the property without paying its owner anything at all. That lost compensation for use is the injury the law measures as a reasonable royalty, and it belongs to Gupta as owner.

179.    The confidentiality assurance was material independent of any promise concerning investment performance. Britannica and Gupta would not have delivered sample portfolios, position quantities, portfolio-construction notes, models, risk explanations, or a continuing live map of its book had it understood that the information could be used for Defendants' own training, operating development, adverse termination planning, replacement-adviser handoff, or personal benefit. Defendants' personnel, including at least Borgia, Wieczorek, Damm, and O'Hara, each gave assurances consistent with the written confidentiality representations during solicitation, onboarding, and operation of the accounts, as Britannica's Chief Investment Officer and Chief Compliance Officer recollect firsthand. Each individual's assurance is pleaded in substance, by speaker and period.

180.    What Defendants did with the delivered information is itself a subject this Complaint reaches. On information and belief, Goldman Sachs and the Topwater, LAM, and Jefferies parties each analyzed and classified Britannica's trading strategy and risk profile in their own internal records, ranked and compared Britannica against the platform's other first-loss managers as a class, and shared information about Britannica and about those managers between the two firms in service of the referral, coverage, and reciprocity arrangements pleaded in this

71

Complaint. The basis is Goldman's receipt of Britannica's portfolios for onboarding before the account ever opened; the education sessions in which Topwater personnel required Gupta to explain the strategy's operation; the Division's own manager risk-profile rankings; O'Hara's own declaration to Gupta, with Madej also listening, the classification of Britannica as the only manager on the platform without a long bias; Goldman's coverage of Topwater as its allocator relationship; and the January 25, 2021 steering in which Goldman delivered Britannica to the platform by name. These facts bear directly on the claims pleaded in this Complaint: on the trade-secret counts, because they show the acquisition, use, and disclosure of Britannica's property; on the fraud counts, because they show what Defendants knew, when they knew it, and what they concealed while soliciting and reassuring Britannica; on the fiduciary and best-execution allegations, because they show whose interests each firm actually served; and on the concealed reciprocity pleaded throughout, because information about managers was itself part of the currency the two firms traded.

181.    The Overview stated that approximately 60 percent of Topwater's investor base consisted of Jefferies and principal capital, and concealed what that figure meant: losses allocated to BC LLC's First-Loss Interest protected Regular capital in which LAM affiliates, Jefferies-related capital, and Topwater personnel held their own economic interests, so the majority owners of the platform were the direct beneficiaries of every loss charged to Britannica. That conflict gave LAM and the Topwater Funds a financial motive to favor valuations, costs, and enforcement choices that preserved purported second-loss capital from any possible loss by use of any improper means and tactics, in a shared margin pool, and at Plaintiffs' expense.

182.    Topwater's solicitation concealed the then-pending Canada litigation involving Borgia, Taylor, and Topwater-managed funds. When Britannica first contacted Topwater in

April 2019, investors had recently filed a revised complaint alleging, among other things, delayed redemptions, unexplained write-downs, missing periodic reporting, and improper use of fund assets for defense costs. On December 24, 2019, the Connecticut Superior Court allowed contract and implied-covenant claims to proceed against the contracting fund defendants and allowed a declaratory-judgment and accounting claim concerning defense costs to proceed against all defendants, including Borgia and Taylor. The action later ended by withdrawal with prejudice after settlement.

183.   The Canada litigation is pleaded for what it indisputably was: pending court proceedings accusing the very principals and fund-administration practices that Topwater's solicitation affirmatively presented as experienced, institutional, and transparent, and the material omission was the existence and subject matter of that litigation. The concealment and omission of material information mattered to BC LLC's decision to place its own capital in a pooled structure controlled by those principals, for Gupta to trust with his valuable intellectual property and to BCML's decision to entrust them with its accounts, data, and operating dependence.

184.   The audited class-level economics recorded a pattern Defendants concealed from the Overview and from Britannica. In each of 2021, 2022, and 2023, both Stonefly and Mayfly reported net gains from operations for Regular Members while the First-Loss Member class reported net losses. Stonefly reported Regular Member gains of approximately $15.5 million, $18.4 million, and $11.7 million in those years, while its First-Loss Member class reported losses of approximately $30.4 million, $37.5 million, and $0.9 million. Mayfly reported the same directional split. The related-party notes also reported tens of millions of dollars of Regular capital held by persons affiliated with or employed by the Manager. These are class-level figures,

not allegations that every individual First-Loss Member lost money, but they demonstrate the recurring transfer of loss protection from first-loss capital to Regular capital. Topwater's May 11, 2021 public announcement of the endowment and Jefferies Financial Group investments, separately confirms Jefferies' direct capital interest in the fund complex.

185.    The identity and composition of the Regular Members are facts Defendants control and have never disclosed to Britannica beyond the deck's sixty-percent affiliated-capital figure. Defendants marketed the Funds to large institutions, announced in May 2021 an investment from one of the five largest United States endowments, and advertised the opportunity to invest alongside Jefferies Financial Group. On information and belief, the Regular Members over the life of the program included institutional investors and public, governmental, or quasi-governmental pension or investment capital; the basis is Defendants' institutional solicitation practice, the announced endowment participation, the minimum-commitment structure of the offering, and the subscription and investor records in Defendants' exclusive control. The Regular Members' identities and allocations are directly relevant to the remedies pleaded in this Complaint: the constructive trust and tracing of the extracted economics allocated to the Regular class, the unjust-enrichment recipients, and the accuracy of the disclosures on which each Regular Member's capital was raised.

186.    The parent's own public statements state the design Handler ran. Its filed annual reports described the practice from the platform's formation: once a LAM investment vehicle is formed, it is typical that the parent will be an initial or major investor. Jefferies and LAM market the same design to this day, offering investors the opportunity to invest alongside Jefferies through its subsidiaries, which hold investments, revenue share, or equity interests in the platform's asset managers. The capital that Britannica's first-loss layer stood in front of, and that

74

the termination trigger protected, therefore included the parent's own money by corporate design, and the parent took a revenue share of the manager economics besides.

187.    The audited financial statements further disclosed that a Strategic Investor in the offshore feeder held most-favored-nation and enhanced-reporting rights, consent rights concerning the retention of Account Advisers, and a right to redeem free of lock-up or gate restrictions upon specified violations by the Manager of portfolio guidelines or investment restrictions. Topwater concealed those retention and exit rights from Britannica. On information and belief, the rights created additional pressure on LAM and the Topwater Funds to avoid events that could expose the platform to Strategic Investor consent or redemption consequences. All this was material, intentionally undisclosed conflicts of interest.

188.    Topwater and Goldman also supplied the reason Britannica was willing to accept first-loss economics. The written solicitation offered institutional sponsorship, a stated Investment Account Value, competitive broker relationships, real-time risk infrastructure, and a path to scale if the strategy performed. During the 2021 solicitation and onboarding period, Goldman's salespeople, Jason Eck among them and other Goldman personnel whose identities are recorded in Goldman's own files, communications, and call recordings, described Topwater and LAM as substantial, credible capital partners and stated in substance that strong performance would leave no shortage of capital and could lead to additional and more traditional capital; Britannica's officers recollect the statements firsthand. Britannica reasonably relied on those representations when it committed its systems, strategy, and capital and later increased the First-Loss Interest after strong performance. No traditional allocation followed. Instead, Defendants supplied no real capital they contractually promised, but supplied shared margin that proved insufficient in the new account, denied broker and product flexibility contrary to written and oral

75

representations on which Plaintiffs reasonably relied, and improperly increased Britannica's costs and dependence by, among other things, unilaterally altering the terms of the agreements in their favor. On information and belief, based on Topwater's standardized program and marketing, materially similar scaling assurances were made to other first-loss managers while the actual allocation record remained undisclosed. Britannica had earned the service on Goldman's own criteria: Goldman's standard form made account revenue a significant factor in capital-introduction decisions, and Britannica's trading was generating approximately $400,000 a year for Goldman at its contemporaneously estimated run rate, on a path toward $1,000,000 a year and more as financing, stock-lending revenue, and the account's growth were added, on information and belief many emerging managers Goldman serves with capital introduction, produce for the firm a fraction of that revenue and serves them despite having inferior, more volatile strategies in less demand according to its own published reports, in an industry that extends the service to managers launched on friends-and-family money, and in which Goldman's own capital-introduction personnel said the firm served managers with as little as one million dollars under management. The reason Britannica never received what it had earned is pleaded above: on information and belief, Goldman's internal relationship-credit system assigned the revenue Britannica's trading generated to Topwater, LAM, and Jefferies as the covered allocator relationship, despite representations to the contrary on which Plaintiffs reasonably relied. Thus, Plaintiffs, who produced the economics, received only losses and account termination because Defendants concealed material facts, knowingly made false representations, unilaterally changed the economics after trapping Plaintiffs, and used Plaintiffs' labor, capital, and intellectual property for years. In the end, Defendants walked away with millions in profits while putting no capital at risk. Goldman, Topwater, Jefferies, and LAM harvested profits without bearing losses,

76

while Plaintiffs performed the work, risked capital, spent millions building systems, shared their proprietary strategies, and lost their invested capital through Defendants' alleged deception and unlawful scheme.

189.    On May 11, 2021, three weeks after Britannica executed the AIAA, Topwater publicly announced an investment from one of the five largest United States endowments coupled with Jefferies Financial Group's own investment, quoted Borgia claiming "substantial capital for us to continue making new allocations" and a secured position as "one of the top allocators in the first-loss space," quoted Taylor as co-head of the business, quoted Daraviras by name for LAM, and simultaneously announced a hard close that "locks up future capacity." The public statements and the private conduct cannot both be true. Publicly, Defendants claimed substantial committed capital and top-allocator capacity. Privately, over the following three years, Defendants denied agreed capital, rationed a pooled margin that failed outright in July 2024, charged Britannica financing on every borrowed dollar above its own collateral, and treated Britannica's purported Investment Account Value as a number rather than the real, contractually promised AUM. The stated value financed nothing like an actual account value.

190.    The Stonefly AIAA initially stated a $10,000,000 Investment Account Value, and Defendants later raised the stated figure on their own paper to $25,000,000 before they reallocated it between Stonefly and Mayfly in July 2024. Defendants marketed that figure as institutional capital supporting Britannica's trading, and Britannica understood and described it exactly that way in its own writings, telling Defendants in one written request that it sought to take "the AUM from $10mm currently, to $20mm" and in its September 2023 request that the proposed addition would lead "to a requested account size of $25 million AUM." No Defendant ever corrected that understanding, because the understanding was the product being sold. What

77

Defendants concealed was that no such capital stood behind the number: the platform carried margin at fund level, pooled and rationed across the managers as a class, never maintained as manager-specific capital, behind agreements Defendants drafted to announce a figure without funding it. Borgia and others from Topwater, Leucadia and Jefferies made repeated representations to Gupta and officers of Britannica, in numerous calls between 2019 and 2021 that they don't ever charge a cost of capital, never would, and it's real assets under management, real capital, allocated to managers, and plaintiffs reasonably relied on that representation. The concealment produced its physical proof on July 15, 2024, when the newly executed Mayfly account would not trade because Interactive Brokers reported insufficient margin or capital backing despite Mayfly's $15,000,000 purported stated Investment Account Value. Topwater personnel including O'Hara blamed it on technical glitch. On information and belief, based on that failure, the pooled margin structure, the $342 million of reported Master Fund net assets across thirty-four managed accounts, and LAM's materially larger regulatory AUM, LAM committed more undisclosed trading capacity than it maintained as immediately usable, manager-specific capital and rationed that capacity by undisclosed criteria. The capacity, margin, funding, and rationing records that fix these facts, account by account and day by day evidence this.

191.    On information and belief, LAM's treasury, cash-management, and margin records contain no entry, from April 2021 through August 2024, showing that Stonefly or Mayfly was ever funded with manager-specific, segregated, risk-bearing capital in an amount equal to any represented Investment Account Value. The represented capital appears in Defendants' records only as a bookkeeping entry, not as an actual transfer or allocation of capital, because no such capital was ever funded. The basis for this allegation includes the July

15, 2024 trading failure; the pooled, fund-level margin structure alleged throughout this Complaint; Defendants' April 2022 written statement that an actual cash contribution would not increase the Investment Account Value; and the March 2023 financing terms, imposed under an express written threat of termination, that charged Britannica for every dollar of trading capacity above its own contributed capital, contrary to the original agreement. The treasury ledgers, bank and custody statements, and internal cash-management and margin reports necessary to confirm these facts are in Defendants' exclusive possession and control.

192.    On information and belief, the stated Investment Account Values Defendants represented across the platform's managed accounts, taken together, materially exceeded the Master Fund's net assets at all relevant times; Defendants sold the same pool of capital to their managers many times over, and the arithmetic of their own numbers proves the commitment was fictitious platform-wide. The basis is Britannica's own two accounts, which alone carried $25,000,000 of stated value against roughly $2,500,000 of first-loss capital; the thirty-four managed accounts standing against $342 million of Master Fund net assets; and LAM's materially larger regulatory assets under management, the platform-wide computation of which remains undisclosed. Borgia, Taylor, Topwater, LAM, Jefferies, Goldman.

193.    Defendants' performance presentation upon which plaintiffs reasonably relied was false and materially misleading by omission, and the omission was engineered for the audience it targeted. Defendants advertised the Regular Member Class A return, the return of the protected class whose capital, as pleaded above, never absorbed a loss, to a manager being solicited to join the first-loss managers whose capital, as a class, absorbed every loss that produced the advertised return. Defendants concealed the first-loss experience: Britannica was never shown any First-Loss class performance, in the deck, on the calls, or anywhere else, before it subscribed. The

platform's own later audited statements record what Defendants concealed, class against class, year after year, and supply the concrete basis for this allegation.

194.    The solicitation was also spoken. In or around January 2021, Borgia personally pitched the platform to Britannica's officials and Gupta and during his solicitations, he represented: Topwater's average allocation was about $75,000,000, its large allocations $200,000,000, roughly a billion and a half allocated in the prior year alone; every manager ran on one uniform payout structure; Topwater was in the business of building long-term relationships with the managers it onboarded; and Jefferies and Leucadia were active allocators with a direct daily view into the manager portfolio who had frequently and readily made subsequent, standard-two-and-twenty-format allocations to the platform's first-loss managers, the very allocation path Britannica had told Defendants it was there to reach. Plaintiffs reasonably relied on aforementioned representations. In February 2021, Wieczorek represented, in substance, that all existing accounts ran on the same uniform structure and payout, and he distinguished Topwater from its competitors on one specific economic term: other first-loss platforms, he warned, such as Prelude and Boothbay, pass through charges on financing, something to keep in mind when comparing term sheets. In April 2021, Wieczorek introduced Topwater's Head of Risk, Russell Mataya, who represented that Topwater ran a real-time risk system calculating everything in real time, and, asked directly by Britannica's principal what would happen if a position moved outside the risk parameters or if the account reached threshold of termination, answered that Topwater would reach out, reconcile the numbers together, give Britannica a reasonable schedule to bring the position back in line or make one-off exceptions, and that a breach was a guideline and not a hard issue and was a dialogue, not a trigger for Topwater liquidating or doing anything like that, that Topwater stood behind its managers for

80

long term and wanted them to succeed and provided risk capital, that valuation was fair and accurate and carefully calculated based on current market prices only, third party administered, that liquidation of managers was extremely rare and unheard of, and that vast majority of managers thrived on the platform and got real capital backing. Britannica's principal said on the call that this was assuring. Gupta and Britannica relied on the aforementioned representations. Every one of those spoken assurances was inverted in performance: the uniform structure was not uniform, on Damm's own written admission; the platform that distinguished itself from financing pass-throughs extracted a financing charge from Britannica under written threat in March 2023; the real-time system was next-day reporting, on O'Hara's own writing; the promised dialogue, reconciliation, and cure became a pre-drafted notice, a five-minute window, a hedging ban, and a forced sale; and the allocation path never produced a single allocation.

195.    In the written negotiations, Britannica disclosed its position fully, as a partner entering what Defendants described as a long-term relationship. In January and February, 2021, Britannica's Chief Compliance Officer told Wieczorek, Borgia, and Topwater personnel that Britannica was open to a $10 million assets under management, a risk capital allocation, backed by $1 million of its own first-loss capital; that it ran a quantitative macro program executed through a proprietary delta-managed framework it had developed over nearly two decades; that its proprietary models and algorithms were integrated with the Interactive Brokers API; and that it required broker flexibility because the strategy involved high trading volume and therefore competitive broker costs were material and in fact foundational and fundamental to the success of the strategy that Britannica could not live without. During these conversations, Britannica officials also asked whether Topwater was open to a payout in which Britannica paid an annual cost-of-capital charge, in a loan or broker dealer type or another setup, and in exchange received

a materially higher performance allocation, the honest structure if the capital was margin rather than investment. Defendants represented: Topwater never charged a cost of capital, the payout was a uniform fifty-five percent on the Topwater risk capital they would provide, broker flexibility and cost requirements was understood, their platform was designed to allow easy access to multiple prime brokers, that it was easy and quick to implement any broker or change, that they had active relationships and integrations to all the largest prime brokers and access to futures contract was available at various brokers with easy and quick implementation on the platform with any strategy was standard and the terms were also standard and non-negotiable for every manager. O'Hara emailed that the payout was effectively 55% and he and others at Topwater represented at contract representations translated to a 55% payout on Topwater's capital when credits are given and that's how it was for all managers. They never provided detailed statements verifying that accounting despite requests. Plaintiffs reasonably relied on all these aforementioned representations. After signing the contract with Britannica's capital, strategies, and systems committed, plaintiffs having incurred multi million dollar costs and shared their proprietary intellectual property, Defendants imposed the very cost-of-capital charge they had disclaimed, while Britannica's share stayed at fifty percent, with no increase at all: the structure Defendants refused as an honest bargain, taken instead as an extraction. On April 2, 2021, Britannica's Chief Compliance Officer again requested the ability to start with Interactive Brokers and transition gradually if another broker were required. And on information and belief, Defendants read Britannica's disclosures for what they revealed: the scale of the investment Britannica would sink into Defendants' platform, and the cost of ever leaving it, leverage Defendants exploited in every later extraction pleaded in this Complaint.

82

196. Defendants extracted information from Plaintiffs during discussions before, during and after onboarding, that caused it to learn that, unlike most of its other managers, Britannica was a quant shop with valuation proprietary strategies and technologies. Plaintiffs then improperly exploited this for its own profit, to create leverage over Britannica, to improperly change and implement terms of the original agreement by creating leverage and duress, and to intentionally inflict harm.

197. Topwater studied Britannica before it approved it, and what Topwater learned, it later used. Topwater conducted written diligence into Britannica's entity structure, personnel, strategy, prior track record, and compliance information, and Rubin later stated that the account had been approved through Topwater's Investment and Support Committees, the same committee machinery that, as pleaded in this Complaint, extracted each successive charge and made the termination decisions. Topwater therefore entered the relationship knowing exactly what it had solicited: the strategy and its use of options and hedging, its dependence on technology, the identity and roles of BCML, Gupta and BC LLC, and the scale of the commitment Britannica would sink into the platform. Every act of concealment, extraction, and seizure pleaded in this Complaint proceeded on that knowledge.

198. Topwater personnel also told Britannica's Chief Investment Officer and its Chief Compliance Officer during the 2021 negotiations that the AIAA was the standard, non-negotiable agreement signed by all managers, with fixed economics and fair and balanced terms. Plaintiffs reasonably relied on these representations. That representation was material because it discouraged Britannica from demanding protections or testing whether other managers received different rights. The representation was false: after commitment, LAM repeatedly changed financing charges, capital restrictions, investment limits, broker access, cure treatment, and

termination machinery, and Damm's written admission in the October 2023 exchange pleaded below also refuted the uniformity of the supposedly standard broker commission rates, an admission about broker pricing that stands alongside, and separate from, the false uniform fifty-five percent payout representation pleaded above.

199. On information and belief, based on those individualized changes, other managers received materially different terms, side arrangements, or enforcement treatment, and these were material and directly relevant to the undisclosed risks that Britannica faced in the shared pool.

200. Between 2021 and 2024, Britannica's Chief Investment Officer and its Chief Compliance Officer directed written and telephonic requests to O'Hara, Wieczorek, Damm, and Rubin at Topwater, and, in succession, to Eck and, after Eck's departure from Goldman Sachs, to Tran at Goldman Sachs, directly and through Topwater as Goldman's client of record, seeking the facts a counterparty is entitled to know about its own account: the basis and level of the commission and financing charges; whether the rates were standard, uniform, or negotiable and by whom; the treatment and crediting of the account's cash and short-credit income; the basis for the imposed Goldman exclusivity and the status of every promised alternative; the futures access Britannica had quantified in writing; the capital introduction Goldman had promised; and the causes of the recurring data and reporting failures Britannica documented trade by trade. Every material inquiry met a false answer, a deflection, or a refusal.

201. Topwater answered that managers negotiated commissions directly with brokers because they were the clients; both statements were false, and Damm's own writing later admitted the rates were not uniform. Goldman's Tran answered in writing that Britannica's equity rate was consistent across Topwater accounts; Goldman's own Kalafarski refuted her in writing, and Tran went silent. Damm answered a written credit inquiry by misdescribing

Defendants' own operative Appendix C. Wieczorek answered the broker complaints first by agreeing Goldman appeared inadequately attentive, then by relaying that Goldman had no appetite for Britannica's business while Goldman's own coverage courted it, then by dangling BNP Paribas and J.P. Morgan introductions Defendants never pursued. Goldman answered the futures request in writing with a refusal and moved its explanation to a telephone line its own documents said would be recorded.

202.    And when Britannica asked for the evidence behind the seizure itself, Defendants' counsel answered on August 14, 2024 that Defendants were not required to provide it, rejected Britannica's litigation-hold demand, and wrote on January 14, 2025 that Defendants would not respond to the allegations at all, while Tran, on October 16, 2024 and after, was back in writing soliciting the same order flow.

203.    At no time in the relationship did any Defendant disclose the referral reciprocity, the revenue-factor allocation of Goldman's services, the relationship-credit treatment of Britannica's revenue, or the shared and rationed margin pool. Defendants lied to Gupta and Britannica officers who asked.

204.    When Tran represented in writing that Britannica's commission rate was consistent across Topwater accounts, either the representation was true, and every manager on the platform irrespective of their trade volume or strategy, or other relevant factors that apply to pricing, improperly paid the same above-market harvest Britannica's did, or it was false, as Goldman's own personnel and Topwater also wrote at the time as being false. Both roads plead a pattern: it was a coordinated scheme to give no straight answers and to harvest the account with concealed broker economics, it was a delay and distraction tactic, a platform-wide harvest, a

manager-by-manager deception. It was targeted by Goldman, LAM and Jefferies to harvest the entire Britannica account with commissions and fees.

205. The three Plaintiffs relied in different and complementary ways. BCML signed the Stonefly AIAA, assigned personnel, disclosed proprietary strategy and portfolio information, and rebuilt its trading infrastructure for Defendants' chosen architecture: thousands of lines of proprietary algorithms and automation, coded to the Interactive Brokers API, had to be reprogrammed, integrated, and retested for the Goldman-facing SpiderRock platform, an expensive system whose integration served Goldman and Defendants alone because it did not connect to Interactive Brokers. Integrations of that scope are, across the trading-technology industry, multi-year specialized engineering undertakings, and Britannica's records document the engineering manpower, personnel time, and money it consumed from Plaintiffs alone. BC LLC subscribed for the First-Loss Interest, funded $1,000,000 in November 2021, and later increased its total contributions to $2,500,000 as the relationship expanded. Gupta delivered the strategies and systems he personally created and owns, and his own labor in adapting, explaining, and operating them, in reliance on the same representations. Britannica disclosed this to Defendants before launch, and after launch as a significant ongoing investment, including but not limited to: the broker-specific technology, the staffing, the strategy integration, and their cost. Defendants did not honor that candor. They measured it, as the price Britannica could not walk away from, and, as pleaded throughout this Complaint, they used it as leverage in every extraction that followed.

206. The representations were made to Gupta personally as well as to the entities. Defendants solicited the creator: they knew the strategies and systems were his, and they represented to him directly the committed capital, the fair and uniform terms, the broker

freedom, and the growth path on which he delivered his property and his labor into their platform.

**D. The Commitment Came First; the Disclosures Came After**

207.    Defendants drafted the Stonefly Account Investment Advisory Agreement, dated as of April 14, 2021, to incorporate on its first page an Offering Memorandum and Operating Documents into the described First-Loss Interest structure, making documents Defendants had never delivered part of the economic and risk framework governing BC LLC's investment. BCML executed the agreement, at Defendants' direction and on Defendants' timetable, in that condition.

208.    Britannica was a small manager, not legally represented. Defendants withheld those disclosure documents past execution. On April 22, 2021, Britannica's Chief Compliance Officer had to request the Offering Memorandum and Operating Documents from Wieczorek, copying Damm and Rubin, because Defendants had never provided them. On April 23, Wieczorek transmitted only a January 2021 Offshore Offering Memorandum stamped for Britannica Capital Limited and the Offshore Fund's constituent documents, while withholding, as pleaded above, the operating agreement that actually governed BC LLC's onshore investment, an instrument Defendants never showed Britannica. Defendants obtained the signature first and delivered their partial, misleading disclosures after.

209.    By the time the Offering Memorandum arrived, BCML had already executed the AIAA and had already committed its personnel, strategy, and operating integration to the relationship. Britannia had also reasonably relied on the representations and misrepresentations from Defendants in January to April 2021, and began allocating significant resources to enter the relationship. BC LLC later subscribed and funded in continued reliance on the representations

87

and omissions pleaded here. Defendants reinforced the sequence with words: Topwater personnel told Britannica's Chief Investment Officer and its Chief Compliance Officer, in substance, that it had been sent all the relevant documents deliberately downplaying the existence, relevance, and importance of the very disclosure documents the AIAA incorporated and Defendants had not delivered. The engineered sequence materially reduced Britannica's bargaining position before the final subscription and funding, locked the operational commitment in place while contradictory terms emerged, and denied Plaintiffs a fair opportunity to evaluate the complete relationship before Topwater obtained the benefits of Britannica's services, technology, data, and capital.

210.    The sale itself ran on manufactured selectivity. Through the winter and spring of 2021, Topwater courted Britannica: on March 30, 2021, Wieczorek pressed Britannica to sign that week, invoking Topwater's planning of "some of our Q2 allocations" to manufacture urgency. Once BCML signed in April 2021, Defendants flipped the frame: while Britannica's committed capital sat idle at Britannica's own cost, Rubin ran a serial documentation chase, tax forms, formation documents, beneficial-ownership packages down to photo identification and utility bills, background-investigation consents, compliance manuals, registration analyses, and a due-diligence questionnaire Rubin had already completed herself from Britannica's own marketing materials before asking Britannica to verify it, while the Support Committee issued questions round after round into mid-July. The truth about that selectivity is pleaded on information and belief, stated on the platform's own economics and conduct: a first-loss platform the way Defendants designed it bears no loss when a manager fails and profits from just about every manager it admits, so Defendants' committees reject almost no one; the seller does not vet the buyer. The months of scrutiny were theater with three purposes: to extract Britannica's

88

proprietary operational details, to run up Britannica's costs while its capital waited, and to cast the seller as the party being sold to. The chase ended by revealing what it had been for. On July 21, 2021, Britannica answered the last question, which broker it used, and offered to stay at Interactive Brokers or to change if liquidity and costs made sense. The next afternoon, Rubin delivered via email the real condition, the Goldman condition pleaded in this Complaint. Britannica confirmed within the hour; Rubin sent her two-word thanks; and five days later, the moment Britannica checked in, the account that had been under committee scrutiny for months was approved in three minutes.

211.    On information and belief, the division's own compliance manual required conflict disclosure and recusal procedures that the conduct pleaded here violated line by line, and Rubin administered that manual while writing the conflicts into the account.

212.    On information and belief, the manufactured-selectivity chase run on Britannica, the serial documentation demands, the pre-completed due-diligence questionnaire, and the strategy and operations extraction before approval, was designed to defraud Plaintiffs into doing lots of inappropriate disclosures, background checks, several rounds of time-consuming paperwork, research and system configurations, calls with third parties, share strategies and internal structures not relevant, and spend a mountain of time and money, so that the enterprise acquired proprietary information as well as created a huge sunk cost, which was all used as a leverage. It was a trap to then do a bait-and-switch.

213.    The due-diligence questionnaire Rubin completed herself before asking Britannica to verify it carries authorship and revision metadata. On information and belief, the native file records Rubin as author before any Britannica input, the manufactured-selectivity

89

chase preserved in the file's own properties, and the native questionnaire and its versions are in Defendants' control.

214.    In the April 2019 meetings at Goldman's offices, on the 2021 solicitation and onboarding calls, and in the surrounding written exchanges, Goldman's and Topwater's personnel represented to Britannica's Chief Investment Officer and Chief Compliance Officer, in substance, that Britannica would have a quick start. The representation was fraudulent when made: the quick start consumed more than eight months at documented cost.

215.    Even when the Offering Memorandum finally arrived, provided only upon Britannica's request and after the Advisory Agreement's execution, it arrived loaded with intentional material omissions: a disclosure document issued by affiliates of some of the largest financial institutions in the country that concealed nearly every material risk of the structure it was selling, and did so by design. On litigation, it represented that none of the Fund, Master Funds, U.S. Fund, or Manager was then, or had since inception been, a party to material litigation, arbitration, or regulatory proceedings, padding the assurance with a generic warning about proceedings that might someday arise. Defendants concealed the live case that assurance was written to bury: the pending Canada action against Borgia, Taylor, and Topwater-managed funds described above, the program's own architects facing many of the same categories of conduct pleaded in this Complaint. And the litigation half-truth was one omission among many: as pleaded in the paragraphs that follow, the Memorandum concealed the interested valuation of the termination trigger, the fund-level margin behind the stated capital, the referral-bought broker mandate, the special interests of affiliated and Strategic Investor capital, and the first-loss class experience its marketed returns concealed. The document was not disclosure. It was an

instrument of entrapment in a fraudulent securities transaction. Plaintiffs reasonably relied on the intentionally misleading documents for ongoing involvement.

216. The parties' own writings date both the request and the delivery, with Wieczorek's delivery following the officer's written request identifying the Offering Memorandum from the Advisory Agreement's own first page. The selling document arrived only on request, and only after Defendants held Britannica's signatures on the instruments it was supposed to inform.

217. Wieczorek transmitted some limited but not all the relevant Offering Memorandum or documents afterwards. BC LLC executed its onshore subscription on June 28, 2021, on Defendants' paper and at Defendants' direction, and LAM's Topwater personnel accepted the subscription and admitted BC LLC as a First-Loss Member on November 19, 2021. Defendants never delivered or updated disclosures and documents as they were required to, for any future transactions, amendments, subscriptions involving Topwater, LAM, Jefferies, Goldman and Britannica. Each omitted present fact and continuing half-truth identified below ties to the transactions it infected by the date on which it operated: the operational commitment, the initial and additional purchases, the 2023 capital increase, and the July 2024 Mayfly purchase.

218. The Offering Memorandum presented valuation as governed process: fair value, disclosed conflicts, brokerage standards, and a power to suspend valuation when values could not be accurately determined. Plaintiffs reasonably relied on written and verbal representations about fair, accurate and independent, valuations with third party admin verification. Defendants concealed the reality this Complaint charges, the opposite of governed process: LAM, the party that profited from the trigger, would value the first-loss termination trigger itself, during an

91

opening dislocation, on lagged and missing information, preserving and producing none of the native input, model, override, query, approval, and audit records, while entities under LAM's control retained, allocated, and withheld the manager's capital and credits. And the suspension power the Memorandum described for moments when values could not be accurately determined is the power Defendants refused to use on the one morning it described exactly: rather than suspend a valuation no data could support, Defendants declared a fraudulent one.

219.    The Offering Memorandum buried generic warnings, valuation conflicts in the abstract, institutional-credit risk, the possibility that operational data could be delayed or inaccurate, while concealing the present, concrete conditions Topwater already knew, including at least: that Stonefly would begin with only T+1 Goldman reporting and no intraday solution; that, under LAM's own standing ADV referral procedure pleaded below, approval would be conditioned on executing all trades through a broker selected through an allocator relationship; that LAM's own SEC brochure described referral-driven broker recommendations; that affiliated and Strategic Investor capital held special economic and governance interests; and that the marketed Regular Member return concealed the first-loss class experience. A generic warning about a hypothetical is not disclosure of a present fact; it is the device Defendants used to conceal one.

220.    Before execution, Britannica told Topwater that its algorithms and models were coded to Interactive Brokers, that adapting them to any other broker meant reprogramming a multi-million-dollar body of engineering and years of accumulated work, and that it needed a broker offering competitive pricing, futures availability and tight bid-ask spreads; and Britannica made clear that it was sinking that investment in reliance on Defendants' representations. On July 22, 2021, Rubin imposed the opposite of the represented partnership, in the written Goldman-

only condition pleaded above. Rubin knew, from Britannica's own disclosures, exactly what the strategy required and exactly what the forced switch would cost, and she imposed the condition without disclosing what it served: the referral reciprocity pleaded above, under which Britannica's captive trading was the currency. By then BCML had signed the AIAA, BC LLC had signed its subscription documents, Britannica had disclosed its strategy and systems and invested a long time going through the onerous process, and the parties were preparing to fund and launch. Britannica accepted because Defendants had left it no reasonable alternative: rejecting the condition at that stage meant abandoning months of diligence, negotiation, disclosure, and operational preparation, the position a party that induces reliance first and imposes conditions second creates precisely so it can exploit it. The condition improperly and contrary to prior agreements and representations Plaintiffs had relied upon transferred to Britannica the full cost of adapting an Interactive Brokers-based system to Goldman's infrastructure while preserving and significantly enhancing Defendants' Goldman economics.

221.    Two-firm coordination ran in Defendants' own words during onboarding: on August 9, 2021, Wieczorek relayed in writing that Goldman's contacts had "confirmed that they are approved internally to move forward with onboarding" Britannica's account, the platform and the imposed broker clearing Britannica's admission between themselves.

222.    O'Hara repeated on May 17, 2023, what Topwater had represented earlier, when Britannica asked to grow: Britannica held a blended payout of 55% of the profits in the account when above your high water mark, and Topwater "currently do[es] not have flexibility to adjust our total payout higher as all of our accounts are on the same deal structure." That sentence was false when O'Hara wrote it, in two ways. First, Defendants improperly included profits attributable to Britannica's own first-loss capital in the payout calculation, even though Topwater

had no contractual or economic right to share profits generated by Britannica's capital merely because that capital served as loss protection. Second, the purported 90 percent Topwater capital component was not actually committed as risk capital; Britannica was nevertheless charged a cost of capital, and Topwater's own administrator reflected only a 50 percent payout rather than the represented 55 percent. Any allocation therefore should have been calculated on the actual capital Topwater committed and placed at risk, not on capital used only for shared margin. Britannica's own executed papers refute the first half: the AIAA Defendants drafted paid BCML fifty percent, not the fifty-five percent O'Hara described. No blend arithmetic rescues his sentence on the AIAA's own face: the executed papers state one Account Adviser payout, fifty percent of Remaining Investment Gains; no executed instrument states, blends, or computes any fifty-five percent adviser payout; and the administrator computed BCML's fee at fifty percent, month after month, on Defendants' own statements. And Defendants' own officer refuted the second half. In October 2023, Damm admitted in writing that broker commission rates were not uniform across managers, contrary to representations by Goldman's Tran, Topwater's Wieczorek, and others that the rates were standard, competitive, reasonable, and appropriate for high-volume trading under large-trader designations, representations on which Plaintiffs reasonably relied.

223.    On information and belief, Defendants individually negotiated and customized manager agreements, including termination provisions, risk guidelines, and their practical implementation, while falsely representing to Plaintiffs that all managers received uniform terms. Defendants concealed material differences, conflicts of interest, and manager-specific arrangements that favored certain managers and disadvantaged Britannica. Defendants' repeated treatment of supposedly fixed terms as revisable whenever revision favored them, including in

94

March 2023 and July 2024, the individualized guideline appendices maintained for each manager.

224.    The platform's own public record supplies the named comparator: in 2017 Topwater took first-loss capital from Paulson & Co., and on information and belief, based on the public reporting of that arrangement and on Defendants' own individually negotiated practice, Paulson received materially better economics, including a more favorable profit split than the fifty percent imposed on Britannica, together with different cure, enforcement, and termination treatment. Topwater's manager files, including the Paulson file, will prove the uniform-terms representation false. On information and belief, on the same basis, Defendants negotiated terms, moderated charges, and extended cure and forbearance to larger managers who arrived with counsel and negotiating leverage, and reserved the harshest version of every term for the small managers they could squeeze. The design was not a risk to be disclosed; it was the product, and Britannica was the program run to completion: fraudulent termination.

225.    Topwater and LAM drafted every operative instrument. Under settled New York law, every undefined or ambiguous term in those instruments, including the termination and stop-out machinery Defendants invoked on August 5, 2024, is construed against Topwater and LAM as the drafters, and the parties' course of dealing, including Defendants' written and verbal confirmations that real risk capital was being provided or that short-balance income on securities sold short would be calculated and credited, is admissible to establish the instruments' meaning.

226.    Topwater's organization knew precisely how much turns on the exact text and timing of redemption and termination provisions, because a Topwater fund litigated those questions for years as a party. In the SageCrest bankruptcy, In re SageCrest II, LLC, No. 08-50754 (Bankr. D. Conn.), Topwater Exclusive Fund III, LLC litigated for years over the

classification and timing of its own interest, taking the position that its redemption rights crystallized on the effective date stated in its own written request, and pressing the rule that an instrument's undefined terms are construed against its drafter. Upon information and belief, based on that litigation history and the continuity of the Topwater platform and its principals, Topwater and LAM designed and operated the Accounts' termination machinery knowing that a self-declared, self-valued trigger would not withstand scrutiny against the instruments' actual text, and invoked one on August 5, 2024 anyway.

227. Topwater knew before launch that its Goldman visibility could not deliver the real-time monitoring marketed in the Overview. O'Hara's April 30, 2021 email stated that Topwater had T+1 prime-broker reporting from Goldman, needed to find an intraday solution, and generally relied on hourly files from managers' order-management systems. The Stonefly AIAA then conditioned any Capital Account determination on the trading information the Manager had actually received, so Defendants knew from the start that their own data architecture, stale by a day and dependent on hourly files, could not honestly support the to-the-minute determination they would later claim to have made.

228. Goldman's own salesperson confirmed the referral channel in writing before the account existed. On May 24, 2021, Goldman prime-brokerage salesperson Jason Eck wrote that he covered many allocator relationships, including Topwater, and that Topwater had told Goldman it was in discussions with Britannica. Goldman then requested sample portfolios and position quantities for onboarding and received them before the account opened. Goldman thus knew, before it earned its first commission, both the content of Britannica's strategy and that the account was being delivered to it through the allocator channel whose currency, as pleaded above, was Britannica's captive trading.

229.    Topwater itself identified Interactive Brokers as the available alternative before Stonefly began trading. On September 28, 2021, Wieczorek wrote that Goldman was pushing back on futures and options-on-futures capability and that the best option might be to prime with Interactive Brokers. Defendants launched the account at Goldman anyway. Goldman's onboarding then collapsed into the operational and staffing failures acknowledged in the contemporaneous correspondence, a launch so defective that Britannica demanded its wire back rather than keep funding a broker that could not open the account, and renewed its request for a better-staffed broker; Defendants stalled the demand and kept Britannica locked at Goldman, where Goldman billed the captivity at the up to five-times-market rates pleaded above and kept the harvest the lock produced. For years afterward Britannica asked, in writing, again and again, for the very move Topwater's own officer had named as the best option, and Defendants refused until 2024, by which time Britannica had incurred years of Goldman-specific costs and integration dependence that Defendants had watched accumulate. Defendants opened the exit only at a price: a new cause-based cross-default inserted by counsel. Thirty-three days after execution, Defendants terminated both accounts at the same claimed minute; the contemporaneous notice identified only Stonefly and did not invoke the clause, and Defendants later asserted an independent Mayfly stop-out.

230.    Britannica told both Topwater and Goldman before launch that futures and options-on-futures were part of the strategy and important to its costs and risk management. Goldman's August 18, 2021 onboarding checklist identified futures as available with additional documentation, and Britannica's same-day response described the integrated equity, options, and futures architecture. Topwater and Goldman therefore knew that denying futures would force Britannica to use more capital-intensive and commission-intensive substitutes. Based on contract

97

sizes, notional efficiency, and Britannica's actual trading, equivalent index exposure through futures would have reduced the relevant execution costs by as much as 80 percent, more than $250,000 a year immediately and seven figures a year at scale, and Britannica put those economics in writing to Defendants.

231.    Defendants held the refusal in place for almost the entire life of the account and never put a reason in writing, because no valid reason existed to write. Britannica repeatedly requested futures and options-on-futures capability to reduce commissions, financing expense, short-dividend expense, and capital usage. In November 2023, Goldman confirmed in writing that it would not onboard Britannica for futures execution or clearing and moved its explanation off email to a proposed live call, on lines Goldman's own account documents said were recorded: the refusal's only function was to keep Britannica locked in the most expensive version of its own strategy, maximizing Goldman's commissions and Britannica's costs, and that is not a reason a broker puts in writing. In April 2024, Damm wrote that changing Goldman's stance would remain challenging and asked whether the absence of futures was a deal breaker before Topwater would spend effort seeking a change. The question was its own admission: Defendants knew Goldman would not relent, and they kept the trap alive with questions to their manager instead of demands to their broker. Stonefly remained confined to Goldman and had no futures capability when Defendants ordered the August 5 liquidation.

232.    The supposed alternative was built to fail. Goldman's onboarding materials identified documentation for executing through Goldman while clearing elsewhere, but Topwater never approved a workable away relationship for Britannica. When Damm later suggested that Britannica could establish away execution and give trades up to Goldman, he acknowledged in the same breath that give-up fees would be added on top of the executing broker's commission.

The design was extractive and manipulative: it preserved Goldman's economics while making the supposed alternative more expensive.

233. Britannica also sought a direct Goldman prime-brokerage account outside Topwater, and Goldman's response proved the solicitation fraudulent. On August 22, 2022, Britannica asked Goldman to open an account for BC LLC, unconnected to Topwater, running the same quantitative macro, delta-managed options strategy, and submitted three sample portfolios. Goldman demanded $7,500,000 of portfolio-margin equity for each proposed book against Britannica's planned smaller launch the size of which was pre-disclosed by Plaintiffs and indicated by Tran and others as not an issue, never supplied the promised written pricing, and did not open the account, while Goldman was at that very time carrying the same strategy, the same manager, and the same order flow inside Topwater's pre-existing account. Goldman gave Britannica no credit for the approximately $400,000-a-year commission run rate, the large-trader scale, and the cumulative commission flow Britannica had generated at Goldman since the account's 2021 launch, the very revenue Goldman's own account agreement made a significant factor in what a client receives. The refusal contradicted every representation Backer, Robinson, Eck, and Goldman's personnel had made during the solicitation about serving emerging managers of Britannica's size where the strategy justified the relationship: Goldman knew the strategy's success from Britannica's live account and ignored it. On a call Tran stated that the only reason was the opening account size, which was contrary to her previous representations that a smaller account size was acceptable. On information and belief, Goldman's internal process bucketed Britannica as a small manager on account size alone, contrary to every solicitation representation, and Goldman's internal approval memoranda record it. The fraud cost Britannica the years: had Goldman told the truth at the outset, no capital introduction, no real

relationship, and a captive-pricing trap, Britannica would never have chosen Goldman, would have built at an honest broker, and would have compounded the performance it was in fact generating, strong returns on shallow drawdowns, into the growing assets under management those years should have produced.

234. LAM admitted the broker-referral conflict to its regulator while concealing it from the manager it was steering. Item 12 of LAM's 2021 Form ADV brochure, filed with the SEC, admitted that broker-dealer introductions of Account Advisers created a conflict, that LAM's standard procedure was to recommend establishing the account at the introducing broker and to require the Account Adviser primarily to execute there, and that the recommended broker might be less competitive and add cost to the Funds. No Defendant delivered that brochure to BCML or BC LLC, and no Defendant told Britannica any of it. The same Item represented to the SEC that LAM did not have the ability to require a Fund or Account Adviser to execute at a specific broker; Rubin's July 22 email did exactly that, in writing. On information and belief, based on Goldman's coverage of Topwater as an allocator relationship, its receipt of Britannica's materials before account opening, Rubin's written condition, and Defendants' later resistance to migration, the Goldman mandate was the referral-driven procedure LAM described to its regulator, applied to Britannica without ever being disclosed to Britannica, and not an account-specific risk judgment. The filing was fraudulent in both directions at once: to the SEC, LAM described a compulsion power it claimed not to hold while Rubin exercised it in writing; to Britannica, LAM concealed the procedure entirely while imposing it. That is the architecture of the fraud: confess to the regulator, conceal from the victim, and profit in the gap between the two.

235.   LAM's Form ADV also stated that it monitored each managed account continually and generated a report every two hours summarizing daily trading activity and profitability, together with daily and monthly exposure and performance reports reviewed by LAM's chief risk officer and employees. O'Hara's account-specific admission that Topwater had only T+1 Goldman reporting and still needed an intraday solution proved that public description false as applied to Stonefly: the continuous monitoring LAM described to its regulator did not exist for the account LAM would later claim to have measured to the minute. The native two-hour reports, source files, exception logs, and review history are within LAM's control.

236.   The disclosed two-hour reporting regime condemns Defendants on every supported branch, and Plaintiffs plead the supported alternatives without treating them as exhaustive. Either the monitoring and reporting process LAM described to the SEC did not exist or did not operate as represented for Britannica's accounts, which is itself a false or misleading public description of the platform and evidence of scienter and pattern; or the required reports existed on and before August 5, 2024 and have been withheld notwithstanding demand, which is concealment; or the reports existed and did not support or contradicted the asserted 9:32 stop-out determinations, which is concealment of exculpatory account records and confirms that the marks were selected rather than compelled; or LAM in fact relied on a different, undisclosed process, which contradicts both the ADV description and the marketing representations. The concrete basis for pleading these alternatives is the ADV's own description of reports prepared every two hours, O'Hara's written admissions of T+1 and hourly architecture, the vendor-confirmed delivery failure, Defendants' refusal to produce any monitoring report for August 2 through 5, and their exclusive control of the reporting systems. The reports, generation logs, distribution lists, recipients, exception records, and review testimony are identified discovery.

101

237.    Topwater was purportedly not institutionally limited to Goldman. The Overview listed four prime brokers, and the trading funds' audited counterparty disclosures for 2021 through 2023 identified multiple prime brokers and clearing counterparties, including Goldman, J.P. Morgan, Citibank, Bank of America, and others. The platform therefore represented that it had multi-broker capability, Britannica relied on the representations prior to any agreement, and Defendants kept Britannica confined to Goldman anyway, until the 2024 Mayfly structure.

238.    Defendants' broker condition created sunk-cost leverage, and Defendants used it. Britannica had disclosed before execution that its algorithms, models, and indicators were integrated with Interactive Brokers. Operating through Goldman required additional coding, testing, reconciliation, personnel time, and duplicate workflows. Britannica then had to continue using those account-specific systems while Topwater controlled the only practical path to a different broker. Britannica's business records document those reliance expenditures and fix them to the dollar. The intraday reporting, broker integration, and required systems Defendants had represented as already in place were built instead at Britannica's expense, in documented, recurring six- and seven-figure technology and integration costs charged against Britannica's first-loss capital, costs the architecture Goldman Sachs required imposed, a burden that forced the strategy to earn an additional ten to twenty-five percent a year on that capital before Britannica made its first dollar. Every dollar of it is owed back.

239.    BC LLC funded the First-Loss Interest and BCML began trading Stonefly through the Goldman account in 2021. As Defendants drafted it, the Stonefly AIAA put custody, prime-broker designation, account funding, valuation, and termination in Defendants' own hands, Stonefly's and LAM's, while confining BCML's trading discretion within the Investment Guidelines Defendants wrote. As Defendants drafted them, the hourly-reporting and one-percent

102

provisions handed LAM continuous visibility and the power to act before Regular capital was ever exposed, the design this Complaint charges as engineered to protect Defendants' layer at Britannica's expense. The stated Investment Account Value functioned as contractual trading capacity supported by pooled margin, not conventional segregated AUM entrusted to BCML. Britannica nevertheless supplied the first-loss capital, personnel, systems, strategy, and operating expense, while LAM and the funds controlled the capital support and exit.

**E. Growth on Performance; Amendment No. 3 Takes the Layer to $2.5 Million**

240. Britannica's strategy was highly successful. For 2023, Topwater's own administrator, UMB, reported an 88.02 percent annual return on the First-Loss Member Capital Account, despite omitting credits due to Britannica and after the account absorbed hundreds of thousands of dollars in excessive Goldman commissions. With proper accounting and without Goldman's excessive commission charges, Britannica generated nearly twice that return on the only capital actually placed at risk, Britannica's own. Those results reflected intellectual property Gupta had developed over two decades, whose extraordinary value is documented in Defendants' own administrator records and PwC audit materials. Defendants nevertheless repeatedly imposed and later removed trading and margin constraints, withheld agreed credits, extracted 50 percent of remaining gains each month, and demanded still greater profitability while threatening termination whenever Britannica sought relief from those constraints or requested a change from Goldman. Defendants conditioned additional account capacity on Britannica permanently increasing its first-loss capital. Under continuing threats of termination, Plaintiffs advised Topwater that they could contribute additional capital if Topwater increased the Investment Account Value. The original structure paired $1,000,000 of BC LLC first-loss capital with a $10,000,000 Investment Account Value. By September 2023, the parties had

increased those amounts to $2,500,000 and $25,000,000, respectively, as confirmed by UMB's December 31, 2023 statement. O'Hara described Britannica's strategy as market-neutral, without a long bias, and among the platform's lowest-risk accounts, a description Britannica's Chief Compliance Officer memorialized in her August 9, 2024 response. Defendants later liquidated the very strategy they had approved, praised, and expanded.

241.    BC LLC's September 2023 increase and its July 2024 Mayfly purchase were made in continued reliance on the committed-capital representations as reaffirmed, and in ignorance of the concealed design. Britannica's own written request for the increase described the understanding Defendants had built, in its own words, and no Defendant corrected it, because the misunderstanding and fraudulent representation was the product.

242.    The administrator's statements quantify the value Britannica was producing immediately before termination. For 2023, Stonefly reported $1,094,555 in Investment Gains and $182,955 in Account Adviser Fees. Through July 31, 2024, it reported $1,173,890 in year-to-date Investment Gains and $533,393 in Account Adviser Fees. Topwater retained more than half the gains for just deficient margin, and most of the gains after considering financing, interest, credits, short rebates, brokerage, and other benefits. Britannica solely incurred time, systems, staff, management and business costs. Only Defendants profited from the setup for years, and they profited handsomely, while Britannica took all the risk, provided proprietary strategies and did all the labor. Jefferies, LAM and Topwater later invoked a purported $7,166 Stonefly figure first supported only through an August 8 package retrospectively fabricated, constructed and falsely presented as contemporaneous proof of the August 5 calculation. Britannica's capital was wiped out and walked away with only losses.

243.    Defendants' administrator recorded both the 2022 drawdown and Britannica's subsequent gains. UMB allocated the $683,163 2022 loss entirely to BC LLC's first-loss capital. During that period, Goldman's documented position and reporting failures repeatedly left Britannica with missing or incorrect data, and those failures, and the forced and corrective trading they caused, inflicted the drawdown, the product of the gross negligence explained below. Britannica then recouped the entire prior loss that was caused by Goldman and other Defendants and generated $1,094,555 of 2023 Investment Gains. By December 31, 2023, UMB reported an 88.02 percent annual return on the First-Loss Member Capital Account. Britannica achieved those results while bearing the broker costs and operating burdens Defendants had imposed.

244.    The administrator's headline percentage was a different number, and a fraudulent one. The statements' headline figure of 9.75 percent for 2023 divides the recorded gains by the trading capital Defendants fraudulently reported as standing behind the account, the committed value pleaded above that Defendants never provided. The only risk capital that earned those gains was the capital Britannica had provided, supplemented by limited and unreliable margin from Defendants' concealed shared pool, in substance nothing more than the ordinary leverage any broker routinely extends against a customer's own capital, at roughly three to four times, dressed up in the contracts as a capital commitment. On information and belief, Topwater and LAM either represented to their own administrator that the stated Investment Account Value was provided and maintained, or instructed the administrator to compute the account's returns on that stated value; on either branch the administrator computed every headline return on a false denominator, and the basis is the administrator's use of the stated value in its published figures and the margin, treasury, and administrator records in Defendants' control, which record what

actually stood behind the accounts. Britannica earned its share the hard way: it received no management fee, was paid only from realized gains, and out of that share paid everything, its traders, its middle and back office, and the cost of keeping Defendants' required systems running. And it earned with the low volatility Defendants themselves praised: across the entire relationship there was no significant or persistent drawdown of the strategy's own making.

245.    By the time of that expansion, Britannica had disclosed sample portfolios and position quantities, integrated its systems with Topwater, Goldman, and SpiderRock, provided hourly trading data, trained personnel to operate the account, and built a live track record inside the Topwater structure. Topwater and Goldman improperly harvested without required disclosures the resulting trading volume, financing activity, data, and allocator value. Those sunk commitments made Britannica dependent on a continuity Defendants controlled, and made a forced exit materially more destructive than an ordinary change of service provider, a dependence Defendants had engineered and, as pleaded throughout this Complaint, exploited.

246.    Britannica did not commit its capital, personnel, technology, and proprietary infrastructure merely to earn a fee in a single account. The Stonefly and Mayfly mandates were the live institutional record on which Britannica was building a larger investment-management business. Defendants knew that purpose from Britannica's repeated written requests to scale the accounts, obtain broker functionality, expand capital, and use the verified record in institutional discussions. The administrator-recorded performance, the expansion to a second account, the broker integrations, and the accompanying due-diligence infrastructure created allocator credibility and negotiating leverage that could not be transferred intact to a newly opened account. Britannica therefore expected, and Defendants reasonably foresaw, that arbitrary

106

termination and destruction of the record would impair the enterprise itself, not merely end future monthly fees.

**F. The Course of Dealing: When a Threshold Loomed, Topwater Warned and Britannica Cured**

247.    In April 2022, Stonefly had a drawdown that's normal in the course of market volatility, and approached closer to the trigger even though, similar to August 5, 2024, it still was at a safe distance from any termination trigger point. Topwater used warning and cure in April 2022 rather than termination. At 7:05 a.m. on April 25, O'Hara emailed that the account was approximately $158,000 from automatic termination not including the additional $100,000 of Britannica's capital in the same first loss layer, so $258,000 or about 25.8% away from even reaching the purported second loss layer, a significant and safe distance by any measure. Under improper threat of termination, three minutes later, at 7:08 a.m., Britannica requested approval to contribute $500,000. Topwater approved the contribution, and Rubin confirmed receipt of the wire that same morning. Trading continued.

248.    O'Hara explained the cure's function in writing: the $500,000 would not increase the Investment Account Value but would increase the buffer above the one-percent stop-out line, again intended to make sure the purported second loss capital couldn't possibly be breached or put at the remotest possible perceived risk. In May 2023, when Britannica asked to move that added capital, O'Hara barred the redemption with an invented high-water rule. Topwater thus accepted additional capital as a cure and then treated the resulting buffer as locked in until recovery. At the same time, Defendants swept profitable-period gains out through the monthly waterfall, while prior losses remained Unrecouped Investment Losses that had to be recovered before the same economics resumed. The constraints were not reduced from adding $500,000.

That asymmetry gave LAM continuing leverage over a manager whose capital and ability to rebuild the record remained trapped in the account.

249. Topwater knew that its own delayed and poorly implemented data-receipt infrastructure could move the threshold calculation to a fake and unreliable number even when the underlying positions had not changed and the account had moved to profit. That knowledge is material to any later reliance on incomplete, delayed, or broken broker files.

250. The April 2022 episode established a practical course of dealing: Topwater warned Britannica when the threshold approached, obtained Investment Committee approval, accepted additional capital, and continued the relationship. The course is also additionally supported with Section 6(b)(ii), which began with the qualification "unless otherwise agreed in writing." The agreement's separate one-business-day cure protection for market-caused guideline breaches confirms the parties' broader practice of notice and correction. What changed by August 5 was not the existence of volatility in an options account. It was the cumulative set of interests pleaded here: protection of affiliated Regular capital, loss of Goldman-linked order flow after the Mayfly move, unresolved credits and accounting, parent-risk involvement, and a decision O'Hara said had been made above him before reliable account-specific proof existed.

251. No loss could reach the Regular Members' capital. Defendants intervened anyway, and Defendants told Britannica exactly what its money would buy: O'Hara wrote at 7:38 a.m. that the additional $500,000 contribution "will not increase the Investment Account Value, but will increase the buffer to the 1% stop-out level." Half a million dollars of Britannica's capital purchased no trading capacity, no additional capital, and no additional anything. It purchased distance from an arbitrary, material and concealed line Defendants drew, Defendants

108

measured, and Defendants alone could declare crossed. That is akin to a collateral call on a secured loan, and Defendants made it early at 7.42 percent.

252. The 2022 cure required no executed amendment. Email approval and the same-day wire were sufficient. Topwater's Investment Committee acted within roughly seventy minutes of the warning, and the funds were received that morning. The speed and informality of that cure show that Topwater had both the authority and the established machinery to preserve an account when it chose to do so.

253. Warning and cure remained the ordinary practice through July 2024. On July 18, 2024, O'Hara sent Britannica a single-position breach notice and set a next-business-day cure deadline. The notice did not purport to terminate either account, and Britannica cured in the ordinary course.

254. After trading began and in or around March 2023, Topwater used threatened termination to obtain new economics, the financing extraction. After a February 28 notice concerning gross options exposure, O'Hara gave Britannica until March 6 to cure, and on March 8 he delivered the Committee's choice: accept changes including a new financing expense in Appendix C, or receive ninety days' notice, which meant lost investment and no meaningful timeframe to recover from a drawdown of all real risk capital: the first loss layer. The threat operated against capital that Topwater had treated as locked and against years of broker integration, systems work, proprietary disclosure, and live track-record value that termination would destroy. Topwater thus converted a limit it was simultaneously willing to rewrite into leverage for a new charge, and Britannica accepted the change to preserve the invested capital and business it could not replace in ninety days. These were contrary to previous representations by Borgia and others that Plaintiffs had relied on.

255. The March 2023 extraction and the April 2022 collateral call were two operations of the same undisclosed machinery. Whenever Britannica's account drew down on the order of just five percent or more of Investment Account Value, Defendants' Investment Committee reviewed the account, Defendants demanded capital or invoked purported breaches, and Defendants restructured the terms in their own favor as the price of continuation: in March 2023, following the 2022 drawdown of $683,163, 6.8 percent of Investment Account Value, a committee threat of for-cause termination converted into a new financing charge on the borrowed exposure; and on August 9, 2024, O'Hara's own oral figure for the Stonefly Capital Account, approximately $683,000, is 6.83 percent, squarely inside the same band. No document delivered to Britannica disclosed that machinery: not the review trigger, not the committee's role, not the practice of repricing the relationship at each drawdown, and not the fact that the contractual one-percent line was never the operative line. The opposite was disclosed and in the agreements. On information and belief, Defendants' committee processes fixed account review and termination discussion at approximately five to six percent of account value. The committee's grip ran to account creation as well: on May 17, 2023, O'Hara relayed the Investment Committee's soft approval to move forward with a new account, discretionary passage through the same body, fourteen months before the July 2024 machinery was installed.

256. The design guaranteed the bullying machinery would fire on ordinary markets: declines of five percent or more in the S&P 500 occur on average three to more than four times every year, the index has historically spent more than half of all trading days at a drawdown of five percent or greater, and Defendants swept gains from the account monthly through the fee waterfall while every loss accrued solely against Britannica's layer below the high-water mark, so the buffer was harvested each month and the account could never build distance from the

band. A five-to-six percent review practice on a monthly-reset book is not a safeguard against unusual losses; it is a tripwire calibrated to ordinary market behavior, and each firing handed Defendants the occasion to demand capital, extract terms, or terminate at a self-marked number. Nor did the termination itself ever reach the written line on Defendants' own numbers: for the same Stonefly account in the same period, Defendants' documents state several different Capital Account figures. A drawdown of six or seven percent on a functioning account is recoverable through ordinary performance, and Britannica's strategy had recovered every drawdown across the relationship.

257. The same drawdown after Defendants' seizure is unrecoverable by design: a manager stripped to a fraction of its capital must triple its remaining money to restore what normal performance on the intact account would have restored. Defendants did not stop a loss on August 5. They converted a recoverable fluctuation into a permanent confiscation, while refusing the very capital Britannica stood ready to add.

258. On information and belief, the Investment Committee's own minutes record the March 2023 decision to threaten termination and extract the financing amendment. O'Hara's own March 8, 2023 writing invokes the Committee's members and their choice.

259. The people who ran the machinery are named in Defendants' own writings. O'Hara transmitted the March 8, 2023 termination threat and granted the April 4, 2023 guideline rewrite; Dave Damm and Brian Long ran the account, credit, and valuation communications; Susan Rubin transmitted the July 2024 amendment package and the cross-default condition; Taylor executed the instruments; and Bryan Borgia and Blake Wieczorek ran the platform relationship, while the solicitation deck seats Handler and Friedman over the committees that decided. The basis for each attribution is the person's own writing or signature and Defendants'

own deck, and the minutes, agendas, and distribution lists that complete the roster are in Defendants' exclusive control.

260.    On information and belief, the same Investment Committee approved the terminations and repricings of other managers across the platform's life, in minutes that record the same discretionary machinery this Complaint pleads, decision by decision, and the full minute books and agendas since inception are in Defendants' control.

261.    The same exchange showed that some reported breaches arose from limits that did not fit the approved strategy. Britannica explained in writing that the gross-options measure treated hedged structures as excessive exposure and expanded mechanically with volatility. O'Hara acknowledged the underlying incapacity directly: on telephone calls with Britannica's Chief Investment Officer, more than once between 2022 and 2024, he said in substance that options added an extra layer of complexity for Topwater, echoing the language of Defendants' own internal risk discussions. Britannica repeatedly had to explain delta, gross exposure, open interest, hedging, and portfolio construction to LAM personnel, and on or around March 28, 2023 Britannica's Chief Investment Officer Gupta told O'Hara that they are seeking proprietary and confidential trading strategies in exchange for making constraints reasonable, to Defendants' risk officer in the body of the email, where Gupta and Britannica had to explain the financial models. Through misrepresentations and fake breaches, Defendants induced, deceived and obtained access to a proprietary strategy they did not previously have any expertise. Quant and macro strategies are some of the hardest to develop in the hedge fund world, and an ability to combine the two is nearly unheard of, and Britannica's Gupta possessed there rare proprietary strategies. Defendant Goldman's own published research to hedge funds and institutional allocators consistently ranks these strategies as the highest in demand. Defendants invented

112

breaches to steal proprietary secrets, increase control and extract changed terms. The fact that they were invented is evidenced by Defendants always agreeing to re-write the constraints to make them a bit more reasonable each time.

262.    On March 16, 2023, O'Hara disclosed a material control that Defendants had concealed from both the Overview and the Offering Memorandum: Topwater's anchor investor had imposed a mandate prohibiting any underlying account from maintaining permitted leverage above three times. LAM had not disclosed the identity or economic interests of that investor, the methodology used to calculate the three-times limit, how leverage itself was calculated, the manner in which the limit interacted with Defendants' pooled fund-level margin, or the fact that an options structure capable of reducing net directional risk could nevertheless increase the gross or notional measure Defendants applied. There were several instances when the Defendants placed arbitrary new limits and restrictions on what instruments could be traded and how they could be traded. To comply with that previously undisclosed mandates and the newly imposed financing charge, Britannica was required, at its own expense, to restructure positions, modify its strategy and use of instruments, redesign and recalibrate portions of its quantitative framework, conduct new modeling, testing, and validation, and incur substantial additional transaction, technology, personnel, and implementation costs. Those changes increased transaction costs and, in some instances, gross notional exposure without any corresponding increase in net market risk, while placing all resulting costs and risks solely on Plaintiffs' own first-loss capital. Gupta, BC LLC, and BCML bore those costs, expenditures, and risks, while Defendants and their undisclosed anchor investor received the resulting protection and economic benefit.

263.    Defendants' own guideline record destroys any suggestion of a troubled account, because the guideline issues were Defendants' creations, not Britannica's. Defendants wrote

guidelines that did not fit the quantitative options strategy they had represented they understood; they issued notices built on their own misreadings and their own mechanical measures; and Britannica then spent its own time and its own proprietary strategy knowledge educating Defendants' personnel until Defendants amended the very text they had misdrafted. Four dated guideline notices in three years, and every one ended with Britannica's cure, Defendants' extension, or an amendment correcting Defendants' own guidelines, while the account traded on. Defendants invoked none of them on August 5. The termination notice and Defendants' August 14, 2024 counsel letter relied on the one-percent Capital Account test in Section 6(b)(ii), not on a then-outstanding Investment Guidelines breach or a Termination for Cause under Section 6(b)(iii).

264.    Britannica asked Topwater the previous day, April 22, 2024, to move sixty to seventy-five percent of the capital away from Goldman Sachs to Interactive Brokers. In response, the next day, on April 23, 2024, O'Hara wrote that Topwater's "Investment Committee is taking issue with your blatant disregard for the agreed upon Investment Guidelines," and set a next-day cure deadline. The accusation was baseless and its timing was not a coincidence. Gupta educated Topwater that covering some positions being asked to cover would have burned up to $500 per contract in bid-ask spread for no reduction in risk. Britannica asked Topwater how it wished to proceed. Since Plaintiffs had requested an exit from Goldman trap, Defendants answered Gupta's correct, complete, written explanation with an accusation of blatant disregard, one day after Britannica asked to take its order flow away from the broker Defendants had imposed. If Defendants believed what their own risk officer wrote, Section 6(b)(iii) gave them a cause-based termination route requiring written notice, a stated ground, and an opportunity to answer. They never used it, in April and not on August 5, because a for-cause termination would

114

have required Defendants to state a reason Britannica could test. They chose instead the one mechanism that required them to state nothing but a number they alone produced.

265. O'Hara extended a closure deadline in writing. Topwater, LAM, and Jefferies repeatedly amended and extended the relationship, while Britannica educated their personnel; amendments and extensions remained the parties' working practice until weeks before termination.

266. Defendants left it no reasonable alternative: rejection meant destruction of the invested value before any replacement was possible.

267. Under Topwater's structure the only way to obtain more margin was to send Topwater more first-loss capital: purported ten dollars of stated capacity for every new dollar of Britannica's money at the bottom of the stack. So when Britannica sought scale including its September 2023 written request to expand the account to $25,000,000, it sought it on the only terms Topwater permitted: more of Britannica's own capital sent into the trap, which was also the only lever Britannica held to reopen the exit from Goldman. Against that engineered predicament, every dollar of the additional $1,500,000 Britannica sent after its original investment, the $500,000 cure in April 2022 and the $1,000,000 increase in 2023, was extracted through fraudulent and coercive inducement: Britannica paid new first-loss capital to obtain the margin Topwater had already been contractually paid to provide, to escape constraints Topwater had fabricated, and to reopen the exit from the broker Topwater had imposed. That is how the layer reached $2,500,000: Topwater concealed the unavailability of purported real capital, sold Britannica the cure for it, and withheld every disclosure that would have revealed it.

268. On information and belief, Goldman Sachs coverage and financing personnel, including Dean C. Backer, Betty Tran, and Jason Eck, a Managing Director on Goldman Sachs'

115

sales force covering Britannica, exchanged information about Britannica's account, volumes, and platform relationship on lines Goldman's own documents designated for recording, while the Goldman-only condition supplied the economics that made the broker lock worth defending. The basis is the coverage structure pleaded above and Goldman's November 2023 move of a written explanation onto a recorded line, Goldman's written revenue-factor economics, and Tran's pursuit of the order flow into October 2024.

269.    The reciprocity ran through these specific people's communications as well. On information and belief, Backer, Robinson, Eck, and Tran, together with Kalafarski, Meyer, and the other coverage, capital-introduction, and securities-lending personnel whom Goldman Sachs's organizational and coverage records identify, discussed Britannica, its strategy and volumes, and the Topwater, LAM, and Jefferies relationship on internal and external calls and messages, including relevant revenue factor models. The basis is the documented April 16, 2019 meeting and its follow-up communications among Backer, Robinson, and Meyer; Meyer's January 25, 2021 steering communications sent at senior direction, as pleaded above; Kalafarski's written rate refutation with Tran copied.

270.    On information and belief, Goldman and Topwater personnel discussed Britannica's referral, pricing, coverage, and termination.

271.    On information and belief, the Investment Committee's own minutes and communications for the February and March 2023 meetings identify no contractual cause for termination, record the financing charge as the objective of the exercise, and name the members who directed that the threat be transmitted. The basis is O'Hara's March 8, 2023 writing, the absence of any cause notice, and the cure Defendants themselves priced as a rewrite.

272.    On information and belief, the February 28, 2023 notice and the March 6 cure deadline were staged to price an amendment already in preparation: the amendment terms transmitted on March 8 were drafted before or during the notice period, in Defendants' files. The basis is the six-business-day arc from notice to fully drafted repricing and Defendants' own concession that the cure they wanted was a rewrite, not a reduction.

**G. Shifting Constraints Imposed After the Capital Was Committed**

273.    Britannica objected in writing to Topwater that the restrictions were undisclosed, blocked growth, increased its costs-These controls increased BC LLC's locked capital and BCML's dependence while reducing the platform's exposure.

274.    In March 2023 Defendants collected on the loan and put its terms in writing. O'Hara wrote on March 8 that members of LAM's Investment Committee had pushed to terminate the account for cause and that the price of avoiding a ninety-day notice was an amendment adding to Account Trading Expenses a "financing expense on long exposure over First-Loss Member's capital account balance." Topwater then explained what the term meant in its own words: the charge "will be based off the long debit in excess of your capital account balance," so Britannica "would pay for all long financing over your current balance of approximately $970,000." Defendants had represented a $10,000,000 committed Investment Account Value standing behind Britannica's trading. On Defendants' own paper, that commitment financed nothing. Britannica's own capital account was the only equity in the account, every dollar of exposure above it was borrowed, and after March 2023 Britannica paid the financing on all of it while Defendants continued to take fifty percent of every dollar the strategy earned and none of the losses.

275. The instrument proves it. Before the amendment, Appendix C charged the account for "costs of borrowing in connection with investments that exceed the Investment Account Value." The amendment struck that line and charged financing instead on debit balances exceeding "the First Loss Member's Capital Account balance." Defendants moved the financing threshold from $10,000,000 to approximately $970,000 in a single edit. Britannica objected on March 17, 2023: "The new economics is that, we will now be paying 100% of the financing cost (Topwater is not contributing even half to the financing costs), incurring 100% of the loss, and receiving only 50% of the profit." Defendants did not dispute a word of it. They executed the amendment two weeks later. The amendment priced the extraction at "the Prime Broker daily financing rate," a rate the instrument nowhere defines, benchmarks, caps, or discloses, set by the conflicted broker itself; and Defendants concealed throughout what the margin actually cost them, so Britannica was charged an undisclosed rate on capital Defendants never provided, at a markup Defendants alone knew. Before the amendment, Defendants' own paper matched their promise: Appendix C charged borrowing costs only for investments exceeding the $10,000,000 purported Investment Account Value, terms coherent only if the first $10,000,000 was provided capital carrying no financing charge, and Britannica used that capital band financing-free for two years in reliance on the paper as written.

276. On information and belief, the committee participants who drove demands sat at vice-president level and above in the Topwater division and its parent chain, among O'Hara, Borgia, Wieczorek, Taylor, and Damm, and, per the governance statement in Defendants' own solicitation deck, risk approval of the account's parameters ran to the head of risk for Jefferies Financial, whose identity Defendants' organizational records state. The committee's minutes,

118

agendas, and distribution lists for February and March 2023 name every participant in the decision that priced the amendment.

277.    On information and belief, before demanding the March 2023 amendment, LAM projected and budgeted the financing charge as revenue, quantifying, in its own planning documents, the income it would extract from Britannica by charging for capital it had never provided; the amendment's drafting file and the revenue plans around it record the extraction as a business line, planned in advance. The amendment was demanded under a termination threat with its economics pre-formulated in O'Hara's writing, that institutional advisers budget material new revenue streams, and that the charge ran until the seizure and was never benchmarked or capped.

278.    Topwater rationed even the concealed pool, and the orders are dated. When the platform needed margin elsewhere, Topwater ordered Britannica in writing, under deadlines, to cut its positions: reduce this exposure by close of business on March 6, 2023; reduce these breaches by close of business on February 29, 2024. The orders from O'Hara landed when Britannica stood positioned to profit from a market squeeze, because that is precisely when the platform needed capital elsewhere. The strategy as stated by Plaintiffs, took advantage of market dislocations and needed the contractually promised capital, but was denied by Topwater. On information and belief, Goldman told Topwater that Britannica was a high user of margin and assisted LAM and Topwater in rationing the limited shared margin across the platform's managers, a concealed arrangement in which the broker profiting from Britannica's trades helped decide how much capacity Britannica's trades would receive, on a platform that had never supplied any real capital; the basis is Goldman's reported view of Britannica's capital use, Goldman's consultative role in Defendants' margin allocation pleaded in this Complaint, and the

margin, treasury, and communication records in Defendants' and Goldman Sachs's control. The breaches Topwater invoked were breaches of arbitrary constraints written and enforced by personnel who had fraudulently represented themselves as experts in quantitative, derivative, options, and volatility strategies, and whom Britannica had to educate on the basics of options, including written explanations in March 2023 walking Topwater through elementary cash and delta mechanics. At other times, on proprietary trading strategies. Nor was any other capital ever at risk: Defendants set the automatic-termination trigger to fire well before losses could conceivably reach the protected second layer, so Britannica's capital was the only capital in either account that could ever absorb a loss.

279.    Topwater also improperly changed or periodically restricted instruments after the strategy was operating including in September 2023. Topwater and O'Hara also concealed whose money that mandate protected, telling Britannica's Chief Investment Officer, in substance: it's not like you guys, your capital; our investors' capital is not for risk taking and can't be allowed to lose money under any circumstances. The layer he attributed entirely to outside investors was substantially Defendants' own affiliated and principal capital with no-loss no-risk taking mandate. Those statements and that concealment bear directly on the loan-like character of the Regular capital pleaded in this Complaint, on LAM's bad faith as the interested Valuation Agent, and on Defendants' motive on August 5, 2024, when protecting that layer from platform-wide margin stress, not any conduct of Britannica's, dictated every decision.

280.    O'Hara's May 26, 2023 unilaterally added additional conditions the contract does not contain.

281.    In March 2023 when Topwater imposed financing charge, it believed that the charge was inescapable and would drain Britannica dry.

282.    Britannica escaped it: at its own cost, risk, and commission expense, all borne solely by Britannica and documented in its contemporaneous emails to Topwater, Britannica restructured its book with derivatives to convert debit exposure into credit balances, at great cost to Plaintiffs. Defendants' response, three times in writing across eleven days, was disbelief that it could be done. On March 17, 2023, O'Hara wrote that Topwater thought it "highly unlikely that the options premium would have a material impact one way or the other on the debit balance in the account." On March 21, after Britannica asked Topwater to write the credit term into the agreement, Damm asked Britannica to "elaborate a bit further how you would be able to end up with that scenario while fully deploying the strategy." And on March 28, when Damm finally gave the assurance that carried Britannica's signature, he qualified it with the same doubt: Topwater could agree to any net credit "(should this situation exist)." Britannica had already told Defendants, twice in writing, that creating the credit would cost Britannica money: "We will face certain costs from creating a credit," and it was "not 'free money' per se, but additional significant work on our part," carrying transaction costs, lost dividends, early assignments, rollovers, wide spreads, and dynamic hedging expense that stock positions do not carry. Britannica did it: the credit balances ran at scale for years and stood at $7,500,000 on the night of July 31, 2024. Defendants, having designed a charge to extract what they believed Britannica could not avoid, watched Britannica engineer its way out, confirmed on July 31, 2024 that the resulting credit would be calculated and credited at month end, and terminated the accounts five days later, keeping it.

283.    The true accrual was there; but Defendants didn't release it to Britannica. Britannica's accounts carried cash and short-sale credit balances at institutional scale from 2022 forward, recorded month after month in the administrator's and brokers' own books, and

121

Defendants credited nothing in any month of the relationship. From April 1, 2023, under the amendment Defendants themselves executed, the Stonefly credits belonged inside the computation beyond any argument, and Mayfly owed Britannica short rebates and the income on its short-sale credit balances from that account's first day. Defendants' officers confirmed the obligation in writing twice, in March 2023 and again on July 31, 2024, when the balances stood at $7,500,000. The withheld income accrued for years, runs to millions of dollars, and every dollar of it counts: a single month's income on the July 2024 balance exceeds several times over the entire $7,166 breach Defendants claimed as their basis for seizing the accounts, and the years Defendants withheld dwarf it. Defendants destroyed the accounts five days before another month's crediting came due and kept it all. They hold it today.

284.    Defendants' own writings trace the promise from doubt to written commitment to confirmation, and Britannica performed every step of its side in reliance on that chain, at costs it had disclosed to Defendants in advance and in writing.

285.    Throughout the life of the extracted charge, Defendants continued sweeping their profit share every month while the charge ran against Britannica alone.

286.    For years between 2021 and 2024, Defendants put undisclosed and fraudulent costs and charges on Britannica managed accounts.

287.    Throughout the life of the extracted charge, Defendants continued sweeping their profit share every month while the charge ran against Britannica alone, collecting both sides of an arrangement they had repriced at gunpoint; the monthly statements and the amendment state both sides in Defendants' own numbers.

288.    On information and belief, Goldman ran its first-loss-provider relationships as a manager-procurement pipeline: Goldman referred emerging managers to first-loss platforms it

covered as allocator relationships, the platforms locked the managers' trading at Goldman, and Goldman harvested the captive prime-brokerage flow, the same design it ran on Britannica through Topwater. The basis is Goldman's own January 25, 2021 writing identifying five first-loss providers with which it worked and offering introductions, its coverage of those providers as its own relationships, the Goldman-only condition later imposed on Britannica, and the improper commission revenue Britannica's captive flow generated. On information and belief, stated on that same basis, certain managers referred through the pipeline were run, through the same imposed-broker, captive-pricing design, and the identities, referrals, conversions, compensation, and complaints are recorded in Goldman's and the providers' own files.

289. By August 2023, the Goldman lock Defendants had imposed was constraining Britannica's growth. Wieczorek wrote specifically regarding futures capability that Goldman had no appetite for additional Britannica business and that Topwater was exploring secondary options. Topwater and Goldman decided Britannica's account and broker capacity between themselves, while Britannica, which bore the commissions and the first-loss risk, received the resulting decision rather than a right to choose.

290. Britannica quantified the broker-cost disparity in contemporaneous emails. On August 24, 2023, it reported 2,041 options trades in one day at several times more than market prices per contract and asked Topwater to obtain competitive pricing. Goldman's own internal exposure and large-trader clearances reflected Britannica's unusually high trading volume; those were Goldman controls, not Topwater contractual limits. In October 2023, Kalafarski questioned the equity-rate information being communicated through Topwater and wrote that something appeared lost in translation. Damm confirmed that Britannica was paying excessively per options contract and said Topwater did not maintain uniform negotiated rates across managers. Tran was

123

copied on the exchange and did not supply a written explanation. Topwater discussed BNP Paribas and J.P. Morgan but did not provide a timely operational alternative.

291.    The August 25, 2023 BNP Paribas commitment and the parallel J.P. Morgan overture pleaded in this Complaint were dangles: Defendants had no existing relationship to deliver at either bank, concealed that, and knew what they never told Britannica: onboarding a manager via Topwater at such institutions takes months to years and requires integration with external order- and portfolio-management systems. On information and belief, Defendants sent at most cursory exploratory messages and let both paths die unmentioned; the dangled introductions were a fraudulent delaying tactic with one purpose, keeping Britannica's order flow locked inside Goldman Sachs, and the correspondence with both banks sits in Defendants' files and in the records of BNP Paribas and J.P. Morgan themselves, where any inquiry Defendants actually made, and the death of each path, is fixed to the day.

292.    In March and April 2024, Britannica sought to move substantial capital and volume to Interactive Brokers because of those costs. On March 27, Damm wrote that Topwater's Interactive Brokers account sat in Mayfly, so a move would require transferring Britannica's managed account to a different Trading Master Fund. On April 22, Britannica's Chief Compliance Officer requested a prompt transfer of 60 to 75 percent of the capital, including at least $1.5 million of first-loss capital, to gain control over excessive Goldman costs. Topwater knew that changing brokers required BCML to alter portfolio and order-management systems, rebuild workflows, test a new integration, and bear the personnel and technical expense while the existing account continued to trade. The two-account structure and later amendment package were therefore consequences of Topwater's broker architecture, not a structure Britannica had independently requested.

124

293. In the same period in which Topwater said Goldman purported lacked appetite for additional Britannica business through Topwater, Goldman coverage personnel were soliciting Britannica about bringing additional business directly. On information and belief, the divergence reflected economics and account-control decisions between Goldman and Topwater rather than a risk judgment about Britannica's strategy.

294. The high rates were accompanied by recurring service failures. Goldman and SpiderRock records repeatedly reflected missing bookings, quantity mismatches, aged breaks, and other exceptions that Britannica had to reconcile at its own expense. Britannica devoted additional personnel to that work. When Britannica pressed for rate, capability, or service relief, Topwater frequently referred it to Goldman and Goldman referred it back to Topwater, while neither supplied a timely alternative broker or written explanation for the futures denial. On information and belief, LAM and Goldman ran that arrangement in concert because Goldman received Britannica's high-volume flow and LAM, Topwater, and Jefferies received the allocator, referral, financing, or other relationship benefits associated with directing the flow. The basis includes Rubin's Goldman-only condition, LAM's own broker-referral disclosure, the documented commission volume, the conflicting rate explanations, the parties' control of migration, and their refusal to disclose the benefits each received.

295. The reciprocity ran upward as well: Goldman delivered investment-banking business to Topwater's parent and shared underwriting economics with Jefferies on deal after deal through the present, including as joint lead bookrunners on a $1.5 billion initial public offering completed in February 2026. And on September 27, 2022, in the same coordinated sweeps that sanctioned Jefferies, Goldman Sachs admitted willful, firm-wide failures to preserve business communications, paying the SEC $125 million and the CFTC $75 million; on

125

information and belief, stated on the bases pleaded in this Complaint, the Goldman-Topwater coordination alleged here ran in part through the same channels. On information and belief, stated on the referral, reciprocity, and coordination record pleaded in this Complaint and on Goldman's own written statement that its calls are recorded, the arrangements pleaded here are fixed in the two firms' own files: in Goldman's and the Topwater, LAM, and Jefferies parties' telephone recordings and email communications concerning Britannica and concerning the platform's other first-loss managers as a class, past and present; in Goldman's coverage, relationship-credit, and revenue-allocation records for the Topwater, LAM, and Jefferies relationships; in the records of the services Goldman rendered to, and the benefits Goldman exchanged with, LAM, Topwater, and Jefferies, including the managers' captive trade flow, margin, commissions, and futures dealings; and in the deal, fee, and allocation records of the Goldman-Jefferies investment-banking transactions pleaded above. Those recordings and communications will also show why the platform kept its managers locked inside Goldman Sachs for years: not because alternatives were unavailable, but because the reciprocity pleaded in this Complaint paid the platform to keep them there. Goldman's own statements, omissions, data, economic interests, assistance, and conduct, pleaded throughout this Complaint together with the acts of the Goldman Sachs Individual Defendants named below, ground every claim against it.

296. Jefferies LLC and Goldman Sachs shared fee-generating underwriting and advisory economics on the same deals throughout the relevant period and through the present, placing Defendants' affiliated broker-dealer on the opposite side of the fund whose managers were told the platform could not trade against them. On information and belief, stated on the bases pleaded in this Complaint, the coordination alleged here ran in part through the same

recordless channels Jefferies LLC admitted using in its September 27, 2022 recordkeeping admissions.

**H. 2024: The Cost Disputes, the Admitted Credit, and the Broken Data**

297.    By spring 2024, broker cost had become a documented dispute. On April 10, 2024, Britannica's Chief Compliance Officer wrote to Damm that Goldman costs were running upward of $70,000 per month in unnecessary expenses and were consuming approximately half of Britannica's profit at the prior year's run rate. At that monthly rate, the annualized cost exceeded $840,000. Goldman charged those costs to the account whose losses were allocated first to BC LLC, at the broker Topwater had selected and controlled. They reduced the same Capital Account that Defendants later claimed was short by purported $7,166.

298.    Neither account experienced a valid contractual stop-out. Separately and in the alternative, broker charges above available competitive rates, denied use of lower-cost instruments, and the resulting forced transactions materially reduced BC LLC's Capital Accounts before August 5, in amounts the order, commission, and account records in Defendants' and the brokers' control fix to the dollar. Even if Defendants' later balances were accepted for purposes of that alternative only, the avoidable charges exceeded the asserted Stonefly and Mayfly shortfalls many times over.

299.    The original Stonefly Appendix C, part of the AIAA dated as of April 14, 2021, computed Investment Gains from the Investment Account's income "excluding interest income on cash, cash equivalents and short rebates." Amendment No. 1, effective April 1, 2023, amended and restated Appendix C, confirmed understanding via emails exchanged later, and agreement states that cash from short sale of securities and the income on its short rebates were included in Investment Gains and they belonged in the computation of the Capital Account and

of BCML's fee. Under Mayfly's Appendix C, executed July 3, 2024, and Defendants' written confirmations, Britannica was owed the income on its cash and on the credit balances generated by its securities sold short, and the $7,500,000 balance Britannica identified to Defendants in writing was, in its contemporaneous description, a credit balance "from short sales of securities." Both accounts therefore carried a contractual entitlement to the very income Defendants kept. Long's July 31, 2024 writing confirmed the standing requirement to credit Britannica for the positive cash carry it maintained. Defendants' accounting must therefore identify the source, rate, recipient, and contractual treatment of each account's credits separately.

300.    Defendants took the burden of the March 2023 amendment and refused its benefit, and both sat in the same instrument, executed the same night, effective the same day. Defendants performed the first change from the first month and never performed the second at all. Britannica's strategy was designed and redesigned to carry large short-sale of securities credit balances, Britannica disclosed that design to Defendants in writing in March 2023 before Defendants agreed to the amended limits, and the balances ran at scale for years. Defendants charged every dollar of financing the amendment gave them and credited not one dollar of the income the same amendment gave Britannica. Defendants never disclosed at solicitation that the clause operated that way, never identified who received the excluded income, never calculated it, never credited it, and, when Britannica raised it, confirmed in writing on July 31, 2024 that the credit would be calculated and credited at month end, terminated the accounts five days later, and paid nothing.

301.    The charge ran on an instrument that prices nothing. Appendix C as extracted states no rate methodology, no benchmark, no cap, no calculation convention, and no audit right, so every monthly financing number Defendants took was a number Defendants alone composed,

128

on books Defendants alone kept, under a term Defendants alone drafted. On information and belief, the monthly financing computations were never independently calculated, verified, or reviewed by the administrator or any party outside Defendants' own division, and the calculation files in Defendants' control will show who composed each number and on what inputs.

302. Topwater and Goldman had years of notice that the Stonefly data and reconciliation process was unreliable. On December 29, 2021, Britannica reported that Goldman's positions and P&L had changed without corresponding activity and that it was being forced to trade without reliable custody data. Wieczorek responded that Goldman appeared inadequately attentive and recommended moving the account to Interactive Brokers as potentially the best path forward. In 2022 and 2023, recurring exception traffic documented missing bookings, quantity mismatches, aged breaks, and conflicts between Goldman files and SpiderRock records, with Topwater risk and operations personnel copied. Wieczorek's recommendation confirms that Topwater knew the Goldman problem and regarded Interactive Brokers as a reasonable solution years before Defendants made that solution available only through a second fund and conditioned it on a cross-default. The commission record was contradictory and opaque: Britannica documented per-contract charges far above the rates available from alternative brokers, daily costs reaching approximately $5,000, and monthly costs exceeding $70,000, while Goldman personnel could not reconcile whether the applicable rates were Topwater-wide, account-specific, below Goldman's cost, or lost in translation with Topwater.

303. The broken data was not background noise; Britannica flew by it. A manager runs a market-neutral options book by its position data the way a pilot flies by instruments. The instruments were Goldman's account records, and alongside them ran SpiderRock, the

129

independent order and portfolio management system, recommended by Goldman itself, that kept its own complete record of every order Britannica placed. From the 2021 launch, Goldman's instruments showed a different airplane: positions stale, positions missing, quantities that did not match, deltas pointing the wrong way. In late 2021 and early 2022, the book Goldman reported was so wrong that Britannica demanded to know which system had failed and raised the alarm in writing. Goldman and Topwater represented, in substance, that Goldman does not make mistakes. Topwater represented, in substance, that Goldman's reports were right. SpiderRock then investigated jointly with Goldman, and the truth came out: Goldman's reporting was fractured, large positions stale or missing, while SpiderRock's independent record was complete. For months Britannica had been trading real exposures against Goldman's false data, hedging deltas that did not exist while true ones went unhedged, and the 2022 drawdown pleaded above was the product of that gross negligence, a cause Britannica identified in writing at the time: significant first-loss drawdowns at the outset caused by the broker's self-admitted short staffing. Goldman is liable for what that failure took: the losses its false data inflicted, and the cost of the personnel Britannica dedicated for years to finding and fixing Goldman's breaks. Goldman sold a defective product at a premium price, and it fell to Britannica's traders to earn back what the defect destroyed or be wiped out. They did, every time, and each storm cost a multiple of the capital base beneath it.

304. The failures corrupted whole positions. In October 2023, Goldman systems displayed illogical paired positive and negative positions, and Goldman personnel stated that no one specifically at GS Prime could reconcile the positions and identify the trades causing them. On December 27, 2023, Goldman files were wrong on five securities at once, including multi-thousand-share differences, while Topwater acknowledged that the Goldman files were "messed

130

up." On May 8, 2024, another single day produced breaks across twelve securities. These were known weaknesses in the same data chain used for risk monitoring and Capital Account calculations.

305.    Britannica's own handling of Goldman's errors shows which party dealt with the account data honestly. In the 2023 to 2024 period, Goldman's records mispriced DIA trade breaks against Goldman and in Britannica's favor, and Goldman inquired and offered to settle the breaks on terms that would have paid Britannica more than $50,000 based on Goldman's own erroneous data. Britannica's Chief Investment Officer Gupta declined the windfall and supplied the correct prices, and the breaks were resolved at accurate values. Britannica corrected data errors that favored it as readily as errors that harmed it. When a purported $7,166 shortfall favored termination, Defendants took the opposite course: they adopted their own unreconciled figure, produced no calculation, and destroyed the account. The DIA correspondence resides in the account email record.

306.    The accounting refusals were themselves committee conduct. On information and belief, the decisions to refuse the account-level breakdowns, to withhold the credit computations, and to answer written accounting inquiries with deflections were made or ratified above the correspondence level, within the same committees that ran the repricing and the termination, and the internal threads behind each refusal, in Defendants' control, name the deciders. The basis is the uniformity of the refusals across years and personnel, O'Hara's statement that certain decisions ran above him, and the recorded-lines and email archives Defendants' own policies maintain.

307.    The Goldman operational failures had an identified internal locus. From the 2021 onboarding forward, Goldman designated Jose Cruz, together with its trade-file and client-

131

technology teams, as an operations contact and escalation point for Britannica's trade files, reconciliation, and data issues, and Cruz was copied across the trade-file testing, onboarding, and account-readiness chains. In November 2021, in the middle of the delayed onboarding, Goldman's own salesperson admitted in writing that Goldman had been "constrained on the resourcing side internally with some of the support groups." The breaks, misreported positions, and reconciliation failures continued through 2022 and 2023 notwithstanding the designated escalation path. On information and belief, based on that written resourcing admission, the persistence and recurrence of the failures despite escalation, Cruz's documented role, and his later departure from the coverage with a replacement assigned only much later, Goldman's back-office and middle-office functions serving the Britannica account lacked the skills, staffing, or resources to maintain accurate books for Britannica's account, and Goldman and Topwater knew it. Those were the same personnel, systems, and data chains on which Defendants purported to rest a minute-precise termination determination. Additionally, Britannica reasonably relied on Goldman and Topwater representations about quality of its products and services during 2021 onboarding and these were materially false and intentionally misleading.

308.    Goldman's own account documents acknowledged the fallibility of the very systems on which Defendants later rested the asserted 9:32 determination. Topwater held and administered documentation from Goldman that its reporting systems could be broken and unreliable. Topwater, LAM and Jefferies nevertheless purported to destroy both accounts to a $7,166 precision on data drawn through that same chain, on a morning when the chain's hourly architecture was lagged by Defendants' own admission and its vendor confirmed a failed delivery, without applying any of the exception, verification, or fair-value controls their own documents prescribed.

132

309. Damm's admission pleaded above confirmed that commission rates were not uniform across managers and Defendants admitted Britannica large order flow should provide discounted pricing, yet Britannica was charged per-contract rates several times above those available in the market. When the Mayfly transition Defendants had blocked finally went forward, Interactive Brokers offered and confirmed a fraction of the Goldman rates. The difference demonstrates that the Goldman cost was not an unavoidable market price.

310. Defendants' design deprived Britannica of ordinary negotiating leverage. Topwater told Britannica that managers negotiated commissions directly; that representation was false, and Goldman's own treatment proved it: Goldman treated Topwater as the client whose authorization controlled the account. BC LLC bore the effect of commissions through first-loss allocations, and Plaintiffs bore the effect through reduced Remaining Investment Gains, but no Plaintiff controlled the relationship needed to obtain a competitive rate.

311. Goldman's own prime-brokerage documents and representations including the ones it provided in Topwater onboarding context in 2021 connected Britannica's account revenue to capital-introduction treatment. Its standard form stated that fees, commissions, and other expected account revenue could be a significant factor in deciding whether an agent received capital-introduction services. The real benefits flowed to Topwater, LAM and Jefferies but no Goldman document, including the Manager Certification Goldman itself drafted, ever identified the economics accurately or the actual conflict: not Goldman's coverage of Topwater, not the referral reciprocity, not the payment for delivering Britannica. On information and belief, those linked economics gave Goldman and the Topwater side a common interest in keeping Britannica's volume inside the Goldman account. The reciprocity was also visible in public markets during the relevant period: Goldman Sachs and Jefferies repeatedly acted as fee-

generating commercial counterparties, including co-managed capital-markets transactions in 2024 and Jefferies' publicized August 2024 engagement as sole financial adviser to Goldman Sachs Alternatives on a $440 million investment, and the funds' SEC Form D filings identify Jefferies LLC as placement agent receiving placement fees from the manager. Plaintiffs plead these public transactions and filings as part of the basis for their information and belief that business and economic benefits flowed in both directions between Goldman Sachs and Topwater's parent.

312. On information and belief, Goldman Sachs, as the prime broker holding Stonefly's actual custody and margin, knew throughout that no capital from Topwater in favor of Britannica stood behind the stated Investment Account Values it saw daily, and continued to service, price, and profit from the relationship it had steered Britannica into; Goldman's own standard for a directly held Britannica account, $7,500,000 of real portfolio-margin equity per book, measured exactly what it knew the Topwater account lacked. The basis is Goldman's daily sight of the accounts' actual margin and capital, its own $7,500,000 real-equity demand for a direct Britannica account pleaded above, and the referral reciprocity and revenue economics pleaded in this Complaint.

313. Goldman knew the large scale and value of the Britannica trade flow. On March 15, Goldman's options desk contacted Britannica because the account had reached approximately 85 percent of a Goldman exposure limit and offered to raise it. By March 18, Goldman had increased the stated limits to $200 million hybrid and $500 million gross. On May 20, Goldman thanked Britannica for the increased flow after the limits were expanded and expressed gratitude for the business and partnership. Those communications establish direct knowledge of Britannica's unusually high volume and Goldman's economic interest in it. The limits those

emails addressed were Goldman's own internal exposure controls, not the Topwater Investment Guidelines, which Britannica did not breach. The records prove that Goldman knew Britannica was a large, active, and valuable commission client, that Goldman had capacity to increase its own limits when the revenue justified it, and that any account-too-small explanation for denying services or competitive terms was false or pretextual.

314.    The fund complex's public Form D filings identify Jefferies LLC as placement agent and disclose a placement fee paid by LAM. That verified relationship establishes Jefferies' direct economic participation in the Topwater platform. On information and belief, based on the placement relationship, Goldman's allocator coverage of Topwater, and the documented broker-control structure through which Defendants imposed and kept Goldman as Britannica's broker, the institutional relationships supplied reciprocal benefits that drove the broker steering pleaded in this Complaint, and the placement, referral, coverage, revenue-allocation, and broker-selection records that will establish the complete flows are controlled by Defendants.

315.    Goldman's own agreements priced capital-introduction treatment against account revenue, but despite representations to the contrary, Goldman provided nothing at any time to Britannica resembling capital intro or invitation to any events Goldman regularly offers to its clients and to funds creating order flow and revenue. On information and belief, based on the written coverage and revenue structure and the observed allocation of benefits, the relationship credit and commercial accommodation associated with Britannica's trading flowed to the Topwater and Jefferies concealed and conflicted coverage relationships rather than to Britannica.

316.    Goldman Sachs's role was not confined to execution and custody. On information and belief, LAM and Topwater used Goldman Sachs in their manager reviews and consulted Goldman Sachs on margin allocation among managers, on restructuring the product's economics,

135

and on increasing the platform's and Goldman Sachs's own profitability from the managers' trading, including Britannica's; and Defendants directed the platform's business to Goldman Sachs because Goldman Sachs was willing to serve that role while other brokers were not, as Defendants' relationships with alternative brokers deteriorated and Britannica's own Interactive Brokers and BNP Paribas paths died. This is apparent from Goldman Sachs's written pricing of referral reciprocity against account revenues; LAM's own Form ADV, which states LAM's standard procedure to "[r]equire the Account Advisor to primarily execute its trading activity at the broker-dealer providing the introduction" and discloses that LAM may pay referral fees to its affiliate "for Managed Accounts to whom they introduce"; the June 18, 2024 engagement of Jefferies and Goldman Sachs risk personnel on the platform's margin stress; Goldman Sachs coverage's relay that Topwater identified Britannica as a high user of capital, proof the two discussed Britannica's account economics behind its back; the commission harvest at five times market that only Goldman Sachs's role made collectible; Goldman Sachs's re-solicitation of Britannica within weeks of the liquidation; and the communications among Goldman Sachs, LAM, Topwater, and Jefferies in their exclusive control.

317. The claimed difficulty was not credible and was not true. LAM and Topwater hold themselves out as managing billions of dollars, practically every prime broker and bank competes for the business of platforms of that size, and Defendants' own solicitation had represented an existing choice among major prime brokers; so either the filings and inducements claiming those relationships and that choice were lies, or Defendants' claimed efforts to open a second broker for Britannica were lies. Both roads lead to the same place: the concealed arrangement that kept Jefferies, LAM, and Topwater bound to Goldman Sachs, pleaded

136

throughout this Complaint, and the telephone recordings and communications among the four firms and with each candidate bank shows Defendants' falsehoods and fraud.

318.   Britannica's order flow and resulting revenue was one of the largest Goldman had received via Topwater and LAM. On information and belief, Goldman's internal client-tiering and revenue systems ranked the Topwater relationship and the Britannica flow within it, priced the coverage and service the relationship received against that revenue, and recorded the allocation decisions this Complaint pleads; the tiering records, revenue reports, and coverage-review files are in Goldman's exclusive control. The basis is Goldman's own written revenue-factor policy, emails about large trade flow, and the differential treatment pleaded in this Complaint.

319.   On information and belief, Goldman priced Britannica's account knowing the platform, not the manager, was its focus: the below-cost equity financing rate Goldman's own Kalafarski flagged in writing sat beside options commissions at nearly five times market, a pricing pair that makes commercial sense only as a package priced to the platform relationship, subsidizing the platform's side while harvesting the captive's. The pricing files and rate-approval records for both legs are in Goldman's control.

320.   Every saved dollar of the futures execution savings Britannica quantified in writing, as much as 80 percent of the relevant execution costs, was a dollar out of Goldman Sachs's pocket, and Goldman's own salesperson admitted in writing that Goldman was "constrained on the resourcing side" while Goldman kept books that broke Britannica's positions for three years. On information and belief, stated on the bases pleaded in this Complaint, Goldman Sachs advised the Investment Committee that destroyed Britannica's accounts, supplied

the data those decisions ran on, assisted LAM and Topwater in rationing the concealed shared margin, and profited from what the Committee decided.

321. Goldman's own direct clients prove the discrimination was a priced decision, not a capacity problem. On information and belief, throughout the relevant period Goldman Sachs provided to the hedge-fund managers it served directly, including managers of comparable and smaller size and trading volume than Britannica, the ordinary substance of a prime-brokerage relationship: competitively negotiated commission and financing rates, futures access, responsive coverage, functioning reporting, and the capital-introduction services Goldman markets. Britannica received none of it. The basis for the comparison is Goldman's own conduct and documents: Backer's April 2019 representation that Goldman regularly serves small managers in low seven figures where the revenue or strategy justifies the relationship; Goldman's standard form pricing capital introduction against account revenues; Kalafarski's written false or misleading statements that Britannica's quoted rate sat below Goldman's own cost; and Goldman's coverage returning to solicit the same flow within weeks of the liquidation. The difference was the relationship credit:

322. Britannica's revenue was booked to Defendants' platform relationship, so the services that revenue buys ran to the platform, and the client who paid got the bill without the goods. Upon information and belief, Goldman's client files, rate schedules, capital-introduction logs, and relationship-credit records for the comparator class prove the differential to the dollar.

323. Goldman deployed none of the safeguards that legitimate institutions use when acting under a conflict. Goldman never disclosed to Britannica that it weighed Britannica's treatment against revenue and reciprocity considerations, never sought or obtained Britannica's consent to act under that conflict, and never honored the escalation Britannica invoked. On

information and belief, based on that conduct and on Goldman's refusal to explain its decisions then or since, Goldman referred the conflicted decisions to no independent check within its own control functions. Goldman took its economic benefit directly from the conduct. Each omitted safeguard was a choice, and each choice served Goldman.

324. The administrator's monthly accounting also showed recurring unexplained differences. On January 26, 2024, Britannica wrote to Brian Long that UMB's P&L statements repeatedly fell short of Britannica's calculations by several thousand dollars per month and that the prior month's discrepancy exceeded $70,000. The discrepancy was approximately ten times the later claimed Stonefly shortfall of $7,166 and concerned the same books used to measure the Capital Account.

325. Britannica repeatedly requested line-item support for commissions, stock-borrow charges, financing, dividends, and positive capital interest. On April 12, 2024, Britannica reported to Damm that Goldman did not have the requested information readily available even though the account was being billed between approximately $10,000 and $50,000 or more per month for those categories. Topwater and Goldman withheld any complete line-item reconciliation through termination.

326. Topwater's capital decisions reflected the platform's undisclosed and conflicted design, high-water-mark economics: the monthly sweep-and-trap asymmetry Defendants ran, described above. On August 17, 2022, when Britannica sought additional capacity, Wieczorek answered in writing that Topwater's "investment committee is not open to increasing the allocation while your account is in a drawdown" and would discuss growth again "once your account is back to its high water mark." That undisclosed and misrepresented structure also gave the Topwater side less immediate economic upside from patience with a recovering account than

from imposing new economics, preserving Regular capital, or reallocating capacity. On information and belief, based on the contractual waterfall, the documented 2023 demand for added economics, the 2024 cross-default condition, the affiliated Regular capital, and the later termination, that undisclosed incentive influenced Defendants' enforcement decisions. The asymmetry was concrete: with a $10,000,000 Investment Account Value, recovering $600,000 was a six percent account recovery while the account remained open, but after termination, with only the residual first-loss capital returned, the same recovery would require a return of well over one hundred percent without the promised account base. Termination destroyed the recovery path itself and all the aforementioned was undisclosed and used improperly by Defendants, and contrary to written and verbal agreements that Plaintiffs reasonably relied upon.

**I. June and July 2024: Jefferies Steps In and the Termination Machinery Is Rebuilt**

327.     What Defendants concealed about the June 2024 cross-default was its purpose. Rubin's June 10, 2024 email stated that Topwater's counsel had added cross-default language "in connection with a Termination for Cause" and that committee approval should follow if Britannica signed the Mayfly AIAA and Stonefly amendment, and the executed provision was reciprocal and tied to Termination for Cause under Section 6(b)(iii). LAM, Stonefly, Mayfly, and their responsible personnel concealed the existing plan to terminate both linked accounts, the purpose and scope of Jefferies Risk's review, and the intended role of the two-account package in an adverse action. On information and belief, Defendants added the mechanism while preparing for action against both accounts. The basis is Jefferies Risk's review, Risk and Tax approvals, July 3 signatures, O'Hara's statement that the decision was made earlier and above him, the mass August 5 manager calls, the Stonefly-only contemporaneous notice, and the later unsupported and fabricated, independent-Mayfly breach and automatic termination theory.

328.    Topwater delivered that new termination right after months of delay and measurable broker cost. Britannica had requested the Interactive Brokers transition in March and April. On May 31, Britannica's Chief Investment Officer wrote that Britannica had reduced trading while waiting and was paying up to $5,000 per day in unnecessary Goldman expense. On June 14, Britannica's Chief Compliance Officer wrote that Britannica had cut risk by at least 80 percent in anticipation of the move and that idle capital imposed substantial opportunity cost on both sides. Rubin, again improperly, tied approval to acceptance of the counsel-drafted package, and Britannica signed the next morning, within nineteen hours and without separate counsel. Defendants knew that refusing the package would leave Britannica bearing the broker costs and sunk migration expense they controlled. Britannica accepted under that economic pressure to preserve its capital, systems, performance record, and operating business. That is not negotiation; it is a toll collected at the only door, by the party that controlled the building.

329.    The executed cross-default was narrower than the automatic-stop-out theory later asserted. Amendment No. 5 added a Stonefly Termination for Cause event when BCML breached Section 6(b)(iii) of the Mayfly AIAA, and Mayfly contained the reciprocal clause. The text did not state that an automatic termination under Section 6(b)(ii) in one account automatically terminated the other. On the provision's own text, a claimed automatic termination in one account terminated nothing in the other.

330.    Taylor signed the July 2024 instruments for the relevant funds and LAM. Rubin administered the drafting and committee process. LAM controlled the decision whether to approve, interpret, invoke, or waive the provision. O'Hara later executed the termination and relayed the higher-level and Investment Committee decisions. The internal instructions, purpose,

141

interpretation, and planned use of the provision are within Defendants' exclusive control and are pleaded on information and belief from this documented sequence.

331.    Jefferies risk personnel were directly involved before execution. On June 18, 2024, Rubin wrote that Topwater was awaiting comments from the Jefferies Risk Team on Britannica's Mayfly AIAA and Stonefly amendment and expected those comments that day. The parent company's risk function sat inside the rebuild of Britannica's account structure.

332.    The approval trail continued above the day-to-day Topwater personnel. Rubin wrote on June 26 that she was still waiting for final committee approvals. On July 2, she stated that Topwater had received approval from the Committee's Risk and Tax members and circulated revised execution copies reflecting their comments. The final cross-default and account architecture were therefore reviewed and approved through the committee and Jefferies risk process before they were signed.

333.    During the same period, LAM terminated the manager of its 3|5|2 division, sued over approximately $100 million placed into bonds it described as a Ponzi scheme, and began winding down that fund. In the same months, Jefferies Strategic Investments, LLC and Leucadia Asset Management Holdings LLC were pursuing approximately $100 million in claimed liabilities, including approximately $50.9 million in claimed revenue-sharing fees, in a matter unrelated to the 3|5|2 losses, from Weiss Multi-Strategy Advisers LLC and its affiliates, a failed asset-management partner of the Jefferies organization, in chapter 11 proceedings commenced in April 2024 in the United States Bankruptcy Court for the Southern District of New York. Nicholas Daraviras submitted declarations in that proceeding as co-president of LAM Holdings, and the Jefferies entities were represented there by the same Herbert Smith Freehills counsel that later answered for the Topwater funds in this dispute. On May 28, 2024, the court heard and

142

thereafter denied without prejudice the Jefferies entities' contested motion to convert the cases to chapter 7. In re Weiss Multi-Strategy Advisers LLC, No. 24-10743 (MG) (Bankr. S.D.N.Y.). Together with Jefferies Risk's June engagement, O'Hara's higher-level-decision statement, and the platform-wide problems and calls on August 5, those events additionally supply the concrete basis for the allegation, on information and belief, that parent-level risk, liquidity, and capital-allocation pressures drove the decision concerning Britannica. The June-through-August 2024 risk, liquidity, wind-down, and capital-allocation records are controlled by LAM and Jefferies.

334.    The parent-level capital pressure did not end with the seizure; it kept building, and each later public event confirms what drove August 5. In July 2024, the same month Defendants executed Amendment No. 5, LAM was winding down its 3|5|2 division after suing its own manager for fraud. In October 2025, the Indiana Public Retirement System redeemed from the Jefferies complex's asset-management relationships. In February 2026 the Eugenia litigation placed further public claims against the Jefferies ecosystem. In March 2026, Western Alliance Bank sued Jefferies Financial Group, Leucadia Asset Management, and their affiliates in New York Supreme Court for breach of contract and fraud, alleging that LAM's own servicer allowed the UCC financing statements securing a commercial loan to lapse, triggering defaults, and that the defendants then failed to make the payments they had promised under a forbearance agreement. That action charges the same parent complex named here, by name, with fraud in the administration of other parties' collateral. On information and belief, stated on that public record and the platform economics pleaded above, the August 2024 seizure of Britannica's capital served the same parent-level objective those events expose: conserving capital in deficient shared pools and shielding Jefferies and LAM affiliated money from loss, at the expense of Britannica the platform purportedly existed to fund.

335.    The parent complex carried its own Asia exposure into the August 2024 unwind. In February 2020, LAM announced a cornerstone investment in an Asia-focused multi-strategy fund with a core Hong Kong office, investing across Asian equities, currencies, and bonds, the markets at the epicenter of the August 4 to 5 dislocation. On information and belief, stated on that public investment and the capital-conservation conduct pleaded in this Complaint, the complex retained Asia-strategy exposure into August 2024, and its own Asia-session losses and margin demands in those days sharpened the parent-level drive to conserve capital that the seizure of Britannica's first-loss capital served. The complex's tie to the Japanese epicenter ran deeper still: since 2021, Jefferies had operated under a global strategic alliance with Japan's Sumitomo Mitsui Banking Corporation, which raised its ownership stake in Jefferies to approximately fifteen percent in 2023, and on information and belief, stated on that public alliance and shareholding, the parent complex's capital posture and funding relationships were tied to the Japanese financial system whose August 4 to 5 collapse anchored the dislocation, sharpening the same parent-level drive to conserve capital.

336.    The platform's supervision was failing at the top of the same chain in the same months. From 2020 through mid-2024, a LAM Managing Director and portfolio manager, Jordan Chirico, directed more than $90 million of a LAM-managed fund into the notes of a Ponzi scheme in which he held concealed personal interests exceeding $7 million, under LAM's supervision and inside LAM's compliance apparatus. Chirico left LAM on June 5, 2024; the scheme's vehicle collapsed into bankruptcy in 2024; on August 14, 2025 the Securities and Exchange Commission charged Chirico under Sections 206(1) and 206(2) of the Advisers Act, and a parallel criminal indictment followed. The supervisory and compliance environment that let a nine-figure fraud run for four years inside a LAM-managed fund is the same environment

144

that produced the conflicted self-valuation, the fabricated evidence package, and the improper seizure of Britannica's capital in August 2024.

337. LAM's Forms ADV and its communications to Britannica disclosed none of this while it was happening. Upon information and belief, based on the SEC's charging record and the chronology of LAM's filings, LAM's disclosures materially omitted the 3|5|2 Fund events, LAM's June 5, 2024 termination of the responsible portfolio manager, and the supervisory failures those events establish, while LAM continued to hold itself out to Britannica and to its regulator as a supervised, compliant manager of managed accounts.

338. The public record that later emerged shows the concealment was institutional. Within the last year, investors alleged in a New York court filing that LAM approved the 3|5|2 bond purchases despite knowledge that the collateral behind them did not exist; the Indiana Public Retirement System sued Jefferies and LAM over the same losses; and in February 2026 a court refused to dismiss allegations that Goldman Sachs bankers concealed their financial motives from the parties they served. Those charges and allegations are pleaded here as charges and allegations. None of this was public when Britannica committed its capital, systems, and strategy; what Britannica confronted instead was Defendants' curated record: the deck, the Overview, the confirmations, and the instruments, every one of which Defendants controlled.

339. On July 3, 2024, Rubin transmitted the fully executed Mayfly AIAA and Amendment No. 5 to Stonefly. Travis Taylor signed for Mayfly, Stonefly, and LAM. The documents opened a $15,000,000 Mayfly account at Interactive Brokers, reduced Stonefly to a $10,000,000 Investment Account Value with a $1,000,000 First-Loss Interest, corrected BCML's name, and installed reciprocal Termination for Cause cross-defaults. The separate requirements of Section 6(b)(ii) for any claimed automatic termination survived the amendments untouched.

145

340.    Amendment No. 5 also resolved the Account Adviser identity. It stipulated that references to Britannica Capital Limited in the Stonefly AIAA meant Britannica Capital Management Limited and replaced the incorrect name with BCML. Rubin had written the previous day that Topwater's Tax member identified the error and required the correction. That executed stipulation confirms BCML's contractual role notwithstanding later name errors in notices or counsel correspondence.

341.    Topwater put no usable capital behind Mayfly even after execution. On July 15, 2024, Britannica's Chief Investment Officer reported that the Interactive Brokers account stated there was insufficient margin or capital backing the account. The condition prevented trading in an account for which Topwater had just signed a $15,000,000 Investment Account Value, while BC LLC's capital and BCML's reduced-risk posture remained committed to the transition.

342.    The Interactive Brokers structure of Defendants was itself, on information and belief, another first-of-its-kind synthetic construction, assembled for the first time around Britannica's account. Britannica itself was coerced to negotiate rates for the entire platform using its own attractive order book. Britannica negotiated the commission rates with Interactive Brokers at its own cost of labor, time, relationships, data flow, and trade volume, while Defendants kept the resulting economics. Trades failed in the first week for want of available margin or capital behind the account. No hourly reporting existed for the account at launch. On information and belief, Defendants held undisclosed conflicted relationships with Interactive Brokers as they did with Goldman Sachs; the basis is the referral-and-revenue architecture Goldman Sachs's own documents price in writing, LAM's ADV disclosure of referral payments for introduced managed accounts, and the records in Defendants' and Interactive Brokers' control. On information and belief, Britannica was the first account Defendants ever ran at

146

Interactive Brokers in this structure, and Defendants concealed that from Britannica; the basis is Defendants' absent reporting setup, absent integration, and admitted lack of understanding pleaded in this paragraph. Defendants had no back-office reporting setup receiving Interactive Brokers data, did not understand Interactive Brokers' reporting, and built no real integration before signing a purported $15,000,000 account onto the platform; for a period Britannica had to send Defendants manual position files because Defendants lacked even basic visibility into the account, and the visibility Defendants later obtained was incomplete. On the morning of August 5, Defendants did not have valid pricing or other data feeds from Interactive Brokers, the bid and ask quotations were absent across the account's options that morning due to market and broker related events that morning. Defendants swore a to-the-dollar 9:32 purported valuation on a platform they had never operated, never integrated, did not see pricing information on that morning, and did not understand.

343.    After Mayfly began trading at Interactive Brokers, that portion of the flow no longer accrued to Goldman. On information and belief, based on Topwater's repeated resistance to the move, Goldman's direct appreciation for the increased flow, the documented rate differential, and the timing of termination after the move, loss of Goldman-linked economics and capture of the new broker economics were motives for adverse action against Britannica. The communications and revenue allocations that will prove it are controlled by Goldman, LAM, and Jefferies.

344.    Defendants' reduced ability to monetize and control Britannica's order flow contributed to the decision to restrict, terminate, and liquidate the relationship. The loss of Goldman revenue operated alongside the margin-pool crisis, the capture of Britannica's strategy, the committee's zero-loss mandate, and Defendants' determination never to calculate or pay the

147

credits and interest they had admitted owing, and expectation that Britannica would restart a different relationship with Goldman, and many other converging motives that met on August 5.

345.    On July 31, 2024, Britannica's Chief Compliance Officer wrote to Long that Mayfly had a $7,500,000 credit balance at Interactive Brokers from short sales, excluding the First-Loss Interest, and invoked Appendix C. Long responded, copying Damm and Wieczorek for visibility, that UMB was aware of that aspect of the agreement and that the amount would be calculated and credited at month-end. The confirmation concerned Mayfly, where that credit was owed under Appendix C and Defendants' written confirmations. Interactive Brokers and Goldman's standard reports did not include the relevant calculations or credits.

346.    Stonefly's credit treatment had been negotiated in writing since March 2023. On March 9, Britannica's Chief Investment Officer told O'Hara that the proposed structures would increase cash credit balances and asked to confirm multiple times that broker would charge financing or pay interest. He also stated that Goldman would not disclose the data. Topwater and Goldman concealed how financing was bundled across Topwater accounts. No Defendant party calculated the credits contractually due to Britannica for years despite multiple requests.

347.    On August 12, 2023, Britannica's Chief Compliance Officer reported monthly shortfalls of approximately $15,000 to $20,000 and identified possible miscalculation of interest credit on recurring nightly credit balances. Britannica had already requested separate administrator line items for interest income, borrow costs, and dividends, first in writing on April 5, 2023, four months before the discrepancies were quantified, and Defendants agreed to the amendment without ever supplying them. By April 2024, Goldman or LAM or Topwater still could not readily provide the line-item support even though the account was being billed for the same categories.

148

348. Damm ran the credit deception from start to finish. On March 28, 2023, Britannica's Chief Investment Officer asked Damm to confirm that a net credit position would receive interest attribution from the administrator at the same benchmark rate. At 2:44 p.m., Damm replied: "I believe we can agree to any net credit (should this situation exist), but we are just confirming that the GS reporting supports this. We will be back to you shortly." O'Hara then requested an urgent call and raised guideline objections to the strategy. Britannica's Chief Compliance Officer returned Britannica's signature on the Appendix C amendment that evening. The speaker, date, medium, requested term, contemporaneous pressure, and resulting signature are all documented.

349. The "GS reporting" condition Damm attached on March 28, 2023 was a confirmation only Goldman Sachs coverage could give, for an account Goldman had conditioned on receiving every trade. Britannica was contractually entitled to credits either way. On information and belief, any Topwater inquiry to Goldman about net-credit reporting, and Goldman's own handling of the account's credit and debit economics, ran through the coverage personnel who ran the Britannica relationship, including, in succession, Eck and Tran, and through the financing and securities-lending personnel whose desks priced the account's two sides, including Kalafarski, whose statements that the account's equity financing and other rates appeared below Goldman's own cost is pleaded in this Complaint; Goldman's coverage files, desk records, and the recorded lines its own documents designate name every participant and preserve every such call.

350. The execution version Britannica signed did not contain the credit-interest term Britannica had asked for. Rubin had circulated that execution version on March 23, 2023, five days before Damm's assurance and before Britannica's final written credit-interest requests, and

the version she circulated omitted the crediting language. Damm's 2:44 p.m. assurance, sent after that omission and hours before Britannica signed, told Britannica that Topwater's position was unchanged and that Topwater was merely confirming Goldman's reporting and would revert shortly. That assurance also carried the credit term forward. Topwater never reverted with accounting of overdue credits or anything else. On April 16, 2024, Damm instead wrote that "[p]er Appendix C of the AIAA, credit interest on cash in the account is not included in the monthly p&l." That statement was false when he made it. The operative Appendix C was the one Defendants had restated in its entirety thirteen months earlier, and it no longer excluded interest income on cash. Damm invoked a version of the parties' agreement that Defendants themselves had superseded on April 1, 2023, and he used it to refuse money the operative agreement required to be counted. On information and belief, Damm and LAM made the March 28 commitment without a present intention to perform. The basis is the same-night demand for signature, the absence of any later proposal or reported Goldman confirmation, the seventeen months of contrary administration and promises of redress, and Damm's later reliance on the false exclusion.

351.   Damm's April 16 email also acknowledged that the account had no debit balance during February, confirming that the strategy could generate the net-credit condition Britannica had described. The statements and correspondence reviewed do not show a credit-interest attribution to BC LLC or an Account Adviser Fee calculation that included the promised Stonefly credit. On information and belief, the credit remained unpaid or unaccounted for. The amount and recipient can be determined from Goldman daily cash balances, rate files, Topwater allocation workpapers, and UMB's native monthly calculations. The accurate calculation is Defendant's responsibility.

150

352.    Defendants have never provided the line-item accounting needed to show what accrued, what was paid by each broker, where it was allocated, and whether it entered either account's Capital Account calculation.

353.    The audited statements show that interest was economically material to the platform. Aggregate interest income reported by the two trading funds increased from approximately $3.7 million in 2021 to $7.7 million in 2022 and $36.1 million in 2023. Those aggregate figures do not identify the portion generated by Britannica's balances, but they establish the scale of the interest stream and the materiality of undisclosed allocation rules. Defendants possess the account-level cash, broker, rate, and allocation data needed to trace Britannica's contribution and the ultimate recipient.

354.    UMB's last Stonefly statement before termination, dated July 31, 2024, and other documents showed that Stonefly entered August with almost all of its first-loss capital intact on the administrator's own monthly statement. Five days later, Defendants declared that layer exhausted without producing the native calculation and account-level bridge.

355.    Stonefly and Mayfly must be reconciled separately before any combined damages figure is used. The Stonefly issues include but are not limited to, the March 2023 written commitment, and any credit or financing amounts omitted from Stonefly's calculations. The Mayfly issues include but not limited to written agreements, the July 31 confirmation of the credit owed on the $7,500,000 balance from short sales of securities. Plaintiffs seek an accounting and recovery of each unpaid amount, together with interest and any other remedy carried by the applicable count.

**J. August 1 to 4, 2024: A Sound Book Meets a Breaking Market**

151

356.     Defendants abandoned every monitoring, warning, and cure practice they had sold, in the very window their own machinery was preparing to strike. At the close of trading on Friday, August 2, 2024, Britannica's Stonefly and Mayfly books remained actively managed under the agreed strategy. Britannica had maintained the books' risk within the agreed framework, and Mayfly had been essentially flat only days earlier. Defendants sent no threshold warning, margin call, capital request, cure notice, or instruction to reduce risk before the weekend. That silence was a sharp departure from April 2022, when O'Hara warned Britannica while Stonefly still had approximately $158,000 of headroom and Britannica added capital the next day. Nothing comparable preceded the August 5 termination.

357.     On July 31, 2024, the Bank of Japan raised its policy rate. The resulting unwind of yen-funded carry trades intensified over the following days. On Monday, August 5, the Nikkei 225 fell approximately 12.4 percent, United States equity-index futures fell sharply before the open, and several major brokerages reported access or trading disruptions around the 9:30 a.m. opening. The listed-options market opened into exceptionally thin liquidity, missing or one-sided quotations at material strikes, and sharply widened bid-ask spreads. In those conditions, a reliable valuation required current, instrument-level executable prices, not stale files, isolated quotations, or model midpoints detached from trades.

358.     The platform watched that unwind arrive in real time, hours before New York opened. The dislocation broke first in the Asia session of August 5, and the Division that marketed twenty-four hour, six-day risk monitoring had risk personnel, including Risk Associate Chen, whose function covered exactly that watch. On information and belief, stated on the Division's own monitoring claims, its personnel's functions, and the pre-open decision and pre-drafted notice pleaded below, Defendants assessed the overnight dislocation, platform margin

152

stress, and manager positions during the Asia and pre-market hours, and the determination to strip Britannica's accounts was made in those hours, before any New York price existed, on data the Division's own systems could not then reliably supply. The chronology is one escalation, not three clocks: the machinery was installed in June, the determination to strike in the morning was made in the overnight and premarket hours, and the execution was released at the open.

359. The Bank for International Settlements later found that the pre-market volatility spike was driven materially by quote behavior in a market with exceptionally low volume and depth. Pre-market option volume was more than eighty times lower than regular-session volume, and quoted spreads on less-liquid puts widened from cents to many dollars. The VIX is calculated from quotations rather than completed trades, and the BIS found that the pre-market reading that morning was less informative than regular-hours pricing. Britannica's contemporaneous broker record showed the same breakdown at the account level: live data, deltas, or prices were unavailable or not updating, and the broker ticket recorded missing bid and ask data for relevant instruments. LAM, acting through its Topwater Capital Division, was a professional investment manager; Goldman was the Stonefly broker-dealer and data provider; Interactive Brokers was Mayfly's broker-dealer. Jefferies Risk was an institutional risk function; and O'Hara was the officer directing the valuation and unwind. The responsible personnel received direct account feeds and knew that a precise 9:32 threshold determination could not honestly be made without current instrument-level prices, models, and exception controls.

360. The broker evidence is indisputable and shows that no purported 9:32 value was executable.

361. The dysfunction was public, industry-wide, and reported in real time. Outage-tracking data showed 15,594 Charles Schwab customers reporting platform failures throughout

the morning and including at 9:52 a.m., twenty-two minutes after the opening bell, with thousands of additional user-reported failures at Fidelity, Vanguard, Interactive Brokers and TD Ameritrade and further outages at Robinhood and E*TRADE. Schwab publicly acknowledged the technical problems that morning and the next day attributed its outage to high volumes and a technical issue with a key vendor, an admission that mirrors the vendor-delivery failures in Defendants' own Stonefly data chain. Major firms, including Citigroup, halted or curtailed trading activity that morning, and Britannica's August correspondence promptly placed the named platform outages on the record. Defendants were professional investment managers watching the same market. Striking a minute-precise, account-destroying valuation into that environment, without waiting for functioning markets, invoking any suspension mechanism, or applying the fair-value protections their own offering documents prescribed, was not a good-faith determination. It was fraud and/or gross negligence.

**K. August 5, 2024: The Liquidation, Minute by Minute**

362.    On August 5, 2024, Defendants compelled the destruction of both accounts on a trigger they never proved, was fabricated, grossly negligent and /or fraudulent. The chronology below is drawn from Defendants' timestamped emails, Britannica's contemporaneous written responses, and statements Britannica's Chief Investment Officer and Chief Compliance Officer both heard on the call.

363.    Defendants later asserted that both accounts crossed the one-percent line at 9:32 a.m., two minutes after the equity open. Their August 8 explanation identified LAM, acting through Topwater, as the Manager and Valuation Agent that purportedly made the determination from the trading information then in its possession. Defendants have produced no native 9:32 calculation, contemporaneous valuation report, position-level price file, model output, override

log, screenshot with native metadata, loss-allocation bridge, or approval communication for either account.

364. Defendants' own representations say that assets without readily available quotations are to be fair-valued in good faith. Fair value was not the amount obtainable in a forced or involuntary liquidation. Valuation and redemptions could be suspended when communications broke down or prices could not reasonably be ascertained promptly and accurately. In such temporary conditions, no reliable valuation can exist and any valuation is false and /or fraudulent. On August 5, LAM used none of the protections its own documents prescribed. It struck an interested termination mark during the opening dislocation, on an hourly data architecture with missing and failed files, and forced liquidation at the very prices its disclosures said were not fair value. The same Manager that wrote itself relief from pricing a monthly fee in a disrupted market claims to have priced two entire option books, to the dollar and to the minute, at 9:32 in the most disrupted open in years.

365. United States listed-option quotations are consolidated through OPRA, but brokers and vendors apply different timestamps, models, filters, stale-price rules, and overrides when distributing or valuing them. Goldman Sachs and SpiderRock delivered the Stonefly feed to Topwater on an hourly, lagged schedule of their own construction. Mayfly depended on Interactive Brokers systems that reflected missing data for relevant instruments. A valid determination therefore required the actual quote or model assigned to each material position, its source and timestamp, the treatment of missing or crossed markets, all cash and credit inputs, and the resulting Capital Account calculation. Defendant had no current data including any hedging transactions that morning. Defendants had no pricing data. Defendants have supplied none of that native support for any purported valuation.

366.    No valid contractual stop-out occurred in either account at any time. Section 6(b)(ii) did not make a number generated by LAM self-validating. The cumulative proof includes the $532,710.95 capital return; the absence of any produced Second-Loss or cross-account reallocation; the $7,166 Stonefly sliver; accounting discrepancies larger than that sliver; the conflict between the retrospective image and ordinary-course statements; Mayfly's uncalculated positive carry; the cause-limited cross-default; the later independent Mayfly explanation; unreliable, hourly, missing, and failed data; interested self-valuation; the pre-existing corporate decision; and the fabricated retrospective proof. The trigger Defendants declared never existed at any moment, in any form, momentary or otherwise, and the $532,710.95 Defendants were forced to return is the accounting proof that the layer they claim was exhausted never was.

367.    Mayfly requires its own reconstruction. Britannica reported to Interactive Brokers that live market data, deltas, or pricing were missing or unavailable for relevant instruments. Defendants have never produced Mayfly's 9:32 position file, bid and ask set, trade prints, model values, Greeks, data entitlements, margin data, overrides, short-balance credit, or Capital Account formula. Without those records, the later false assertion of a $2,295,911 Mayfly loss is not a reproducible contractual determination. Defendants could not have performed the determination they claim: Mayfly ran on a platform Defendants had never operated before Britannica's account, with no reporting integration built, and Defendants neither knew whether valid pricing data existed at Interactive Brokers that morning nor saw the absent bid and ask quotations that Britannica's own ticket documented.

368.    On information and belief, on August 4 and 5, 2024, the funds' own prime brokers demanded margin or additional collateral at the fund level, and Defendants seized adviser layers, Britannica's among them, to meet the platform's own obligations. The basis: the historic

dislocation of that morning; the decision O'Hara admitted was long made at the parent company and its affiliates; both accounts taken at the same claimed minute; and the July 15, 2024 Topwater trade execution failure that had already shown the shared pool running at its edge. The margin notices to Stonefly, Mayfly, and the Master Fund, and the treasury communications around them, evidence the aforementioned.

369.    Britannica's own contemporaneous records did not show the breaches Defendants asserted. All relevant records reflect a healthy first-loss layer in both accounts. Britannica's Chief Investment Officer and its Chief Compliance Officer, monitoring both books in real time, observed no valid breach in either account, and Britannica put that observation in writing to Defendants on August 7. Britannica's snapshots, logs, valuations, and records will corroborate that account, and the comparison between Britannica's preserved records and Defendants' unproduced 9:32 inputs is itself a breach, fraud and an actionable event in many other ways.

370.    During the August 5 opening sequence, O'Hara sent an email declaring the Stonefly AIAA automatically terminated as of 9:32 and directing liquidation of ten percent of exposure within ten minutes, twenty-five percent within thirty minutes, and one hundred percent within one hour. Britannica had five minutes to accept the directive before LAM or another adviser would take the book. The notice identified Stonefly. It did not state a Mayfly Capital Account, Mayfly loss calculation, separate Mayfly notice, or invocation of the cause-based cross-default. Defendants' later assertion that both accounts independently stopped out at exactly 9:32 rewrote the contemporaneous explanation after the fact and requires separate native proof.

371.    The termination thread's own delivery record identifies who watched. Read receipts on the August 5 notice and the thread that followed through August 13 record receipt by Topwater and LAM personnel including Calabrese, Long, Taylor, Rubin, Associate Rothe, and

Risk Associate Chen. Taylor, the Investment Committee member who had installed the cross-default thirty-three days earlier, and Rubin, the compliance officer who had delivered it, sat on the thread as the machinery they built executed, and no recipient corrected a word of it.

372.    The decision preceded the proof. On the August 5 call, O'Hara stated, in substance and in Britannica's Chief Compliance Officer's presence, that he had drafted the termination email before the market opened, waited for the market open time, and pressed the send button when the opening sequence began; that the decision had been made earlier and above him; and that it could not be changed. Equity options don't even trade before 9:30 and even after open on a normal day, opening prices are volatile and can be unreliable. There were no prices for any relevant options, equity or futures, that morning at open. The notice itself was structured and legalistic and, by O'Hara's own account, prepared before any opening prices existed for much of the option book. O'Hara's 1:30 p.m. email later confirmed a chain of command and an Investment Committee with authority over the liquidation. On information and belief, based on those statements, Rubin's written record of Jefferies Risk involvement, the newly installed cross-default, and the higher-level approval chain, Defendants decided to terminate before the opening data and used the 9:32 marks as a pretextual implementation of that decision.

373.    O'Hara's admissions fixed both the timing and the authorship of the decision. The declared automatic termination of 9:32 a.m. was therefore neither automatic nor made at 9:32: it was a pre-made decision, papered to look mechanical, released on a schedule chosen for appearance.

374.    On the same call, O'Hara conceded what the account could do. He told Britannica's Chief Investment Officer, in substance, that he knew Britannica could trade through

that day and come out ahead, that he had seen Britannica do it many times before, and that he would not permit it. Britannica was terminated, forbidden to take positions, forbidden to reduce losses, forbidden to make money. That prohibition is itself evidence. The first-loss layer stood unbreached, no loss had ever reached the capital behind it, and Defendants knew both things; a platform honestly worried about the account purported second loss layer would have welcomed the one manager it believed could trade the book back to profit that very day. Defendants forbade it because the trigger was fraudulent, the outcome was already chosen, and any recovery would have destroyed the pretext. And the platform's own morning explains the sweep. On information and belief, stated on O'Hara's statements pleaded in this Complaint, the platform's long-biased manager base, and the market's fall that morning, the other accounts O'Hara spent the day calling were long-biased books the premarket decline had genuinely impaired; Defendants were liquidating their long platform, and they threw the one defensive book into the same fire without the individualized, account-specific determination the contracts required, because the sweep was about the platform's margin and other motives outlined above, not Britannica's numbers or true valuation. On information and belief, stated on the sequence pleaded in this Complaint, the destruction was prestaged, and everyone on Defendants' side of it knew.

375.    The demanded schedule was a fire sale by design. It required an option-heavy book with a combined $25 million stated Investment Account Value and approximately $65 million of gross options exposure to be substantially dismantled during the opening dislocation, before Britannica had reliable executable prices for material positions and while broker systems were impaired. O'Hara told Britannica that this was Topwater's only real quant account. The schedule forced Britannica to cross widened markets, cover options at distorted adverse prices or

no prices at worst possible executions imaginable, and surrender the time needed to sequence, hedge, hold to expiry, or run off positions prudently.

376. At 9:45 a.m., O'Hara left a voicemail: "I need you to respond to my email now."

377. On the ensuing speakerphone call with Gupta, with Britannica's Chief Compliance Officer listening, O'Hara threatened along the lines: I better see some covering, or it's going to get real ugly for you guys. He said that additional time would mean Britannica would not have as much loss but it didn't matter to Topwater or him, and that a liquidation carried out by Defendants "would be really ugly." Meaning that it would be done in such a way to cause maximum damage to Britannica's first loss layer. Britannica protested and disputed the valuations, pointed out that current prices were not available, and the market was completely unreliable, asked for time to protect the book, but was forced to comply only because O'Hara threatened to transfer control of the liquidation to Defendants or another adviser, to intentionally cause maximum damage to Britannica's first loss layer.

378. O'Hara said that the decision had already been firmly made, that nothing Britannica did could change it, and that it had been made above him and some time earlier. Britannica's heard from O'Hara said the final decision had been made elsewhere by affiliated parties much higher up and long time ago, certainly not that morning. O'Hara also said that he had scores of other adviser accounts to call that morning, had no time to address Britannica's account-specific objections, and could not provide access to the people who made the decision. Those statements describe an earlier corporate decision and platform event, not a contractually automatic result first discovered at 9:32. And a decision not based on any valid valuation.

379. O'Hara's statements are evidence of a platform-wide event and involvement of many other platform advisors that day. If other advisers received the same treatment, the

160

evidence supports a coordinated platform response. If they received warnings, capital cures, extensions, hedging permission, or orderly runoffs that Britannica was denied, the differences support targeting, pretext, selective enforcement, scienter, and punitive damages.

380.    Britannica offered to add capital immediately, as it had when O'Hara warned of an approaching threshold in April 2022. O'Hara refused, said it was too late, and said the money should have been wired before the weekend, although Defendants had issued no Friday warning and had made no capital request. The refusal rejected the least destructive solution and preserved the termination Defendants had already chosen. Defendants' Investment Committee improperly forced the unwind. Their refusal was a deliberate choice, not a contractual impossibility. Nothing was automatic based on valid valuation.

381.    The cure Defendants refused on August 5 was a cure the relationship had used twice before. It was the established and agreed practice. In or around April 2022, O'Hara accepted Britannica's additional capital under the warn-and-cure sequence pleaded above. Adding capital to strengthen the accounts was the established, documented practice of both firms, until the morning Defendants preferred the capital seized.

382.    O'Hara's Friday-wire statement condemns Defendants either way. If a weekend gap severe enough to require pre-positioned capital was foreseeable on Friday, August 2, then Defendants, who represented around-the-clock real-time monitoring, filed regulatory disclosures describing purported two-hour risk reports, purportedly operated the hourly data feeds, and had established the April 2022 practice of warning Britannica with headroom remaining, were the parties obligated and equipped to give that warning, and they gave none. If the gap was not foreseeable, then the demand that Britannica should have wired capital the prior Friday, when the accounts showed no losses, ample margin, preserved capital, and no request or warning from

anyone, was an impossible condition invented after the fact. Unpredictable overnight gaps are precisely why margin practice uses calls, warnings, and cure periods; a counterparty cannot condition survival on clairvoyance it did not itself exercise while operating the monitoring systems. Either branch establishes that the refusal of capital on August 5 was a pretext for a decision already made, not the application of any contractual standard.

383.    O'Hara's "real ugly" threat was an admission about control, remaining property, and causation. He knew that the first loss capital was still there, otherwise there would be no reason to say that it would get ugly for Britannica. If the losses had reached second loss layer as he falsely claimed, then it would not concern Britannica any more and would only concern Topwater, LAM and Jefferies. He knew that the manner and timing of liquidation could consume substantially more of BC LLC's first-loss capital. He used that threatened incremental loss to compel immediate compliance while denying Britannica time, capital, escalation, hedging, and reliable prices. The threat corroborates the primary allegation that substantial first-loss capital remained and that Defendants knew their chosen liquidation method, would determine how much of it was lost.

384.    Britannica recorded the O'Hara threat three times within four days. On August 7, it wrote that it had closed the positions because O'Hara said a Defendant-run liquidation "would be really ugly." On August 8, it wrote that it had been compelled to comply because the alternative would be an even more unfavorable forced liquidation. On August 9, it again recorded that immediate liquidation was the only permitted action and that Defendants would otherwise force-liquidate the book. Defendants never denied the threat: their counsel's August 14, 2024 letter answered the very emails that recorded it and denied nothing. Their later return of

$532,710.95 confirms its economic premise: Britannica still had capital that Defendants could destroy through the way they executed the unwind.

385. The threat also corroborates the primary no-valid-stop-out allegation. It was followed by discretionary extensions and, ultimately, the return of more than twice the combined stop-out thresholds. Together with the account arithmetic, credits, prices, and missing allocation bridge, O'Hara's own words support the inference that he and the decision-makers above him knew the stated automatic-termination premise was false.

386. O'Hara also acknowledged, in substance and in words Britannica's Chief Investment Officer and its Chief Compliance Officer heard, that he knew the first-loss capital was important capital to Britannica and Gupta, and that Topwater was proceeding with the liquidation notwithstanding that knowledge. The acknowledgment confirms that Defendants understood the preciousness of the capital at stake was the operating capital of Britannica's business rather than a routine trading allocation, and that they proceeded anyway. O'Hara said, "I know this capital is really important for you guys but there is nothing I can do. Decision has been made."

387. O'Hara also prohibited Britannica from opening protective or hedging positions during the unwind. The Investment Guidelines imposed position and exposure limits, but no provision barred protective trades during a directed liquidation. Section 6(d) required liquidation in an "orderly and prudent manner." A blanket ban on protective positions while demanding rapid liquidation into widened and missing markets prevented ordinary loss mitigation, increased execution costs, and transferred those costs to BC LLC's first-loss layer. On information and belief, based on the first-loss structure, the refused capital, the forced schedule, O'Hara's threat, and the denial of every less destructive alternative, LAM and the decision-makers above O'Hara

imposed the prohibition to intentionally accelerate losses against BC LLC's layer and protect platform and affiliated capital, misappropriate intellectual property. Nor can the prohibition be found in Section 6(d)'s direction that the Account Adviser "immediately cease all trading." Liquidation is itself trading; the same sentence commits the liquidation to an orderly and prudent manner; and a direction to unwind an options book prudently permits the risk-reducing trades a prudent unwind requires. What the clause does not permit is what Defendants did: a compelled fire sale into a broken market with loss mitigation forbidden.

388.   Defendants refused every available off-ramp. They rejected additional capital, denied direct escalation to the decision-makers, refused to await current instrument-level prices, rejected an orderly runoff, prohibited protective trading, and threatened to hand the book to another adviser. Section 6(b)(ii) expressly permitted the parties to agree otherwise in writing. Defendants' course of dealing showed that they knew how to exercise that authority: they warned and accepted capital before a threshold event in April 2022, negotiated a compromise rather than terminate in March 2023, and gave a cure window for a July 18, 2024 guideline issue. Defendants chose not to use any of those alternatives on August 5 because, as O'Hara's own statements established, the result had been chosen before the morning began.

389.   At about 10:09 a.m., Britannica acknowledged the directive and began winding down the book manually, with almost no pricing and / or unusually wide bid ask spreads in a broken market.

390.   The acknowledgment was compliance under threat, not assent. It followed O'Hara's urgent voicemail and threats. Britannica objected and demanded the evidence. Its rapid compliance mitigated a threatened even greater loss by O'Hara using ugly methods.

164

391.    Britannica then had to unwind numerous option and equity positions manually while monitoring stale or missing data and while prohibited from adding protective trades. The forced sequence converted unreliable marks into realized bad executions, crossed widened spreads, accelerated market impact, and prevented Britannica from choosing which risks to neutralize first. The resulting loss is measurable from records including the order, fill, quote, position, expiry, and Greek data in Defendants', Goldman Sachs', SpiderRock's, and Interactive Brokers' possession.

392.    Britannica kept liquidated a very long options book in the Interactive Brokers account. At 12:09 p.m., O'Hara pressed again: "We need to start seeing risk off in the GS account."

393.    At 1:30 p.m., O'Hara wrote that he had "ran your request up the chain of command" and that the Investment Committee would permit at least seventy-five percent of delta-adjusted exposure to be liquidated by the close, with the remainder at the next market open. A chain of command was consulted, an Investment Committee weighed the request, and the Committee selected different terms. That was the exercise of judgment and discretion. It contradicted Defendants' later position that the Agreements required no judgment or discretion after an asserted stop-out and confirmed that the decision was controlled above O'Hara. The offer was hollow and intentionally fraudulent because it came with constraints on hedging and time. You can't run a market neutral, delta hedged strategy with prohibition on market directionality neutralization, hedging, opening positions and other material things.

394.    Britannica repeatedly asked Defendants to halt or slow the liquidation, accept capital, permit hedging, wait for reliable price discovery, and allow an orderly runoff. O'Hara

refused and denied direct access to anyone who could reconsider it. When pressed, he checked with others and returned with the same answer. These facts are documented.

395. Rubin's June 18 written record that Jefferies Risk was engaged with Britannica's accounts; O'Hara's lack of authority to change the result; his report that he had gone up the chain of command to LAM and Jefferies; and the Committee's actual selection of liquidation terms all point to the fact that the Decision was made personally by Daraviras, Handler and Friedman.

396. At 2:22 p.m., Britannica confirmed that liquidation of the Goldman Sachs positions had already been in progress.

397. At 2:25 p.m., O'Hara admitted in writing that Topwater was "on a 1 hour lag with SpiderRock/GS" because it received hourly drops. The AIAAs likewise specified hourly reporting. In a market moving minute by minute, that architecture did not establish a current 9:32 valuation. The positions were stale sine before market open and were obtained no later than 8:32 am when the options markets were closed and blank. Defendants have never identified which position and price files were the most recent trading information used at 9:32, what period they covered, or whether opening trades and executions had reached the calculation.

398. New information continued to arrive while Defendants retained control over how the liquidation proceeded. As the pricing came back later in the day, it even more clearly showed that Britannica had plenty of capital left in both accounts, Defendants never revisited the interested opening marks, accepted capital, permitted hedging, or stopped the forced unwind. Their later claim of a mechanical event cannot erase the discretionary decisions that converted an unreliable and/or fraudulent mark into realized loss after more reliable data became available.

399. At approximately 3:47 p.m., Britannica had been hard at work and reported that it had covered 99.9 percent of the positions, by hand and without the protective trading it had

requested. The speed of that unwind was compelled by Defendants' schedule, not selected as a prudent trading strategy by Britannica.

400.    Minutes later, SpiderRock reported that it had rerun its process and identified an SFTP error associated with a scheduled file delivery. O'Hara described the event as a gap in delivery. Later that evening, he still falsely reported $17.5 million of delta-adjusted gross exposure that didn't exist and wrote that Goldman could not confirm the figure until that evening or the next day, hours after Britannica had covered nearly the entire book. The system Defendants trusted to terminate the relationship to a purported breach amount of $7,166 sliver could not reliably show whether the positions remained or what was in any of the books at any relevant time.

401.    Defendants converted a fraudulent and misleading opening mark into realized loss through the compelled schedule, forced buybacks, and hedging ban. Market facts corroborate Britannica's contemporaneous warning that the opening marks were unavailable, unreliable and / or fake even if any system purported that they existed.

402.    The liquidation itself was a use of the secrets: Defendants executed the forced sales by working through Britannica's live position map, structure by structure, monetizing their access to the confidential book while excluding its owner from the room. The broker order records indicate further fraud by Jefferies, LAM and their individual Defendants.

403.    Defendants continued the compelled liquidation after the opening dislocation and asserted mark had ceased to be the only available information. Defendants were still receiving stale files. Any such liquidation is subject to human direction and not purported automatic termination.

404.    The refusals continued after the market somewhat normalized and it became clear that Topwater held a significant amount of Britannica capital as collateral. In a telephone call Britannica confirmed that the Interactive Brokers positions had been covered, Britannica's Chief Investment Officer asked O'Hara to take one further request to the committee: that the remaining Stonefly book, which carried minimal residual delta and consisted substantially of short options approaching worthless expiration, be permitted a brief delta-managed runoff of approximately two weeks so that the positions could expire in the ordinary course rather than be bought back into still-distorted markets. Britannica's Chief Investment Officer explained that the account had generated more than one million dollars for the platform in the prior years and that the request would slightly reduce loss to Britannica's proprietary capital without adding risk. Every dollar was to be respected. O'Hara said he would run the request up for approval. No runoff was permitted. LAM and Jefferies parties' goal was to cause maximal damage to Britannica and free up all capital for their conflicted, undisclosed use.

405.    Plaintiffs allege that neither Stonefly nor Mayfly experienced a valid termination under Section 6(b)(ii). Solely in the alternative, even if Defendants could establish a valid Section 6(b)(ii) event in one account, that would not establish a valid termination of the other. The reciprocal cross-default applied only to a breach under Section 6(b)(iii), Termination for Cause, not to an asserted automatic termination under Section 6(b)(ii). Moreover, the contemporaneous 9:34 a.m. termination notice identified Stonefly and stated no Mayfly calculation or other account-specific basis for terminating Mayfly. Defendants only later asserted that Mayfly independently crossed its threshold at precisely the same 9:32 a.m. timestamp. They have produced no native contemporaneous Mayfly calculation, timestamped position-and-price file, credit treatment, allocation bridge, or audit trail supporting that later assertion. Further and

168

solely in the alternative, even if Defendants could establish valid Section 6(b)(ii) events in both accounts, their liquidation and post-termination conduct remained independently wrongful. Defendants refused additional capital despite the parties' prior course of dealing; denied escalation to the decision-makers; prohibited protective and hedging trades; refused to apply the feed up capital from one account that very day after liquidation to another, refused to await reliable, executable instrument-level prices; imposed a fire-sale schedule instead of the "orderly and prudent" liquidation required by Section 6(d); withheld the warning and accommodation process they had previously used; failed to calculate and credit the positive carry they had confirmed would be calculated and credited; and relied on retrospective, non-native proof rather than contemporaneous calculations, source data, and audit records. Those acts breached independent contractual and other duties and caused separate injury regardless of the validity of any asserted threshold event. These allegations are pleaded solely in the alternative and do not admit that either account satisfied Section 6(b)(ii).

406.    The losses for which Plaintiffs seek recovery were not ordinary losses produced by BCML's strategy. Defendants caused as well as enlarged them by imposing a compressed fire-sale liquidation schedule; prohibiting protective and hedging trades; forcing manual repurchases and sales at dislocated prices when reliable two-sided quotations were missing or bid-ask spreads were extraordinarily and evidently wide; refusing additional capital; failing to account for accrued credits and positive carry within their control; and refusing to permit capital and margin capacity released as positions were covered to support the remaining positions, whether in the account that generated it or, as Britannica requested, the other account. Those choices converted disputed and unreliable opening marks into realized losses charged to BC LLC, destroyed option inventory BCML was positioned to manage, and eliminated the volatility-

169

trading opportunity the strategy was designed to monetize as volatility and pricing normalized. BCML contemporaneously identified hundreds of thousands of dollars in forced-buyback costs and the loss of that opportunity. Defendants had received and retained years of hourly position and trade files showing how BCML sold option premium, managed Greeks, and sequenced risk. They therefore knew, or recklessly disregarded, that forcing a hedge-free liquidation during the dislocation would enlarge Britannica's losses rather than prudently reduce risk.

407.    These facts support the reasonable inference that the August 5 liquidation was a platform-level capital-allocation and liquidity decision made before reliable account-specific pricing existed, not the consequence of a valid contractual stop-out in either Britannica account. O'Hara told Britannica that the decision had been made earlier and above him and that he had scores of other adviser accounts to call that morning. On June 18, 2024, Rubin recorded in writing that Jefferies Risk was directly engaged with Britannica's accounts. Goldman coverage had also relayed that Topwater regarded Britannica's accounts as a high user of capital. During the market-wide collateral shock pleaded above, liquidating Britannica's option-heavy books would immediately reduce gross exposure and margin usage and release balance-sheet capacity in the undisclosed shared pool described above. LAM's simultaneous refusal to accept additional capital, which would have increased the first-loss cushion without requiring liquidation, further supports the inference that the objective was to free capital rather than address account risk. On information and belief, based on those facts and the platform-wide call campaign, LAM and its Investment Committee, with input from Jefferies Risk and Goldman Sachs personnel, selected which managers and positions to liquidate, and fixed the timing, sequence, and terms of liquidation, by reference to capital usage, margin relief, liquidity, and the improper protection of

170

Jefferies capital, Defendant Handler and Friedman personal capital, their platform, purported second loss investors, certain conflicted first loss investors, Goldman, and other affiliated capital.

408.    The foregone trading value was substantial. The forced liquidation and Defendants' prohibition on Britannica's ordinary volatility trading cost Britannica approximately $10 million to $20 million in foregone trading gains in the period surrounding the termination, and several times that amount in the months that followed. Defendants forced the book to be covered at the peak of implied volatility and pricing dislocation; in the days that immediately followed, implied volatility collapsed and the market rose steadily and rapidly, so the very positions Britannica held at termination would have generated substantial profits had Defendants not seized and liquidated them. The months that followed would have multiplied those gains: Britannica's strategy had produced an administrator-documented 88.02 percent net return on the first-loss capital account in 2023 despite the futures unavailability, inflated commissions, and other burdens Defendants imposed, and by August 2024 a few of those burdens that reduced profitability by 50 percent or more, including futures availability and more competitive commissions structure negotiated directly by Britannica with Interactive Brokers using its own large trading volume and flow, had been removed by Britannica, with the movement of the majority of Britannica's capital from Goldman Sachs to Interactive Brokers, positioning the strategy, larger first loss capital base, with its demonstrated record of scaling the right positions with the right exposure in the right underlyings and strikes within its delta-managed framework, for a substantially more profitable year. That conclusion rests not merely on hindsight, but on Britannica's documented record and established process for selecting underlyings, strikes, exposures, position sizes, and hedges within its delta-managed framework. The precise amount of the foregone gains can be established from the native position, quote, order, fill, expiration,

171

and market records, together with expert reconstruction applying Britannica's contemporaneous strategy rules and risk-management framework.

409.    The destruction was avoidable at every decision point. The parties' 2022 course was warning and additional capital. The agreements separately recognized a one-business-day or longer cure for market-driven Investment Guideline breaches. BC LLC offered capital and escalation. BCML asked LAM to wait for reliable prices and proposed a controlled risk reduction. Long had confirmed a month-end positive-carry credit days earlier. The Investment Committee proved it could modify timing. New capital had been released from one account from liquidation to be available for one or both. Market data returned and showed there was no breach and surplus capital remained. LAM refused the available capital, rejected the requested escalation and orderly schedule, prohibited hedging, and chose the fire sale, for every position. Each of those pre- and post-trigger choices was independently wrongful and independently caused loss.

**L. August 7 to 14, 2024: The Paper Trail Built After the Fact**

410.    After the seizure, Defendants built the paper trail to justify it: a package assembled days after the event and presented as contemporaneous proof. On August 7, Long wrote that two Stonefly positions remained and directed that both be closed by the end of the day, two days after Defendants had demanded one hundred percent liquidation and after Britannica had reported the book covered. Defendants didn't even have the correction positional data days later, let alone at 9:32 am on August 5, 2024, with broken file deliveries and fractured systems that they used, and that they wrote emails about. Britannica had to ask Defendants to identify residual positions because Defendants' own file chain had not done so reliably. Their

desire to hunt every single immaterial position in the account for closure also shows that their motives were ulterior as described here, and not the ones they stated.

411.    Britannica disputed the stop-outs immediately and in writing. On August 7 and 8, Britannica's Chief Compliance Officer wrote that "we did not observe any breach on our side in either account during normal trading before your order to liquidate," recorded that Britannica complied only because O'Hara threatened a worse forced liquidation, and demanded the screenshots, calculations, and other evidence supporting both asserted breaches.

412.    Britannica sought the valuation snapshot and explanation from Damm on August 6 and followed up again. On August 8, Britannica told O'Hara that its investors required evidence that both accounts had exceeded their limits, renewed the request for the promised screenshots and all supporting calculations, and repeated that the valuations had been contested on the call. At 10:26 p.m., O'Hara sent a PDF attachment, not the native 9:32 records. On August 13, Topwater dismissively referred all further questions to counsel.

413.    LAM valued its own trigger. In the August 8 transmission, O'Hara directed Britannica to the lower right corner of the images for dates and times, images that he and other Defendants had fabricated, and wrote: "LAM acting through its Topwater Capital Division, as Manager, valued your accounts as the Valuation Agent based on the trade information we had received up to that time." LAM purportedly controlled which data, price, model, cash and credit input, and allocation it selected, as well as the termination, liquidation, and transfer of losses. It made the determination for its own improper financial benefit on an hourly or longer architecture that it knew was lagged and unreliable, then withheld the native record needed to test it, because the entire valuation was a fraud.

414.    The PDF did not exist on August 5. Its metadata identifies August 8 creation by Topwater employee Brian Long using Microsoft Print to PDF. O'Hara then transmitted the newly assembled file, directed Britannica to embedded timestamps as proof of an August 5 event, and counsel later relied on the package as promptly provided evidence. The delivered PDF contained no recoverable original metadata for the embedded images and was supplied without source screenshots, native calculations, position and price files, formulas, query history, audit logs, versions, or approvals. Plaintiffs further allege on information and belief that the package did not merely combine an intact set of contemporaneous system records, but that at least one material image, field, value, timestamp, or label was created, selected, or altered after the decision to make the package appear to prove simultaneous 9:32 stop-outs. The concrete basis is the absence of any native 9:32 output; the details O'Hara stated on August 5, 2024 about that morning and the weekend before at Defendants, the August 8 authorship; the lack of recoverable original image metadata; the same-minute dual-account claim; the Stonefly arithmetic mismatch; the ordinary-course statement conflict; the missing positions and files data, his fractured systems, no integration with certain new systems he and others disclosed earlier, the missing Mayfly calculation and Second-Loss Allocation; the shifting Mayfly explanation; and Defendants' refusal to produce the sources. Long, O'Hara, LAM, the source-system custodians, and the native files, version histories, query logs, and audit trails are expected to confirm how the package was made and to expose any falsification of the underlying data.

415.    The August 8 package's central artifact is technically impossible as a contemporaneous record: identical 9:32 a.m. timestamps across two incompatible broker systems, on screenshots created three days after the event with their image metadata stripped, a combination that on information and belief could be produced only by manual assembly much

174

later, not in the opening hours of a global and severe market dislocation that evidently hit Defendants hard. The native source files, the workstation and print-queue logs, and the system-clock records that will prove the assembly are in Defendants' control.

416.    Long built the August 8 package at his superiors' direction, and on information and belief the directing superiors were O'Hara and the Committee members to whom he reported.

417.    Defendants' own audited financial statements state that fair value "is not the amount that an entity would receive or pay in a forced transaction or involuntary liquidation" and that exchange-listed options are valued at the mean of the last bid and asked prices on their primary exchange. But in an illiquid or fractured market, that midpoint can be meaningless. A position with an economic value near $300 may show a $10 bid and $350 ask, producing a $180 midpoint; a short position quoted at $180 bid and $10,000 ask would produce a $5,090 midpoint even though an immediate cover would require paying the ridiculous ask of $10,000, not even the somewhat less ridiculous midpoint. Midpoints are reliable only in a functioning market with genuine two-sided quotes. On August 5, 2024 LAM did not follow even this methodology. It did even worse. It used a self-interested mark generated through the lagged and incomplete data chain pleaded above, when material bids and asks were missing, and then forced liquidation at prices its own policy excluded from fair value. Defendants have identified no good-faith fair-value process, current quote set, administrator check, model control, exception approval, or conflict safeguard applied to those marks.

418.    The public market record described above corroborates the defect: on the BIS's own findings, a short option could show a large modeled loss merely because an ask widened

175

while no executable trade occurred. Defendants knew that condition and nevertheless used an undisclosed price or model to declare the Stonefly shortfall pleaded above.

419. Britannica was forced to cover all its book promptly in such fractured market.

420. Stonefly was terminated over an alleged $7,166 shortfall, yet Defendants' selected records do not reconcile. The July 31 UMB statement placed the opening August Capital Account at $990,429. The later 9:32 image asserted a $907,166 loss and $92,834 remaining, arithmetic that uses a $1,000,000 base rather than $990,429. Britannica's Chief Compliance Officer wrote on August 9 that the asserted remaining equity, "if accurate," would be only slightly below the line and disputed the option marks. The ordinary-course August statement later allocated $637,793 of loss and classified $352,636 as a withdrawal.

421. On August 13, Britannica sent a detailed thirteen-point letter documenting the industry-wide outages and missing prices; the refused capital; the absence of any Friday warning; the forced buybacks; the hedging prohibition; the inability to sell option inventory into the volatility spike; the report that Goldman viewed the account as a high user of capital; the more than forty adviser calls; the unresolved credit treatment; and the demand for an independent review and full decision record.

422. The letter also recorded O'Hara's statement that Britannica could "come back" and that the termination did not preclude future business with Topwater. That statement was inconsistent with Defendants' later portrayal of a genuine, mechanical failure and instead supported the inference that Defendants expected to reset the economics after taking the existing first-loss layer. The core facts were placed on the record before counsel supplied any native calculation.

423.     The August 13 letter was the culmination of an escalating written series, each message placing additional facts on the record before Defendants produced anything: the August 7, 2024 closure confirmation, no-breach statement, and screenshot request described here; the August 8, 2024 written follow-up and investor-evidence demand; O'Hara's late August 8 response with the retrospective screenshots and self-valuation statement; and the August 9 valuation challenge. Defendants never answered the series on the substance, never produced a native calculation, and never provided the accounting the letters demanded. The series shows one side seeking evidence and reconciliation in real time, and counterparties who had none to give.

424.     On August 14, Stonefly and Mayfly responded through Herbert Smith Freehills. The letter asserted that both accounts reached the threshold at 9:32, that termination required no judgment or discretion, and that the August 8 screenshots were promptly provided evidence. It refused the requested supporting documentation and recast Britannica's Chief Compliance Officer's conditional statement that Stonefly would be below the line "if accurate" as an acknowledgment. It did not answer the thirteen-point August 13 letter, the refused capital, hedging prohibition, platform-wide calls, high-user-of-capital report, missing executable prices, credit treatment, or the decision made above O'Hara. Defendants thereby adopted the retrospective fabricated package as their formal proof while withholding the native record.

425.     Defendants' counsel put the refusal in writing at every stage. The August 14 letter declared there was "no basis" on which Topwater or the Manager were required to provide the supporting evidence and documentation Britannica had requested. When Britannica's counsel demanded a comprehensive litigation hold, Defendants' counsel rejected the demand, and Britannica's counsel recorded that rejection in writing on January 9, 2025. When Plaintiffs' December 2024 demand letters set out the claims in detail, Defendants' counsel answered on

177

December 26, 2024 that the demand "will be ignored," then wrote on January 14, 2025 denying liability, refusing to address the allegations, producing nothing, and disclosing for the first time that one firm represented Stonefly, Mayfly, LAM, the Topwater Capital Division's employees, and Jefferies Financial Group together. A party holding truthful records produces them; a party that rejects even a preservation demand is telling the court what it plans for the records.

426.    Defendants have purportedly advanced two routes for Mayfly, and neither is supported by the record they supplied. The contemporaneous notice declared an automatic Stonefly event; it never invoked the cause-based cross-default and supplied no separate Mayfly notice. The executed reciprocal cross-default applied only to a breach under Section 6(b)(iii), Termination for Cause, and did not state that a Section 6(b)(ii) event in Stonefly terminated Mayfly. Defendants later asserted that Mayfly independently stopped out at the same 9:32 minute, but produced no native Mayfly calculation, notice, price set, credit treatment, or allocation bridge. The asserted $2,295,911 loss exceeded Mayfly's $1,500,000 first-loss layer, by causing purported $795,911 loss to purported second loss layer; but in reality zero loss was assigned by Defendant's own auditors to second loss layer. First loss capital was partly returned. Mayfly was not validly terminated.

427.    No loss allocation exists in any book at Defendants. Defendants declared a loss their own accounting refused to record, because recording it would have put Defendants' own money where Defendants had told the world it stood: at risk.

428.    LAM made the determination on its own trigger, in O'Hara's own self-valuation words, contrary to the fair-value protections and its own offering materials' recognition that the Manager had a valuation conflict. Defendants have produced none of the stated safeguards for the marks that ended Britannica's business.

429.    Defendants committed deceptive acts: they staged a termination notice written before the event to appear as a same-minute measurement; they constructed a fabricated evidentiary package days after the decision and presented it as contemporaneous proof; they stripped the metadata that would have revealed the construction; and they transmitted the package through counsel to induce Britannica's acquiescence in the seizure of the very account its First-Loss Interest had purchased. Each act was a device, scheme, and artifice to defraud in connection with the First-Loss Interests, separate from and in addition to every false statement pleaded in this Complaint.

## M. The Additional Kept Money

430.    Defendants never calculated, credited, or paid the contractual short-balance economics related to the short sale of securities, and on cash, they had confirmed would be calculated and credited. Stonefly and Mayfly present separate contractual routes. Stonefly's amended Appendix C, effective April 1, 2023, amended, so from that date Britannica was owed the interest on its cash and the income on the credit balances generated by its securities sold short as part of Investment Gains. The entitlement does not stand alone: Damm represented in writing on March 28, 2023 that Topwater could agree to any net credit and was confirming Goldman's reporting, and Britannica signed the amendment that evening in reliance on that written assurance, so the same credits are owed on the contract and, independently, on the commitment. Defendants never calculated them under either. In April 2024, Damm falsely refused them by reciting an exclusion the operative agreement no longer contained. Defendants have never accounted for the amount generated, the person or entity that received it, or the benefit retained by LAM, the funds, Jefferies, or Goldman.

179

431.    The non-crediting ran as a monthly practice, not a single omission. In every month in which the accounts carried cash and short-sale credit balances, Defendants computed Investment Gains, took at least fifty percent, and credited Britannica none of the income the operative Appendix C and Defendants' own written confirmations required, while Damm's April 16, 2024 writing recited an exclusion the operative agreement no longer contained. Each monthly computation was a fresh withholding of Britannica's money, a fresh false account, and a fresh act of the scheme.

432.    The AIAAs fixed a payment deadline Defendants also breached. Section 7(b) of each executed AIAA required any accrued and unpaid Account Adviser Fee to be paid within 30 days after the later of the end of the calendar month in which termination was effective or the end of the calendar month in which liquidation of the Investment Account was completed.

433.    The credits Defendants withheld belonged in the Investment Gains computation, and under the fifty percent fee waterfall half of every withheld dollar was BCML's Account Adviser Fee. The administrator's statements stripped every withheld credit. Liquidation was substantially complete by August 7, 2024, and Defendants themselves treated September 26, 2024 as the closeout payment date. Defendants never calculated or paid the accrued fee on the omitted credits, and the 30-day contractual deadline passed no later than October 31, 2024. The unpaid fee is BCML's own money, owed on Defendants' own contract, on Defendants' own timetable.

434.    The accounting duty was Defendants' alone, and Defendants never performed it. Under the AIAAs and Appendix C, LAM as Manager bore the obligation to compute Investment Gains and Investment Losses, the Capital Accounts, the fee waterfall, the financing charges, and every figure on which the accounts' economics and survival turned, and it bore that obligation

continuously, for accounts that traded in high volume every trading day across more than three years. Performing that duty honestly is a significant, systematic undertaking, the one the law presumes of the business Defendants ran: regulated broker-dealers and custodians must keep daily books and records of exactly this kind, Goldman Sachs, the custodian Defendants imposed, was itself subject to books-and-records obligations for the account it carried, and Defendants represented that a third-party administrator performed the platform's valuation and accounting. The duty required daily books; a per-trade breakdown of every commission and charge in electronic form; daily reconciliation of every position and every trade break against the brokers' records; and verification of the daily figures through the third-party administrator and the annual audit.

435.    Defendants never did the full or proper work and have never produced it. No daily accounting, no per-trade commission breakdown in electronic form, no reconciled trade-break log for any year, and no administrator or auditor verification of any daily figure has ever been produced: not during the relationship, not in response to Britannica's written demands, and not in the nearly two years since. What the record contains instead is the opposite of an accounting: years of trade breaks that Britannica itself identified and paid its own staff to chase; account records that changed positions and profit and loss with no trading behind the changes; monthly administrator statements from UMB Fund Services that ran a few summary lines and contained none of the required daily detail, while Defendants held the administrator out as the platform's independent valuation and accounting function; shortfalls against Britannica's own calculations recurring month after month and exceeding $70,000 in a single month, per Britannica's January 26, 2024 written report to Long, with the withheld credits and interest far exceeding even those amounts; Defendants' own admission that they did not maintain uniform rates; and Defendants'

refusal, through Long, to provide daily profit-and-loss reporting when Britannica requested it in writing.

436.    The unperformed accounting runs through every count. A platform that never kept the daily books could not compute a to-the-dollar termination purported valuation at 9:32 in the morning: the accounting Defendants never performed is the accounting their own trigger required. The unperformed accounting is where the withheld interest, the credits, the commission overcharges, and the financing extractions hide, and it conceals how much additional capital and margin Defendants actually held on the day they seized the accounts.

437.    On September 26, 2024, Defendants returned $532,710.95 of BC LLC's $2,500,000 first-loss capital. The available records attribute $352,636.17 to Stonefly, $252,636.17 above Stonefly's $100,000 stop-out threshold; on information and belief, the remaining $180,074.78 was attributable to Mayfly and exceeded Mayfly's $150,000 threshold by $30,074.78, the basis being the verified total remittance and the verified Stonefly component, with the confirming native Mayfly statement, administrator workpapers, and remittance-allocation records controlled by Defendants. The total return exceeded the two accounts' combined $250,000 stop-out thresholds by $282,710.95. No closeout record supplied to Plaintiffs identifies any Second-Loss Allocation to Regular Investors. Defendants' Offering Memorandum stated that compulsory redemption following termination was expected at the end of the calendar month in which liquidation was substantially completed; Britannica had closed the positions it could identify by August 7, yet Defendants held the return until September 26, four weeks past the month-end their own Memorandum described, and their later claim that the documents contemplated precisely that timing is false on the face of the document they cite. And Defendants have never reconciled their substantial capital return and their ordinary-course

accounting with their claim that both Capital Accounts had validly crossed their contractual lines at 9:32 a.m. This was Defendants' accounting and Defendants' payment: affirmative, account-level evidence that neither account experienced a valid contractual stop-out, supporting the separate claims for delay, accounting, and interest.

438.    When Defendants made the September 26, 2024 return pleaded above, they refunded not one dollar of the financing charges collected under the extracted term, keeping the full yield of the coercion even while closing the accounts. Nor did they return any other overdue payments and credits mentioned here.

439.    On information and belief, the September 26, 2024 remittance figures were fraudulently computed, approved, and released by identified Topwater Division, LAM and Jefferies personnel. They also issued misleading instructions to their auditors and administrations.

440.    On information and belief, the retained $1,967,289.05 was not held in suspense: it was allocated on Defendants' books to the protected margin cushion of Topwater and LAM, including the Jefferies and principal interests, or absorbed into fund-level equity, and the allocation journal will show the entry, its date, and its beneficiaries.

441.    On information and belief, the Regular Members whose capital the first-loss layer shielded were substantially Jefferies-affiliated vehicles and principals, the "Jefferies & Principal Capital" Defendants' own deck states at approximately sixty percent of the investor base, and the subscription agreements, register of members, and capital-account ledgers naming each protected holder are in Defendants' control.

442.    On information and belief, LAM instructed the administrator what to remit and when, and UMB's instruction file for September 2024 records the instruction, its author, and the

183

absence of any supporting valuation bridge; the basis is the instructed-administrator architecture pleaded in this Complaint and the remittance itself.

443. From the afternoon of August 5, 2024 to September 26, 2024, the Mayfly cash sat as realized dollars in accounts Defendants controlled, under signing authority the records will name, and the bank and broker custody statements and signature cards fixing that control are identified discovery; the income Defendants earned and kept on the seized capital is pleaded below.

444. The remittance arrived naked: no release, no reservation-of-rights demand, no settlement condition, and no accounting accompanied it, and Defendants never asked Britannica to sign anything in exchange.

445. Goldman's conduct the morning after the seizure shows what it knew and what it wanted. At 8:20 a.m. on August 6, relationship manager Betty Tran wrote to "catch up on the Prime account." She followed up on August 14, August 27, August 31, and October 16, offered to visit Britannica's office, and on August 31 referred in writing to "an active Prime relationship" while seeking an update on AUM and performance. Britannica twice requested a written agenda; Goldman gave none. On information and belief, based on the immediate and persistent outreach after Britannica's commission flow stopped, Goldman was seeking, among other things, to preserve or convert the commercial relationship and knew more about Topwater's decision and the account's status than it disclosed.

446. Tran kept pursuing the commission stream her account had generated after Defendants seized the capital behind it: on or around August 31, 2024, she wrote Britannica that "as part of having an active Prime relationship" Goldman regularly engages managers for a firm update covering "current AUM, performance and any other relevant fund updates," and on or

184

around October 16, 2024 she wrote again to schedule the call, offering to work around Britannica's schedule while her co-venturers held Britannica's money.

447.    The accounts' books were kept by UMB Fund Services, the administrator Defendants retained, paid, and presented to Britannica as an independent third party, and fed the funds' PwC-audited financial statements, and those books never supported Defendants' termination arithmetic.

448.    Those books were also stacked against Britannica by construction: computed on the methods, inputs, and instructions Defendants supplied, as pleaded in this Complaint, they charge Britannica with every loss Defendants' own conduct inflicted, and they omit every credit Defendants owed in writing and never paid. Even on that accounting, kept on Defendants' own rules and treating Britannica as harshly as books could, the maximum drawdown ever charged against Britannica, measured across the entire relationship and reached only through Defendants' own forced liquidation, was 7.9 percent of the $25,000,000 book Defendants claimed to run, against a termination theory that required cumulative losses of roughly nine percent. Restore the interest and credits Defendants confirmed in writing and withheld, and there was no drawdown at all: the accounts stood in profit at the moment Defendants seized them.

449.    Defendants' own numbers refute the termination on any denominator, and the same numbers prove the strategy's quality. The worst annual decline Defendants' own books ever charged against Britannica was 6.83 percent of the stated account value, in 2022, and the relationship-wide total pleaded above, with Defendants' own liquidation losses included, never approached the tripline their termination theory required. Proportion matters, because the structure translated shallow account declines into deep consumption of the manager's thin layer, exactly as Defendants designed it. In 2022, the S&P 500 fell roughly 25 percent peak to trough

185

and the Nasdaq lost more than a third of its value; Britannica's account, on Defendants' own stated value, declined 6.83 percent, a decline Goldman's fractured books had themselves inflicted, and because Britannica's layer was the thin first slice of that stated value, absorbing every loss first while Defendants swept the account's profits out every month, even that shallow decline consumed approximately half of Britannica's capital. And at the close on August 5, 2024, the S&P 500 stood roughly 8.5 percent below its July record and the Nasdaq roughly 13 percent below its own: the broad market fell further in one month than Defendants' accounting charged against Britannica across the entire relationship, forced liquidation included. Britannica's drawdowns were shallow, its recoveries complete, and its record was earned in exactly the crash conditions first-loss capital exists to weather. The strategy was clearly successful at all times.

450.    On information and belief, no one at LAM or the administrator ever reconciled the three Stonefly figures against each other, because no reconciliation exists: the numbers were produced for different audiences, not from one set of books.

451.    Plaintiffs' monetary injuries must be kept in separate channels, only some of which are as following, while the rest are described elsewhere in these pleadings: (a) BC LLC's capital contribution, the $532,710.95 returned, and the $1,967,289.05 retained or allocated; lost profits from the opportunity; (b) 50 percent unreasonably taken by Topwater without providing the contractual capital; lost profits from contractual capital not provided, ranging from lost profits on $10 million to $25 million (c) amounts described as withdrawals or redemptions; (d) unpaid short-balance credits, interest, rebates, and offsets; (e) financing, borrow, commission, spread, and other execution costs; (f) excess liquidation loss caused by the compelled schedule and hedging ban; (g) Defendants' avoided losses and unjust enrichment; (h) BCML's lost advisory fees, enterprise value, and business-destruction damages; and (i) trade-secret actual

186

damages, unjust enrichment, reasonable royalty, exemplary damages, and fees. These categories are pleaded in the alternative and will not be recovered twice.

452. The administrator's records were never an independent check on Defendants, because Defendants controlled what the administrator saw and what rules it applied. UMB Fund Services was retained and paid by Defendants' funds, answered to LAM as Manager and self-described Valuation Agent, and computed BC LLC's capital under the methods, inputs, instruments, and instructions Defendants chose to supply.

453. Defendants fixed the retention before any computation existed: the decision to keep the layer was made and communicated by August 7, 2024, and the arithmetic offered for it was assembled on August 8, which is the order the metadata records.

454. On information and belief, Defendants either withheld from the administrator the operative account instruments, including Appendix C as amended and the written confirmations of the credits, or delivered superseded or incorrect terms and instructions in their place, so that the records ran wrong in Defendants' favor and against Britannica in every period. The basis is Defendants' own conduct: the administrator's statements omitted the cash and short-credit income the amended Appendix C made components of Investment Gains, in every month after the amendment's April 1, 2023 effective date; the statements fell short of Britannica's own calculations month after month, as Britannica documented in writing; the headline returns were computed on the stated Investment Account Value Defendants never provided; and when Britannica demanded the credits,

455. Plaintiffs seek an account, by account and by day, of every economic category, including without limitation: cash and short balances; applicable benchmark and negotiated rates; interest, rebates, financing spreads, commissions, execution charges, stock-loan and

187

ancillary revenue; administrator adjustments; first-, second-, and third-loss allocations; amounts characterized as withdrawals; avoided losses; recipient entities and accounts; and the September 26, 2024 return. Plaintiffs plead the existence and nonpayment or noncrediting of these categories from the contracts, communications, statements, and observed balances and do not guess the final recipient or amount where Defendants' ledgers supply the answer.

456.    Damm answered on April 16, 2024 by reciting an exclusion the operative Appendix C no longer contained, the text of a superseded instrument still being applied as though it governed. The administrator's engagement terms, instruction files, valuation policies, the instrument set Defendants actually delivered to it, and the correspondence between Defendants and the administrator are identified discovery. And the conclusion pleaded in this Complaint survives on either branch: even those records, kept on Defendants' rules and stripped of every credit owed, showed the profits, the balances, and the standing capital that refute the termination Defendants declared.

457.    The instructed accounting ran to named hands. The UMB personnel who received Long's July 31, 2024 written confirmation of the crediting requirement, and who received LAM's August 2024 valuation figures and instructions, are identified by name in the correspondence LAM and UMB control, and on information and belief they recorded the accounts as instructed rather than as independently computed. The basis is Long's July 31 writing confirming UMB's awareness of the crediting requirement, the instructed-administrator design pleaded above, and the three irreconcilable versions of the same claimed loss, versions no independent computation could produce.

458.    On information and belief, LAM instructed UMB to book the August 5 valuations on LAM's own fraudulent, made-up, and arbitrary numbers rather than on any independent

pricing, and UMB's files carry the instruction. The figures were not computations; they were commands. No independent computation could produce three irreconcilable versions of the same claimed loss, and no honest mark could stand on data LAM's own risk officer admitted ran hours behind the market.

459. On information and belief, the administrator's and the auditor's own exception and reconciliation files flag the gap between Defendants' claimed August 5 losses and the books that later recorded the 2024 capital surplus, because a loss claimed at three irreconcilable values cannot pass a tie-out.

460. On information and belief, the credit income generated on other managers' cash and short balances was retained by the platform exactly as Britannica's was, a platform-wide cash-diversion practice, and the administrator's credit ledgers across managers, with the sweep instructions behind them, will fix the amounts and destinations.

461. On information and belief, the fees, financing spreads, and charges extracted from Britannica's accounts flowed to identified LAM and Jefferies affiliates, entity by entity, and the intercompany transfer ledgers and distribution records naming each recipient are in Defendants' control. The recipient-level accounting demanded in this Complaint reaches every one of them.

462. On information and belief, the administrator's files record valuation and reconciliation exceptions on Britannica's accounts before August 2024, each an instance of the unreliable process Defendants ran, and the exception log will list them by date. The same UMB subpoena carries it.

463. Each monthly statement was a fresh act of the same fraud. Month after month, Defendants caused the administrator to issue statements presented as an independent record of BC LLC's capital while computed on the methods, inputs, instruments, and instructions

Defendants supplied, with the operative credit terms withheld or superseded terms in their place. Every issuance restated the false account, concealed the extraction as it ran, stood before each later contribution as part of its inducement, and reset the deception for the period that followed.

464.    The accounts' internal or external accountants and administrators, including UMB, implemented the financing charge on LAM's instruction and carried it into BC LLC's capital account month after month without any independent verification of its basis, on the instruction records those administrators and LAM control; and to this day Defendants have rendered no accounting of any of the debits taken from or credits owed on the accounts, in any period, to any Plaintiff.

465.    On information and belief, the Feeder Fund's 2024 audited financial statements could not and do not present the seizure-day arithmetic Defendants asserted to Britannica, and the auditor's workpapers record the difference.

466.    Defendants' own closeout conduct supplies powerful affirmative accounting evidence that no valid stop-out occurred.

467.    Defendants' own tax reporting then contradicted their own account statements, under penalty of perjury. The FINAL 2024 Schedule K-1 that Topwater Partners LLC issued to BC LLC reports, in Box 19 Code A and in the Item L capital-account analysis, cash "[w]ithdrawals and distributions" to BC LLC of $1,972,569 for 2024, against a beginning capital account of $2,499,825, a current-year tax loss of $527,256, and an ending capital account of zero. BC LLC actually received $532,710.95. Defendants therefore reported to the Internal Revenue Service that they distributed to BC LLC $1,439,858.05 that BC LLC never received. The administrator's statements tell the opposite story, booking the seized capital as loss allocations. The two sets of Defendants' own books cannot both be true, and either way

190

Defendants lose: if the K-1 is accurate, Defendants state in a federal filing that $1,439,858.05 of BC LLC's money was its distribution and remains unpaid; if the administrator's statements are accurate, Defendants filed a false information return with the IRS characterizing seized capital as money paid to their victim. Defendants chose their characterization by audience: losses for the account statements that justified the termination, distributions for the tax authorities. The choice is evidence of concealment, of scienter, and of the retrospective construction of the termination record pleaded in this Complaint.

468. The K-1 chain behind that filing confirms that the layer stood whole, on Defendants' own tax books, until the year Defendants seized it. Topwater changed the Partnership's taxable year from November 30 to December 31 and issued BC LLC two K-1s for 2023 under a cover notice signed by Travis Taylor that directed member questions to a Jefferies tax contact at a jefferies.com address, parent-level administration of the platform's own tax reporting. The two K-1s record, in the Item L capital-account analysis, a beginning capital account of $1,499,935, BC LLC's $1,000,000 contribution during the fiscal year, a net loss of $683,547 reflecting the cross-year timing differences the cover notice itself describes, withdrawals of $42,225, and a capital account of $1,774,163 at November 30, 2023; the stub-period K-1 then carries the account to $2,499,825 at December 31, 2023, the same $2,499,825 the FINAL 2024 K-1 states as BC LLC's opening balance before reporting it to zero. On Defendants' own filings with the Internal Revenue Service, BC LLC's capital stood intact at $2,499,825 through the end of 2023, and everything that took it to zero happened in 2024, the year of the seizure.

469. Defendants' filings with the Internal Revenue Service and their administrator's own statements are party admissions that destroy the exhaustion story. The K-1 chain carries BC

191

LLC's capital account into 2024 intact, as pleaded above. The 2024 records close the year of the seizure in a capital surplus of $536,097, counting every loss Defendants' own forced liquidation inflicted and not one dollar of the withheld credits. Defendants told the tax authorities and their own investors that the capital was there; they told Britannica it was gone; both statements were Defendants' own, and only one could be true.

470.    The ordinary-course book never recorded the event Defendants declared. No administrator statement, capital-account record, or allocation entry generated in the normal course reflects a first-loss exhaustion in either account at 9:32 a.m. on August 5, 2024, a Second-Loss Allocation in any amount, or the termination event itself as an accounting fact. The only records asserting the event are the ones built after the decision. A termination Defendants' own books never booked is a termination that did not occur.

471.    The waterfall itself overcharged Britannica every month it ran. Defendants sold a uniform fifty-five percent manager payout and papered fifty, and every monthly Investment Gains computation from the first through the last applied the shorted split. On Defendants' own statements, each month's Account Adviser Fee was computed five points below the represented uniform standard, on an Investment Gains base already stripped of the withheld credits: an overcharge inside an understatement, repeated monthly, quantifiable to the dollar from records Defendants control.

472.    Defendants' final tax filing completes the false-accounts record in Defendants' own arithmetic. The 2024 Schedule K-1 that Topwater Partners LLC issued to BC LLC was marked final and carries the figures described above, and its own loss figure reconciles with nothing Defendants ever asserted to Britannica: not with the three irreconcilable Stonefly figures,

192

not with the claimed Mayfly loss, and not with the $1,319,925.22 Defendants later presented as their final claimed damage.

473.    Defendants' own filings fix the chronology of BC LLC's first purchase. The New Jersey Schedule NJK-1 that Topwater Partners LLC issued to BC LLC states on its face that BC LLC's interest in the partnership began on December 1, 2021: Defendants' own record placing the first interest after the November 19, 2021 acceptance pleaded above and before the December 9, 2021 date the fully executed subscription papers carry. Each later purchase and addition, including the April 25, 2022 contribution, the September 22, 2023 increase, and the July 2024 Mayfly funding, carries its own later date, as pleaded in the timeliness section of this Complaint.

474.    The final accounting Defendants did render came late and closed the books on their own taking. Defendants delivered the 2024 Schedule K-1 package in 2025, more than eight months after the seizure, and the electronic package Defendants transmitted carries a May 22, 2025 creation date, months after Britannica's December 2024 demand letters, while the prior year's package had been created in the ordinary course by April 10, 2024. They marked the K-1 final, closing BC LLC's interest on their own tax records while holding $1,967,289.05 of its capital. And they have issued no statement, no Schedule K-1, and no accounting of any kind for any period after 2024, leaving the disposition of the retained capital unrecorded in every document Defendants have ever provided.

475.    Defendants' own final tax reporting admits what stood behind the stated values: borrowed money, not committed capital. The 2024 Schedule K-1 that Topwater Partners LLC issued to BC LLC reports $3,945,872 of nonrecourse liabilities allocated to BC LLC's interest at

the beginning of 2024, and none by year end. The account Defendants marketed as backed by committed Topwater capital ran, on Defendants' own sworn filing, on fund-level debt.

476. The same final K-1 reports BC LLC's share of profit, loss, and capital as 0.000000 percent at both the beginning and the end of 2024, while allocating BC LLC $527,256 of loss. Defendants' sworn tax position is that a partner entitled to nothing absorbed everything.

477. Defendants' state filing adds a fourth version to the three they have never reconciled: the 2024 New Jersey NJK-1 reports partnership loss of $528,671 against the federal $527,256, alongside the $637,793, the $907,166, and the approximately $683,000 versions of the same claimed Stonefly loss.

478. The final K-1 carries $525,044 of loss under box 11's catch-all code ZZ.

479. From August 5, 2024 until the partial return, and to this day for the balance, Defendants held Britannica's seized capital in interest-bearing form. On information and belief, the fiduciary earned and kept the yield on the beneficiary's own money, and the fund cash ledgers and sweep-account statements will fix every dollar of it. The accounting demanded in this Complaint reaches the yield.

480. The administrator's own statements prove the capital was never there, from documents already in Plaintiffs' hands. The UMB Fund Services member statements for December 31, 2022, December 31, 2023, July 31, 2024, and August 31, 2024 each record exactly one capital account behind the Stonefly account: Britannica's First Loss Member capital account. Each statement's own account-level Total Capital Contribution line equals Britannica's first-loss contribution alone, $2,500,000 against the stated $25,000,000 Investment Account Value on the December 2023 statement and $1,000,000 against the stated $10,000,000 value on both 2024 statements, and no statement records any Topwater, fund, or Regular capital account funding the

account at any represented value. The party that kept the official books never booked the represented capital, because there was none to book.

481.    On information and belief, in the entire instruction correspondence between LAM and the administrator, no instruction ever directed the booking, receipt, or maintenance of Topwater capital in either account at any represented value; LAM instructed its administrator on fees, allocations, and exclusions, and never once on the capital it claimed stood behind the accounts. The basis is the instructed-administrator record pleaded above, the capital-account structure the administrator's own statements display, and the pooled design pleaded in this Complaint; the complete LAM-administrator correspondence file, onboarding instructions, and chart-of-accounts setup are identified discovery.

482.    On information and belief, the Regular Members' own 2024 statements show no loss allocation from either account in any amount, and show the year's results enhanced by the losses shifted onto Britannica's seized layer. The investor-level administrator statements are identified discovery.

483.    On information and belief, Handler's and Friedman's own capital-account statements in the protected layer for 2024 record the benefit of the shifted losses and retained economics, to the dollar, in documents a subpoena will produce in an afternoon. The basis is the deck's own statement of the Jefferies and principal capital in the protected layer and the committee roles personally pleaded as to each.

484.    On information and belief, part of the seized capital or its economic benefit moved upstream through the Cayman Master Fund's accounts in the weeks after August 5, 2024, and the fund-level transfer journal for August and September 2024 will show each movement.

**N. Notice, Demand, and Defendants' Conduct After Notice**

485.    Defendants had notice of the dispute from the first week, and their conduct after notice was refusal and concealment. O'Hara and LAM, acting through Topwater, had notice of the dispute no later than August 7, 2024, when Britannica challenged both asserted breaches and demanded the supporting evidence. Stonefly and Mayfly had notice no later than August 14, when litigation counsel answered for the funds, denied the challenge, relied on the August 8 package, and reserved all rights and remedies. Each other person or entity's preservation duty arose when that recipient actually received the dispute or preservation demand, participated in the response, or independently anticipated litigation. From the applicable recipient-specific date, the relevant actor was required to preserve the decisions, valuations, liquidation records, capital and credit accounting, communications, and confidential-information evidence within that actor's possession, custody, or control.

486.    In December 2024, Britannica, through counsel, sent detailed demands to Topwater and individual recipients including Borgia and O'Hara. The demands identified the disputed valuations, liquidation directives, accounting, confidential information, and damages and expressly required preservation of documents, communications, data feeds, logs, calculations, and messages, including on Teams, Slack, Bloomberg Chat, WhatsApp, text messaging, and other ephemeral or auto-deleting platforms. The demands required immediate suspension of auto-deletion and purging. On January 9, 2025, Britannica's counsel again demanded a comprehensive litigation hold.

487.    Defendants did not substantively answer the evidence or preservation demands. On December 26, their counsel called the response period "silly" and "needlessly heavy handed," said it would be ignored, and declined to address the substance. On January 14, 2025, the same counsel denied liability, declared that no further correspondence would be answered, and did not

196

confirm a litigation hold or identify any preserved native record. Defendants' emails carried a footer stating that Topwater archived and monitored incoming and outgoing email. Yet Defendants have never produced the 9:32 inputs, calculations, logs, native screenshots, message history, or allocation bridge demanded since August 7.

488. The January 14 letter confirmed that the same counsel represented Stonefly, Mayfly, LAM, employees of the Topwater Capital Division, and Jefferies in the dispute. It also stated that any losses allegedly sustained by BC LLC were the direct result of the "mandatory liquidation" under the Agreements. That statement concedes the causal role of the liquidation; no valid stop-out authorized it, and its manner violated the Agreements and Defendants' duties, as pleaded throughout this Complaint. The letter further asserted that the capital was returned precisely as the offering documents contemplated, an assertion false on Defendants' own documents: the Memorandum's month-end redemption language, the August liquidation dates, the August statement, and the September 26 payment. The assertion is also an admission: the amount and the timing of the return were Defendants' own chosen mechanics, applied while Defendants refused the accounting that would test the amount.

489. LAM's Form ADV brochures stated that annual fund audits and delivery of audited financial statements were components of its custody-rule practice. BC LLC did not receive a fiscal 2024 audited statement that reconciled the August liquidation and disposition of its capital. That audit year necessarily required the auditors, administrator, and management to address the valuation, loss allocations, amounts classified as withdrawals, unpaid credits, and capital return. On information and belief, the audit files, workpapers, confirmations, adjustment entries, and management representation letters contain evidence of those matters. Defendants have not delivered that accounting to BC LLC.

197

490.    The disclosures moved after the seizure, and the records moved after the demand letters. On information and belief, after seizing Britannica's accounts, LAM rewrote several of its public conflict disclosures, adding to or altering in its later Form ADV filings conflict, valuation, or termination language that its 2021 through 2024 filings did not carry while Britannica's capital was being solicited. And on information and belief, after receiving Britannica's December 2024 demand letters, LAM and Topwater Partners LLC altered, suppressed, or destroyed records bearing on Britannica's claims and changed disclosures and books to fit the position their counsel had announced. The basis is Defendants' own demonstrated method: the August 8, 2024 package assembled after the event with its image metadata stripped; the native contemporaneous calculations demanded within forty-eight hours and never produced to this day; the 2024 K-1 package whose own file metadata records creation on May 22, 2025, months after the demand letters, while the 2023 package was created in the ordinary course; and the 2022 regulatory recordkeeping orders, pleaded in this Complaint, entered against the institutions for failing to preserve exactly this class of record.

491.    On information and belief, the Master Fund's 2024 audited financial statements disclose the August 2024 terminations and first-loss forfeitures in their related-party or subsequent-events notes, in words Defendants chose for their auditors while refusing Britannica any accounting at all.

492.    On information and belief, the audited financial statements of the Topwater funds, and the auditor's workpapers behind them, record pooled fund assets and disclose no liability, commitment, or obligation to fund any individual managed account at its stated Investment Account Value, because no such obligation was ever booked; Defendants' audited books and their marketed commitments describe two different businesses. The basis is the fund accounting

198

standards that require commitments to be disclosed, the Master Fund's reported $342 million of net assets across thirty-four managed accounts, and the pooled structure pleaded in this Complaint.

493.    On information and belief, LAM, Jefferies, and Goldman Sachs noticed their professional and management liability insurers of Britannica's claims after the December 2024 demand letters, and those notices describe the conduct in the detail the policies require. On information and belief, the claim submissions quantified the exposures in Defendants' own words: the withheld credit and interest income, an internal admission of that stream's existence and scale; the interference and concerted-conduct exposure, including the enterprise-value component; and the statutory exposures, including rescission of the fee streams, separately identified and priced. The basis is the pleaded demand letters and the uniform institutional practice of noticing carriers upon a preserved claim; the insurance agreements are mandatory initial disclosures under Rule 26(a)(1)(A)(iv), and the notices, claim submissions, and coverage correspondence follow in discovery.

494.    On September 25, 2024, Jefferies stated publicly that the market environment for certain asset-management strategies had been challenging during the quarter that included August 5. The statement did not identify Britannica or Topwater. Read together with Rubin's June 18 record of Jefferies Risk involvement and O'Hara's statement that the decision was made above him, it provides a concrete basis to seek the parent-level risk, strategy, margin, loss, and management-reporting records for the August event.

495.    LAM, Topwater, the funds through counsel, O'Hara, Borgia, and any other recipient shown by delivery records had notice of the dispute and the preservation demand. LAM, through O'Hara, supplied a retrospective package instead of the native calculations, source

files, and audit logs. The notified recipients refused repeated requests for the sources and did not confirm a hold. On information and belief, at least some responsive records in the custody of a notified person or entity were destroyed, or intentionally allowed to expire after that person's duty attached. The concrete basis is the continued absence of native 9:32 outputs and audit trails; the August 8 substituted package; the refusal of the sources; the use of platforms with short or automatic retention; the failure of notified recipients to confirm preservation; and the institutional preservation history pleaded below. Jefferies' or Goldman's duty date is pleaded from actual receipt, counsel representation, or independent anticipation, not collectively.

496.    The preservation risk had already been documented within the Jefferies corporate structure. On September 27, 2022, while the Britannica agreements were in force, Jefferies LLC admitted the facts stated in SEC Exchange Act Release No. 34-95923 and acknowledged that its conduct violated the federal securities laws. The SEC found a widespread, longstanding, and firm-wide failure to preserve business communications sent from personal devices by employees at every level, including dozens of managing directors and senior supervisors. Nearly all of a sample of approximately thirty personnel used off-channel communications and together sent or received tens of thousands of messages by text, WhatsApp, Signal, and other unapproved methods. Jefferies LLC failed to preserve the substantial majority of those communications, and the SEC found that the failure likely deprived the Commission of required records in multiple investigations. The order found willful violations of Section 17(a) of the Exchange Act and Rule 17a-4(b)(4), censured Jefferies LLC, and imposed a $50 million civil penalty.

497.    Jefferies Financial Group had actual notice of the order and undertakings. On January 10, 2023, JFG and Jefferies LLC jointly filed a Schedule 13D identifying Jefferies LLC as JFG's wholly owned direct subsidiary and disclosing the order, willful preservation violation,

200

$50 million penalty, and electronic-communications retention undertakings. JFG's Executive Vice President and General Counsel signed for JFG and Jefferies LLC after certifying that he had made reasonable inquiry and that the filing was true, complete, and correct.

498.    The order required Jefferies LLC to retain a compliance consultant; review preservation on personal devices; require quarterly certifications; assess surveillance, technology, unauthorized channels, employee usage, and discipline; conduct an internal audit; report preservation-related discipline through September 27, 2024; certify compliance to the SEC; and preserve every undertaking record for at least six years.

499.    Goldman Sachs & Co. LLC was subject to a parallel SEC order on September 27, 2022, Exchange Act Release No. 34-95922. The order found widespread and longstanding failure to preserve business communications sent through unapproved channels from at least January 2018 through September 2021, imposed a $125 million civil penalty, and required preservation-related undertakings.

500.    The Commodity Futures Trading Commission entered parallel orders against both firms the same day. On September 27, 2022, the CFTC ordered Goldman Sachs & Co. LLC to pay a $75 million civil monetary penalty and Jefferies LLC to pay a $30 million civil monetary penalty for failures to maintain and preserve required records of business communications conducted over unapproved channels and related supervision failures. Together with the SEC penalties, the two firms paid $280 million in coordinated sanctions on a single day for admitted, firm-wide recordkeeping failures. The CFTC orders independently required remediation and preservation undertakings, and they are directly relevant here because Plaintiffs' Commodity Exchange Act count places Defendants' commodity-interest conduct, records, and supervision at issue.

**O. Britannica's Trade Secrets and Defendants' Acquisition, Disclosure and Use**

501.    Plaintiff Sanjay Gupta created and owns the proprietary trading, investment-research, portfolio-construction, risk-management, financing, hedging, and execution methods described below, collectively, the "Britannica Trade Secrets." BCML possessed, deployed, and commercialized the Britannica Trade Secrets in its investment-advisory business under Gupta's authorization and license. No Plaintiff assigned ownership of the Britannica Trade Secrets to any Defendant.

502.    Gupta developed the Britannica Trade Secrets through more than two decades of investment banking, quantitative research, software and model development, live trading, derivatives analysis, and firsthand global investigation.

503.    Gupta thereafter conducted extensive proprietary research across more than eighty-five countries and all major global markets, traveling hundreds of thousands of miles and, at times, assuming substantial personal risk to investigate capital flows, infrastructure, factories, ports, stock exchanges, financial institutions, commodity markets, energy reserves, currencies, political systems, monetary conditions, companies, and local securities markets. He developed local brokerage, research, industry, and information networks and combined firsthand observations unavailable from conventional financial publications with economic, market, corporate, geopolitical, and quantitative data.

504.    Gupta transformed that research and experience into thousands of pages of proprietary models, specifications, calculations, scenario analyses, decision rules, portfolio frameworks, and operating procedures. The Britannica Trade Secrets contain Gupta's nonpublic selection, collection, organization, transformation, weighting, calibration, sequencing, timing,

202

and interaction of information and methods and in the specific rules by which those components are converted into positions, hedges, financing arrangements, executions, and portfolio decisions.

505.    The Britannica Trade Secrets include separately protectable but interdependent components, including the following:

a.    **The Reconnaissance Research Architecture**, which converts proprietary firsthand intelligence concerning capital flows, infrastructure, factories, companies, commodities, currencies, political developments, monetary policy, liquidity, regulation, market structure, and investor behavior into ranked investment hypotheses, regime classifications, risk assessments, and trade signals.

b.    **The Capital-Flow and Market-Regime Models**, including the nonpublic variables, relationships, weightings, thresholds, and timing rules used to identify and anticipate changes in cross-border and cross-asset capital movements, liquidity regimes, correlations, volatility, risk appetite, index and fund flows, sector leadership, currency movements, commodity demand and supply, and the movement of capital among equities, fixed income, currencies, commodities, futures, indices, options, exchange-traded products, and related instruments.

c.    **The Instrument and Position-Selection Architecture**, including the proprietary rules used to select markets, securities, derivatives, underlying instruments, position direction, position size, strike, maturity, duration, and combinations of instruments based on liquidity, volatility, catalysts, pricing relationships, expected capital movements, transaction costs, portfolio interactions, and risk-adjusted return.

d.    **The Options, Volatility, and Relative-Value Architecture**, including proprietary analyses of volatility surfaces, skew, term structure, implied and realized volatility,

203

dispersion, correlation, index-component relationships, put-call relationships, synthetic exposures, options and futures relationships, and relative-value and arbitrage opportunities. The architecture includes rules for selecting among single-instrument options and multi-instrument structures, including vertical, calendar, diagonal, ratio, butterfly, condor, dispersion, correlation, synthetic, conversion, reversal, financing, volatility, index, exchange-traded-fund, futures, and related structures.

e.     **The Dynamic Hedging Architecture**, including the nonpublic thresholds, intervals, sequencing, instruments, and decision rules used to measure and adjust delta, gamma, vega, theta, rho, skew, correlation, interest-rate, volatility, gross, net, factor, and higher-order exposures. These rules determine when to hedge, when not to hedge, which instrument to use, how much exposure to retain, how rapidly to adjust, and how the exposures should interact as prices, volatility, liquidity, correlations, time, and market regimes change.

f.     **The Market-Neutral Portfolio-Construction Architecture**, including the proprietary method for combining long and short positions, independent sources of alpha, limited or negative beta, volatility positions, options overlays, cross-asset hedges, position sizes, concentration limits, liquidity limits, and correlated and negatively correlated exposures into a dynamic portfolio designed to capture alpha while maintaining controlled directional and systemic exposure.

g.     **The Financing and Short-Credit Architecture**, including the proprietary methods for constructing, sequencing, sizing, collateralizing, and hedging short positions and related securities so that short-sale proceeds and credit balances offset or eliminate debit financing while preserving the portfolio's intended market, volatility, correlation, and risk exposures.

h.    **The Execution and Adjustment Architecture**, including the proprietary rules governing order timing, trade sequencing, execution intervals, position adjustment, maturity migration, strike migration, hedge frequency, instrument substitution, transaction-cost management, entry and exit, and movement from the portfolio's current exposures to its intended exposures.

i.    **The Scenario and Constraint Architecture**, including proprietary models showing how particular positions, combinations, and portfolio exposures respond to specified changes in prices, volatility, skew, correlations, liquidity, interest rates, time, and other market variables, and how apparently conventional risk constraints may increase rather than reduce actual portfolio risk.

j.    **The Complete Strategy Map**, consisting of the integrated relationship among the foregoing components, the live and historical positions generated through them, and the complete time-stamped record demonstrating how the components were applied under actual market conditions.

506.    The foregoing categories identify the boundaries and functional characteristics of the Britannica Trade Secrets without disclosing the secret formulas, parameters, thresholds, weightings, source selections, code logic, precise mathematical relationships, or operating instructions themselves.

507.    The complete trading record generated through the Britannica Trade Secrets was itself a valuable and confidential compilation. It included the identity, direction, quantity, price, underlying instrument, strike, maturity, sequence, and exact time of each trade and hedge; the complete history of entries, exits, replacements, adjustments, and rebalancing; the resulting

positions and profit-and-loss information; and contemporaneous portfolio, financing, volatility, and Greek exposures.

508. When combined with the models, spreadsheets, presentations, written explanations, oral explanations, scenarios, market prices, volatility surfaces, and contemporaneous market movements supplied by Plaintiffs, it disclosed a functional map of how the Britannica Trade Secrets operated under changing conditions.

509. The Britannica Trade Secrets derived actual and potential independent economic value from their secrecy. They allowed Plaintiffs to identify and exploit market opportunities, manage complex and interacting risks, generate substantial cash and credit balances, maintain market-neutral or non-biased exposures, and construct positions capable of profiting during market dislocations while limiting conventional equity-market exposure.

510. The Britannica Trade Secrets could not be duplicated without access to Gupta's firsthand global research, relationships, investment-banking and derivatives experience, decades of live trading and testing, proprietary datasets and models, substantial financial expenditures, technology and operating infrastructure, and the historical relationship between the models and the executed positions.

511. Plaintiffs continuously took extensive and reasonable measures to preserve secrecy. Within Britannica, substantive access to the models, methods, and detailed strategy information was restricted to Gupta, Britannica's Chief Investment Officer, and Madej, its Chief Compliance Officer.

512. Plaintiffs protected the information through passwords, encrypted devices, restricted systems and folders, access limitations, confidentiality policies, nondisclosure

obligations, and prohibitions and controls concerning unauthorized copying, forwarding, disclosure, and distribution.

513.     Plaintiffs' materials were also marked, as applicable, "Proprietary," "Trade Secret," "Highly Confidential," "Private and Confidential," "Distribution Prohibited," or with equivalent restrictions. The materials expressly prohibited unauthorized copying, scanning, reproduction, transmission, disclosure, distribution, and use.

514.     All records, positions, trades, models, calculations, investment advice, strategy information, risk information, account information, and other materials furnished or made available by Plaintiffs in connection with the relationship were highly confidential and subject to the confidentiality and limited-use obligations including those contained in Section 10 of each AIAA and the other applicable agreements and undertakings.

515.     Plaintiffs disclosed the Britannica Trade Secrets to Defendants only because Defendants represented that the information was required for diligence, onboarding, account operation, monitoring, legitimate account-specific risk management, brokerage, valuation, or administration, and because Defendants and their personnel were subject to written contractual and other duties to maintain its secrecy and limit its use.

516.     Defendants received confidential presentations, spreadsheets, models, calculations, scenario analyses, written emails, oral explanations, live and historical positions, precise execution timestamps, complete trading logs, portfolio exposures, risk reports, financing information, and instrument-level explanations of the options, volatility, hedging, financing, and market-neutral methods.

517.     LAM and its Topwater division received the information directly through diligence, account onboarding, continuous account feeds, portfolio and risk distributions,

financing discussions, committee materials, emails, telephone conferences, and the account-review process. Stonefly and Mayfly obtained and held the same information through the accounts, systems, agents, and personnel through which they acted.

518.    Jefferies was directly integrated into the process. Jefferies' Chief Executive Officer Richard Handler and President Brian P. Friedman sat on the Investment Committee governing the platform and Britannica's accounts. Daraviras sat on the Investment Committee and Support Committee. The head of risk for Jefferies approved the platform's risk parameters and investment guidelines. Jefferies Risk entered and reviewed Britannica's accounts by June 2024.

519.    All Topwater, LAM, and Jefferies individual Defendants received the confidential information directly, were included on common distribution lists carrying Britannica's account, position, risk, model, and strategy information, or obtained and analyzed the information through the Investment Committee, Support Committee, Jefferies Risk process, account systems, and decision channels in which they participated.

520.    Goldman Sachs received confidential strategy presentations and materials during its solicitation, diligence, and onboarding of Britannica. As the imposed prime broker for Stonefly, Goldman Sachs also received the complete live order, execution, position, exposure, financing, and performance record generated by Britannica's trading.

521.    Defendants repeatedly used purported risk, financing, compliance, and constraint issues to compel Plaintiffs to disclose additional layers of proprietary methodology. Defendants' personnel frequently did not understand the quantitative, options, volatility, financing, and market-neutral characteristics of Britannica's positions and imposed or proposed constraints that would have increased, rather than reduced, actual risk.

522. To prevent those constraints from damaging the accounts, Gupta and Madej were required to provide detailed written models, spreadsheets, emails, calculations, telephone explanations, instrument-level examples, and market scenarios showing how the portfolio would respond to changes in price, volatility, liquidity, correlation, maturity, interest rates, and other conditions and why Defendants' proposed constraints would create unintended exposures or losses.

523. During the financing-charge dispute pleaded elsewhere, Plaintiffs requested that any charge on debit balances be accompanied by corresponding credit for cash and credit balances created through short sales and related positions. Defendants expressed genuine disbelief that Britannica could operate its strategy without maintaining a continuing net debit cash balance.

524. Defendants then required Plaintiffs to explain, through emails, models, calculations, and telephone discussions, the proprietary sequencing, sizing, short-sale, collateral, options, financing, and hedging relationships through which Britannica generated substantial cash and credit balances while maintaining its intended market, volatility, and risk exposures. Those disclosures taught Defendants a commercially valuable financing and portfolio-construction method they had not previously understood.

525. Defendants similarly required Plaintiffs to disclose detailed scenario models demonstrating how Defendants' constraints would perform under different market movements. Those disclosures included instrument-level explanations concerning strikes, maturities, volatility changes, Greek exposures, gross and net exposures, timing intervals, and the sequence and interaction of hedges.

526.    O'Hara acknowledged that Defendants and their committees had analyzed Britannica's methodology. He stated in substance that options created an additional layer of complexity that Defendants had previously failed to understand; that Defendants' earlier restrictions reflected their experiences with and misunderstanding of other managers who had used volatility instruments and were liquidated; and that the risk committee had acquired a materially improved understanding from Britannica's explanations.

527.    Defendants thereafter revised Britannica's constraints and risk requirements consistently with the methods Plaintiffs had taught them. O'Hara stated that the committee's new understanding would allow the constraints and risk practices to be applied more effectively. That statement and the resulting revisions acknowledged that Plaintiffs' confidential instruction had been incorporated into Defendants' risk processes and was not confined to passive observation of Britannica's account.

528.    O'Hara further stated that Britannica was the only genuinely market-neutral or non-biased manager on Defendants' platform and that the committee understood that distinction. Defendants therefore analyzed and classified Britannica's methodology comparatively across their platform and understood that it differed materially from the strategies and risk characteristics of the other managers they supervised.

529.    On August 5, 2024, O'Hara demonstrated Defendants' knowledge of the strategy's value and expected operation during the market dislocation. He stated in substance that he knew Britannica would make substantial money if permitted to continue trading that day, but that Defendants would not permit Britannica to do so.

530.    Defendants' permission to receive confidential information was strictly limited to purposes connected with Britannica's accounts and the governing relationships. It did not

authorize Defendants to use the information to educate or train their personnel; improve platform-wide risk, financing, valuation, or operating models; revise constraints, contracts, or procedures for other managers; develop competing systems or strategies; inform proprietary, affiliated, employee, or personal trading; anticipate Britannica's future trades; facilitate adverse termination or liquidation decisions; transfer the strategy to another adviser; or obtain any other commercial benefit unrelated to the proper operation of Britannica's accounts.

531. Defendants exceeded those limited purposes. Defendants used Plaintiffs' models and explanations to correct their prior misunderstanding of complex options and volatility exposures, revise risk constraints and practices, classify and compare strategies across their platform, and develop knowledge applicable to other managers, accounts, contracts, and operations.

532. Defendants used internal, affiliate, and external distribution lists to disseminate Plaintiffs' trade secrets and confidential proprietary data and strategies widely and without authorization.

533. On information and belief, Defendants further copied, disclosed, transmitted, incorporated, or used the Britannica Trade Secrets to create, revise, or improve risk-management models, constraint systems, valuation procedures, financing practices, manager agreements, account terms, operating protocols, training materials, surveillance systems, and trading methods throughout the Topwater, LAM, and Jefferies complex.

534. On information and belief, Defendants also used, disclosed, or made the Britannica Trade Secrets available for proprietary, affiliated, employee, or personal trading in options, volatility instruments, indices, futures, securities, and related hedges, and to anticipate,

replicate, trade with, trade against, or profit from positions and market responses identified through Plaintiffs' methodology.

535.    Those information-and-belief allegations rest on concrete facts, including Defendants' repeated acquisition of detailed models and explanations; their complete possession of Britannica's live and historical strategy map; the common distribution lists; the committee analyses; O'Hara's admissions concerning Defendants' prior misunderstanding and newly acquired knowledge; Defendants' subsequent revisions based on Plaintiffs' instruction; their comparison of Britannica with other managers; Jefferies' direct committee and risk involvement; and Defendants' financial, technical, and operational ability to apply the information throughout their complex.

536.    The precise internal recipients, model changes, downstream transmissions, derivative materials, contracts, training uses, trades, positions, revenues, avoided losses, and personal or affiliated account activity are reflected in Defendants' committee materials, risk-model histories, source and version histories, policy revisions, account agreements, communications, access logs, surveillance systems, trade blotters, proprietary and affiliated account records, employee-account records, and related documents exclusively within Defendants' possession.

537.    Defendants' unauthorized use and disclosure impaired Plaintiffs' control over the Britannica Trade Secrets; diminished their secrecy, exclusivity, competitive advantage, and licensing value; impaired Plaintiffs' ability to deploy and monetize them; enabled Defendants to avoid substantial research, development, testing, staffing, technology, and operating expenditures; and conferred platform, risk-management, contractual, trading, counterparty, and other commercial benefits on Defendants.

538. The Britannica Trade Secrets relate to products and services used and intended for use in interstate and foreign commerce, including investment advisory services, portfolio management, financial research, brokerage, securities trading, options and futures transactions, derivatives pricing, risk management, and financial technology conducted through United States and international markets.

539. Plaintiffs discovered Defendants' unauthorized acquisition, disclosure, and use no earlier than January 2, 2025 and through the subsequent facts and records described in this Complaint. The internal scope of Defendants' use and dissemination remains concealed and is discoverable only through Defendants' records.

## P. The Platform-Wide August 5 Event, the Differential Treatment, and the Enterprise

540. The August 5 liquidation was part of a platform-wide event directed through an integrated chain. O'Hara's statements pleaded above fixed the event's scale across his platform-wide call list, its source in a decision long made at the parent company and affiliates, its finality, and Britannica's exclusion from anyone with authority. LAM was the contractual Manager and self-described Valuation Agent. The Investment Committee controlled accommodations. Jefferies Risk had been engaged with Britannica's accounts. Goldman was the Stonefly prime broker, received account data through SpiderRock, and harvested the economics of the trading flow. The administrator later reconciled BC LLC's capital. Each participant had a distinct role, and the internal records will identify each person's authority, knowledge, motive, benefit, communication, and causal act.

541. On information and belief, the platform event was driven by Defendants' own liquidity, margin, capital, affiliated-investor, and broker interests rather than uniform application of account contracts. The basis is O'Hara's statement that the decision served Topwater's liquidity

213

requirements and came from above him; the more than forty calls; the centralized Investment Committee; Jefferies Risk involvement; Goldman's reported view that Britannica was a high user of capital; the contemporaneous market-wide collateral demands; and Jefferies' later disclosure that certain asset-management strategies faced a challenging quarter. Defendants' aggregate exposures, margin calls, liquidity reports, capital flows, selection criteria, and decision communications are expected to confirm the purpose and beneficiaries of the event.

542.    On information and belief, the more than forty advisers contacted during the August 5 event did not all receive mechanically identical treatment. Some were terminated or ordered to reduce risk, while others received time, cure opportunities, different schedules, capital accommodations, or other forbearance. The basis is the multi-manager structure; the standing Investment Committee; its documented exercise of discretion in Britannica's liquidation; and Defendants' repeated prior use of warnings, cures, extensions, and negotiated limits. If other managers were treated the same way, that supports an institutional practice, notice, continuity, and punitive relief. If they received better treatment, that supports selective enforcement, targeting, pretext, and scienter. Defendants' call lists, scripts, notices, cure decisions, schedules, margin files, and Committee records will establish which branch occurred.

543.    On information and belief, Defendants moved against other first-loss managers in the same August 5 to 9, 2024 window under the same machinery. The basis: O'Hara told Britannica on August 5 that he had more than forty other managers to call; the stated values across the platform drew on one shared pool then under platform-wide stress; and the division's economics ran account by account. The termination notices, valuation runs, and committee records for that week, all in Defendants' control, will identify every manager the machinery reached.

544.    On information and belief, Defendants ran the same termination machinery against other managers in the platform's earlier stress windows, including the March 2020 dislocation and the 2022 drawdowns. The basis is the design's uniformity across managers, the trigger's structure, and the division's own audited loss record for those years; the termination notices, valuation runs, and committee minutes for each window are in Defendants' control.

545.    On information and belief, Defendants ran the same repricing machinery on the platform's other first-loss managers as a class: drawdowns on the order of five percent triggered committee review, and continuation was priced in new charges, restrictions, or capital demands, exactly as it was priced against Britannica.

546.    On information and belief, either the cross-default was imposed on Britannica alone among the platform's managers in the summer of 2024, or it was rolled out platform-wide; Defendants' amendment files will show which, and each answer convicts: singling out proves targeting, and a platform-wide rollout proves the scheme's design.

547.    Prior counterparties had already accused Topwater-related principals of withholding investor capital and imposing unexplained write-downs. The Connecticut decision in *Canada v. Topwater Exclusive Fund III* records allegations of delayed redemptions and unexplained valuation or write-down conduct by Topwater-related entities. The prior dispute gave relevant principals notice of valuation, accounting, redemption, document, custodian, and preservation issues and identifies comparator records and witnesses. On information and belief, based on that prior dispute, the platform's standardized first-loss structure and committees, the recurring audited allocation pattern, the more than forty August 5 calls, and Defendants' exclusive possession of other manager files, similar acquisition, accounting, valuation,

restriction, termination, or retention practices occurred with other managers. Those records will show whether the conduct was recurring and who knew of it.

548.    Britannica was not alone, and the sequence was not improvised. In December 2023, the same platform issued a redemption notice to another of its managers, Weiss Multi-Strategy Advisers, demanding repayment of $53 million by the end of that year. When the demand was not met on the platform's terms, the Jefferies parties accused the manager of fraud, demanded personal guarantees, and litigated; by April 29, 2024 the manager's companies were in the chapter 11 proceeding. In that proceeding, the court denied the Jefferies entities the right to credit bid for estate assets because their asserted lien was actively disputed, and observed that they had declined an opportunity to purchase the assets and presented no concrete bid while demanding an auction. Within a single twelve-month window, the platform ran the same sequence against two managers: an abrupt liquidity ultimatum, an accusation, and destruction. Upon information and belief, based on that repeated signature, the treatment of Britannica was not an aberration; it was the platform's design in operation.

549.    The trap is still recruiting. Defendants hold the program out as an active offering today: Leucadia Asset Management's own current public materials present Topwater as managing its multi-strategy, multi-manager first-loss fund, marketed as a structure that "seeks to mitigate drawdown risk for investors," and LAM's 2025 and 2026 Form ADV filings keep the program registered and operating. On information and belief, Defendants continue to solicit new first-loss managers on materially the same representations this Complaint pleads false; the basis is the standardized program design pleaded above, the active public offering, and the filed ADVs, and the current decks, questionnaires, and solicitation correspondence in Defendants' control will show the representations verbatim.

216

550.     On information and belief, the mandate O'Hara stated aloud, that the Regular capital could never see a dollar of loss, exists in written form inside LAM, in risk limits, committee guidelines, or investor communications, because a registered adviser's operating mandate of that consequence does not live only in speech; the writing that states it is the confession the oral admissions predict. The basis is O'Hara's repeated oral admissions between 2022 and 2023, pleaded in this Complaint on the recollection of Britannica's officers and reconfirmed by them, and the trigger architecture and audited one-way loss history that enforced the mandate in practice.

551.     The accounting and cash-diversion conduct was continuous and ran in the platform's favor. Britannica documented recurring statement discrepancies, including a monthly difference exceeding $70,000, and sought transaction-level support that Defendants never supplied. In March 2023, Damm transmitted Stonefly's revised credit language while representing that Topwater was investigating positive-credit treatment with Goldman and would paper the result. In July 2024, Long confirmed that Mayfly's credit on a $7,500,000 short balance would be calculated at month end. Defendants terminated before that calculation, never showed the credit as paid, and returned only part of BC LLC's capital. Meanwhile, the audited fund interest-income stream pleaded above, which grew roughly tenfold across the relationship, was allocated under Defendants' methodology to Regular Members rather than first-loss accounts. On information and belief, based on the aggregated reporting, absence of account credits, and audited allocation method, LAM, the funds, Jefferies affiliates, Goldman, or other platform participants retained or benefited from at least part of the omitted economics. Their ledgers will identify each recipient and amount.

217

552.     The trade-secret misconduct comprised separate actor-specific acts outside the limited account-administration purpose. LAM and Topwater demanded and received Britannica's methodology and live data and, on information and belief, transmitted it to Jefferies Risk for the adverse pre-termination decision and parent-level risk purposes. Goldman received strategy and position information for Stonefly brokerage functions and, on information and belief, used or transmitted part of it for broader relationship, risk, or commercial purposes not disclosed to Britannica. O'Hara threatened to transfer the live book to LAM or another adviser. After deciding to terminate the relationship, LAM and Topwater used the information to implement the adverse liquidation for platform benefit, retained it after the account purpose ended, refused to identify recipients or uses, and refused to confirm return, deletion, segregation, or cessation of use. On information and belief, based on the access, dissemination, integration, operational adaptations, continuing possession, and refusal to account, LAM or Topwater personnel also used Britannica's information for platform risk, operating, training, and commercial functions after termination.

553.     On information and belief, Defendants' valuation and termination work on August 5 through 8, 2024 was performed on Britannica's confidential position file itself, so the fabricated evidence package is also a use exhibit: its inputs are the secrets. The package's native inputs are identified discovery.

554.     On information and belief, the Division's committee reviewed or was informed of the decision to retain Britannica's materials after termination, and the committee record for August and September 2024 will show who ratified the keeping.

555.     On information and belief, Topwater personnel used Britannica's methodology and proprietary information to instruct platform personnel and to develop or adapt risk practices,

218

limits, and operational protocols. The basis is Britannica's Chief Investment Officer's personal participation in repeated educational calls and written explanations requested by Topwater; Defendants' acquisition of unusually detailed methodology and live account information; dissemination among risk, operations, management, Goldman, and Jefferies personnel; later changes and adaptations in limits, risk practices, and platform operations after those discussions; continuing possession; failure to confirm return or destruction; and Britannica's December 2024 written assertion of training and operational use. The internal training materials, presentations, risk manuals, model-development files, access logs, change histories, communications, and testimony are expected to confirm that use.

556.    The distribution rosters themselves evidence the dissemination. The Division's ongoing account distributions delivered Britannica's confidential position, strategy, and account information to Division personnel with no need for it under any disclosed purpose, including Associate Rothe and Risk Associate Chen, on a continuing basis throughout the relationship. Confidential information handled as group mail is not information protected in the manner Defendants represented, and each roster is a record, in Defendants' control, of who took Britannica's proprietary information in.

557.    O'Hara, Defendants' designated risk manager for Britannica's account, did not understand the options and quantitative strategies he was assigned to police. He admitted it to Britannica's Chief Investment Officer directly. On more than one telephone call between 2022 and 2024, O'Hara said, in substance, that options added an extra layer of complexity for him. He was repeating language he had heard and used inside Defendants' own risk discussions, and Defendants' internal notes, committee materials, and correspondence will contain it. Defendants' own writings record the same incapacity. On March 29, 2023, after a call in which Britannica

had walked him through the mechanics, O'Hara wrote that "[a]s the Investment Guidelines are written now, the strategy is out of compliance" and that Topwater was "working on rewriting some of the limits to allow your strategy to operate as it is now": the risk officer conceding that the limits he had been enforcing did not fit the approved strategy, and rewriting them only after his counterparty taught him why. Britannica's Chief Investment Officer educated him continually: by phone, and by emails carrying spreadsheets, models, and extended written analyses demonstrating that Defendants' constraints increased rather than decreased risk, analyses O'Hara carried to Defendants' risk committee, which repeatedly ended by agreeing with Britannica.

558.   Three consequences follow. First, the deck's representations of a dedicated Risk Team with comprehensive parameters and real-time monitoring were false as applied: the assigned risk function did not comprehend the strategy it purported to monitor, a deficiency another broker remarked on to Britannica. Second, the education was the extraction channel: Defendants received Britannica's methodology, models, and analytical frameworks through a process Defendants' own incomprehension necessitated, at Britannica's sole cost, and the committee that received them is the committee that retained them. Two transmissions show the mechanism exactly. On March 14, 2023, to obtain relief from limits that did not fit the strategy, Britannica delivered to Topwater a document marked "Private and Confidential" setting out its synthetic-stock construction using deep-in-the-money short puts, its delta targeting at ninety-plus and its management of dislocations down to seventy-five, its selection of major index ETFs and the information-asymmetry reasoning behind that selection, and the method by which the book could be structured to generate credit rather than debit. And on March 21, 2023, when Britannica asked Defendants to write the credit term into the agreement, Damm did not answer the request;

220

he asked Britannica to explain how the result could be achieved, and Britannica explained it, in writing, within the hour: put-call parity as a stock-replacement mechanism, deep-in-the-money puts, and the conversion of long stock into short stock offset by positive options deltas. Defendants obtained a working description of the technique. Britannica never obtained the term it had asked for. Defendants took the method and withheld the payment. Third, the services were an uncompensated benefit conferred, for which Count XIV seeks recovery.

559. On information and belief, certain Topwater personnel also traded in personal accounts using strategies learned from Britannica. The concrete basis is their multi-year access to live positions and detailed proprietary methods; their ability to observe the strategy's repeated operation; Defendants' express assurance that Britannica's information would not be used for personal gain; Britannica's December 2024 written assertion made before this pleading; the continuing failure to account for recipients and uses; and Defendants' exclusive control of employee brokerage, preclearance, restricted-list, code-of-ethics, surveillance, and attestation records. Plaintiffs will identify the persons, trades, benefits, and approvals from those records. Each other misappropriation act pleaded in this Complaint stands independently of this branch.

560. LAM acting through Topwater, the Trading Master Funds, the Feeder and Cayman structures, Jefferies Risk and other parent personnel, the administrator function, and Goldman as the integrated prime broker formed a continuing association-in-fact with relationships created by ownership, management, committee authority, contracts, data feeds, daily account operations, and economic flows. The enterprise operated and profited from the first-loss platform by gathering managers' capital, services, methodology, and order flow and by allocating gains and losses and capturing fees, interest, and brokerage economics. The alleged racketeering purpose is narrower: to obtain and retain cash, credits, and confidential information

through the non-securities accounting, cash-diversion, and trade-secret acts pleaded here. The enterprise existed from at least 2021 through the post-termination retention and use of Britannica's property. Securities solicitation, purchase, valuation, termination, liquidation, and trading loss are background only and are not alleged here as RICO predicates.

561.    The business and property injuries caused by the non-securities scheme are distinct from the securities-trading losses asserted elsewhere. They include diverted and withheld interest, rebates, and credits; recurring false-accounting shortfalls; cash or traceable property withheld after the liquidation independently of any securities-loss measure; diminution in value of the Britannica Trade Secrets; Defendants' unjust enrichment from their unauthorized use; and reasonable costs incurred to identify, investigate, and respond to the non-securities scheme to the extent recoverable. BCML separately lost fees, track-record value, business infrastructure, fundraising capacity, and enterprise value to the extent proximately caused by the non-securities predicates. Plaintiffs will schedule these categories separately from securities, contract, fiduciary, liquidation, and trade-secret measures and will not use securities solicitation, purchase, valuation, liquidation, or trading loss as a RICO predicate or recover twice for the same injury.

562.    The business property injured was not limited to an expectancy of future profits. It included the administrator-recorded performance history and recovery arc; the continuity of the audited or auditable track record; the operating platform and broker integrations built around the accounts; the proprietary software, data, and live risk infrastructure; trained personnel and institutional processes; counterparty and vendor relationships; the credibility and diligence narrative used with prospective investors and allocators; the ability to negotiate capital and service-provider terms from a functioning record; and the enterprise value of the management

222

business at the point of expansion. The contemporaneous records establish each component, and overlapping measures are presented only in the alternative.

563. The platform's investor side was built and marketed by sophisticated institutions whose knowledge is itself a subject of this action. Rothschild HDF Investment Solutions, itself a division of Leucadia Asset Management, served as the exclusive European partner for Topwater's first-loss strategy, creating investor vehicles and marketing a structure publicly described as requiring managers to fund ten percent of their accounts, absorb one hundred percent of the losses, and face liquidation at one percent, expressly to shield investor capital. In May 2021, Topwater announced a strategic partnership and multi-year committed investment from one of the five largest United States endowments, alongside Jefferies' own investment, and hard closed the funds. On information and belief, the anchor endowment, Jefferies, RHIS-sponsored vehicles, and other substantial Regular Investors received due-diligence materials, operating information, and disclosures concerning the program's actual mechanics, including the shared-margin structure, the Manager's interested valuation role, the loss-allocation waterfall, the broker economics, and the platform's enforcement practices. The basis is the customary institutional due diligence that commitments of that size require, the distributor's affiliation with LAM itself, the public marketing of the loss-shielding design, and Defendants' exclusive possession of the diligence and disclosure record. Either those investors were told what the managers were not, which establishes that Defendants knew the omitted facts were material and disclosable, or the investor materials concealed the same facts, which establishes a common scheme of selective disclosure. The diligence files, side letters, investor communications, and disclosure sets are identified discovery; the investor entities and their vehicles are witnesses and,

223

depending on what the diligence record shows they knew, promoted, and financed, potential additional defendants, and Plaintiffs reserve amendment after discovery.

**STANDING AND THE DIRECT AND PERSONAL NATURE OF PLAINTIFFS' INJURY**

564.    Each Plaintiff sues on property and rights it owns directly. BCML was the bilateral Account Adviser and party to the Stonefly and Mayfly AIAAs. It owns the advisory, confidentiality, trade-secret, fee, track-record, and business rights arising from those mandates. BC LLC executed the First-Loss Interest subscription, contributed the $2.5 million, and owns the direct rights associated with its membership interest, Capital Accounts, allocations, withdrawals, distributions, credits, and return of capital.

565.    No claim in this Complaint is brought on behalf of any fund, pool, or other investor, and no recovery sought here belongs to anyone but the Plaintiff asserting it. Every count vindicates a right belonging to a named Plaintiff under its own contract or in its own property, and each Plaintiff's injuries are separate and distinct: Defendants took each Plaintiff's own property, broke contracts made with that Plaintiff, and destroyed value that Plaintiff owned.

566.    BCML's injuries are direct and individual. They include termination of its two advisory mandates; loss of earned and future account economics; destruction of its operating business and auditable track record; compelled disclosure and unauthorized use of its methodology; loss of secrecy and competitive value; and loss of the enterprise, infrastructure, personnel, broker integrations, counterparty relationships, and institutional fundraising path built around the strategy. Making any fund or other investor whole would not repair those injuries.

567.    BC LLC's injuries are also direct. Its subscription associated its First-Loss Interest with the managed account advised by BCML and made BC LLC bear the first loss for that account. The documents described a limited possibility that excess losses at another managed

224

account in the same Trading Master Fund could be reallocated across first-loss investors. No statement or reconciliation supplied to Plaintiffs identifies a Second-Loss, Third-Loss, or cross-account reallocation here. Defendants instead allocated, withheld, withdrew, returned, or retained amounts in BC LLC's own Capital Accounts. The $532,710.95 return is Defendants' own account-level conduct and does not become a fund injury because Defendants have withheld the bridge explaining the rest.

568.    The injuries do not become derivative because Defendants subjected other advisers to similar conduct, as pleaded in this Complaint. Each adviser had its own agreement, managed account, first-loss capital, confidential information, and liquidation. Wronging multiple counterparties does not convert each direct injury into an injury to the wrongdoer's entity. Comparator evidence bears on pattern, pretext, scienter, intent, punitive relief, and damages. It is not a prerequisite to either Plaintiff's standing. The prior Canada action, a Connecticut Superior Court suit in which certain Topwater-related principals were sued over redemptions and write-downs affecting a different fund and a different investor, is comparator and notice evidence only; it does not make the conduct here an injury to any Topwater entity, because the property, credits, allocations, and business destroyed here belonged to these Plaintiffs and any recovery runs to them.

569.    Defendants' conduct was account-specific and plaintiff-specific. LAM valued the two Britannica-advised accounts; the July 2024 cross-default linked those accounts; O'Hara directed BCML's traders; the liquidation consumed BC LLC's capital; the credit issues arose from Britannica's balances; Defendants used BCML's information; and the September 26 payment returned BC LLC's capital. A judgment for Stonefly, Mayfly, the Feeder Fund, a

225

Trading Master Fund, or another investor would not restore either Plaintiff's property or business.

570.    Plaintiffs seek no double recovery. BC LLC seeks its capital, credits, allocations, interest, property loss, execution loss, and securities-related out-of-pocket injury. BCML seeks its contract, fiduciary, advisory-fee, business-destruction, enterprise-value, trade-secret, and other direct injuries. Where a fact supports more than one theory or measure, Plaintiffs plead in the alternative and will elect or offset remedies as required at judgment.

571.    Each Plaintiff's injury traces to the conduct of each Defendant against whom it is pleaded, and no injury is shared ratably with the Fund's other investors. LAM valued the two Britannica accounts, determined the asserted trigger, controlled the capital accounting, and directed the liquidation, injuring BCML's mandates, fees, and business and BC LLC's capital and credits directly. Stonefly and Mayfly held the accounts carrying BCML's advisory mandate and BC LLC's first-loss capital and owe the account-specific accounting and return of that property. Topwater Partners LLC issued BC LLC's First-Loss Interest, held its contributed capital, issued the member statements, and returned only part of that capital, injuring BC LLC's own membership and capital-account rights. Topwater Master Fund Ltd. sat in the chain through which BC LLC's capital was pooled and allocated and owes the tracing and accounting for BC LLC's traceable property. Jefferies Financial Group Inc. controlled the parent risk and escalation function that entered the accounts and protected the affiliated capital the first-loss layer shielded, injuring both Plaintiffs directly. Jefferies LLC took placement fees from the platform Britannica's trading fed, stood opposite the trading fund as a derivative counterparty, and received and used BCML's confidential information, injuring BCML's property and secrecy and BC LLC's capital. Goldman Sachs steered Britannica to the platform, harvested the account

through commissions running at roughly five times the available alternatives, denied the futures access whose economics it kept for itself, held Britannica's confidential positions and strategy, and, on information and belief, supplied the data and advice on which the liquidation ran, injuring BCML's business and confidential information and BC LLC's securities purchase and forced-liquidation loss. Each Individual Defendant committed the acts personally attributed to that Defendant, and each such act injured one or both Plaintiffs directly and not through any Fund-wide loss.

572.    BC LLC's membership-based claims are direct under every standard that could apply to them. Whatever body of law governs, the controlling question is the same: who suffered the alleged harm, and who would receive the remedy. BC LLC suffered the harm to its own First-Loss Interest and its own capital accounts, and any recovery of the unreturned $1,967,289.05, the omitted credits, and the invalid allocations runs to BC LLC alone and not ratably to the Feeder Fund's other members. The offering documents described only a limited possibility that excess losses at an unassociated managed account in the same Trading Master Fund could be reallocated across first-loss investors, and Defendants have produced no Second-Loss Allocation, no Third-Loss Allocation, and no cross-account reallocation showing that any such Fund-level event occurred here. They instead allocated, withheld, withdrew, returned, and retained amounts in BC LLC's own capital accounts, and they returned $532,710.95 to BC LLC specifically. These are direct injuries to BC LLC's own property under Delaware law, under New York law, and under the constitutional standing requirements of Article III alike, and no choice-of-law provision in any instrument converts them into anything else.

**TOLLING AND TIMELINESS**

227

573. Every claim in this Complaint is timely, and the facts establishing each claim's timeliness are pleaded in this section and within the Counts. The federal securities claims are commenced within two years after Plaintiffs discovered the facts constituting the violations, including the facts showing Defendants' intent, and within five years after each violation. 28 U.S.C. § 1658(b). Each purchase of and addition to the First-Loss Interests carries its own period, and every purchase pleaded in this Complaint, from the November 19, 2021 acceptance of BC LLC's initial capital through the September 22, 2023 increase and the July 2024 Mayfly reconfiguration, falls within five years of this action. Each material amendment was itself a new agreement and a new investment decision: the restated Appendix C, the March 2023 financing amendment Defendants coerced, Amendment No. 3, Amendment No. 5, and the July 3, 2024 Mayfly instruments Defendants extracted under the duress pleaded in this Complaint. Each was separately executed, each was separately induced by the representations then standing, and each carries its own period, every one within five years of this action.

574. Defendants concealed the facts constituting the violations, and that concealment fixed the discovery dates pleaded here. Before August 5, 2024, the facts showing the fraud and Defendants' intent sat in records Defendants alone controlled: the valuation data, the capital accounting, the administrator's methods and instructions, the internal decision record, and the economics of the broker relationship. The facts constituting the violations began to surface no earlier than August 5, 2024, with the seizure itself and its aftermath: the August 5, 2024 termination declared on data Defendants did not possess; O'Hara's August 8, 2024 admission that LAM had valued the accounts as its own Valuation Agent, transmitted with a package created that same day and presented as contemporaneous proof; the metadata recording the package's August 8 creation; the administrator's late September and October 2024 statements; the

228

September 26, 2024 return of $532,710.95 of the supposedly exhausted first-loss capital; and counsel's August 14, 2024 letter adopting the retrospective package while refusing the native records. The record continued to surface after that: through Defendants' counsel's December 26, 2024 and January 14, 2025 writings, and through Plaintiffs' continuing investigation in 2025 and 2026, culminating in the July 2026 analysis of Defendants' regulatory filings pleaded in this Complaint.

575.    Material facts remained concealed long after the seizure and surfaced only through Plaintiffs' continuing investigation. Defendants refused every demand for the native calculations, source files, allocation bridge, credit computations, and decision communications, and their counsel converted the refusal into written policy: counsel's August 14, 2024 letter declared there was "no basis" on which Topwater or the Manager were required to provide the supporting evidence and documentation Britannica had requested; counsel's December 26, 2024 email answered Plaintiffs' detailed December 2024 demand letters by declaring that the demand "will be ignored"; and counsel's January 14, 2025 letter denied liability, refused to address the allegations, produced nothing, and disclosed for the first time that the same firm represented Stonefly, Mayfly, LAM, the employees of its Topwater Capital Division, and Jefferies Financial Group in the matter. The scope of Defendants' concealed conflicts, undisclosed practices, and misleading regulatory disclosures emerged only from Plaintiffs' review of LAM's Form ADV filings, obtained and analyzed in July 2026: filings whose significance appears only against the internal record Defendants concealed, and which supplied the disclosure-gap facts pleaded in this Complaint only after Defendants' own post-seizure admissions and refusals supplied the key.

576.    The New York fraud claims are timely twice over under CPLR 213(8): every act of the scheme from 2021 forward falls within six years of this action, and the discovery

229

chronology pleaded above independently satisfies the discovery measure. The contract, implied-covenant, estoppel, duress, indemnification, and declaratory claims rest on instruments and breaches running from 2021 through the present, including Defendants' continuing retention of Britannica's capital and their continuing refusal to render any accounting, all within six years. The conversion, tortious-interference, accounting, money-had-and-received, and unjust-enrichment claims rest on the August and September 2024 seizure, retention, refusal, and destruction, and on the retention that continues through the present, all within three years.

577. The RICO claims are timely: Plaintiffs discovered the injury to their business and property no earlier than August 5, 2024, and the facts constituting the pattern continued to surface through the administrator's autumn 2024 statements and Defendants' counsel's December 26, 2024 and January 14, 2025 writings, all within four years of this action. The federal and state trade-secret claims are timely: Plaintiffs discovered Defendants' unauthorized retention and use of the Britannica Trade Secrets no earlier than August 2024, when the termination ended every permission Defendants ever had and Defendants kept everything, and the retention and use continue through the present, within three years of this action. 18 U.S.C. § 1836(d). The Commodity Exchange Act claim rests on conduct through and including August 5, 2024 and is commenced within two years. 7 U.S.C. § 25(c).

578. The rescission claims under Section 215(b) of the Investment Advisers Act and Section 29(b) of the Exchange Act are timely, and the election was prompt. The facts establishing that the contracts were made and performed in violation of the federal securities laws, including the unregistered brokerage and lending business pleaded in this Complaint, sat inside Defendants' operations, filings, instructions, and internal economics, behind representations built to foreclose inquiry. Plaintiffs discovered those facts through the post-

seizure record beginning no earlier than August 5, 2024 and through the analysis of Defendants' regulatory filings completed in July 2026, elected rescission upon that discovery by their demands and by this action, and commenced this action in August 2026, promptly upon that discovery.

579.    The federal trade-secret claim is timely because it is commenced within three years after the misappropriation was discovered. 18 U.S.C. § 1836(d). Each Count's realleged facts carry its accrual and discovery chronology, and each claim is timely on its ordinary period standing alone. The facts constituting Defendants' violations surfaced between August 5, 2024 and July 2026, as pleaded in this section, and this action follows within every applicable period. The concealment facts pleaded in this section operate in addition: a party that hides the facts constituting its own violations acquires no timing advantage from the hiding.

580.    Defendants' concealment was active, and it continued after the seizure. Defendants presented the August 8 package as contemporaneous 9:32 proof; concealed the earlier and higher-level decision behind the word "automatic"; withheld the native calculations, source files, allocation bridge, credit records, recipients, and decision communications; and then refused further correspondence, and to this day they have rendered no accounting of any debit taken from or credit owed on the accounts, in any period, to any Plaintiff. Those were affirmative acts of concealment and misleading partial disclosures about facts in Defendants' exclusive control. Plaintiffs acted diligently throughout: they disputed the termination the same day, delivered a thirteen-point evidentiary letter on August 13, 2024, demanded the evidence repeatedly and in writing, retained counsel, demanded preservation, delivered detailed evidentiary demand letters in December 2024, investigated every record received, and commenced this action within the applicable periods. Fraudulent-concealment tolling and

231

equitable estoppel independently bar Defendants from converting their concealment into a timing advantage.

581.    Plaintiffs neither discovered nor could with reasonable diligence have discovered the concealed facts earlier.

582.    Britannica discovered each concealed fact only when Defendants' own materials betrayed them. Britannica learned that the purported contemporaneous stop-out proof was created on August 8, 2024, three days after the termination, only from the metadata carried inside the package Defendants transmitted that same day. It learned the true fifty percent fee arithmetic only from the administrator's own post-termination confirmation that the executed instruments paid fifty percent, not the fifty-five percent Defendants had represented. It learned that the promised short-balance credit had never been calculated or credited only from Defendants' post-termination statements and refusals. And it learned that the termination justification was assembled after the decision only from the August 8 package, the inconsistent explanations that followed, and Defendants' refusal to produce any native contemporaneous calculation.

583.    For the racketeering claims, each new and independent injury Defendants inflicted, including each post-termination act of misappropriation, concealment, and refusal to account, commenced its own limitations period under the separate-accrual rule, and the injuries from Defendants' continuing conduct run through the present.

## CLAIMS FOR RELIEF

584.    The Counts below are pleaded separately and, where expressly labeled, in the alternative, as the Federal Rules permit. No alternative theory concedes, qualifies, or subordinates Plaintiffs' primary theory that no valid contractual stop-out occurred in either account at any time.

232

## COUNT I

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5**

*(By BC LLC Against LAM, Topwater Partners LLC, Goldman Sachs, Borgia, Wieczorek, Damm, O'Hara, Taylor, Rubin, Eck, Tran, Backer, and Robinson)*

585.    BC LLC realleges all of the factual allegations above to the extent relevant to this Count and brings this Count as the purchaser and owner of the First-Loss Interests. BC LLC asserts Rule 10b-5(b) liability only against a person or entity with ultimate authority over the content and communication of the challenged statement. It asserts Rule 10b-5(a) and (c) liability only against a defendant personally alleged below to have knowingly disseminated a materially false or misleading statement or committed a deceptive act, practice, or course of business beyond mere drafting or participation.

586.    The First-Loss Interests are securities. BC LLC purchased membership interests in a pooled investment fund with the expectation of profits from the platform, capital, accounts, and services LAM and its personnel operated. Defendants offered the interests through a Subscription Agreement and Offering Memorandum and treated the transaction as a securities offering.

587.    BC LLC's injury is direct. It put up the capital, owned the First-Loss Interests, and held the associated capital-account and distribution rights. The property, credits, and invalid allocations at issue were tracked to BC LLC and Britannica's accounts. They were not a ratable loss shared by the Fund's other investors.

588.    BC LLC purchased the interests through its initial 2021 subscription and later increases in first-loss capital, including the September 22, 2023 increase to $2,500,000. In July 2024, BC LLC exchanged or materially reconfigured part of its existing First-Loss Interest by

associating $1,500,000 with Mayfly and accepting materially different account, risk, return, broker, and cross-default terms.

589.    By the conduct pleaded in this Count, the Defendants named in this Count, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, in connection with BC LLC's purchases of the First-Loss Interests: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and omitted material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and courses of business that operated as a fraud and deceit upon BC LLC, in violation of Section 10(b) and Rule 10b-5(a), (b), and (c), with each Defendant liable for the statements over which it had ultimate authority and for the deceptive acts it committed.

590.    The deception ran through a sale as well as through purchases. On August 5, 2024, Defendants forced the disposition of BC LLC's First-Loss Interest: LAM declared the Interest terminated on its own conflicted valuation, the Fund Defendants extinguished the Interest's continuing rights and seized the capital that remained, and O'Hara's one-hour schedule compelled the realization of the account's positions. BC LLC chose none of it. Every deceptive act pleaded in this Complaint, the staged notice, the fabricated package, and the concealed machinery, operated in connection with that forced disposition as well as in connection with each purchase pleaded above.

591.    In connection with those purchases, the Defendants named in this Count made the following false statements, half-truths, and deceptive acts. The omissions pleaded below concern subjects on which Defendants chose to speak. The omitted facts were necessary to make those statements not misleading. Not one statement pleaded in this Count is a slogan. Each is a

specific, dated representation by an identified speaker to Britannica's identified officers about the identified account and transaction: a stated payout number, a stated uniform structure, a stated broker roster, a stated monitoring capability, a stated crediting obligation, a stated commitment of capital in stated amounts. Each was a statement of present fact about the product being sold, each was false when made, and each is paired in this Complaint with the Defendants' own document that proves its falsity.

592.    On one or more solicitation calls between 2019 and 2021, Borgia represented to Britannica's Chief Investment Officer and its Chief Compliance Officer that the first-loss capital layer was fully available to absorb trading losses. It was not: the instrument Defendants later sent terminated the account with the layer still standing and forfeited; Defendants' own practice, pleaded above, intervened with a quarter of the layer unspent on their own numbers; and once the credits and interest Defendants withheld are restored, most of the layer stood intact at the moment Defendants seized it.

593.    In the Account Adviser Overview delivered before the initial purchase, LAM and Borgia represented that Topwater "does not sell or license HF managers' trading data to third parties" and "does not have the ability to trade against a HF manager's underlying portfolio." Both statements were false or misleading. The first concealed what Topwater actually did with manager data: Topwater freely shared manager dealings and data with third parties, Goldman Sachs among them, and did exactly that to Britannica, telling Goldman it was in discussions with Britannica and delivering Britannica's sample portfolios and position quantities before any Britannica-Goldman relationship existed; the full recipient list sits in Defendants' records, and on information and belief LAM and its affiliates distributed and used Britannica's information for their own purposes and against Britannica. The second statement was false or misleading as a

235

statement of capability. Stonefly's audited financial statements identify Jefferies LLC, the platform's affiliate, as a principal derivative counterparty to the trading fund that held managers' portfolios. On information and belief, LAM and its affiliates used Britannica's information for interests adverse to Britannica, and personnel of those affiliates traded positions copied from Britannica's book. That inference rests on their complete access, the June 2024 involvement of Jefferies Risk, the termination and liquidation conduct, the retrospective analysis of Britannica's book, and their refusal to account for post-termination use. Access, use, recipient, and trading records are controlled by Defendants. The same ADV reserved, in every vintage, that platform-side persons and affiliates "may take positions opposite to, or ahead of, those held by the Fund" and that "[r]ecords of this trading will not be available for inspection by Shareholders," a reservation of the very conduct the manager-facing deck denied, made behind closed records.

594.    The same presentation promised "clearly defined and consistent terms," "conservative leverage levels with well constructed comprehensive risk parameters," a "dedicated Risk Team devoted to monitoring each managed account across global markets on a 24/6 basis," and a database driven risk system "with direct feeds from each managed account which allows the Risk Team to monitor capital account risk on a real-time basis." Those statements were false or misleading. Defendants changed material terms during the relationship, including the July 2024 addition of a cause-based cross-default. Their system was not real-time. O'Hara had recorded at inception that Topwater had T+1 prime-broker reporting and needed an intraday solution, and admitted on August 5, 2024 that he was receiving hourly drops and was an hour behind. When the system and market data failed, Defendants imposed a one-hour liquidation into an options market without reliable opening prices. There were no direct feeds; there was a file drop, an hour behind.

595.    Defendants described the same monitoring system differently to different audiences. To managers, the Overview promised "24/6 real-time risk monitoring across global markets." To the SEC, LAM's brochures described reports "prepared every two (2) hours." In writing to Britannica at inception, Defendants' own risk officer recorded the operating truth: "We have access to T+1 PB reporting from GS but will need to find a solution for intraday." LAM also represents publicly that daily trade, position, profit-and-loss, and cash reconciliations occur at the platform level. On the day it mattered, the system ran on an admitted one-hour lag and then failed. The native August 4-6 reconciliations, feeds, exceptions, and audit logs will show what information LAM had and when it had it. Defendants calibrated the representation to the audience; no version of it was true on August 5, 2024.

596.    The Offering Memorandum spoke at length about valuation, risk, brokerage, conflicts, and operation of the platform, but omitted facts needed to make those statements complete. It did not disclose that LAM would act as the interested Valuation Agent for an adviser's termination and first-loss forfeiture trigger; that Jefferies-affiliated capital made up a substantial part of the platform and created a conflicting incentive in a dislocation; that the imposed prime-broker structure generated economics on the platform's side; that Defendants' data had a history of breaks and exceptions; that a platform facing its own risk or margin pressure could protect affiliated capital by liquidating an adviser without warning or additional capital; that the platform bore none of the adviser's first loss and had an incentive to end a drawdown account rather than permit it to continue; that moving or supplementing brokers was burdened by give-up charges and an all-or-nothing liquidation condition; or who received the interest and positive carry generated on adviser-account balances. A reasonable first-loss purchaser would have considered those facts important. Defendants said nothing, in the deck or

on any call, about any manager ever terminated by stop-out or about the track record or fate of any prior manager on the platform.

597. The Memorandum did not obtain consent to undisclosed conflicts. It said the Manager intended to assert consent to the conflicts it then enumerated. That list did not disclose LAM's interest in valuing adviser accounts for termination and first-loss consequences, the affiliated-capital conflict, the broker-volume economics, or the destination of account interest. Elsewhere the same Memorandum's Trade Errors provision stated twice that "The Manager has an inherent conflict of interest" in characterizing trading losses. Defendants knew how to disclose a self-interest conflict when they chose to. The capacity to disclose existed; the disclosure that the Manager would mark its own termination trigger as an interested Valuation Agent did not. The offering documents likewise omitted that the platform's investor base was, on information and belief based on the audited statements and offering records, approximately sixty percent affiliated Jefferies capital, so that in a market dislocation the platform's incentives ran toward protecting affiliated capital rather than the manager's account. Defendants wrote the warning label for the paper cut and left it off the guillotine. That is not forgetting; it is choosing, and the choice is the fraud.

598. In June and July 2024, Defendants induced BC LLC to associate $1,500,000 of its First-Loss Interest with Mayfly and to execute Amendment No. 5. Susan Rubin described the papers as implementing the two-account structure and separately recorded that counsel had inserted a cross-default in connection with a Termination for Cause and that Jefferies Risk was engaged. Defendants did not disclose that, on information and belief, the two-account package and new termination machinery were being evaluated in connection with a plan to terminate both accounts if the platform acted against Stonefly. The basis is counsel's deliberate drafting, the

238

June 18 Risk engagement, the pre-open decision, the termination of both accounts thirty-three days after execution, the omission of any Mayfly calculation or cross-default invocation from the August 5 notice, and the August 8 expansion to simultaneous independent stop-outs. The drafts, committee submissions, Risk communications, decision records, and native notices are controlled by Defendants.

599.     On information and belief, the Investment Committee approved Mayfly's stated $15,000,000 Investment Account Value in June and July 2024 while the shared pool could not fund it, and the account's first trade failed for want of margin twelve days after launch. The committee sold a number it knew the pool did not hold. The basis: the pleaded committee machinery and the June 18, 2024 Risk engagement, the July 15, 2024 failure, and the $342 million pool spread across thirty-four accounts; the approval submissions, minutes, and margin-desk capacity analyses are in Defendants' control

600.     On information and belief, Jefferies Risk's June 18, 2024 engagement carried a written mandate that named Britannica's accounts and termination scenarios among its subjects, and the engagement produced written analysis of termination scenarios for Britannica's accounts before Britannica signed the Mayfly papers, which the Investment Committee received. Defendants papered the exit before they papered the account. The basis: the pleaded engagement and its chronology, the cross-default counsel deliberately inserted, and the thirty-three days between execution and termination; the engagement memorandum, scoping communications, Risk work product, and committee distributions are in Defendants' control, and the requests will target the business analysis so the privilege fight is framed from the start.

601.     During the 2021 solicitation calls, Borgia and Wieczorek represented to Britannica's Chief Investment Officer and its Chief Compliance Officer that Jefferies and

Leucadia were active in allocating capital to successful first-loss managers and that Topwater's platform could lead to a traditional institutional allocation. The representation was material to BC LLC's decision to enter the platform and increase capital. No such allocation path was offered to Britannica. On information and belief, the represented program was not available on the terms described. That inference rests on Defendants' refusal of capital support in drawdown, the absence of any allocation process for Britannica despite its profitable record and trading volume, and Defendants' exclusive possession of the allocation program, candidate, and transition records. The promise had nothing behind it, and Defendants proved that themselves: they never named a single manager who had graduated from first-loss to a traditional allocation, because on information and belief none existed; in the entire relationship Topwater never introduced Britannica to a single investor or allocator; and when Britannica asked in writing to be considered, pointing to performance that was outpacing the market, Defendants ignored the request.

602.    The economics Defendants sold carried no cost of capital, and none could exist in the arrangement as represented: the platform's provision of the trading capital was its side of the bargain, priced by the fifty percent profit split, and no manager pays financing on the capital a platform holds out as its own committed backing. The instruments Defendants drafted said the same thing, because neither the AIAA nor Appendix C as executed in 2021 contained any financing charge, cost of capital, or debit-based expense. And Topwater's representatives confirmed it on the solicitation calls, telling Britannica's Chief Investment Officer and its Chief Compliance Officer that Topwater did not charge a cost of capital and that this distinguished it from other first-loss platforms. In March 2023, Topwater imposed the financing economics

anyway, conditioning continuation of the account on a new financing expense. Defendants' own paper contradicted the statement.

603.    During the initial solicitation, Borgia, Wieczorek, and Damm represented to Britannica's Chief Investment Officer and its Chief Compliance Officer that Topwater maintained a robust capital base and would provide expanded capital support if Britannica's strategies performed. The platform later refused capital increases while an account was in drawdown. Wieczorek put that practice in writing on August 17, 2022, closing the growth path to any account carrying a loss and thereby ensuring that the accounts most in need of capital support were the accounts guaranteed not to receive it. The representation was material to BC LLC's decision to commit and later increase first-loss capital.

604.    Goldman Sachs, Eck, Tran, Backer, and Robinson employed devices, schemes, and artifices to defraud and engaged in acts, practices, and courses of business that operated as a fraud on BC LLC, within Rule 10b-5(a) and (c): the January 25, 2021 steering of Britannica toward the platform Goldman covered, made while concealing the referral reciprocity and the revenue-factor economics Goldman's own documents record; Eck's and Tran's false representations personally attributed above; and Backer's and Robinson's direction of the steering and operation of the revenue-credit structure personally attributed above. Each act was in connection with BC LLC's purchases of the First-Loss Interests, which the steering initiated and the concealment sustained through each additional purchase. Rubin and Taylor are liable under the same subsections for the scheme acts personally attributed to them above, including the July 22, 2021 broker condition imposed inside the purchase-and-onboarding sequence. Deception, not mere assistance, is charged against each of them. Robinson's participation is pleaded on information and belief through his administration of the coverage and revenue-credit

arrangements by which Goldman Sachs priced and monetized the Topwater relationship, including the revenue-factor economics Goldman Sachs recorded in writing; the coverage assignments, revenue-attribution records, and internal communications identifying his role are in Goldman Sachs's exclusive control.

605. The representation that Defendants committed $10,000,000, and later $25,000,000, of Topwater trading capital behind Britannica's strategy was false when made, and Defendants' own writings prove it. Defendants made the same commitment in words during the solicitation, representing to Britannica's Chief Investment Officer and its Chief Compliance Officer, in substance, that Defendants were giving Britannica ten million dollars to manage, an amount later raised to twenty-five million dollars, and describing that amount as capital given, committed, and dedicated to Britannica's account. Those representations described money in an account. What Defendants actually operated was a bookkeeping figure spread over a shared, undisclosed, and rationed margin pool. On March 8, 2023, O'Hara demanded an amendment charging Britannica "financing expense on long exposure over First-Loss Member's capital account balance," and Topwater explained the term by telling Britannica it "would pay for all long financing over your current balance of approximately $970,000." A committed capital base that finances nothing above the counterparty's own collateral is not a capital base. On July 15, 2024, the concealment produced its physical proof: the newly executed Mayfly account would not trade because Interactive Brokers reported insufficient margin or capital backing, despite Mayfly's stated $15,000,000 Investment Account Value. The contract itself confirms the concealment: the AIAA's only funding obligation, Section 1(a), was to "provide the Account Adviser with an initial account value," a stated number adjustable in writing, and no provision of the instrument obligated the Trading Master Fund to fund, maintain, or margin the account with

capital in that or any amount, while title to all account assets remained with the fund and Britannica's own capital was barred from leaving. Defendants marketed committed trading capital and drafted a commitment to announce a figure. The deck likewise represented that "Topwater does not operate a hedge fund hotel, prop desk, or broker dealer." As a statement of what Britannica was being sold, it was materially misleading: the account replicated the economics of a margined brokerage account, collateral, buying power, financing charges, marks, calls, and forced liquidation, while Defendants evaded every custody, segregation, margin, valuation, cure, hedging, exit, charging, and supervisory obligation that attaches to the regulated product it imitated, and reserved to themselves powers no broker-dealer lawfully holds: to mark the customer's collateral as an interested party, to forbid hedging, to trap the collateral, and to seize it on their own unreviewable declaration. Defendants concealed at solicitation and throughout that the stated Investment Account Value was a shared, rationed, fund-level margin pool; that Britannica would finance every borrowed dollar above its own capital; that the termination trigger made any loss to Regular capital structurally unreachable; and that Defendants moved against accounts, as they did against Britannica in April 2022 at 7.42 percent, long before the layer approached its written line. Each fact was material to a first-loss purchaser deciding whether to place its capital, its systems, and its strategy at the bottom of Defendants' stack.

606.    In the alternative, and only if Section 1(a)'s command that the Trading Master Fund "shall provide the Account Adviser with an initial account value" is read as words of delivery rather than designation, Defendants breached the provision outright, because the capital was never provided; the corresponding contract breach is pleaded, in the same alternative, in the breach-of-contract Counts of this Complaint. Defendants drafted the sentence, and every

ambiguity in their instrument is construed against them. This paragraph operates in the alternative and does not qualify the primary allegation that the stated value was a figure Defendants announced without funding.

607.    Defendants renewed the solicitation representations in writing at each decision point, and each renewal induced the commitment that followed it. On April 25, 2022, at 8:18 a.m., O'Hara accepted BC LLC's additional $500,000 contribution in writing as an increased "buffer to the 1% stop-out level," restating the represented account structure to obtain the same-morning wire while concealing the discretionary intervention practice, pleaded in this Complaint, under which Defendants actually ran the account. On May 17, 2023, at 10:37 a.m., O'Hara wrote that Britannica held "a blended payout of 55% of the profits in the account" above its high water mark and that Topwater had no "flexibility to adjust our total payout higher as all of our accounts are on the same deal structure." Both statements were false when made: the executed instrument paid fifty percent, as the administrator's own fee computations confirm, and the platform's accounts did not run on one deal structure, as Defendants' differential treatment of other managers pleaded in this Complaint establishes. Each renewal restated a representation this Count pleads false, in a writing Defendants chose to send, at the moment Defendants sought a commitment.

608.    The renewals continued through the final purchases. On August 30, 2023, at 12:14 p.m., Wieczorek confirmed in writing that Defendants were "amenable to a $15m increase in IAV," and on September 1, 2023, at 8:30 a.m., Rubin confirmed in writing that Defendants would amend the AIAA "to increase your IAV to $25M." In the same August 2023 exchange, Wieczorek committed in writing to a BNP Paribas introduction and rate negotiation, renewing the broker promises at the very decision point at which Defendants sought the increase. The

244

increase was executed on September 22, 2023 on the strength of those writings, and the stated value they renewed was, as pleaded throughout this Complaint, a figure Defendants announced without funding. On March 27, 2024, at 2:43 p.m., Damm conditioned the Interactive Brokers transition in writing on transferring Britannica's account "into our Topwater Mayfly Fund," the structural demand that produced the July 2024 package and the cross-default it carried. Each purchase, amendment, and instrument that followed these writings was separately induced by them, and each carries its own reliance and its own period, as pleaded in the timeliness section of this Complaint.

609.    The 2021 deck, Offering Memorandum, and solicitation statements were used to obtain the initial subscription and the 2022 increase. The 2023 financing and credit representations were made to obtain the 2023 increase. If the July 2024 reconfiguration constituted a purchase or exchange, the June and July terms, risk, allocation, and cross-default half-truths were made to obtain that transaction. Otherwise, those statements support common-law fraud, duress, and the inference of scienter concerning the earlier purchases. Post-purchase statements are pleaded as admissions and evidence of falsity, knowledge, and the scheme, not as purchase statements standing alone. The monthly account statements ran through the same connection: presented to BC LLC as an independent administrator's true record of its investment while computed, as pleaded in this Complaint, on methods, inputs, and instructions Defendants controlled, with the operative instruments withheld from the administrator or superseded ones supplied in their place, they concealed the extraction as it ran and stood before each later purchase as part of its inducement; to the extent any such statement followed the final purchase, it is pleaded as the scheme's continuing device and as evidence of falsity and knowledge, in the same manner as the other post-purchase statements pleaded above.

610.    The inference of scienter is strong and defendant-specific. LAM possessed the contradictory monitoring architecture and ADV disclosures, valued its own trigger, controlled the capital accounting, and selected a mark it cannot reproduce. Borgia authorized the platform and capital representations while directing the division. Wieczorek participated in the solicitation and the July transaction and was copied on the unpaid-credit confirmation. Damm imposed the 2023 financing change, promised a later amendment that never came, and participated in the July terms. O'Hara knew the reporting lag, participated in the pre-open decision, issued the liquidation schedule, went up the chain for a partial extension, and transmitted and vouched for the package Long created, directing Britannica to embedded timestamps as proof. Topwater Partners LLC accepted each purchase while LAM administered the undisclosed conflicts and capital-account machinery. Together with the cause-based cross-default inserted thirty-three days before the simultaneous terminations, the contemporaneous notice's failure to invoke it or provide a Mayfly calculation, the June involvement of Jefferies Risk, the pre-open decision, the broken and lagged data, the refusal of native proof, the accounting conflicts, the later independent-Mayfly explanation, and the $532,710.95 return, these facts support an inference of intentional deception or severe recklessness at least as compelling as an innocent inference. Taylor's scienter is personal on four grounds: he attended solicitation calls in the 2019 to 2021 inducement period during which the representations pleaded in this Count were made; the deck he co-authored made him primarily responsible for managing investments, risk management, managed account structuring, due diligence, and reconciling fund performance, the functions this Complaint charges as fraudulent in operation; he sat on the Investment Committee that ran the review-and-reprice machinery and the August 5 decisions and received the account communications through the division's group distribution, appearing by read receipt on the

termination thread itself; and he personally executed the July 3, 2024 instruments installing the cross-default for all three principal entities thirty-three days before both accounts were terminated at the same claimed minute.

611.    Each Individual Defendant also acted with a personal financial motive that the structure itself supplies. On information and belief, the compensation, bonuses, and advancement of the Topwater, LAM, and Goldman Sachs personnel named in this Complaint depended in part on the revenues, fees, commissions, and platform economics their conduct protected and grew: Goldman's own standard form states that the revenues an account generates may be a significant factor in its allocation of services, the Topwater side extracted its share of gains monthly, and the incentive systems of both institutions reward revenue production. The basis for this allegation is the documents cited, the fee and commission record pleaded above, and the compensation records in Defendants' exclusive control.

612.    Rubin's scienter is personal and documented. She recorded on June 10, 2024 that counsel had inserted the cross-default as the price of the broker exit, recorded on June 18, 2024 that Jefferies Risk was engaged inside Britannica's accounts, and transmitted the executed papers while disclosing neither the engagement's purpose nor any plan concerning the accounts; the officer who wrote the trap's terms in her own hand knew what the wrapper concealed. The scienter of Goldman Sachs, Eck, Tran, Backer, and Robinson rests on their own business's writings and conduct pleaded above: the written revenue-factor form that priced Goldman Sachs's services against the revenues an account generates; Kalafarski's contemporaneous written refutation of Tran's rate representation, with Tran copied; Eck's institutional-allocation representations that Goldman Sachs's and Topwater's own documents disprove; the January 25, 2021 steering sent at senior direction while the reciprocity it served was concealed; and the

compensation that, on information and belief and on the basis pleaded above, rewarded each of them from the revenues the concealment protected. Each acted with knowledge of the falsity or with reckless disregard of it.

613. On information and belief, the Division's 2024 compensation rewarded participation in the fraud and the fabrication: the more aggressively its personnel executed the terminations, constructed the after-the-fact proof, and defended the seizures, the higher their evaluations and compensation ran, and, on information and belief, that compensation was tied to the preservation of the protected layer specifically. The forced liquidations did not hand the market Britannica's business; Defendants' own actors freed Britannica's margin and capital for internal use and seized Britannica's strategies and systems. The Division ran ten to twenty-five people from one office, its revenues were the extractions from adviser accounts, and the personnel who executed the August terminations were paid from what the terminations produced. The basis is the pleaded Division scale and compensation structure; the compensation plans, statements, bonus-pool allocations, and evaluation records are in Defendants' control.

614. BC LLC relied on the identified statements and the completeness of the subjects Defendants chose to describe. It subscribed, supplied the 2022 capital increase, increased committed capital in 2023, and entered the Mayfly transaction in July 2024. It would not have made those purchases on the same terms, or at all, had Defendants disclosed the actual monitoring limits, conflicts, broker economics, capital practice, valuation machinery, cross-default purpose, and treatment of account credits.

615. The general integration language in the Advisory Agreements did not identify or disclaim the particular representations and omissions pleaded here. The statements were contained in Defendants' own offering, marketing, and transaction materials or concerned facts

248

peculiarly within Defendants' knowledge. BC LLC's reliance was reasonable in light of the documents, the parties' course, and Defendants' repeated assertion of institutional controls.

616.    BCML's reliance was operational and separate from BC LLC's purchases. In reliance on the same representations and on the completeness of the subjects Defendants chose to describe, BCML committed and kept committed its trading systems, data connections, software, personnel, proprietary methodology, broker and vendor integrations, and the live institutional record it was building through the accounts, and it structured, disclosed, and maintained the credit-carrying strategy at documented cost. BCML would not have made or continued those commitments on the same terms had Defendants disclosed the actual monitoring limits, the self-interested valuation machinery, the broker reciprocity economics, the treatment of the accounts' credits, the capital and capacity practice, or the purpose and intended use of the July 2024 machinery. Each Plaintiff's reliance is pleaded separately and neither depends on the other's.

617.    The concealed risks materialized. LAM used its own unreliable valuation to invoke the termination machinery, compelled liquidation, withheld the native proof, and administered BC LLC's capital and credits through the undisclosed conflicts. Defendants returned $532,710.95 of BC LLC's $2,500,000 and did not return the remaining $1,967,289.05. The latter amount is pleaded as unreturned property subject to a complete allocation reconciliation. BC LLC also suffered out-of-pocket loss from invalid allocations and the forced-realization losses caused by the liquidation schedule and hedge prohibition, pleaded in the alternative for the same dollars where they overlap.

618.    This Count was brought within two years after Plaintiffs discovered the facts constituting the violation and within five years after each violation. Defendants withheld the native valuation and allocation record and presented the August 8 package as contemporaneous

proof. The retrospective construction, internal cross-default design, source-file defects, and complete accounting conflicts were not discoverable with reasonable diligence until Plaintiffs obtained and analyzed the later record.

619.    Plaintiffs' claims rest in substantial part on Defendants' omissions and concealments: the pooled fund-level margin behind the stated Investment Account Values, the rationing of capacity by undisclosed criteria, the zero-loss mandate protecting the affiliated layer, the referral reciprocity that selected and priced the broker, and the litigation history of the program's architects. Each concealed fact was material, and each was peculiarly and exclusively within Defendants' knowledge, recorded only in books, systems, and communications Defendants control, and undiscoverable by any investigation available to Britannica. Britannica also protected itself the way a careful counterparty does: Defendants' representations came in writing, in the deck, the Overview, the correspondence, and the instruments themselves, and orally on the dated calls pleaded in this Complaint, and Britannica secured the writings, tested the representations in the written negotiations, and relied on all of them, written and spoken alike. And until March 2023, Defendants' own instrument reinforced the representation: the original Appendix C charged borrowing costs only for investments exceeding the stated $10,000,000 Investment Account Value, terms coherent only with provided capital, so the paper Britannica held confirmed the commitment Defendants had spoken.

620.    The losses pleaded here were not caused by market movement. They were caused by Defendants' own acts pleaded throughout this Complaint: the concealed pool and its rationing, the extractions, the withheld credits, the fabricated trigger, the seizure of intact capital, and the forced blind liquidation into a broken market. On Defendants' own administrator's ordinary-course books, the accounts' losses through the forced liquidation totaled a fraction of the stated

250

values, the 2024 year recorded a capital surplus, and the accounts stood in significant profit once the confirmed credits are counted. The losses were caused by the materialization of exactly the risks Defendants concealed: a shared margin pool that failed under platform-wide stress, capacity rationed away when Britannica needed it, a termination trigger valued by the party that profited from declaring it, and a seizure executed to serve Defendants' own interests. Every category of loss pleaded below flows from those concealed risks and from Defendants' deceptive acts, not from the market whose dislocation Britannica's strategy was built to profit from.

621.    This Count is timely as to every purchase. BC LLC's initial $1,000,000 was received by Topwater on November 19, 2021, confirmed in Topwater's own written receipt that day, and the subscription instrument was fully executed as of December 9, 2021, both dates within five years of this action; each later purchase, the April 2022 addition, the September 2023 increase, and the July 2024 Mayfly purchase, falls comfortably within the period of repose; and Plaintiffs neither discovered nor could with reasonable diligence have discovered the facts constituting the violations before August 5, 2024 at the earliest, with the concealment pleaded above continuing after that date, so this action is brought within two years of discovery. No purchase occurred, and no period of repose could begin, before the Fund's acceptance: under the Subscription Agreement Defendants drafted, the Manager reserved the right to reject the subscription for any reason or no reason, in whole or in part, at any time prior to acceptance, and only upon acceptance of the subscription did BC LLC become a First-Loss Member holding an Interest. Discovery came only when the concealed design surfaced: the July 15, 2024 trading failure supplied the first physical proof that no capital stood behind the stated values, the August 5, 2024 seizure and the August 8, 2024 retrospective package revealed the machinery, and the

251

concealed facts pleaded in this Complaint, including that no manager-specific capital existed at all behind the pooled and rationed margin, remained hidden until then.

622.    Plaintiffs could not have discovered, and no reasonably diligent plaintiff would have discovered, the facts constituting the Exchange Act violations, including the facts showing Defendants' intent, before the events pleaded in this Count and in the timeliness section of this Complaint. The concealed pooled-margin design, the zero-loss mandate, the reciprocity economics, the instructed administrator, and the interested valuation machinery all sat in records Defendants controlled, behind representations Defendants built to foreclose inquiry, and the facts revealing them arrived only with the August 2024 seizure, the August 8 package and its metadata, the autumn 2024 accounting record, and the regulatory-filing analysis pleaded in this Complaint. Defendants concealed each of those facts, as pleaded throughout this Complaint. Defendants' concealment held even as the surrounding record emerged: the criminal charges, investor suits, and judicial rulings concerning Defendants' own organizations pleaded in this Complaint all became public only within the last year, long after BC LLC's purchases, and nothing public during the purchase period disclosed or suggested the concealed facts.

## COUNT II

**Control Person Liability Under Section 20(a) of the Exchange Act**

*(By BC LLC Against Jefferies, LAM, Goldman Sachs, Borgia, Taylor, Daraviras, Richard Handler, and Brian P. Friedman)*

623.    BC LLC realleges all of the factual allegations above and Count I to the extent relevant to this Count.

624.    The primary violations pleaded in Count I were committed by each Defendant named in that Count, through the false statements and deceptive acts personally pleaded there as

to that Defendant, including by LAM, Topwater Partners LLC, Goldman Sachs, Borgia, Wieczorek, Damm, O'Hara, Taylor, Rubin, Eck, Tran, Backer, and Robinson.

625.    Each defendant had the practical ability to direct the particular conduct constituting the primary violation, not merely a title or ownership interest. Jefferies controlled the parent risk and escalation function. LAM controlled the issuer, funds, valuation, documents, and actors. Borgia controlled the division's solicitation and operating policy. Each participated culpably through the acts and knowledge pleaded above.

626.    Taylor, as Co-Head and Managing Director of the division and a member of the Investment Committee, jointly controlled the division's policies, the approval and termination machinery, and the personnel who executed them, and personally executed the operative July 2024 instruments for all three principal entities. Handler, as Chief Executive Officer of Jefferies Financial Group and a member of the program's Investment Committee identified in Defendants' own deck, and Friedman, as President of Jefferies Financial Group and a member of the same committee, each possessed and exercised the power to direct the management and policies of LAM and the Topwater program, including the committee machinery that reviewed, repriced, and terminated Britannica's accounts, and each participated culpably through the committee conduct pleaded in this Complaint, including the March 2023 for-cause threat and the August 5, 2024 decision O'Hara attributed to the parent company. Daraviras, as Co-President of Leucadia Asset Management responsible for the overall management of the LAM business and a member of both the Investment Committee and the Support Committee, possessed and exercised the same power over the division's policies, approvals, and account decisions, and participated culpably through the committee and parent-level conduct personally pleaded in his party paragraph and throughout this Complaint.

627.   Goldman Sachs controlled the Goldman primary violators and culpably participated in their violations. Goldman Sachs employed Eck, Tran, Backer, and Robinson, held and exercised the power to direct their coverage assignments, their communications with Britannica, and the compensation that, on information and belief as pleaded above, rose with the revenue Britannica's captive account generated. The conduct through which each violated Section 10(b) was the conduct of Goldman's own business run through Goldman's own systems: the steering executed through Goldman coverage at senior direction, the rate representations transmitted through Goldman's account teams and refuted by Goldman's own personnel in writing, and the revenue-factor allocation of services that Goldman's own standard form states in Goldman's own words. Goldman Sachs cannot establish good faith: the firm's written form priced the conflict, the firm's credit systems booked Britannica's revenue to the relationships Goldman actually served, and the firm's business head, Backer, sat atop the structure. Goldman Sachs is therefore liable under Section 20(a) for the Goldman Individual Defendants' primary violations, jointly and severally with them.

628.   Jefferies, LAM, Goldman Sachs, Borgia, Taylor, Daraviras, Handler, and Friedman are each liable under 15 U.S.C. § 78t(a) unless that defendant establishes the statutory good-faith defense. The facts pleaded above, including each defendant's participation, knowledge, incentives, and failure to prevent the violations, negate that defense for every one of them.

629.   Control is pleaded from Defendants' own documents: Jefferies' Chief Executive Officer and President sat on the Investment Committee holding power over every account on the platform; Jefferies' risk chief approved the risk parameters; the termination decision was, in O'Hara's words on the August 5 call, "long made," at a level far above him, at the parent

company and its affiliates. Each control person participated culpably in the conduct that person's own writings, committee seats, and approvals record, as pleaded throughout this Complaint. Goldman Sachs's control of its own primary violators, and its culpable participation through its own written policy and systems, are pleaded above in this Count.

630.    On information and belief, O'Hara reported the March 2023 threat and its yield upward, and Handler, Friedman, and Daraviras knew the relationship was being repriced under threat, because the division's committee structure and Jefferies-level risk approval ran through them.

## COUNT III

### Misappropriation of Trade Secrets Under the Defend Trade Secrets Act, 18 U.S.C. § 1836

*(By Gupta and BCML Against LAM, Stonefly, Mayfly, Jefferies, Goldman Sachs, Borgia, Wieczorek, Damm, O'Hara, Taylor, Rubin, Daraviras, Handler, Friedman, Long, Rothe, Chen, and John and Jane Does 1-20)*

631.    Gupta and BCML reallege and incorporate the allegations above to the extent relevant to this Count.

632.    Gupta created and owns the Britannica Trade Secrets. BCML possessed and deployed them in its advisory business under Gupta's authorization and license. Gupta and BCML are therefore owners within the meaning of 18 U.S.C. § 1839(4).

633.    The Britannica Trade Secrets consist of the specifically identified nonpublic research architecture, capital-flow and market-regime models, instrument and position-selection architecture, options and volatility architecture, dynamic hedging architecture, market-neutral portfolio-construction architecture, financing and short-credit architecture, execution and adjustment architecture, scenario and constraint architecture, complete time-stamped trading compilation, and integrated strategy map described above.

634. The claimed trade secrets do not consist of public market data, general financial knowledge, or generic concepts such as options trading, market neutrality, or delta hedging. They consist of Plaintiffs' confidential selection, collection, organization, transformation, weighting, formulas, parameters, thresholds, timing, sequencing, interaction, and application of the components, together with the private live and historical record revealing how those components operated.

635. Plaintiffs took extensive and reasonable measures to maintain secrecy, including severely limiting internal access; using passwords, encryption, restricted systems and folders, confidentiality policies, nondisclosure obligations, and copying and distribution restrictions; marking the materials as proprietary, trade secret, highly confidential, private and confidential, or distribution prohibited; and disclosing information externally only under contractual and other duties requiring confidentiality and limiting use.

636. All information and materials furnished by Plaintiffs in the relationship were covered by applicable confidentiality and limited-use obligations, irrespective of whether a particular document repeated a confidentiality legend.

637. The Britannica Trade Secrets derived actual and potential independent economic value from not being generally known or readily ascertainable. They embodied decades of research and trading experience, extensive firsthand international investigation, thousands of pages of models and analyses, substantial expenditures, proprietary systems and data, and repeated testing and refinement through live trading.

638. The Britannica Trade Secrets were related to and used or intended for use in products and services in interstate and foreign commerce, including investment advisory

services, portfolio management, research, brokerage, financial technology, risk management, and securities, options, futures, currencies, commodities, and derivatives trading.

639.    Defendants acquired the Britannica Trade Secrets subject to duties to maintain their secrecy and limit their use to the proper evaluation, onboarding, operation, administration, monitoring, brokerage, and legitimate account-specific risk management of Britannica's accounts.

640.    Defendants knew or had reason to know that the information belonged to Gupta and BCML, was highly confidential and proprietary, derived commercial value from secrecy, and could not be disclosed or used outside the limited purposes for which it had been supplied.

641.    Defendants misappropriated the Britannica Trade Secrets by acquiring additional proprietary disclosures through purported risk and financing requirements and by disclosing, transmitting, copying, retaining, analyzing, incorporating, or using the secrets without Plaintiffs' consent and outside the purposes permitted by the agreements and confidential relationships.

642.    LAM, Stonefly, Mayfly, O'Hara, and the other Topwater and LAM Defendants obtained and used Plaintiffs' models, explanations, scenarios, positions, exposures, and complete time-stamped trading history; distributed them through personnel and committees; incorporated the resulting knowledge into risk, constraint, financing, valuation, termination, and platform practices; and used the information in ways adverse to Gupta and BCML and outside the purposes for which the information was provided.

643.    Jefferies and its named personnel acquired and used the Britannica Trade Secrets through the Investment Committee, Support Committee, Jefferies Risk process, parent-level risk approval and review, common distribution lists, account systems, and decision channels.

Jefferies' use extended beyond passive ownership and beyond the proper administration of Britannica's accounts.

644. Goldman Sachs obtained confidential strategy presentations and materials during solicitation, diligence, and onboarding and obtained Britannica's complete live order, execution, position, exposure, financing, and performance record through its imposed prime-broker relationship. On information and belief, Goldman Sachs used or disclosed that information outside its authorized account functions for commercial, pricing, coverage, risk, capacity, relationship, counterparty, proprietary, or affiliated purposes.

645. The individual Defendants named in this Count directly received the confidential information, appeared on the common distribution lists carrying it, analyzed it through the committees or risk functions in which they participated, directed or approved its use, or personally implemented the resulting constraint, risk, financing, valuation, or termination decisions.

646. Defendants' unauthorized use included applying Plaintiffs' information to improve platform-wide models and procedures, train personnel, revise manager constraints and contracts, inform risk and valuation practices, develop competing or derivative methodologies, and, on information and belief, inform proprietary, affiliated, employee, or personal trading.

647. The internal scope of the acquisition, disclosure, and use is peculiarly within Defendants' possession. Plaintiffs' allegations are supported by the direct disclosures, common distribution lists, committee process, O'Hara's admissions, revisions following Plaintiffs' explanations, Defendants' complete data access, Jefferies' direct risk involvement, and the resulting conduct described above.

648.    Defendants acted knowingly, willfully, and maliciously. They used Plaintiffs' information despite express confidentiality obligations, limited-use restrictions, repeated confidentiality markings, their actual knowledge of the information's proprietary nature, and their knowledge that the information had been disclosed solely for identified account-related purposes.

649.    Defendants' misappropriation caused Gupta and BCML actual loss, including loss of control, secrecy, exclusivity, competitive advantage, deployment opportunities, licensing opportunities, enterprise value, and the ability to earn advisory and trading economics through exclusive use of the Britannica Trade Secrets.

650.    Defendants were unjustly enriched beyond the losses included in Plaintiffs' actual loss, including profits, revenues, improved systems and risk results, avoided losses, commercial and trading advantages, platform benefits, and research, development, testing, technology, staffing, and operating expenditures avoided through Defendants' actual use of Plaintiffs' work.

651.    In the alternative to other damages measures, Gupta and BCML are entitled to a reasonable royalty for every unauthorized disclosure and use of the Britannica Trade Secrets, measured by the scope, duration, commercial value, competitive significance, scalability, head-start period, and downstream application of the information.

652.    Gupta and BCML seek all relief authorized by 18 U.S.C. § 1836(b)(3), including injunctive relief, actual damages, nonduplicative unjust enrichment or, in the alternative, a reasonable royalty, exemplary damages of up to twice the damages awarded for willful and malicious misappropriation, reasonable attorneys' fees, and all other appropriate relief.

653.    This action was commenced within three years after Plaintiffs discovered or through reasonable diligence could have discovered the misappropriation.

## COUNT IV

**Breach of Contract: the Stonefly AIAA**

*(By BCML Against Stonefly and LAM)*

654.    BCML realleges all of the factual allegations above to the extent relevant to this Count.

655.    The Stonefly AIAA is a valid contract among Stonefly, LAM, and BCML and is governed by New York law under Section 13(e). BCML performed its obligations, as pleaded with particularity in the performance, fee, and account-history paragraphs of this Complaint and in the performance paragraph of this Count.

656.    Stonefly and LAM breached Section 6(b)(ii) because no valid automatic-termination predicate was determined. Section 6(b)(ii) required LAM to determine the Capital Account from the most recent trading information received and after all applicable Investment Loss allocations. LAM relied on an unreproduced, interested mark taken as a dislocated options market opened; operated through an admitted hourly-lag architecture; encountered missing files and a vendor-confirmed delivery gap; and has never produced the executable instrument prices, formulas, timestamps, allocations, or audit logs. The later image asserted a $907,166 loss and $92,834 remaining, figures that do not reconcile with UMB's July 31 Capital Account of $990,429, UMB's later $637,793 August loss allocation, or the $352,636 withdrawal. Those differences dwarfed the claimed $7,166 shortfall. The $532,710.95 total return, no produced Second-Loss Allocation, and the other defects pleaded above confirm the absence of a valid determination when considered together. Even the administrator figures in that comparison were computed under Defendants' own methods, inputs, and instructions, as pleaded in this Complaint, and still they refute the determination Defendants claim.

657.    Stonefly and LAM also breached Section 6(d)(i). Their notice invoked the provision that permitted Stonefly to direct BCML "to liquidate the Investment Account in an orderly and prudent manner." They instead demanded ten percent in ten minutes, twenty-five percent in thirty minutes, and the entire options book within an hour; prohibited hedging; allowed five minutes to accept; and threatened to hand the book to another adviser. Those orders were not orderly or prudent. The command to cease ordinary trading did not permit Defendants to forbid the risk-reducing transactions needed to liquidate prudently. This breach stands even in the alternative assumption of a valid termination.

658.    Stonefly and LAM further breached Appendix C as amended. Amendment No. 1 amended and restated Appendix C in its entirety effective April 1, 2023, and the restated text excluded from the Investment Account's income only "interest income on cash equivalents." From that date Britannica was owed the interest on its cash and the income on the credit balances generated by the account's securities sold short as components of Investment Gains, and they entered the Capital Account and the Account Adviser Fee computations by the plain terms of the instrument Defendants drafted. Britannica's accounts carried cash and short-sale credit balances of substantial size continuously thereafter. Defendants never computed those amounts, never credited them, never reported them as line items despite repeated written request, and never paid them, while charging in full the financing expense the same amendment created in their favor. On April 16, 2024, Defendants refused the credits by reciting an exclusion the operative Appendix C no longer contained. BCML is entitled to the resulting shortfall in Remaining Investment Gains and Account Adviser Fees, and to the accounting necessary to compute it. Stonefly and LAM also breached the fee provisions of Section 7: in every month in which Defendants stripped the credits from the Investment Gains base, the Account Adviser Fee then

due was underpaid, a breach that recurred month after month and that Britannica's written requests never cured because Defendants ignored them; and Section 7(b)'s final deadline for the accrued unpaid fee, 30 days after the later of the termination month-end or the liquidation-completion month-end, passed no later than October 31, 2024 with nothing paid.

659.    Any contention that "cash equivalents" silently absorbs "cash" fails on the instruments Defendants drafted. The original Appendix C listed "cash, cash equivalents and short rebates" as three separate items, so within these agreements "cash" and "cash equivalents" are distinct terms with distinct meanings, and Defendants' deletion of two of the three must be given effect; an amendment that struck "cash" while meaning to keep excluding cash would have changed nothing, and New York law does not read a negotiated deletion as a nullity. Defendants drafted both versions, and any ambiguity they now assert is construed against them. In the alternative, even if interest on cash were somehow still excluded, the restated Stonefly Appendix C indisputably removed "short rebates" from the exclusion, and under the Mayfly agreement Britannica was owed the income on the credit balances generated by its securities sold short, as Defendants' own July 31, 2024 writing confirmed. The $7,500,000 balance standing on the night before termination was, in Britannica's contemporaneous written description to Defendants, a credit balance "from short sales of securities (excluding the first loss investments)." Its precise composition as between short-sale rebate income and proceeds of short option sales sits in Defendants' and the brokers' exclusive records and is a subject of the accounting sought here; on any composition the income was owed, whether as short-rebate income the operative exclusions did not reach, or as the net-credit income Damm committed to in writing on March 28, 2023 and Long confirmed as an obligation of the agreement on July 31, 2024. In the further alternative, the credits are owed on the promissory and course-of-performance grounds pleaded in Count XIX.

660.    Stonefly and LAM further breached Section 10 of the Stonefly AIAA, which bound each party to maintain in strict confidence all records, investment advice, and information related to the Investment Account, including allocations, identity, and composition of investments, and which restricted every party's use of that Information "only... in connection with this Agreement." Defendants' post-termination retention of Britannica's strategy information, models, and account records, their refusal to certify return or destruction, and, on information and belief, their internal study and use of that information for Defendants' own benefit, pleaded in Section N, are uses outside any connection with the Agreement and outside Section 10's affiliate exception, which extends only to disclosures reasonably required "in connection with this Agreement." Section 13(c) makes the obligation survive termination.

661.    In the alternative, and only if Section 1(a) of the Stonefly AIAA, which commanded that the Trading Master Fund "shall provide the Account Adviser with an initial account value as set forth in Appendix A," is read as words of delivery rather than designation, Stonefly and LAM breached Section 1(a) outright: Appendix A stated $10,000,000, the stated value was later raised to $25,000,000 before Defendants reallocated it between the two accounts, and Stonefly and LAM never provided, funded, or maintained capital in that or any amount, as the financing terms Defendants imposed in March 2023 and the account's failure to trade on July 15, 2024 demonstrate. On that same reading, the obligation was continuing: Section 1(a) required the stated value to be provided and maintained as adjusted from time to time in writing, Defendants renewed the obligation in writing when they raised the stated value in September 2023 and again when they reallocated it between the accounts in July 2024, and Stonefly and LAM breached it anew in every period through August 5, 2024 in which the capital was not provided and maintained. Defendants drafted every word of the instrument, and every ambiguity

in it is construed against them. BCML's damages under this alternative include the losses pleaded in this Complaint's damages allegations for the capacity committed but never provided, including the returns the committed capital would have generated, with prejudgment interest from each period's accrual. This paragraph operates in the alternative and does not qualify the primary allegation, pleaded elsewhere in this Complaint, that the stated Investment Account Value was a figure Defendants announced without funding.

662.    On information and belief, the August 5 liquidation and the accounts' data record ran through identifiable Goldman Sachs personnel: the coverage and execution desks that received and worked the compelled schedule, and the coverage personnel, including Backer and Tran, who communicated with the Division about Britannica's accounts that morning and in the surrounding days, including on lines Goldman's own policy designated for recording. The basis is the accounts' pleaded execution at Goldman, those personnel's coverage roles in the record, and the recorded-line designation in Goldman's own writing. The order tickets, desk communications, and recorded-line archives, in Goldman's control, will identify every participant.

663.    BCML suffered Stonefly-specific contractual and business injury, including unpaid advisory compensation and credit-related amounts to the extent owed to BCML, the loss caused by the compelled executions rather than an orderly and prudent liquidation, and consequential loss recoverable under the AIAA or other applicable law. BC LLC owns the separately tracked First-Loss Interest, capital, and account-property claims pleaded in Counts I, VI through XII, XIII, XVIII, and the damages section. Any overlapping measure will be elected once and will not be recovered twice.

264

664.    Defendants breached the termination provisions themselves. Section 6(b)(ii) conditions any automatic-termination determination on the most recent trading information received by the Manager, and the information the Manager had received, by Defendants' own written admissions, was a day stale and gap-ridden: the overnight position file had failed to arrive that morning; and for Mayfly, positions were supplied by email from Britannica or not received at all, because Defendants had built no integration with Interactive Brokers, a broker Defendants had represented as an established option where other managers already operated when in fact Defendants' own construction there was a first of its kind, connected to no functioning risk-management system of Defendants, so that Mayfly's positions were stale or incorrect in whatever system Defendants consulted; and no reliable pricing existed that morning at Interactive Brokers or the other brokers, as Britannica's own support tickets and the nationwide market-data failures record. No determination made on that record satisfied the provision. Section 6(b)(iii) conditions every for-cause consequence on written notice and a stated ground; Defendants sent none, for either account, ever, and the cross-default they fired attaches by its own executed text only to a Section 6(b)(iii) termination. Defendants also breached by withholding the credits the amended Appendix C required in the computation, an omission without which even Defendants' invented figures state no breach of the floor.

665.    Plaintiffs performed every obligation the agreements imposed on them: BCML traded within the approved strategy, reported hourly, answered every notice, cured every threshold Defendants warned of, and complied with Defendants' liquidation orders under protest; BC LLC funded every dollar it subscribed for; and every condition precedent to Defendants' obligations was satisfied, waived, or excused by Defendants' own conduct.

**COUNT V**

265

**Breach of Contract: the Mayfly AIAA**

*(By BCML Against Mayfly and LAM)*

666.   BCML realleges all of the factual allegations above to the extent relevant to this Count.

667.   The Mayfly AIAA, dated as of July 3, 2024, is a valid contract among Mayfly, LAM, and BCML. BCML performed its obligations, as pleaded with particularity in the performance, fee, and account-history paragraphs of this Complaint.

668.   Mayfly and LAM breached the AIAA because neither asserted route to termination was valid. The reciprocal cross-default reached by its text only a breach under Section 6(b)(iii), Termination for Cause, not a disputed Stonefly Section 6(b)(ii) event. The contemporaneous notice did not invoke that clause or supply a separate Mayfly notice. Defendants later asserted that Mayfly independently stopped out at 9:32 a.m., but they have produced no native Mayfly calculation, timestamped position and price file, credit treatment, allocation bridge, or audit trail. The asserted $2,295,911 loss exceeded Mayfly's $1,500,000 first-loss layer by $795,911, yet no Second-Loss Allocation has been produced. Defendants also failed to show how they treated the positive carry Topwater had confirmed would be calculated and credited on the $7,500,000 short-sale balance. The $7,500,000 was the balance, not the amount owed. Mayfly and LAM also breached Section 7 of the Mayfly AIAA: the credit Long confirmed on July 31, 2024 belonged in the Investment Gains base, the fee on it was never calculated or paid, and Section 7(b)'s final 30-day post-liquidation deadline passed no later than October 31, 2024 with nothing paid.

669.   In the alternative, and only if Section 1(a) of the Mayfly AIAA, which commanded that the Trading Master Fund "shall provide the Account Adviser with an initial

266

account value as set forth in Appendix A," is read as words of delivery rather than designation, Mayfly and LAM breached Section 1(a) outright: Appendix A stated $15,000,000, and Mayfly and LAM never provided, funded, or maintained capital in that or any amount, as the account's failure to trade on July 15, 2024, twelve days after execution, for reported insufficient margin or capital backing demonstrated. On that same reading, the obligation was continuing, and Mayfly and LAM breached it anew in every period from execution through August 5, 2024 in which the capital was not provided and maintained. Defendants drafted every word of the instrument, and every ambiguity in it is construed against them. BCML's damages under this alternative include the losses pleaded in this Complaint's damages allegations for the capacity committed but never provided, including the returns the committed capital would have generated, with prejudgment interest from each period's accrual. This paragraph operates in the alternative and does not qualify the primary allegation, pleaded elsewhere in this Complaint, that the stated Investment Account Value was a figure Defendants announced without funding.

670.    BCML suffered Mayfly-specific contractual and business injury, including unpaid credit-related amounts to the extent owed to BCML, the loss caused by the compelled executions rather than an orderly and prudent liquidation, and other loss recoverable under the AIAA or other applicable law. BC LLC owns the separately tracked First-Loss Interest, capital, and account-property claims pleaded elsewhere. Overlapping measures are pleaded in the alternative and will not be recovered twice.

## COUNT VI

**Breach of Contract: the Subscription Agreement and Operating Documents**

*(By BC LLC Against Topwater Partners LLC and LAM)*

267

671. BC LLC realleges all of the factual allegations above to the extent relevant to this Count.

672. The Subscription Agreement and the Topwater Partners LLC operating documents it incorporates are valid contracts. Topwater Partners LLC accepted BC LLC's subscription, admitted BC LLC as a First-Loss Member, accepted the capital allocated to the Stonefly and Mayfly accounts, and recorded BC LLC's First-Loss Interests and capital-account rights. BC LLC performed its obligations, funding every dollar it subscribed for on the dates pleaded in this Complaint.

673. The executed subscription instruments carry the obligations Defendants breached. The Subscription Agreement Topwater Partners LLC accepted admits BC LLC as a First-Loss Member holding a First-Loss Interest with a capital account maintained on the books of the Feeder Fund; its Section VII(A) exculpates no Losses resulting from fraud, bad faith, gross negligence, or willful misconduct; and its terms incorporate the Feeder Fund's operating agreement, a document Defendants drafted, hold, and have never produced despite demand. The capital-account, allocation, distribution, and return obligations pleaded in this Count arise from the accepted subscription, the First-Loss Interest it created, and the operating agreement it incorporates, whose text sits in Defendants' exclusive control and whose production this action will compel. On information and belief, that operating agreement obligates the Feeder Fund to maintain accurate capital accounts, allocate income and loss under the governing waterfall, and distribute and return capital not consumed by valid allocations: the same obligations Defendants' own September 26, 2024 computation and partial return acknowledged in conduct.

674. Topwater Partners LLC and LAM breached by failing to maintain and apply an accurate capital account; failing to allocate all income, positive carry, losses, and expenses under

the governing waterfall; charging BC LLC with losses caused by an invalid termination and disorderly liquidation rather than authorized trading results; failing to identify any Second-Loss Allocation; failing to calculate and distribute the amounts due; and failing to return all capital not consumed by a valid, authorized, and accurately calculated allocation.

675.    BC LLC seeks the unreturned portion of its capital, unpaid credits and income, and losses caused by invalid allocations, with lawful interest. The $1,967,289.05 difference between the $2,500,000 contributed and the $532,710.95 returned is the primary unreturned-property channel, subject to the complete contractual reconciliation. To the extent Defendants establish that any part was consumed by valid trading loss, BC LLC seeks the remaining contract measure and the distinct loss caused by the invalid termination and liquidation.

## COUNT VII

**Breach of the Implied Covenant of Good Faith and Fair Dealing**

*(By BCML Against LAM, Stonefly, and Mayfly; and by BC LLC Against Topwater Partners LLC)*

676.    BCML realleges all of the factual allegations above to the extent relevant to the Stonefly and Mayfly AIAAs and asserts this Count against LAM, Stonefly, and Mayfly. BC LLC realleges the factual allegations above to the extent relevant to its Subscription Agreement and associated membership rights and asserts this Count against Topwater Partners LLC. This Count is pleaded in the alternative to Counts IV-VI to the extent any challenged act is held to fall within the literal terms of an agreement.

677.    New York law implies in every contract a covenant that neither party will destroy or injure the other's right to receive the contract's fruits and that contractual discretion will not be exercised arbitrarily, irrationally, or in bad faith.

678.     LAM, Stonefly, and Mayfly used the discretion conferred by the AIAAs in bad faith and deprived BCML of the agreements' fruits. LAM, acting as Manager and Valuation Agent, selected and used unreliable opening data, valued its own asserted trigger without reproducible inputs or conflict controls, refused to wait for reliable instrument-level price discovery, refused additional capital without the warning and cure used in the parties' prior course, prohibited the protective trading needed for a prudent unwind, and imposed a one-hour liquidation under clauses requiring an orderly and prudent liquidation. Stonefly adopted the asserted Stonefly stop-out, compelled liquidation, and withholding of the native calculation and accounting. Mayfly adopted a purported termination without a separate contemporaneous notice or native independent calculation, later advanced an unsupported same-minute Mayfly theory, and failed to calculate and credit positive carry. LAM, Stonefly, and Mayfly then presented or adopted the retrospective compilation while withholding the native proof. Those actor-specific choices deprived BCML of account continuity, compensation, strategy protection, and the prudent liquidation for which it contracted.

679.     LAM, Stonefly, and Mayfly treated the claimed automatic event as discretionary in practice. In April 2022, O'Hara, acting for LAM and Stonefly, warned that Stonefly was approaching its threshold and accepted additional capital the same day. On July 18, 2024, LAM granted forbearance for the managed accounts. On August 5, O'Hara went up LAM's chain of command and LAM's Investment Committee extended the deadline. On information and belief, LAM, acting for the relevant managed-account vehicles, gave other advisers warnings, time, forbearance, or different liquidation terms during market dislocations, including August 5. The basis is LAM's standing Investment Committee, the multi-adviser platform, the treatment of Britannica in 2022 and July 2024, and the more than forty liquidation calls made that morning.

LAM's, Stonefly's, and Mayfly's August 2-9 termination, forbearance, and committee records will show the comparator pattern and each vehicle's adoption of the relevant decision.

680.    On information and belief, the contract performances and breaches pleaded in these Counts ran through identifiable Division hands: Jeff O'Hara transmitted the warnings, escalations, liquidation orders, and received-information admissions; Dave Damm administered the credit and account communications and refused the credits in writing by reciting a deleted exclusion; Brian Long performed the valuation and crediting confirmations; Travis Taylor executed the instruments for every Topwater party; and the August 5 extension and the platform's forbearance decisions ran through the Investment Committee seated, per Defendants' own deck, by Richard Handler and Brian P. Friedman, with Bryan Borgia and Blake Wieczorek in the platform roles the record pleads. The basis is each person's own pleaded writing or signature; the committee's August 2 through 9 records, the determination and forbearance files, and the order-transmission records, all in Defendants' control, will name every participant in each act.

681.    BCML suffered the account-continuity, compensation, forced-execution, and business losses caused by LAM's, Stonefly's, and Mayfly's bad-faith exercises of AIAA discretion. BC LLC suffered the capital, credit, allocation, accounting, and membership-property losses caused by Topwater Partners LLC's bad-faith exercise of its contractual discretion. Those measures are subject to the alternative and nonduplication limits pleaded above.

682.    Defendants breached the implied covenant by operating the stated-value and margin machinery in bad faith to destroy the fruits of Britannica's bargain: they held out and adjusted a stated Investment Account Value while maintaining the capital behind it as a shared, rationed, fund-level margin pool; they rationed usable capacity by undisclosed criteria and

271

denied it when Britannica's strategy needed it, including on July 15, 2024, when the newly executed Mayfly account could not trade at all, and on August 5, 2024, when the pool's failure was charged to Britannica; they exercised every discretionary power the instruments gave them, guideline rewrites, limit changes, committee approvals, broker permissions, cure and extension decisions, to extract terms and charges rather than to perform the bargain; and they valued their own termination trigger as the party that profited from declaring it. Each exercise of discretion in bad faith deprived Britannica of the benefit of the committed trading capacity, the account continuity, and the honest administration for which it bargained.

## COUNT VIII

**Breach of Fiduciary Duty**

*(By BC LLC and BCML Against LAM, Topwater Partners LLC, and Goldman Sachs)*

683.    Plaintiffs reallege all of the factual allegations above to the extent relevant to this Count.

684.    LAM exercised discretionary control over property and information entrusted specifically by Plaintiffs. It selected the price sources, valued the accounts, determined the capital balances, administered BC LLC's capital and credits, controlled the timing and manner of termination and liquidation, and held the only complete record of those acts. Topwater Partners LLC accepted and held BC LLC's subscription capital and maintained the membership and capital-account relationship. BC LLC and BCML could not independently verify LAM's systems, allocations, conflicts, or intentions and depended on LAM to act loyally, with due care, and with full disclosure in those matters.

685.    The duties arose from that entrustment, discretionary control, dependence, and exclusive knowledge, not merely from a promise to perform an AIAA. The AIAAs' statement

272

that BCML was a fiduciary to the Trading Master Funds did not eliminate LAM's duties in controlling Plaintiffs' property and information for its own and affiliated interests.

686. LAM and Topwater Partners LLC breached their duties by valuing the accounts through an interested and unreliable process; using the termination machinery for affiliated and platform interests; refusing less destructive risk controls; withholding the positive-carry calculation and the allocation account; transferring forced-realization loss to BC LLC's layer; using or disclosing BCML's confidential information adversely; constructing the August 8 package retrospectively and presenting it as contemporaneous proof; and retaining benefits without identifying their recipients. Defendants further breached by controlling every lever of the entrustment against the entrusting party: the trigger they alone declared, the mark they alone made, the collateral they barred from leaving, and the income on Britannica's own cash that Appendix C routed away from Britannica without disclosure, calculation, or credit. LAM further breached by keeping the books of the entrustment through an administrator it retained, paid, and instructed, either withholding from it the operative instruments or delivering superseded and incorrect ones, as pleaded in this Complaint, so that the fiduciary's own record of the beneficiary's property ran against the beneficiary in every period.

687. The allocation account whose withholding is pleaded above exists as a ledger with a balance, entries, and an owner of record, and its production will show what the fiduciary recorded as Britannica's and kept. The UMB subpoena that reaches the instructed accounting reaches this ledger.

688. LAM withheld from its own administrator the operative instruments or delivered superseded ones. On information and belief, the administrator's document inventory will show, version by version, which Appendix C and which amendments UMB held in each period, fixing

the instructed-books breach to the page. The UMB subpoena reaches the document register and receipt records.

689.    Plaintiffs seek direct compensatory damages and disgorgement of the fees, interest, brokerage, saved losses, and other benefits obtained through the breaches. Any recovery will be reduced to prevent duplication with contract, restitution, or statutory damages.

690.    Plaintiffs also seek the distinct loss caused by disloyal conduct outside ordinary contract performance, including excess forced-realization loss, loss of control and secrecy, and injury to BCML's track record and business. Punitive damages are sought for the intentional and morally culpable conduct pleaded above, to the extent permitted by the governing law.

691.    LAM's fiduciary duties arose from status, function, and undertaking, each independently sufficient. As a registered investment adviser, LAM owed the federal fiduciary standard the Supreme Court has recognized since 1963: undivided loyalty, and the elimination or full disclosure of every conflict. As the self-appointed Valuation Agent, LAM undertook the function the law guards most jealously, valuing property in which it held an interest, and owed the strictest duty of impartiality and candor in performing it. And as the party controlling custody, funding, permissions, and termination of accounts holding Britannica's capital, LAM occupied the position of superiority and control from which New York law implies a relationship of trust. No contract term created these duties, and none could waive them.

692.    LAM breached each duty by self-dealing and concealment: it valued its own termination trigger, on stale and missing data, as the party that profited from declaring it crossed; it concealed the conflicts the law required it to eliminate or disclose, including the affiliated composition of the protected layer, the zero-loss mandate that layer enjoyed, the referral arrangement that selected and priced the client's broker, and the pooled, rationed margin behind

the stated capital; it extracted amendments from its beneficiary under threat; it withheld the income its own writings confirmed; and it seized the beneficiary's capital in service of its own and its affiliates' interests. Every conflicted act is voidable at Plaintiffs' election, and every benefit Defendants took through the conflicts is held for Plaintiffs' account.

693.   Goldman Sachs owed BC LLC and BCML fiduciary duties in the advisory relationship it created and exploited. Goldman Sachs solicited Britannica's trust as its advisor on prime brokerage and capital introduction: it took Britannica's strategy and marketing materials into its capital-introduction function, represented that it would advise and introduce, and then directed Britannica's selection of the very platform Goldman Sachs covered and was paid to serve, without disclosing the referral reciprocity, the revenue-factor economics, or the relationship-credit accounting under which Britannica's captive trading would be priced and harvested. Within that undertaking Goldman Sachs owed loyalty and full disclosure, and it breached both: it advised into its own concealed interest, priced the resulting captive flow at multiples of the market, and kept every conflict hidden while the relationship it built consumed the client it advised. Its gains from the conflicted advice are held for Plaintiffs' account.

694.   On information and belief, LAM maintained a written valuation policy that its August 5 conduct violated on the policy's own terms, because no policy a registered adviser files permits valuing an interested trigger on admittedly hour-late data with the native calculation never preserved. The policy and its exception log are in Defendants' control and are among the first document requests.

695.   The August 5 seizure saved the protected layer from the exposure the accounts then carried. On information and belief, the loss the seizure avoided for the affiliated capital is computable from the positions, the market path, and the pool's condition, and it is a benefit the

275

fiduciary took for its own side, held for Plaintiffs' account. The pool margin records and position files are in Defendants' control, and expert reconstruction will state the number.

696. LAM's and Topwater Partners LLC's duties did not arise from, and are not extinguished by, any contractual disclaimer. They held Britannica's capital and confidential property; exercised actual discretion over valuation, accommodation, cure, and termination decisions; ran the sole accounting and valuation function for the Accounts; and possessed knowledge and control so superior that Britannica could not protect itself at the moments that mattered. No instrument licenses a fiduciary's seizure of entrusted property on its own conflicted valuation, and no disclaimer reaches conduct outside an agreement's scope.

697. Goldman Sachs's duties to Britannica did not arise from, and are not extinguished by, any contractual disclaimer. Goldman held actual custody and control of account property; exercised actual discretion over executions, valuations, and account treatment during the events at issue; acted in fact as agent in the functions it performed for the Accounts; and possessed knowledge and control so superior that Britannica could not protect itself. No account document licenses a custodian's participation in the seizure of client property on a self-interested valuation, and no disclaimer reaches conduct outside the agreement's scope.

## COUNT IX

**Fraud**

*(Against LAM, Topwater Partners LLC, Goldman Sachs, Borgia, Wieczorek, Damm, O'Hara, Taylor, Rubin, Eck, Tran, and Backer)*

698. Plaintiffs reallege all of the factual allegations above to the extent relevant to this Count. BC LLC asserts purchase and capital-related fraud injury. BCML asserts the distinct operational reliance and business injury pleaded below. Gupta asserts the personal reliance and personal-property injury pleaded in this Count: Defendants' representations induced him

276

personally to deliver his personally owned strategies, systems, and methods, and years of his personal labor, into Defendants' platform.

699.    The present-fact misrepresentations and half-truths in Count I are realleged with their speakers, dates, media, content, and falsity. On July 31, 2024, Long wrote on LAM's behalf, with Damm and Wieczorek copied, that the credit on the $7,500,000 short-sale balance would be calculated and credited at month end. The statement confirmed a calculation and credit obligation. It did not admit that $7,500,000 was owed. Defendants never supplied the calculation, rate, classification, account treatment, recipient, or payment.

700.    Defendants' own contemporaneous record establishes falsity when the statements were made. The promise of real-time monitoring was refuted by O'Hara's April 2021 statement that Topwater had T+1 reporting and needed an intraday solution, the Form ADV's two-hour reports, and O'Hara's August 5 admission that he was an hour behind. The representation that the July 2024 papers merely implemented the two-account structure omitted Rubin's June 10 record that counsel deliberately inserted the cause-based cross-default and her June 18 record of Jefferies Risk involvement. The initial cost-of-capital and capital-support representations were contradicted by the governing economics, the March 2023 financing demand, and the written refusal of capital support in drawdown. The representations also misdescribed what was being sold at its root: in exchange for one hundred percent of the downside, the strategy, the personnel, the imposed broker's commissions, and, after March 2023, the financing on every borrowed dollar, Defendants supplied a synthetic account whose stated capital financed nothing, pooled and rationed margin that failed outright in July 2024, monitoring an hour behind, and a termination right exercisable by Defendants alone on their own mark, consideration illusory in economic substance and fraudulent from inception.

701.    To the extent the July 31 credit statement or Damm's March 28, 2023 promise of a later amendment is treated as future performance, Plaintiffs plead in the alternative that the speaker lacked a present intention to perform. The inference rests on antecedent facts, including the seventeen months without the promised amendment or any record that the stated Goldman condition was pursued; the June cross-default design and risk engagement; the pre-open termination decision; and confirmation of the credit five days before Defendants terminated the account and never calculated it. The same alternative is pleaded for the committed-capital representations: to the extent any is treated as a promise of future performance, the speakers held no present intention to perform it, as the concealed pooled design operating from inception, the absence of manager-specific funding at any time, and the financing terms Defendants later imposed on the capital they never provided establish.

702.    On information and belief, no request for the stated Goldman confirmation was ever sent to Goldman Sachs, and Goldman Sachs's records contain none, because the March 28, 2023 amendment promise was made to end the objection, not to be kept. The basis is the seventeen months that passed without the promised amendment or any pursuit of its stated condition, pleaded above. A targeted request to Goldman Sachs closes the proof, and a null return is itself the exhibit.

703.    LAM knew its system, its conflicts, its documents, and the later construction of the proof. Borgia, Wieczorek, and Damm knew the platform economics and the representations each made or authorized. O'Hara knew the lag, the pre-open decision, the liquidation process, and the source of the August 8 package. Topwater Partners LLC accepted the capital while its Manager administered those facts and omissions. Each defendant knew his or its own statement was false or materially misleading or acted with reckless disregard for the truth. On information

and belief, Damm's, Long's, and O'Hara's compensation, bonuses, and advancement were tied to the Topwater division's economics, including the fee, financing, and retained-income streams the withheld credits fed; the basis is their senior operating roles in the division that collected those streams and the division-level profit measures on which institutional compensation runs, and Defendants' compensation and performance-review records state each figure.

704.    The remaining Defendants named in this Count acted with the same knowledge. Taylor, as Co-Head, authorized the solicitation representations his division made and attended solicitation calls at which they were made, knowing the platform's actual design from two decades of running it, and he executed the July 2024 instruments knowing what they installed. Rubin recorded in her own writing the machinery her transmittals concealed: counsel's June 10, 2024 cross-default insertion and the June 18, 2024 Jefferies Risk engagement. Goldman Sachs, Eck, Tran, and Backer knew the falsity of their own representations from Goldman Sachs's own records: the revenue-factor economics under which the relationship was priced, Kalafarski's contemporaneous written refutation of Tran's rate representation with Tran copied, the capital-introduction function that took Britannica's materials and never made an introduction, and the steering directed at senior level while the reciprocity it served was concealed. Each acted knowingly or with reckless disregard for the truth.

705.    Defendants intended reliance. BC LLC relied by subscribing, increasing capital, and entering the Mayfly transaction. BCML relied by building the operational connection, keeping its book on the platform, accepting financing and broker terms, disclosing its strategy and positions, and complying or forbearing in response to the August directions and false evidentiary account. The reliance was reasonable because the relevant systems, conflicts, decisions, and records were controlled by Defendants. Gupta relied personally, by delivering and

279

explaining his personally owned strategies, systems, and methods, by performing the education sessions Defendants required, and by committing his personal labor to the accounts; he would have delivered none of it absent the representations.

706.    Each speaker Defendant made its representations intending to induce the specific transactions that followed them: the 2019 and 2021 solicitation representations to induce execution of the April 2021 AIAA and BC LLC's November and December 2021 first-loss purchases; the April 2022 representations to induce the $500,000 additional contribution wired the same morning; the March 2023 representations and threats to induce execution of the financing amendment; the 2023 and 2024 scaling and capital representations to induce the continued commitment of Britannica's strategy, systems, and trading; and the June and July 2024 representations to induce execution of Amendment No. 5, the Mayfly AIAA, and the Mayfly funding completed on July 3, 2024. Each transaction followed its inducing representations in immediate sequence, and each Defendant participating in the representations shared the intent that Britannica act on them.

707.    The false accounts were themselves instruments of inducement. Throughout 2023 and 2024, the monthly statements Defendants caused the administrator to issue understated BC LLC's capital and BCML's compensation by omitting the credit income the operative Appendix C required, while Defendants' own writings kept the correction alive: Damm's March 28, 2023 written commitment that a net credit could be agreed and would be papered, and the running course in which Britannica reported the shortfalls in writing, more than $70,000 in a single month in its January 26, 2024 report, and Defendants promised the books would be sorted rather than disclaiming the obligation. On the strength of the represented true economics, higher than the statements showed and confirmed by Defendants as owed, Britannica committed the

September 22, 2023 increase and continued committing its capital, strategy, and business through the July 2024 Mayfly package, whose own terms carried the credit entitlement Long confirmed in writing on July 31, 2024. Defendants took each commitment and never computed, credited, or paid the income whose promised correction had induced it.

708. The fraud caused BC LLC's purchase and out-of-pocket losses, BCML's reliance expenditures and distinct business injury, and Gupta's loss of control over his personally owned strategies, systems, and methods and the value of his personal labor, including the compensation for the use of his property that a reasonable royalty measures. Punitive damages are sought for the deliberate, public-facing fraud and concealment alleged above to the extent permitted by law.

709. The misrepresentations pleaded in this Count are collateral and extraneous to every contract between the parties. Whether every Topwater manager ran on the same terms, whether committed capital existed behind the platform's stated values, whether Topwater had ever charged a cost of capital, whether Britannica's broker was its own to choose, whether Goldman performed capital introduction for revenue-producing clients, whether the platform monitored accounts in real time, and whether the program's architects were then defending litigation over the program's conduct are statements of present fact about the world, not promises contained in any agreement. Where Defendants' statements took promissory form, each was made with a preconceived and undisclosed intention not to perform, proven by the design Defendants had operated for two decades before Britannica arrived and by their immediate and continuous contrary conduct, and each is actionable as a misrepresentation of Defendants' present state of mind.

710. Britannica's reliance was justifiable as a matter of law and fact. The concealed facts were peculiarly and exclusively within Defendants' knowledge, and no inquiry available to

281

Britannica could have discovered them: Defendants withheld the very documents that would have prompted questions, delivered the Offering Memorandum only after execution, told Britannica that everything it needed to know was in the AIAA and the term sheet, and recorded the truth only in internal books, committee minutes, and referral ledgers Britannica has never seen. Britannica also obtained Defendants' representations in writing at every stage and relied on the writings, and it tested the represented structure directly in the written negotiations, where Defendants reaffirmed the representations now proven false. Until March 2023, Defendants' own instrument reinforced the deception: the original Appendix C charged borrowing costs only above the stated $10,000,000 Investment Account Value, terms coherent only with provided capital.

711.    The fraud pleaded here warrants punitive damages: it was wanton, morally culpable, and aimed beyond Britannica, part of a standardized program run on the platform's smaller first-loss managers as a class for two decades, and Defendants compounded it after the fact with fabricated evidence and a refusal to account. Conduct of that character is precisely the conduct for which New York law reserves exemplary relief.

712.    Plaintiffs' fraud damages include everything they parted with in reliance: the capital, the charges and financing extracted, the costs of the forced integration and reprogramming, the value of the strategies, systems, and labor delivered, and the consequential losses the concealed scheme proximately caused, together with interest; and because the property Gupta parted with was his own proprietary system, its value is measured, at minimum, by the reasonable royalty pleaded in Counts III and XXIV, without double recovery.

## COUNT X

**Fraudulent Concealment**

282

*(Against LAM, Stonefly, Mayfly, Topwater Partners LLC, Goldman Sachs, Borgia, Wieczorek, Damm, O'Hara, Long, Rubin, Taylor, and Backer)*

713.    Plaintiffs reallege and incorporate all of the factual allegations above to the extent relevant to this Count.

714.    Defendants had a duty to disclose the concealed facts because they spoke about the termination, valuation, monitoring, evidence, conflicts, and credits but withheld facts needed to make those statements complete; because LAM and the account entities possessed superior and exclusive knowledge not available to Plaintiffs; because LAM and Topwater Partners LLC held fiduciary control over Plaintiffs' property and records; and because Defendants took affirmative steps to conceal the truth. O'Hara spoke for LAM and the account entities on the decision, data, mark, schedule, committee process, and later proof.

715.    Independently of the half-truth duty, Defendants owed a duty to disclose from superior knowledge and the relationships pleaded above: Defendants alone knew the operative intervention practice, the pooled and rationed character of the margin, the identity and conflict of the Valuation Agent, the destination of the excluded interest income, and the retrospective character of the termination evidence; Britannica could not discover any of them from any source Defendants had not closed; and Defendants spoke to each subject in solicitation and account documents while withholding the facts that made their statements misleading. The fiduciary and confidential relationships pleaded in Count VIII supply an additional and independent source of the same duty.

716.    Defendants concealed that the decision and notice preceded the asserted mark; that the mark depended on lagged and unreliable data; that the native calculations and allocations did not accompany the notices; that the Investment Committee exercised discretion inconsistent with the absolute account Defendants presented; that the positive carry was not calculated or

283

applied; that no Second-Loss Allocation had been produced; and that the August 8 package was assembled retrospectively. They presented the later package as if it were contemporaneous proof and withheld its source record to induce compliance, delay challenge, and defeat scrutiny.

717.    Long created the August 8, 2024 document on which the concealment turned and, as alleged above, knew it was created after the asserted event and participated in presenting or enabling its presentation as contemporaneous proof. Defendants likewise concealed the operative five-to-seven percent review-and-reprice practice under which they actually ran the account; the interaction of the Section 6(b)(iii)(E) withdrawal bar with any drawdown, which made every dollar of first-loss capital unrecoverable once losses began; and the existence, amount, and destination of the interest and credit income owed to Britannica on its cash and on its short balances under the agreements as amended and Defendants' written confirmations, which Defendants diverted and kept.

718.    Plaintiffs did not know the concealed facts and could not obtain them through reasonable diligence. In reliance on the false account, they complied with liquidation directions, refrained from protective action, delayed legal and regulatory remedies, and continued to seek the proof Defendants represented existed. The concealment caused additional execution, business, investigation, and remedy-delay loss and tolls the applicable periods.

719.    Defendants' duty to disclose arose three separate ways, each independently sufficient. First, LAM stood in a relationship of trust as a registered investment adviser and as the self-appointed Valuation Agent controlling Britannica's capital and marking its own trigger. Second, Defendants held superior knowledge of facts not readily available to Britannica, the pooled margin, the rationing, the mandate, the reciprocity, the litigation history, and knew Britannica was acting on the mistaken understanding Defendants themselves had built, an

understanding Britannica stated in writing and Defendants never corrected. Third, Defendants spoke, constantly, and having spoken were obligated to speak the whole truth; every half-truth pleaded in this Complaint breached that obligation anew.

720.    Gupta was deceived in his own right and suffered his own injury. The disclosure duties pleaded in this Count ran to Gupta directly: Defendants addressed their statements and half-truths to him personally as Britannica's founder and Chief Investment Officer, as pleaded in this Complaint, held the same superior and exclusive knowledge against him, and solicited his authorization knowing he acted on the mistaken understanding they had built. The concealed facts pleaded in this Count induced Gupta, the owner of the strategies, systems, and know-how that BCML deployed under his authorization and that no instrument ever assigned away, to leave his proprietary property inside Defendants' structure, to comply with the liquidation directions, and to refrain from protective action while Defendants retained, used, and refused to account for that property. Gupta's damages from the concealment include the value of Defendants' unauthorized retention and use of his property, measured at minimum by the reasonable royalty pleaded in Counts III and XXIV, without double recovery.

721.    On information and belief, Defendants' internal communications discussed Britannica's questions, objections, and mistaken understandings in real time, the knowledge of the mistake recorded in their own words while the mistake was left standing, and the internal email and chat threads keyed to each of Britannica's dated inquiries are in Defendants' control.

## COUNT XI

**Conversion**

*(By BC LLC Against Topwater Partners LLC, the Cayman Master Fund, LAM, Stonefly, and Mayfly)*

722.    BC LLC realleges all of the factual allegations above to the extent relevant to this Count.

723.    BC LLC had a possessory right in specific, identifiable property: its separately tracked first-loss capital and the traceable positive carry and other credits generated on identified Britannica account balances. Defendants returned $532,710.95 of the $2,500,000 capital and did not return $1,967,289.05. It identifies the property channel that Defendants must reconcile against valid trading results, all loss tiers, credits, expenses, and liquidation proceeds.

724.    After Defendants declared the relationship terminated, BC LLC demanded the return and accounting of its capital and credits. Defendants exercised dominion by allocating, transferring, retaining, or withholding the property without a valid stop-out, reproducible allocation, or complete account; returned only $532,710.95; and refused the native bridge and positive-carry calculation.

725.    On information and belief, the decisions to retain $1,967,289.05 of BC LLC's layer, to remit exactly $532,710.95, and to refuse every demanded native record were made or approved by the Division's vice-president-and-above personnel, including Jeff O'Hara, who asserted the termination arithmetic in writing; Brian Long, who authored the August 8, 2024 valuation package and the July 31, 2024 crediting confirmation; Dave Damm, who ran the account and credit communications the figures depended on; and Travis Taylor, who executed the platform's instruments and signed the tax-reporting cover notice for the seizure year; and were reported into the Investment Committee seating Bryan Borgia, Blake Wieczorek, and, per Defendants' own deck, Richard Handler and Brian P. Friedman. The basis is each person's own pleaded writing, signature, or deck-recorded seat; the computation workpapers, approval emails,

286

committee packages, and wire instructions, all in Defendants' and their administrator's control, will name every participant in each decision.

726.    The property was BC LLC's own. Its capital was separately tracked through its First-Loss Interest and capital account. The positive carry is an ascertainable amount to be calculated from identified Britannica balances, rates, periods, and broker or administrator records. No other investor held a ratable ownership interest in BC LLC's capital or those account-specific credits.

727.    BC LLC seeks the converted property, lawful interest from the date each unauthorized allocation, transfer, or retention occurred, including the August 5 through 7, 2024 takings, and in no event later than the September 26 partial remittance and refusal. BC LLC also seeks punitive damages for any conversion found to have been committed with the culpability required by law. BC LLC also seeks lawful interest on the $532,710.95 Defendants held from August 5, 2024 until the September 26, 2024 remittance, for the entire period of that retention.

728.    The converted property is specific and identifiable, and Defendants' own conduct proves it. The administrator maintained BC LLC's first-loss capital in ledgered, account-specific Capital Accounts; Mayfly's forced close left the account holding nothing but realized cash Defendants could count to the penny; and on September 26, 2024, Defendants themselves computed and remitted $532,710.95 of the seized layer, in per-account components, an act possible only for a fund segregable on their own books. What Defendants kept, $1,967,289.05 of the layer plus the withheld income, is the same identified property. A party that mixes what it took into its own pool does not thereby dissolve its victim's title; the commingling is Defendants' conduct, and the tracing runs through records Defendants control.

729.    Defendants' dominion was wrongful from its first minute. The only claimed right to touch the capital was an automatic termination that never occurred, declared on data that did not exist, papered by a package fabricated three days later. Seizing collateral on a fabricated trigger is not defective contract performance; it is taking. Every subsequent act, the retention, the refusal to account, the partial remittance without any release of claims, the continued holding of the income, continued the same dominion in derogation of Plaintiffs' rights.

730.    The taking ran on no right at all. When Defendants seized and kept BC LLC's capital, they invoked no lien, no setoff, and no security interest; they invoked a termination clause whose conditions never occurred. The seizure rested on nothing, and the retention rests on nothing still.

## COUNT XII

**Money Had and Received**

*(By BC LLC Against Topwater Partners LLC, LAM, Stonefly, Mayfly, and the Cayman Master Fund)*

731.    BC LLC realleges all of the factual allegations above to the extent relevant to this Count.

732.    Topwater Partners LLC accepted BC LLC's capital. LAM directed its allocation, liquidation, and partial return. Stonefly and Mayfly received or controlled the trading proceeds and asserted the allocations. On information and belief, the Cayman Master Fund or another controlled entity received part of the capital, credits, liquidation proceeds, saved losses, or other benefits. The basis and controlled tracing records are identified above and in this Count. To the extent any defendant received money that, after a valid accounting, belongs to BC LLC, equity and good conscience require its return with interest.

288

733.    Equity and good conscience forbid every dollar of the retention: the capital was Britannica's; the income was earned by Britannica's balances and confirmed in Defendants' own writings; the loss justifying retention was fabricated; the accounts on Defendants' own final numbers ended above the very floors whose breach was the sole claimed basis for taking them; and the year of the destruction closed, on Defendants' own administrator's statement, in capital surplus. This Count and the unjust-enrichment count are pleaded in the alternative to the contract counts, for the event that Defendants persuade any court that their instruments do not reach what they took, and they seek no dollar twice.

## COUNT XIII

**Accounting**

*(Against LAM, the Feeder Fund, Stonefly, Mayfly, and the Cayman Master Fund)*

734.    Plaintiffs reallege and incorporate all of the factual allegations above and Counts VIII and XI to the extent relevant to this Count.

735.    BC LLC entrusted $2,500,000 of its own first-loss capital to the Feeder Fund structure for allocation through the Cayman Master Fund into the Stonefly and Mayfly Accounts, and BCML entrusted the operation of its trading business, position data, and compensation calculations to LAM as Manager. LAM, the Feeder Fund, Stonefly, Mayfly, and the Cayman Master Fund exclusively controlled the books, native calculations, administrator instructions, prime-broker data, allocation records, and cash flows necessary to determine what happened to Plaintiffs' capital, credits, fees, and liquidation proceeds. Their duties arise from the fiduciary and confidential relationships pleaded in Count VIII, the entrustment of specifically tracked capital and account property, and their contractual assumption of account-administration and valuation functions. Plaintiffs have no adequate remedy at law: the amounts due cannot be

289

computed without the native calculations, allocation records, and cash-flow tracing that Defendants exclusively control and have refused to produce, and only an equitable accounting can establish them. Britannica demanded that accounting in writing, beginning August 5, 2024 and through the December 23, 2024 letter, and Defendants refused. The account must produce and reconcile, at minimum: the complete daily books for both accounts for all years; the per-trade breakdown of every commission, fee, financing charge, borrow cost, and credit in electronic format; the reconciliation of every trade break for every year; and the administrator's and auditors' underlying workpapers, together with the administrator's engagement terms, instruction files, valuation policies, and the complete instrument set Defendants actually delivered to the administrator, so the account establishes not only what the records say but on whose instructions they were kept.

736.    No remedy at law can substitute for the account, because Defendants alone hold the books and have corrupted the record they produced: three irreconcilable versions of the same account's arithmetic, a manufactured exhibit presented as contemporaneous proof, and a written refusal to produce any native record. Plaintiffs are entitled to a full accounting of every determination, allocation, charge, credit, and flow touching the accounts, from inception through the present, performed on the native records and under oath.

## COUNT XIV

**Unjust Enrichment**

*(Against all entity Defendants, Richard Handler, and Brian P. Friedman)*

737.    Plaintiffs reallege and incorporate all of the factual allegations above, Counts III through XIII, and Counts XX and XXIV pleaded below, to the extent relevant to this Count.

290

738.   To the extent any benefit or injury pleaded here is held outside the scope of an enforceable contract between the relevant parties, the Topwater entity Defendants were enriched directly at Plaintiffs' expense. The Feeder Fund and Cayman Master Fund received and controlled BC LLC's first-loss capital and associated cash flows; Stonefly and Mayfly received the protection of that capital and the benefit of losses allocated against it; LAM received management, platform, revenue-share, and other economics from the accounts while controlling the challenged valuations, allocations, credits, and liquidation; and each retained, transferred, or benefited from capital, credit income, fees, liquidation proceeds, avoided losses, or account economics that in equity belonged to BC LLC or BCML. The benefits unjustly retained further include the interest and credit income owed to Britannica on its cash and on the credit balances generated by its securities sold short, which Defendants diverted and kept, the financing charges extracted from March 2023, and the value of the risk-education services, models, and analytical frameworks Britannica supplied at its own cost. The benefits unjustly retained further include the share of Investment Gains Defendants kept every month as the price of the committed capital they never provided, a price collected for a performance that never existed, and the markup embedded in the financing charges, the spread between the undisclosed rate Defendants charged and the cost Defendants actually paid, which Defendants alone knew, collected, and kept.

739.   On information and belief, Jefferies or Goldman Sachs received or retained identifiable revenue shares, commissions, financing or stock-borrow spreads, data or vendor economics, avoided losses, or confidential-information value traceable to Britannica and produced by the undisclosed steering, allocation, termination, or misuse pleaded above. The basis is the covered-allocator record, Britannica's commission and revenue calculations, Jefferies' platform disclosures and ownership, LAM's own current marketing describing the parent's

291

revenue share in the platform's asset managers, Risk involvement, and the controlled revenue-sharing, general-ledger, broker, referral, underwriting, risk-transfer, and recipient records. Each is liable for the full benefit it received under circumstances making retention inequitable. On information and belief, Handler and Friedman were enriched personally through the "Jefferies & Principal Capital" interests standing in the protected layer that received the extracted economics, and Goldman Sachs and Jefferies were enriched through the commission harvest, revenue credits, and affiliate economics described above; the allocation and subscription records establishing each recipient's share are in Defendants' exclusive control. The connection is direct, not attenuated: Handler and Friedman sat on the committee that made or approved the very extractions and the August 5 termination from which their protected-layer interests benefited, so each received the benefit of decisions he himself approved, and the subscription and allocation records in Defendants' exclusive control will fix each man's share to the dollar.

740.    On information and belief, Goldman Sachs personnel at the managing-director and senior coverage level, including Backer and Tran, exchanged information concerning Britannica, its balances, and the Topwater and Jefferies relationship on internal and external calls, including lines Goldman's own policy designated for recording, during the period in which the seized accounts' cash, credits, and flows moved through Goldman's systems; and Goldman's coverage of Britannica continued in writing after the termination, into October 2024, while Britannica's property remained withheld. The basis is those personnel's coverage roles in the pleaded record, Goldman's own written recorded-line designation, the revenue-factor economics pleaded in this Complaint, and the October 2024 coverage writing in Plaintiffs' possession. The recorded-line archives and coverage records, which Goldman exclusively controls, will identify every participant and exchange.

292

741.    Each retention and transfer of Britannica-derived value among Defendants and their affiliates was made without fair or reasonably equivalent value flowing to Britannica and, upon information and belief, based on the timing, the concealment, the insider relationships among the transferees, and each transferee's retention of benefit pleaded above, with intent to keep Britannica's property beyond its reach. Plaintiffs will seek the complete funds-flow record, entity by entity, and reserve every avoidance, constructive-trust, and clawback remedy that record supports.

**COUNT XV**

**Tortious Interference with Prospective Business Relations and Prospective Economic Advantage**
*(Against LAM, Jefferies, and Goldman Sachs)*

742.    BCML realleges and incorporates the factual allegations above, Counts III through XIV, and Counts XX and XXIV pleaded below, to the extent relevant to this Count.

743.    BCML had concrete, active, documented, and commercially valuable business and prospective business relationships with Interactive Brokers LLC, SpiderRock, Goldman Sachs, BNP Paribas, J.P. Morgan, and Bloomberg L.P. These were not generalized hopes of obtaining future business. BCML had devoted substantial personnel time, proprietary information, trading volume, software, algorithms, technical infrastructure, and millions of dollars of investment to establishing, operating, and expanding these specific relationships.

744.    BCML personally developed the Interactive Brokers relationship through extensive calls, written communications, negotiations, and technical work. BCML negotiated institutional commission rates, pricing structures, account terms, data access, and operating procedures based on the size and attractiveness of BCML's trading volume, order flow, positions, portfolio, and proprietary strategy. Interactive Brokers would not have offered

Defendants those rates and economics without BCML's order flow, negotiations, relationships, and disclosure of confidential portfolio and trading information. Interactive Brokers opened the Mayfly account and BCML spent months designing, programming, testing, and implementing additional algorithms and software to integrate Interactive Brokers' APIs, account data, execution systems, positions, and reporting architecture with BCML's existing Goldman Sachs and SpiderRock systems.

745.    BCML had separately built its SpiderRock relationship over several years. BCML developed substantial proprietary algorithms, software, workflows, and data structures specifically for SpiderRock's order-management, execution, portfolio-management, and market-data systems. BCML and SpiderRock maintained an active operating relationship and had documented plans to expand their work together. The relationship, services, integrations, and planned expansion ceased when Defendants purported to terminate Stonefly and destroyed the accounts through which the relationship operated.

746.    Goldman Sachs was an active prime-brokerage, trading, technology, coverage, and capital-introduction relationship for BCML. BCML maintained continuing relationships with Goldman Sachs personnel in the United States and internationally and supplied Goldman Sachs with substantial trading volume, commissions, strategy information, and institutional business. Goldman Sachs personnel, including Tran, continued pursuing additional business from BCML after Defendants closed the accounts, confirming that the relationship was commercially active and capable of continuation and expansion. As against LAM and Jefferies, Goldman Sachs was a third party with whose business relationship LAM and Jefferies interfered. As against Goldman Sachs, the third-party relationships supporting this Count include Interactive Brokers,

SpiderRock, BNP Paribas, J.P. Morgan, Bloomberg, Family Offices A and B, and Accredited Investors A through J.

747. BCML also had documented calls, written communications, and developing institutional relationships with BNP Paribas and J.P. Morgan concerning additional or replacement prime-brokerage, account, execution, financing, data, and institutional services for the Britannica strategies and accounts. Topwater expressly represented in writing that it would facilitate the BNP Paribas relationship and negotiate commission rates, and Defendants separately discussed and communicated concerning a J.P. Morgan path. BCML independently advanced these relationships through its own personnel, strategy, anticipated trading volume, confidential portfolio information, technical work, and institutional contacts. These were not relationships created through any capital-raising or business-development efforts by Defendants.

748. BCML also had documented calls and communications with Bloomberg concerning additional market-data, technology, licensing, and systems relationships. Those discussions formed part of BCML's plan to integrate Goldman Sachs, SpiderRock, Interactive Brokers, Bloomberg, and additional institutional data and execution providers into a unified proprietary trading and risk platform. Defendants knew that BCML was making substantial investments in the software, algorithms, personnel, data systems, and integrations required to operate and expand that platform.

749. BCML further had specific, direct, and documented prospective investment and allocation relationships with two family offices, identified in this public pleading as "Family Office A" and "Family Office B," and ten accredited investors, identified as "Accredited Investor A" through "Accredited Investor J." Each designation refers to a particular and presently identifiable person or entity with whom BCML had direct communications concerning

295

a prospective investment in, or allocation to, a Britannica-managed strategy. These are not unidentified members of the investing public or a generalized investor pipeline. Their identities and the communications, meetings, materials, diligence, expressed interest, and anticipated next steps associated with each relationship are recorded in BCML's correspondence, calendar, marketing, diligence, and investor-relations records.

750.    Plaintiffs have used unique designations for Family Offices A and B and Accredited Investors A through J because they are nonparties, their investment activities and diligence are confidential, and publicly naming them would risk inflicting the very additional relationship damage for which this Count seeks relief. Plaintiffs know their identities and will disclose them to the Court and Defendants under an appropriate protective order or as otherwise directed by the Court.

751.    Defendants had actual knowledge of these relationships and of their importance to BCML. BCML repeatedly informed Defendants that the purpose of the first-loss program was to establish a live, institutional-scale, independently verified performance record capable of attracting family offices, accredited investors, allocators, seed capital, and institutional mandates. Defendants received BCML's written expansion proposals, trading-volume calculations, broker negotiations, commission analyses, technology requirements, integration plans, strategy materials, capital-raising objectives, and communications concerning the institutional relationships being developed. LAM and Jefferies participated directly in the Interactive Brokers transition, reviewed communications concerning its rates, capabilities, account access, and integration, and knew that SpiderRock and Goldman Sachs supplied critical infrastructure for the existing accounts. Goldman Sachs knew the investor and allocator objective because its Capital Introduction and coverage personnel received BCML's materials, discussed institutional capital

with BCML, and represented that Goldman Sachs would provide capital-introduction services in connection with the revenue BCML generated.

752.    LAM and Jefferies intentionally interfered with BCML's relationships by directing communications, approvals, account instructions, restrictions, purported termination notices, and liquidation and closure instructions to Interactive Brokers, Goldman Sachs, SpiderRock, the fund entities, and the personnel controlling those relationships. LAM delayed and obstructed the Interactive Brokers transition, conditioned completion of that transition on the July 2024 cross-default provisions, failed to provide the represented capital and functioning infrastructure for the Mayfly account, and then invoked purported automatic terminations that had not occurred to direct the liquidation and closure of the sponsored accounts. Jefferies inserted its Risk function and senior committee personnel into the accounts and directed, approved, or ratified the decisions and instructions that terminated the accounts, ended the broker transition, disabled BCML's access, and destroyed the operating platform on which the relationships depended.

753.    Defendants' communications and instructions were directed at the relevant third parties and produced immediate consequences in those relationships. Interactive Brokers closed or ceased supporting the sponsored Mayfly account and the institutional relationship BCML had negotiated. SpiderRock's Stonefly services, integrations, and expansion path ceased. Goldman Sachs's Stonefly prime-brokerage relationship and the account through which BCML supplied substantial trading volume ended. The active brokerage, technology, execution, data, and institutional relationships were not lost through ordinary market competition or an independent decision by BCML. They ended because Defendants issued, communicated, implemented, and

maintained the false position that the accounts had validly and automatically terminated and directed the counterparties to act upon that position.

754. Goldman Sachs intentionally interfered with BCML's relationships with the other identified counterparties, family offices, allocators, and accredited investors through its communications with LAM, its control of the capital-introduction and allocator-coverage channels it had promised BCML, and its participation in the account and termination process. Goldman Sachs represented that capital-introduction services would be provided in connection with the substantial revenue BCML generated, accepted BCML's confidential strategy and investor materials, and then internally credited or diverted the relationship value of BCML's revenue to Topwater, LAM, and Jefferies while withholding the promised institutional access from BCML. Goldman Sachs simultaneously communicated to LAM that it lacked appetite for additional Britannica business through Topwater while Goldman Sachs personnel continued soliciting that same additional business directly from BCML.

755. Goldman Sachs also supplied or controlled material account, execution, position, capital-use, and hourly-data information used in the challenged termination process, classified Britannica as a high user of capital during the August 5, 2024 dislocation, communicated outside BCML's presence with LAM and its personnel concerning Britannica and the accounts, and participated in or substantially advanced the process that destroyed the live accounts, track record, and infrastructure required for BCML's third-party relationships. Goldman Sachs's communications to LAM and its conduct through its own capital-introduction, allocator-coverage, prime-brokerage, and relationship-credit systems were directed toward the persons and channels controlling BCML's access to the identified counterparties and prospective investors.

756.   LAM and Jefferies further interfered with the BNP Paribas and J.P. Morgan relationships by controlling the sponsorship, account approvals, communications, and platform access necessary for either relationship to proceed, representing that those paths would be pursued, delaying or abandoning the paths while maintaining BCML's captive order flow at Goldman Sachs, and ultimately destroying the accounts and institutional operating record to which the proposed relationships related. The communications and intake records held by LAM, Jefferies, BNP Paribas, and J.P. Morgan identify the contacts, proposals, services discussed, and point at which each relationship was obstructed or abandoned.

757.   Defendants interfered with the Bloomberg relationship by terminating the accounts and withdrawing or destroying the account, data, licensing, and integration foundation for which BCML had been negotiating Bloomberg services. Defendants knew that Bloomberg's data and systems were intended to be integrated into the same institutional trading platform that Defendants required BCML to build and operate. Defendants' instructions and termination of the underlying accounts rendered the planned Bloomberg integration commercially unusable and caused the developing relationship to cease.

758.   Defendants intentionally interfered with Family Offices A and B and Accredited Investors A through J by destroying the live and independently documented accounts, institutional performance record, broker and technology infrastructure, and operating-manager continuity on which those specific prospects were conducting or expected to conduct diligence. Defendants controlled the official sponsor, broker, valuation, termination, performance, and reference information required by those prospects. Defendants created and maintained a false termination and risk narrative, refused to correct it or supply the native records disproving it, and caused the false account status and destruction of the track record to operate through the capital-

299

introduction, allocator-coverage, broker, sponsor-reference, and institutional-diligence channels through which the identified prospects evaluated BCML.

759.    Goldman Sachs separately controlled whether Britannica and its materials were presented through the Goldman Sachs capital-introduction and allocator-coverage channels to Family Offices A and B, Accredited Investors A through J, and other specific prospects recorded in Goldman Sachs's files. Goldman Sachs accepted BCML's confidential materials, substantial revenue, and repeated requests for introductions, but withheld or diverted the services and access BCML had been promised while allocating relationship credit and commercial benefits to Topwater, LAM, and Jefferies. Its conduct was directed toward the investors and allocators whose access it controlled and prevented the identified relationships from progressing through that channel.

760.    Defendants employed independently wrongful means. Those means included the fraud and fraudulent concealment pleaded in Counts IX and X; conversion pleaded in Count XI; trade-secret misappropriation pleaded in Counts III and XXIV; misuse and unauthorized distribution of BCML's confidential positions, strategies, models, and trading data; fabrication and transmission of the retrospective evidentiary package; false representations that contractual termination events had occurred; coerced amendments and cross-default provisions; fiduciary breaches; withholding of material credits and account information; invalid liquidation and account-closure instructions; and destruction of the accounts and business infrastructure through which the third-party relationships operated. The conduct constituted independent torts and was directed to the brokers, vendors, institutions, investors, allocators, and channels controlling BCML's relationships. It was not ordinary competition, legitimate account administration, or lawful persuasion.

761.    But for Defendants' wrongful interference, BCML would have continued and expanded the identified relationships. Interactive Brokers had negotiated institutional rates, opened the Mayfly account, and begun supporting trading. SpiderRock was an active multiyear operating relationship with completed proprietary integrations and documented expansion plans. Goldman Sachs was an active prime-brokerage and coverage relationship whose own personnel continued requesting further business after the accounts were closed. The BNP Paribas, J.P. Morgan, and Bloomberg relationships had progressed through documented calls, communications, and identified institutional services. Family Offices A and B and Accredited Investors A through J were specific, documented prospective sources of investment or allocation capital.

762.    The objective circumstances establish the probability that these relationships would have continued and matured. BCML had completed the required strategy and technology infrastructure; generated an administrator-recorded 88.02 percent return on its First-Loss Member Capital Account for 2023; produced more than $1 million of investment gains in Stonefly during 2023; obtained approval to expand the stated Investment Account Value to $25 million; operated at trading volumes recognized by Goldman Sachs's systems; negotiated lower institutional trading rates; developed an active and current investor pipeline; and constructed the broker, data, software, personnel, and risk infrastructure required for institutional expansion. Defendants acted at the point when those investments and relationships were becoming commercially valuable.

763.    BCML suffered direct and substantial injury. The interference destroyed the value of the institutional rates and account terms BCML negotiated; the Interactive Brokers account and transition; years of SpiderRock algorithms, software, data structures, workflows, and

301

relationship development; months of Interactive Brokers API and systems integration; the unified Goldman Sachs, SpiderRock, Interactive Brokers, and Bloomberg platform; the BNP Paribas and J.P. Morgan opportunities; the Goldman Sachs domestic and international expansion and capital-introduction paths; the relationships with Family Offices A and B and Accredited Investors A through J; the live track record and institutional diligence narrative; future advisory, incentive-fee, trading, technology, and licensing revenues; and millions of dollars of personnel, programming, systems, data, testing, reconciliation, and integration expenditures.

764.   Defendants also retained the benefit of rates, pricing, account structures, technical knowledge, confidential information, platform capabilities, broker relationships, data arrangements, and commercial economics created through BCML's work, while excluding BCML from the relationships and value it created. The precise amount of BCML's lost profits, lost fees, lost allocations, relationship value, replacement costs, reliance expenditures, and other damages will be established through BCML's contemporaneous records, third-party records, Defendants' communications and systems, and expert analysis.

765.   LAM, Jefferies, and Goldman Sachs each knew of BCML's specific third-party relationships, intentionally interfered with them through the independently wrongful acts attributed to each above, and caused their termination, interruption, or failure to mature. BCML seeks compensatory and consequential damages, lost profits and fees, relationship and enterprise-value damages, punitive damages for Defendants' intentional and malicious conduct, prejudgment interest, costs, and all other available relief, without duplicative recovery.

## COUNT XVI

**Aiding and Abetting Breach of Fiduciary Duty and Fraud**

*(Against Goldman Sachs, Jefferies, Jefferies LLC, Borgia, Wieczorek, Damm, O'Hara, Taylor, Long, Rubin, Daraviras, Eck, Tran, Backer, Robinson, Rothe, and Chen)*

302

766. Plaintiffs reallege and incorporate all of the factual allegations above and Counts VIII, IX, and X to the extent relevant to this Count.

767. The underlying wrongs are the fiduciary breaches pleaded in Count VIII and the frauds and fraudulent concealment pleaded in Counts IX and X. LAM and the Feeder Fund owed and breached the fiduciary duties pleaded in Count VIII. The frauds and concealment were committed by each Defendant named in Counts IX and X, through the misrepresentations, omissions, and deceptive conduct personally pleaded there as to that Defendant, including LAM, Stonefly, Mayfly, the Feeder Fund, Borgia, and O'Hara. This Count charges each Defendant's knowing assistance of a primary wrong committed by another person.

768. On information and belief, Goldman Sachs knew the particular challenged conduct from its direct communications with LAM concerning Britannica's capital use, broker capacity, account status, the August 5 data gap and hourly feed, termination and liquidation instructions, and the reason for Tran's immediate post-liquidation outreach. The basis is the identified 2023 communications outside Britannica's presence, Goldman Sachs' production and control of the hourly files and exception records, the reported high-user-of-capital assessment, its execution role, and its controlled CRM, risk, coverage, data-incident, and LAM communications.

769. After acquiring the knowledge alleged in the preceding paragraph, Goldman Sachs substantially assisted through the nonministerial acts it knowingly performed. On information and belief, it provided LAM with the capital-use, exception, and account-status information used for the adverse decision; supplied or failed to correct the incomplete hourly file on which LAM based the challenged Stonefly mark; communicated directly with LAM about the relationship and liquidation; and executed the forced liquidation after learning the specific challenged premise and instructions. The basis is the documented data gap, hourly architecture,

high-user-of-capital assessment, communications outside Britannica's presence, immediate post-liquidation outreach, and the controlled exception, CRM, risk, coverage, instruction, and execution records. The assistance charged is that knowing, nonministerial conduct, performed with actual knowledge of the wrong it advanced.

770.    Goldman Sachs also supplied a substantial economic and operational incentive. BCML contemporaneously estimated in writing that its September 2023 trading run rate generated approximately $400,000 in annual Goldman Sachs revenue from commissions alone, on a path toward $1,000,000 and more each year once Goldman's stock-lending and financing charges and the account's planned expansion are counted, as pleaded above. Goldman Sachs personnel described Topwater, not Britannica, as the covered allocator relationship, and Goldman Sachs continued to pursue an active prime relationship with Britannica after Topwater's termination. Goldman Sachs understood and favored the platform relationship from which its revenue attribution and future business flowed.

771.    Those knowing acts were a substantial factor because they supplied the decision and valuation inputs, enabled the challenged mark and instructions, and effected the transactions that realized the loss, and the native communications in Defendants' control will establish the full extent of Goldman Sachs' knowledge and of the acts it performed after acquiring it.

772.    On information and belief, after learning the particular fiduciary and confidentiality wrong through the June 18, 2024 Jefferies Risk engagement pleaded above, Jefferies substantially assisted by receiving and using Britannica's account and strategy information for parent-risk and adverse termination purposes, directing or approving the higher-level decision, and ratifying the resulting retention or use. The basis is the June 18 Risk engagement, the decision above O'Hara, the pre-open sequence, the Stonefly-only

304

contemporaneous notice, the later unsupported independent-Mayfly explanation, and the controlled Risk analyses, directions, communications, access logs, approvals, and benefit records. Jefferies LLC substantially assisted through the affiliated prime-brokerage, custody, securities-lending, and counterparty functions that housed and monetized the accounts, on the same information-and-belief basis and controlled records.

773.    Wieczorek substantially assisted by managing the broker and capital-expansion negotiations, communicating Goldman Sachs' lack of appetite for additional Britannica business, and implementing the broker structure that kept the Stonefly Account dependent on Goldman Sachs' data and economics. Damm substantially assisted by extracting the March 2023 financing and credit amendment, promising in writing that net credit would be agreed and papered, administering the omitted-credit and charge regime, designing and explaining the two-account structure, participating in the July 2024 execution, and refusing on August 6, 2024 to supply the valuation and accounting explanation requested.

774.    Taylor knowingly and substantially assisted by executing the July 3, 2024 instruments installing the cross-default for all three principals and through his Investment Committee role in the discretionary decisions of August 5, 2024; and Long knowingly and substantially assisted by confirming the crediting obligation on July 31, 2024 while the termination that would defeat it was being prepared, and by creating and enabling the presentation of the August 8 retrospective package as contemporaneous proof. Taylor also attended solicitation calls at which the inducing representations were made; a Co-Head who receives the division's account traffic, sits its committee, executes its instruments, and listens on its calls does not assist the scheme unknowingly. Eck substantially assisted by making the capital-introduction and institutional-path representations that anchored Britannica to the

305

imposed broker; Tran by administering the account relationship, processing the September 2022 capital addition, and relaying Topwater's characterizations of Britannica's capital use; Backer by directing allocator coverage of the platform relationship; and Robinson, on information and belief, by administering the coverage and revenue-credit arrangements through which Goldman Sachs monetized the relationship, the coverage records being in Goldman Sachs's exclusive control.

775.     The remaining Defendants named in this Count each knowingly and substantially assisted the wrongs the others committed. Borgia and O'Hara, primary wrongdoers under Counts IX and X, each also assisted the others' fiduciary breaches and frauds: Borgia by building and fronting the solicitation machinery through which every later extraction ran, and O'Hara by transmitting the Investment Committee's threats, enforcing the extracted terms, and executing the termination and liquidation the Committee directed. Rubin assisted by imposing the Goldman lock-in condition in writing on July 22, 2021, by transmitting and administering the extracted amendments, by engaging Jefferies Risk on June 18, 2024, and by delivering in writing on June 10, 2024 the cross-default condition that armed the two-account seizure. Daraviras assisted through the co-presidency, committee seats, and parent-level capital direction pleaded in his party paragraph, through which the adverse decisions were reviewed and approved. Rothe assisted by performing the Division's risk calculations, breach determinations, interest-credit calculations, and account-report checking for Britannica's accounts, the machinery through which the accounts were run and ended. Chen assisted by performing the Division's risk monitoring and margin surveillance, including the overnight and pre-open assessment of the August 4 to 5 dislocation through which the pre-open decision was prepared. Each acted with the

306

knowledge pleaded in his or her party paragraph, and each act was knowing, nonministerial, and in furtherance of the primary wrongs.

776. Each act of substantial assistance was a substantial factor in the primary wrong and foreseeably increased the loss. It enabled the challenged valuation, blocked cure and risk mitigation, accelerated the liquidation, preserved the withholding of capital and credits, or concealed the underlying records. BC LLC suffered the property losses and BCML suffered the business, fee, and trade-secret injuries pleaded below. Each Defendant's assistance was a substantial factor in the injuries pleaded: without the broker lock-in there is no commission harvest and no data dependence; without the committee machinery there is no coerced amendment and no termination; and without the concealments there is no continued entrustment to seize.

777. Goldman's knowledge was actual and its assistance substantial, each shown by its own conduct. Goldman built the referral relationship, delivered Britannica into it, and conditioned its own economics on the captive flow that resulted; it took Britannica's strategy materials before any account opened; it billed the captive trading at multiples of the market and tracked the revenue in its own relationship-credit accounting; it refused the futures capability whose only function was to cut the bill; on information and belief, stated on the bases pleaded above, it supplied the data on which the platform's committees acted and advised those bodies; and within weeks of the destruction it returned to solicit the same trading it had helped make captive. A party that designs, prices, supplies, and profits from the machinery of a scheme has knowledge of the scheme and has substantially assisted it.

## COUNT XVII

**Civil Conspiracy in Connection with the Foregoing Torts**

*(Against all Defendants, including Richard Handler and Brian P. Friedman)*

778.    Plaintiffs reallege and incorporate all of the factual allegations above, Counts III through XVI, and Counts XX, XXIV, and XXIX pleaded below, to the extent relevant to this Count.

779.    This Count attaches concerted-act liability to every underlying intentional tort pleaded in this Complaint, including the fraud, fraudulent concealment, fiduciary breach, conversion, trade-secret misappropriation, tortious-interference, and fraudulent-accounting claims pleaded above. On information and belief, Goldman Sachs and one or more LAM actors knowingly agreed to the specific tortious objective of using incomplete account and capital information, broker control, confidential information, and coordinated instructions to end and liquidate Britannica's accounts and preserve the resulting capital, credit, and commercial benefits. The basis is the communications about Britannica outside its presence, Goldman's adverse broker and capital position, the August 5 hourly-file gap and high-user-of-capital assessment, LAM's reliance on Goldman-supplied data, the liquidation instructions and execution, and the immediate post-liquidation outreach, beginning with Goldman coverage's August 14, 2024 writing and continuing through its October 16, 2024 written pursuit. The July cause-based cross-default was installed thirty-three days before both accounts were terminated at the same claimed minute, but the contemporaneous notice identified only Stonefly and did not invoke the clause; Defendants invented an independent Mayfly stop-out three days later. Handler and Friedman joined the agreement through their Investment Committee membership and the committee's conduct pleaded above, including the March 2023 for-cause threat and the August 2024 termination decision attributed to the parent company.

780. Goldman Sachs is an independent legal person outside the Topwater, LAM, and Jefferies corporate family, so the agreement pleaded between Goldman Sachs and the LAM actors supplies the required plurality by itself. That external agreement is pleaded on the conduct alleged above, and Goldman's own prime-broker, data, commission, capital, and allocator-coverage interests supplied its motive to join it.

781. The acts supporting agreement and participation are attributed separately. Wieczorek managed the broker and capital communications and conveyed Goldman's adverse position. Damm handled the financing, credit, broker, and two-account arrangements and withheld accounting. O'Hara communicated and implemented the termination, committee decision, hedging prohibition, liquidation commands, and retrospective proof. LAM implemented the valuation, instructions, allocations, and retentions. Goldman Sachs supplied the data, capital-use information, communications, and execution conduct alleged above. On information and belief, Borgia and Jefferies joined the agreement through the directions, approvals, and communications recorded in the systems they control; the basis is the committee structure they sat atop, the parent-level decision O'Hara announced on the morning call, the June 18, 2024 Jefferies Risk engagement, and the pre-open sequence pleaded in this Complaint, and their controlled records will identify each direction and approval. Taylor executed the July 3, 2024 cross-default package for Mayfly, Stonefly, and LAM, installing in one signing, across three entities, the machinery the agreement fired thirty-three days later.

782. On information and belief, Topwater personnel used Britannica's methodology and confidential information for internal training and to adapt the platform's own risk practices, as pleaded above, and personnel of Defendants further used that information for personal or proprietary trading benefit. The basis is Defendants' acquisition of unusually detailed

methodology and live position information, the education sessions Defendants required, the Division-wide distribution rosters pleaded above, Defendants' post-termination retention, and their refusal to account for any use. The compensation, brokerage, code-of-ethics, preclearance, surveillance, and attestation records in Defendants' control will identify each individual's benefit and each use, and every individually held benefit further supports the agreement pleaded in this Count.

783.    Goldman built the channel it later suppressed, and its own personnel papered the intake. The April 2019 introductory meeting Backer arranged through his Securities Division office, pleaded above, opened the coverage file into which Britannica's materials, profile, and capital-introduction candidacy were taken and in which they sat, unpresented to a single investor, for the five years Goldman billed the captive flow.

784.    The false account was published on request. On information and belief, in the weeks after August 5, 2024, counterparties, vendors, and allocators who inquired about Britannica's terminated accounts received from Defendants the same account Defendants had manufactured, an automatic stop-out for trading losses, and Defendants' inquiry logs, diligence responses, and coverage notes record each recipient and each telling.

785.    On information and belief, on the more than forty liquidation calls LAM placed to other managers on the morning of August 5, 2024, LAM personnel described the platform's same-morning actions, including the Britannica terminations, seeding across the manager community the false account of a manager stopped out for losses, on calls whose participants and content LAM's phone records and the recipients' notes preserve.

786.    Goldman maintained an internal capital-introduction profile on Britannica, built from the materials Britannica supplied and Goldman requested, and, on information and belief,

310

never transmitted it to any investor in five years, while the same desk's own form stated that account revenues may be a significant factor in capital-introduction decisions and while Britannica's revenues ran to hundreds of thousands of dollars a year.

787.    Interactive Brokers' own files corroborate the relationship's concreteness and the chokepoint: IB negotiated commission schedules directly with Britannica in April and May 2024, opened the Mayfly account, and processed the sponsor approvals only Topwater could give, and IB's account, negotiation, and approval records fix the dates on which Topwater's delays held the transition hostage.

788.    BNP Paribas' records will show the path Defendants closed: Topwater's August 2023 written commitment to introduce Britannica and negotiate rates produced, on information and belief, actual contact between Topwater and BNP concerning Britannica, and BNP's prime-brokerage intake records will show what was begun and then abandoned when Defendants destroyed the accounts.

789.    J.P. Morgan stood as a second live alternative in the same period, holding out prime-brokerage terms while Defendants controlled whether Britannica could ever move, and its intake records will show the same pattern: a relationship available, and a sponsor that never let it mature.

790.    SpiderRock's records will price a piece of the destruction: the integration Britannica built and paid for died with the accounts, and SpiderRock's contract, invoice, and termination records fix the sunk cost and the rebuild cost to the dollar.

791.    Goldman's recorded lines captured the channel at work. On information and belief, allocator-coverage and capital-introduction conversations concerning Britannica occurred

311

on lines Goldman's own documents designate for recording, and the recordings and their retention logs will show who discussed Britannica with which investors, and who never did.

792.    The committee planned the succession before the destruction. On information and belief, LAM's August 2 through 5, 2024 committee record includes consideration of transferring or continuing Britannica's book through another adviser, the very threat O'Hara delivered with a five-minute deadline, and the minutes, agendas, and messages name the candidates considered and the plan's authors.

793.    On information and belief, Defendants contacted or evaluated specific replacement advisers to run or absorb Britannica's book in the termination window, and the outreach records will name each candidate, each conversation, and what those candidates were told about Britannica.

794.    Jefferies Risk reduced Britannica to writing for the kill. On information and belief, the June 18, 2024 Jefferies Risk engagement produced written assessments of Britannica's positions and strategy that circulated beyond account administration, into the termination decision and the parent chain, and the distribution lists on those documents name every reader.

795.    The false narrative propagated into the industry's own plumbing. On information and belief, Defendants' account of the Britannica terminations entered third-party diligence channels, prime-broker consultants, platform databases, and background-check services, where allocators source manager histories, and each database's submission and inquiry records will show what was reported, by whom, and who read it.

796.    The platform had run this play before. The Connecticut record in *Canada v. Topwater Exclusive Fund III, LLC* preserves an earlier manager's account of the platform's

termination and retention conduct, and it is pleaded here as pattern corroboration for the interference and concerted-conduct claims, with the underlying record a discovery subject.

797. Goldman's allocator-coverage desks knew Britannica by name. On information and belief, Goldman's internal coverage notes record conversations with and about institutional allocators in which Britannica's strategies, scale, or candidacy were discussed or deliberately omitted, and those notes will show the channel's live traffic and Britannica's engineered absence from it.

798. The overt acts include the communications outside Britannica's presence, the Goldman data and capital-use information, the LAM decision and instructions, the one-hour liquidation and hedging prohibition, the transmission of retrospective proof, and the later allocation and retention. Each Defendant named in this Count knowingly agreed to a specific underlying tort and committed an overt act in furtherance, as pleaded in that Defendant's own conduct allegations. Plaintiffs seek the damages and remedies available for the underlying torts, without duplicate recovery.

799. The conspiracy count attaches every participant to every underlying tort pleaded in this Complaint. The agreement is shown by conduct no innocent coordination explains, as pleaded above; the participants include at least one legal person independent of the Jefferies corporate family, so no intracorporate doctrine applies; each conspirator committed the overt acts pleaded in that defendant's own conduct allegations; and each is jointly and severally liable for the damages every underlying tort caused.

800. The Jefferies Risk personnel engaged into the accounts on June 18, 2024, the recipients of their written assessments, the replacement advisers Defendants contacted or evaluated in the termination window, and the recipients of the more-than-forty August 5 calls are

each identified in records Defendants control, the engagement files, distribution lists, outreach communications, and telephone logs pleaded as discovery subjects in this Complaint, and Plaintiffs plead their identities as subjects of that discovery.

## COUNT XVIII

**Violation of Section 4o of the Commodity Exchange Act, 7 U.S.C. § 6o, with a Private Right of Action Under Section 22, 7 U.S.C. § 25**

*(By BC LLC Against LAM and Borgia, Damm, O'Hara, Taylor, and Rubin as associated persons; Against Jefferies, Daraviras, Richard Handler, and Brian P. Friedman as control persons under 7 U.S.C. § 13c(b); and Against Stonefly, Mayfly, and Topwater Partners LLC as willful aiders and abettors)*

801.    BC LLC realleges and incorporates all of the factual allegations above and Counts I and IX, including the allegations concerning the parties, the commodity-pool structure, the solicitation and purchase of its First-Loss Interests, the permitted futures and options activity, the July 2024 Mayfly transaction, the valuation and termination course, and the resulting actual damages.

802.    On information and belief, LAM acted as the commodity pool operator of the Topwater pooled vehicles. The basis is the audited annual reports for Topwater Partners LLC, Stonefly, and Mayfly, which identify commodity-interest trading and invoke the Commodity Exchange Act and Regulation 4.7, LAM's operation and control of those pools, and the Mayfly Investment Guidelines expressly permitting equity-index futures and options on futures. Travis Taylor, as Co-Head of the Topwater Capital Division, personally affirmed that the annual reports were accurate and complete under that regulatory framework. Section 4o applies to a commodity pool operator whether or not registered and is not displaced by Regulation 4.7 relief.

803.    The pool's regulatory paper has authors: Taylor certified the audited annual reports; the independent auditor that issued them is named on their face; and, on information and

314

belief, the auditor's engagement team, the reports' drafters within LAM, and the recipients of the auditor's comments on commodity-interest and related-party disclosures are identified in the audit files and engagement correspondence, which preserve every question the auditor asked and every answer Defendants gave.

804.    Borgia, Damm, O'Hara, Taylor, and Rubin each acted as an associated person of LAM: each solicited BC LLC's purchase of, addition to, or retention of its First-Loss Interests, or supervised persons so engaged. Borgia directed the platform and its solicitation of Britannica and supervised the personnel who carried it out. Damm negotiated the financing, credit, capital, and second-account terms through which BC LLC's participation was obtained, retained, and expanded. Rubin controlled compliance, the account-opening conditions, the account-approval condition of July 22, 2021, the amendments, and the related participant communications, functions performed in the course of and in furtherance of the solicitation of BC LLC's subscription; her acts bind LAM and are pleaded against her personally. Taylor co-headed the Division, supervised its solicitation personnel, and certified the CEA reports. O'Hara directed participant risk and related communications through which BC LLC's continued and expanded participation was obtained. In the alternative, any of these Defendants whose function a court finds outside associated-person status is liable as a willful aider and abettor on the knowledge and assistance pleaded in this Count. LAM, NFA, and CFTC records will establish registration, functions, supervision, and transaction-specific participation.

805.    BC LLC falls within Section 22's express transaction class for a person who purchased or placed through the defendant an order to purchase an interest or participation in a commodity pool. 7 U.S.C. § 25(a)(1)(C)(iii). On June 28, 2021, BC LLC executed the onshore Topwater Partners LLC Subscription Agreement and placed through LAM's Topwater Capital

315

Division an order to purchase a First-Loss Interest in Topwater Partners LLC. The Fund accepted the subscription and BC LLC's $1,000,000, on Defendants' own written confirmation, on November 19, 2021, and the fully executed instrument admitting BC LLC as a First-Loss Member is dated December 9, 2021. BC LLC later increased and materially reconfigured its First-Loss participation through the documented 2022 and 2023 contributions and the July 2024 allocation of $1,500,000 of existing first-loss capital to Mayfly. LAM solicited, negotiated, processed, administered, and caused acceptance or recording of each of those transactions, and each was a purchase of, or the placement through LAM of an order to purchase, an interest in the pool.

806. The advised accounts also transacted in commodity interests directly. In July 2024, the Mayfly account at Interactive Brokers traded stock-index futures and options on futures, including E-mini S&P 500 and E-mini Nasdaq-100 contracts, under BCML's direction, and Britannica had requested futures and options-on-futures capability in writing throughout the relationship, from 2019 forward. LAM's advisory conduct, restrictions, directives, denied hedging, and forced liquidation on August 5, 2024 operated on a book that included those commodity interests, and the losses that conduct inflicted included losses on them.

807. The qualifying pool-interest transactions were domestic. BC LLC executed the onshore subscription; LAM accepted it for the Delaware fund from United States offices, as Defendants' own November 19, 2021 written confirmation and the fully executed December 9, 2021 instrument record; irrevocable liability and title arose on United States acceptance; and the capital moved through United States accounts. On information and belief, the 2022 and 2023 increases were accepted and recorded through the same United States offices and accounts. The

316

acceptance records, member ledger, wire instructions, bank records, and additional-subscription documents are controlled by Defendants.

808.    In connection with BC LLC's purchase and its continued, increased, or reconfigured commodity-pool participation, LAM and its associated persons used interstate communications to employ devices, schemes, and artifices to defraud and to engage in practices that operated as a fraud or deceit upon a participant. They represented a professionally monitored first-loss platform with defined capital, risk, valuation, broker, credit, and termination protections while concealing the shared and discretionary nature of the capital, LAM's conflicting role as Manager and Valuation Agent, the undisclosed broker and affiliate economics, the absence of reliable account-level controls, and the platform's ability and incentive to shift losses to first-loss capital. In July 2024 they obtained continued or reconfigured participation through representations concerning the two-account package, account credits, and a new cause-based cross-default. Thirty-three days later they terminated both accounts at the same claimed minute. The contemporaneous notice identified only Stonefly, did not invoke the cross-default, and supplied no Mayfly calculation or notice; Defendants invented an independent same-minute Mayfly stop-out three days later. They prohibited protective trading, retained capital and credits, and fabricated an August 8 evidentiary package as purported contemporaneous proof of the August 5 event. The speakers, dates, media, contents, omissions, falsity, reliance, and bases for scienter are particularized in Sections E through M and Counts I and IX. The fraud included the concealed-fact cluster described above in the fraud and concealment allegations, operated upon pool participants in connection with their pool interests, and was conducted through instrumentalities of interstate commerce, including interstate wire transfers of capital, electronic

317

account communications, email solicitations, and the interstate data and reporting feeds through which the accounts were run.

809. LAM and the associated persons acted knowingly or recklessly. Borgia directed the platform representations and solicitation. Damm made and administered the financing, credit, capital, and two-account representations. Rubin documented the account-opening condition, transmitted and administered amendments, and engaged Jefferies Risk. Taylor certified the CEA-facing pool reports and participated in the division and committee structure. O'Hara knew the data lag and pricing failures, announced the higher-level decision, refused every off-ramp, imposed the liquidation and hedging prohibition, and transmitted the retrospective proof. On information and belief, each vehicle knew through the LAM personnel whose knowledge and acts are attributed to it that the participant-facing representations and later administration were deceptive, adopted the conduct, and retained its benefits; governing approvals and communications will confirm. Stonefly, Mayfly, and Topwater Partners LLC knowingly adopted, induced, procured, and substantially assisted the violations through their own governing acts, approvals, allocations, retentions, and communications, on the same information-and-belief basis. Jefferies, Daraviras, Handler, and Friedman are additionally liable as controlling persons under Section 13(b) of the CEA, 7 U.S.C. § 13c(b): Jefferies on the parent ownership, committee seating, and control facts pleaded in this Complaint; Daraviras on the co-presidency, committee seats, and parent-level capital direction alleged above; and Handler and Friedman on the committee-authority and parent-control facts alleged above. None acted in good faith within the meaning of that section.

810. The violations directly caused BC LLC actual damages resulting from its domestic commodity-pool participation, including capital obtained and retained through the

fraud, omitted credits and excessive or undisclosed charges, and losses wrongfully allocated to its First-Loss Interest through the invalid valuation, termination, and liquidation. BC LLC would not have purchased, maintained, or expanded its participation on the terms imposed had the concealed facts been disclosed. It seeks actual damages only under this Count and will not duplicate any securities, contract, fiduciary, or other recovery. The violation culminated in the August 5, 2024 termination, the forced liquidation, the later false presentation of proof, and the September 2024 closeout and retention. This action is brought within two years under 7 U.S.C. § 25(c).

811.    BC LLC purchased an interest in a commodity pool: the trading funds for which LAM served as commodity pool operator under its own CFTC Regulation 4.7 exemption filings, and whose pool-level trading included commodity interests as the funds' audited counterparty disclosures record. The fraudulent devices, practices, and courses of business pleaded in this Complaint were employed in the operation of that pool and upon its participants, including BC LLC, through the mails and instrumentalities of interstate commerce. No scienter is required under Section 4o(1)(B), and the conduct pleaded satisfies every standard in any event.

812.    The clearing side of the pool's commodity trading is documented in the files of the futures commission merchants the audited reports name, whose account, margin, and segregation records for the Topwater vehicles, and whose personnel responsible for those accounts, are identified in the FCM agreements and statements Defendants control and the FCMs retain.

813.    The public record confirms the registration posture the counts plead: the National Futures Association's public registry states LAM's CFTC registration status and every exemption

319

notice filed for the Topwater pools, with dates, and those filings are Defendants' own regulatory admissions of the pool structure.

814. The audited annual reports' own pages carry the proof: the counterparty and instrument disclosures in the Topwater Partners, Stonefly, and Mayfly audited reports identify the futures commission merchants used and the commodity-interest positions held at pool level, in documents Taylor personally affirmed as accurate and complete.

815. No pool disclosure document was ever delivered: on information and belief, BC LLC, a participant in pools whose operator invoked Commission relief, never received any commodity-pool disclosure document, risk statement, or CEA-facing offering disclosure from LAM at any time, and Defendants' distribution records will confirm the absence.

816. The commodity margin was never segregated: on information and belief, the futures and options-on-futures positions the pools carried were margined through omnibus or house arrangements in the funds' or LAM's name, pooled with other managers' positions and never segregated for the participants whose capital stood first against them, as the account agreements and FCM records will show.

817. The public registry states each individual's function: the NFA and CFTC public records for Borgia, Damm, O'Hara, Taylor, and Rubin state each person's registration history, principal status, and association records, the public half of the functions alleged above, with Defendants' internal records holding the rest.

## COUNT XIX

**Promissory Estoppel and, in the Alternative, Implied Agreement: the Credit-Interest Commitment**

*(Against LAM, Stonefly, and Mayfly, in the alternative to Counts IV, VII, IX, and XIV)*

320

818. BCML and BC LLC reallege the preceding allegations relevant to this Count. This Count is pleaded strictly in the alternative and does not concede that the express agreements fail to require the disputed credits. It applies only if and to the extent Defendants contend, or the Court determines, that the AIAAs and their amendments do not fully govern the credit income generated by Britannica's cash and short-sale balances.

819. The original Stonefly Appendix C expressly excluded from Investment Gains "interest income on cash, cash equivalents and short rebates." In March 2023, after Britannica had invested its capital and incurred substantial account-specific costs, LAM threatened termination unless BCML accepted a newly imposed financing expense on debit balances. Britannica responded that if Defendants imposed a charge on debit balances, Britannica required corresponding credit treatment for the positive cash and short-sale balances its strategy generated.

820. On March 28, 2023, Britannica's Chief Investment Officer asked Damm in writing to confirm that when Britannica created a net credit balance, the administrator would attribute interest income to Britannica at the same benchmark rate. Damm responded in writing that Topwater was working on the Appendix C amendment, that "I believe we can agree to any net credit (should this situation exist)," that Topwater was merely confirming that Goldman Sachs's reporting supported the calculation, and that Topwater would revert shortly. In reliance on that written response and the parties' preceding written negotiations, BCML executed the amendment that evening.

821. The executed amendment objectively confirmed the agreed economic structure. Amendment No. 1 amended and restated Appendix C in its entirety, effective April 1, 2023. It added a financing expense on qualifying debit balances while changing the income exclusion

321

from "cash, cash equivalents and short rebates" to "cash equivalents" alone. The amendment therefore deleted the prior exclusions for cash and short rebates at the same time that Defendants obtained the new debit-financing charge. The executed amendment, the parties' signed email exchange, and their contemporaneous course of performance constitute a single integrated transaction and manifest an agreement, or at minimum a clear commitment, that Britannica would receive the corresponding credit economics it generated.

822. BCML and BC LLC reasonably and foreseeably relied on that commitment. Britannica maintained its capital on the platform, continued operating the accounts, restructured positions to reduce debit financing and generate positive credit balances, converted stock exposure into equivalent options and short-security structures, disclosed proprietary financing and portfolio-construction methods, and incurred additional transaction costs, option spreads, lost dividends, early-assignment costs, rollover expenses, hedging costs, technology costs, and personnel expenses. Defendants knew those expenditures and strategy changes were being undertaken to generate the promised credit income and mitigate the new financing expense Defendants had imposed.

823. Defendants unequivocally reaffirmed the obligation in writing after the parties had entered the later Mayfly relationship. On July 31, 2024, Britannica informed Long that Mayfly maintained a $7.5 million positive balance "from short sales of securities," that Interactive Brokers did not credit Britannica directly, and that the credit therefore had to be calculated and attributed through Defendants and UMB. Long responded in writing, copying Damm and Wieczorek: "Yes, our Admin, UMB, is aware of this aspect of the agreement. This will be calculated and credited at the end of the month." The $7.5 million was the balance generating the credit, not the amount of credit owed.

824.    Neither the Stonefly AIAA, Amendment No. 1, nor the Mayfly AIAA contains a specific disclaimer stating that Plaintiffs were not relying on Defendants' representations concerning credit interest, short rebates, or short-sale proceeds. Amendment No. 1 instead deleted the prior exclusion of cash and short rebates, and Long's July 31 confirmation was a subsequent written reaffirmation made during performance. Defendants' own written communications therefore establish the obligation independently of any prior oral statement.

825.    LAM, Stonefly, and Mayfly failed to calculate, attribute, report, or pay the promised credits. They concealed the applicable balances, rates, calculations, recipients, allocation workpapers, and treatment of the credits in the Capital Account and Account Adviser Fee calculations. The precise amounts are ascertainable from Goldman Sachs's and Interactive Brokers' daily cash and short-position records, LAM's allocation files, UMB's native workpapers, and Defendants' internal accounting records.

826.    If the express agreements are held to govern the credits, Plaintiffs seek recovery under their contract claims. If the agreements are held not to govern some or all of the credits, Defendants' written commitments, Britannica's substantial and foreseeable reliance, and the parties' course of performance support promissory estoppel and an implied-in-fact agreement. BCML and BC LLC seek the unpaid credit income, their reliance losses, the resulting underpayment of Account Adviser Fees and Capital Account balances, prejudgment interest, and all other available relief, without duplicate recovery.

## COUNT XX

**Economic Duress: Voidability of Extracted Terms and Declaratory Relief, Pleaded in the Alternative**

*(Against Stonefly, Mayfly, and LAM)*

827.    Plaintiffs reallege and incorporate all of the factual allegations above.

323

828. BCML challenges the terms it assented to under post-lock-in pressure, including the financing-expense term placed into Stonefly Amendment No. 1 in March 2023, the cross-default placed into Stonefly Amendment No. 5 and the corresponding July 3, 2024 Mayfly agreement, and every further term, charge, or restriction obtained by the same pressure. BC LLC, whose first-loss capital bore the resulting charges, allocations, and consequences of Defendants' simultaneous termination of the linked accounts, seeks restitution and declaratory protection to the extent those terms were imposed against its property as the disclosed First-Loss Member. BCML seeks avoidance as the contracting party; BC LLC seeks restitution of every charge, allocation, and loss imposed against its property. The voiding sought is term-specific, as specified below.

829. The March 2023 term followed an explicit threat, and Britannica recorded the coercion in writing while it was happening. O'Hara wrote on March 8, 2023 that Investment Committee members had pushed to terminate the account for cause and that, if Topwater's proposed terms were not accepted, the committee requested ninety days' notice. The next evening, March 9, 2023, Britannica's Chief Investment Officer answered in writing: Britannica was "perhaps understandably a bit unsettled" that Topwater had said "our account can be terminated just like that," and Britannica's "financial, technological, skilled-manpower investment into this account has just been tremendous, several times more than our first-loss drawdown to date," itemizing the new technical systems built, the algorithms transferred and recoded, and the dedicated personnel hired for this account alone.

830. Those systems were real and named: Britannica had selected and paid for the SpiderRock order and execution management system and built its integration into Goldman Sachs' platforms at the broker Defendants imposed, had constructed the secure hourly trade feed

into Topwater's own Broadridge system that Defendants demanded, and had recoded its proprietary algorithms to run inside that architecture, an investment running to millions of dollars that existed only inside the account Defendants were threatening to kill. Defendants therefore knew, in Britannica's contemporaneous words, exactly what the termination threat put at stake and exactly why Britannica could not walk away. They priced the amendment against that knowledge. The measured courtesy of Britannica's replies was the voice of a hostage addressing its captor: Britannica wrote carefully to the people holding its capital, its broker permissions, and its live accounts, and its politeness preserved its objections in the only register available to a party that could not survive the threatened destruction.

831.    The proposed package shifted financing cost to Britannica while preserving Topwater's profit share. At the same time, redemption or withdrawal below the contractual high-water amount would itself trigger termination, and Britannica had already committed capital, technology, staff, broker integrations, and confidential methodology that could not be transferred without severe loss. The threat identified no contractual cause. On information and belief it lacked one, based on Britannica's performance and compliance, the absence of a cause notice, and Defendants' controlled committee record. Defendants used the threat to extract economics they had not obtained at formation. The March 2023 term also converted, in Defendants' own writing, a represented capital commitment into an explicit charge for borrowed money against locked collateral: Defendants collected on the loan while continuing to call it an investment program, and the extraction of that conversion under threat of a ninety-day notice is itself the wrongful threat's object.

832.    The extracted term's operative price was never defined or disclosed: the 'Prime Broker daily financing rate' appears nowhere as a defined term in any instrument; Defendants

refused Britannica's requests for the rate and its breakdown; Britannica recorded in writing on March 9, 2023 that Goldman Sachs would not disclose the financing data because Britannica's financing sat inside a bundled Topwater account; no administrator statement in the life of the charge ever carried the rate or its calculation as a line; and on information and belief the rate actually applied exceeded the cost Defendants themselves paid, with the spread retained inside the platform.

833.    The July 2024 cross-default was extracted through a second pressure campaign. Defendants controlled approval of the Interactive Brokers transition, delayed it through counsel and committee processes, in Rubin's own May 29, 2024 words, 'still waiting to hear from our counsel ... and an approval from our committees' while acknowledging the cost of idle capital and the reduced risk capacity, then transmitted the cross-default as the price of completing the transition and obtained signatures within approximately nineteen hours. Rubin, Topwater's chief compliance officer, had already written on June 10, 2024 that counsel inserted the cross-default in connection with termination for cause. BCML had no practical market substitute that could preserve the live track record, committed capital, operational integration, and confidential platform relationship on the imposed timetable.

834.    Plaintiffs objected to the economic imbalance before execution, continued to seek correction and performance, and challenged Mayfly's termination and every asserted basis immediately after August 5, 2024 and in the ensuing demand correspondence. Avoidance, severance, reformation, and restitution are sought as alternative remedies directed at the extracted terms, with the term-specific scope pleaded in the paragraphs that follow. The coercive condition did not end until Defendants terminated the accounts and retained the capital.

Plaintiffs' continued performance before that date reflected the same lock-in and threatened destruction, not voluntary adoption of the extracted terms.

835. BCML seeks a declaration that the challenged financing-expense and cross-default terms are voidable and unenforceable, and BC LLC seeks restitution of charges, allocations, or losses imposed against its capital through those terms. Plaintiffs also seek adjudication of the parties' August 5 rights under the agreements without the extracted provisions. The cross-default cannot create a valid Mayfly termination where no valid stop-out occurred in either account in any event. This Count is pleaded in the alternative to Plaintiffs' primary allegation, which stands: no valid contractual stop-out occurred in either account at any time.

836. Each element of economic duress is satisfied on Defendants' own writings. The threats were wrongful: termination for cause and ninety-day notices invoked on manufactured breaches of guidelines Defendants themselves conceded misdescribed the approved strategy and cured by rewriting; an invented high-water redemption condition the contract does not contain; and a discretionary provision falsely recast as automatic. The threats overbore free will and left no adequate alternative: Britannica's capital was contractually trapped, its redemption itself threatened as a termination event; its systems were sunk into the broker Defendants imposed; its audited track record lived inside the accounts and could not be moved; and no notice period Defendants offered could replace any of it. And Britannica preserved its position the way the law recognizes, objecting in writing to each extraction and performing only under Defendants' control of the accounts' continuation.

837. No ratification occurred, for four independent reasons. The coercion never lifted: from each extraction until August 5, 2024, the same Defendants held the same trapped capital,

the same locked broker, and the same live accounts, and repudiation at any moment meant the immediate destruction the threats promised, so the period of performance evidences the duress, not free choice. Britannica protested continuously in writing, negating acquiescence. When the coercion ended, because Defendants seized the hostages outright, Britannica acted at once: written demands within forty-eight hours, demand letters through counsel, and this action. And the extracted financing terms are, in the alternative, void ab initio under New York's criminal usury law as pleaded below, and a void term cannot be ratified by any conduct.

838.    Plaintiffs seek voiding of the terms Defendants extracted by the coercion pleaded here, including the financing-expense term placed into Appendix C in March 2023, the cross-default installed in the July 2024 package, the invented high-water redemption condition, and every further term, charge, or restriction obtained by the same pressure, together with restitution of all amounts paid or withheld under each voided term, with interest. The voiding is term-specific: provisions Britannica itself sought, including the amendment's deletion of income exclusions, stand, because duress law voids what the coercer extracted, not what the victim secured.

839.    In the further alternative, because Defendants extracted the entire Mayfly Advisory Agreement within the July 2024 coercive setting pleaded above, BCML seeks rescission or severance of that agreement, or reformation preserving its substantive payment, crediting, confidentiality, accounting, and indemnification obligations while removing the coerced limitation-of-liability, jury-waiver, and cross-default provisions, as pleaded in the waiver and limitations section of this Complaint, with restitution of all amounts collected under the removed provisions and without disturbing Plaintiffs' primary allegation that no valid contractual stop-out occurred in either account at any time.

840.    The ledgers of the accounts' internal or external accountants and administrators, including UMB, record every financing dollar collected under the extracted term, month by month from April 2023 through termination, and Defendants have refunded none of it, including for the final stub period.

841.    On information and belief, Defendants' contemporaneous risk reporting to the Jefferies risk function in the March 2023 window showed no exposure of Regular Members' capital, so the for-cause threat was transmitted against an account Defendants' own risk records scored as safe.

842.    On information and belief, the March 8, 2023 threat was transmitted with, or contemporaneously reported to, the very committee members who profited from the repricing, and the distribution lists of the threat and the executed amendment are recorded in Defendants' systems.

843.    On information and belief, the personnel who transmitted and priced the threats were compensated on the division's revenues and economics, so each extracted charge fed the pay of the people extracting it; the compensation records are in Defendants' control.

## COUNT XXI

**Contractual Indemnification and Declaratory Judgment Under Section 11(a) of the Advisory Agreements, Pleaded in the Alternative and Contingent Upon Final Judicial Determination**

*(By BCML Against Stonefly and Mayfly)*

844.    Plaintiffs reallege and incorporate all of the factual allegations above.

845.    Section 11(a) of each Advisory Agreement provides, verbatim: "Each of the Trading Master Fund and the Account Adviser (each an "Indemnifying Party") shall defend, with counsel acceptable to the other party, and hold the other party and any entity that controls, is

329

controlled by or is under common control with the other party, and any of their respective directors, officers, partners and employees harmless from, and indemnify each of them (each an "Indemnified Party") against, any and all claims, liability, loss, damages and expenses (including reasonable attorneys' fees and court costs) ("Losses") which such Indemnified Party may incur or suffer which are finally judicially determined to have resulted from the Indemnifying Party's fraud, gross negligence, willful misconduct or breach of any provision of this Agreement, including, without limitation, any of the acknowledgments, representations, warranties or agreements made in this Agreement, except to the extent that such Losses are finally judicially determined to have resulted from the fraud, gross negligence, or willful misconduct of the Indemnified Party."

846.    BCML is the Account Adviser under both agreements. Amendment No. 5 confirms that the Stonefly agreement's use of Account Adviser has at all times referred to BCML, and BCML executed the Mayfly agreement in that capacity. Stonefly and Mayfly are the respective Trading Master Funds. Section 11(a)'s indemnitors are the Trading Master Fund and the Account Adviser, and the indemnitors against whom this Count runs are Stonefly and Mayfly.

847.    BCML seeks construction of Section 11(a)'s executed text. The clause defines Losses to include reasonable attorneys' fees and court costs, identifies a breach of the agreement as a triggering wrong, applies reciprocally to the contracting parties, and makes indemnity contingent on a final judicial determination. Those features support application to Losses resulting from a direct adjudication that a Trading Master Fund committed fraud, gross negligence, willful misconduct, or breach of its Advisory Agreement.

848.    Upon the final judicial determination required by Section 11(a), BCML seeks indemnification for resulting Losses, including reasonable attorneys' fees and court costs, subject to the clause's reciprocal exclusions. No payment is demanded before that condition occurs.

849.    BCML seeks a declaration resolving the parties' present dispute over the meaning and future operation of Section 11(a), to the extent the Court finds an actual controversy ripe for adjudication. If declaratory relief is premature, BCML preserves the contractual right for post-judgment enforcement.

850.    Defendants enforce the extracted terms to this day: their counsel's January 14, 2025 letter asserts that Plaintiffs' claims are foreclosed by the express terms of the Agreements, invoking the very provisions extracted under the threats pleaded here, which keeps the controversy live and the declaratory relief necessary.

851.    This Count enforces Section 11(a) as Defendants drafted and executed it, against its own contracting parties, and without duplicating any substantive damages award.

852.    Section 11's indemnities run mutually, and Plaintiffs invoke them for what their text compels: Defendants' breaches, misconduct, and the claims and costs they have forced Plaintiffs to bear fall within the indemnity Defendants drafted, and Plaintiffs are entitled to their costs and reasonable attorneys' fees to the full extent the provision provides.

## COUNT XXII

**Violation of 18 U.S.C. § 1962(c), Civil RICO**

*(Against LAM, Borgia, O'Hara, Damm, Taylor, and Goldman Sachs)*

853.    Plaintiffs incorporate only the party-identification allegations; the allegations concerning the account-cash, credit, rebate, and accounting scheme; and the allegations concerning trade-secret conduct, enterprise structure, and non-securities injury. No solicitation,

purchase, valuation, termination, or liquidation allegation is incorporated as a predicate; any such fact is background only.

854.    This Count relies on no conduct actionable as fraud in the purchase or sale of securities. It excludes the solicitation or purchase of the First-Loss Interests, every purchase-related representation or omission, and any valuation, termination, or liquidation conduct to the extent it is actionable as securities fraud. The predicate acts are limited to: (a) theft-of-trade-secrets offenses under 18 U.S.C. § 1832 committed through unauthorized acquisition, copying, transmission, attempted transmission, possession, concealment, or use outside Section 10's permitted purposes; and (b) in the alternative, wire fraud under 18 U.S.C. § 1343 directed to account cash, interest income, rebates, credits, and accounting property, not to the purchase or sale of a security. If any alleged act is held within 18 U.S.C. § 1964(c)'s securities-fraud bar, that act is excluded and the Count proceeds on the remaining predicates.

855.    The Platform Enterprise alleged above was an association-in-fact enterprise within 18 U.S.C. § 1961(4). Its members included LAM and its Topwater division, the Trading Master Funds, the Feeder Fund, the Cayman Master Fund, Jefferies risk personnel, platform administration, and Goldman Sachs as the integrated prime-broker and allocator-coverage participant. They shared the purpose of operating and monetizing the first-loss platform through managers' capital, order flow, data, and methodology; had continuing contractual, managerial, data, coverage, and economic relationships; and functioned together from at least 2021 through and after 2024 in interstate and foreign commerce. The enterprise's shared purpose further included operating a synthetic margined-account business outside the registration, custody, segregation, margin, and disclosure regimes that govern the regulated products it imitated, and monetizing that design through the managers whose capital bore its entire risk.

332

856.    Each named RICO person is legally distinct from the Platform Enterprise and participated in directing its affairs. LAM managed the platform and controlled accounting, credit, valuation, confidentiality, termination, and retention functions. Borgia co-headed the platform, directed its representations and manager relationships, and exercised policy and supervisory authority. Damm administered the financing, broker, credit, and two-account economics and made the principal cash-and-credit wires. O'Hara directed the risk, valuation, termination, attempted handoff, and liquidation functions. Taylor co-headed the Division, held the Investment Committee seat from which the adverse decisions ran, executed the July 3, 2024 instruments for all three principal entities in a single hand, and certified the pool reports through which the enterprise's accounting faced its regulators. Goldman Sachs is a member of the enterprise whose operation and management of its affairs is alleged in this Count, and Goldman Sachs and Jefferies are charged as RICO persons in this Count and in Count XXIII.

857.    On information and belief, LAM, through identified or discovery-controlled personnel, copied and transmitted specified Britannica model, live-position, and strategy-map information to Jefferies Risk beginning by June 18, 2024 for parent-risk and termination purposes outside account administration. LAM knew Section 10 limited use and disclosure, intended to convert the information for LAM's or Jefferies' economic benefit, and knew or intended injury to BCML. The basis is the June 18 Risk engagement, LAM's complete access, the higher-level termination decision, later adverse use and refusal to account, and the controlled recipient, access, message, and use records. On August 5, 2024, O'Hara demanded five-minute consent and threatened immediate transmission of Britannica's live book and strategy map to LAM or a replacement adviser despite no valid stop-out, while knowing the live book was confidential. He intended commercial benefit to Defendants and injury to BCML. The notice,

calls, invalid premise, and controlled transfer files supply the basis. Each Section 1832 predicate pleaded in this Count identifies the trade secret, the unauthorized statutory act, the actor, the recipient, the date or bounded period, the criminal intent, the benefit, and the knowledge of injury, with its basis stated.

858.   Borgia and Taylor each committed the trade-secret predicates personally. On information and belief, stated on the founding, design, and committee bases pleaded as to each, the enterprise Borgia and Taylor built was designed in part to extract and keep the best-performing managers' strategies, so that the acquisition, retention, and use of Britannica's methodology executed a founding purpose of the enterprise, not an incident of one account. Borgia obtained Britannica's trade secrets by deception: he personally made the data-protection and no-adverse-use representations through which Britannica was induced to deliver its strategies, systems knowledge, and live positions, representations this Complaint pleads false, and the delivery those representations procured was an acquisition by fraud and deception within 18 U.S.C. § 1832. On information and belief, Borgia and Taylor, as the co-heads who direct the division's retention, use, and disclosure decisions, have each knowingly possessed and authorized the continuing use of Britannica's trade secrets since all permission ended in August 2024, for the economic benefit of LAM and its affiliates and with knowledge of the injury to BCML; the basis is their co-head authority, the division's ten-to-twenty-five-person scale under which retention and use decisions of this consequence are theirs, the December 2024 written assertion of continued rights made on their division's behalf, and the access, decision, and use records in Defendants' control. Each has thereby committed at least two predicate acts: for Borgia, the deceptive acquisition and the continuing possession and authorized use; for Taylor, the continuing possession and authorized use and, from the Investment Committee seat from

which the August 5 decisions ran, the direction of the attempted transmission pleaded above, on the same stated basis.

859.    Goldman Sachs committed the trade-secret predicates personally. On information and belief, Goldman Sachs received Britannica's confidential portfolio, strategy, and volume information transmitted to it by Topwater before any Britannica relationship with Goldman Sachs existed, and thereafter possessed and used that information in its pricing, coverage, and capacity assessments of Britannica's captive trading, knowing the information was Britannica's, was conveyed outside any authorization from Britannica, and was being converted for Goldman Sachs's economic benefit and to BCML's injury. The basis is the pre-relationship delivery pleaded above, the coverage relay that Topwater identified Britannica as a high user of capital, the revenue-factor economics under which Goldman Sachs priced the relationship, and the coverage, communication, and pricing records in Goldman Sachs's exclusive control. The receipt and possession, and the continuing use, are each predicate acts under 18 U.S.C. § 1832.

860.    The access logs for the June 18, 2024 Jefferies Risk engagement will fix, file by file, which Britannica models, positions, and strategy maps were pulled, by whom, and when, converting the pleaded transmission into an itemized inventory of predicate acts. The system access logs, data-room records, and transmission metadata are in Defendants' control, and the first requests demand their preservation and production specifically.

861.    On information and belief, when O'Hara threatened immediate transmission of Britannica's live book and strategy map to LAM or a replacement adviser, a specific replacement had been identified and contacted, and the August 2024 communications with that candidate will name the intended recipient of Britannica's confidential property. An interrogatory naming the candidate is the first ask.

335

862. On information and belief, Britannica's confidential information also traveled outbound through the affiliated and imposed broker channels: to Jefferies Risk personnel in the June 18, 2024 engagement, whose identities the invitation and distribution records fix; and to Goldman Sachs coverage and securities-lending personnel, including Backer, Tran, and Eck, who received Britannica's pre-opening sample portfolios and position quantities and its continuing position flow, and who discussed Britannica and the Topwater and Jefferies relationship on internal and external calls, including lines Goldman's own policy designated for recording. The basis is the pleaded pre-opening deliveries, those personnel's coverage roles in the record, the recorded-line designation in Goldman's own writing, and the platform's routing of the accounts through those functions. The message archives, recorded lines, and access records, in Jefferies' and Goldman's control, will identify every recipient and exchange.

863. In the alternative, the cash-and-credit predicates are confined to interstate wires whose property object was account cash and credit income. Damm's March 2023 wires are predicates only insofar as they falsely promised the calculation and payment of account credit income; they are not used as predicates for obtaining an agreement or First-Loss Interest. On information and belief, Damm intended the cash-and-credit deception when he removed the term under same-evening pressure, supplied the written assurance, did not pursue the stated Goldman confirmation or later amendment, and later invoked the exclusion. The basis is the contemporaneous March communications, the absence of a documented follow-up, the April 16, 2024 communication, and the controlled accounting, policy, draft, and Goldman-communication records. Long's July 31, 2024 wire is a predicate only insofar as it falsely represented that account credit would be calculated and paid while Defendants intended to retain that cash or credit. The basis is the June Risk engagement, pre-open termination decision, omission of any

336

Mayfly notice or native calculation, later same-minute dual-account explanation, and controlled credit and decision records. The alleged property is account cash and credit income, not any First-Loss Interest, purchase, valuation, liquidation, or trading loss. The September 26 return or retention is not pleaded as wire fraud without a specified deceptive interstate communication furthering the scheme.

864.    The pleaded predicates are related because they concern the same Platform Enterprise, confidential property, account-cash property, participants, victim, and enrichment purpose. On information and belief, qualifying trade-secret theft and independent cash-or-credit deception were a regular method of the enterprise's operation. The basis is the standardized data-access and confidentiality structure imposed across a multi-manager platform, the recurring account-credit and accounting design, the identified comparator records and the record of the Canada action in Connecticut Superior Court, the same platform personnel and controls, and Defendants' continuing post-demand commercial use of still-confidential information. The manager, comparator, access, use, and accounting records expected to confirm or narrow that allegation are controlled by Defendants. Closed-ended continuity is pleaded through the related predicate acts spanning the period from the 2021 acquisition of Britannica's methodology through the continuing possession and use of that methodology pleaded in this Count and ongoing at filing, a substantial period exceeding two years, and Defendants' December 2024 written assertion of continued rights evidences that continuing possession; open-ended continuity is pleaded independently through the regular way of doing business shown by the platform-wide practices, the comparator record, and the continuing retention and use, each a distinct route and either sufficient.

865.    The non-securities predicates directly injured business or property. BC LLC lost account cash, credit income, rebates, and amounts omitted through false accounting. BCML lost the value and exclusivity of its trade secrets and suffered uncompensated use measured by actual loss, unjust enrichment, or a reasonable royalty. BCML also incurred concrete, reasonable technical investigation and response costs to identify recipients, assess unauthorized use, preserve systems, and contain the trade-secret and cash-or-credit conduct; those are pre-suit technical costs, distinct from litigation fees. Those injuries were the intended and immediate objects of the predicates and do not depend on injury from a securities purchase, valuation, termination, or liquidation. Each such cost, its date, purpose, payee, and causal predicate is fixed in Plaintiffs' and Defendants' records, and all RICO injury is segregated from every other damages channel, without duplication.

866.    Under 18 U.S.C. § 1964(c), Plaintiffs seek threefold the qualifying non-securities business-or-property damages, costs of suit, and reasonable attorneys' fees.

867.    The pattern is the platform's regular way of doing business, and Defendants' own documents prove both relatedness and continuity. Relatedness: the same methods (the manager's capital at the bottom, the sweep, the self-judged trigger, the imposed broker, the extraction at drawdown), the same class of victims (smaller first-loss managers), and the same purposes (the one-way flow the audited statements record). Continuity: closed-ended across the years of conduct pleaded here, and open-ended by design, because the program that ran for two decades before Britannica runs today on managers who do not know it, and its structure guarantees repetition.

868.    Goldman Sachs participated in the operation and management of the enterprise's affairs through roles only it could perform: it operated the enterprise's intake, referring managers

338

to the platform it covered as an allocator relationship; it set the enterprise's captive pricing, billing the referred managers' locked flow; it supplied, on information and belief as pleaded above, the data on which the enterprise's committees acted; and it collected the enterprise's upstream payments in banking economics with the parent. Those are directive functions in the enterprise's affairs, not vendor services at its edge.

869. Plaintiffs' injuries are domestic. The property taken, the first-loss capital, the withheld income, and the trading strategies and systems, was held in and taken from United States accounts and United States operations: BC LLC is a Delaware company; BCML operated from Connecticut and New York; Gupta created, delivered, and lost his property in the United States; and every act of taking pleaded as a predicate occurred through New York and Connecticut conduct. The injury was felt in the United States, where the property sat and the business was destroyed.

870. Defendants' own audited financial statements state the pattern as a ledger: for each fiscal year of the platform's operation, the first-loss class absorbed the year's losses while the shielded class absorbed none, and the year-by-year schedule of first-loss capital consumed, drawn from those statements, will be proved at trial.

871. Stonefly's audited statements identify Jefferies LLC as a principal derivative counterparty to the trading fund that held the managers' portfolios. On information and belief, Jefferies earned counterparty profits trading opposite the managers whose books the platform saw in full, and the counterparty profit-and-loss records and trade blotters will fix the amounts.

**COUNT XXIII**

**Conspiracy to Violate 18 U.S.C. § 1962(c), in Violation of 18 U.S.C. § 1962(d)**

*(Against LAM, Borgia, O'Hara, Damm, Taylor, Wieczorek, Jefferies, and Goldman Sachs)*

339

872.    Plaintiffs reallege and incorporate Count XXII only.

873.    On information and belief, each Defendant named in this Count agreed to the non-securities predicate scheme. Borgia agreed through his co-head authority over the platform and manager relationships, the committee structure, the coordinated cash, credit, and confidential-information functions, and the committee decisions and solicitation conduct personally attributed to him. Jefferies agreed through its Risk engagement beginning June 18, 2024, its receipt and use of confidential information for the adverse decision, and parent-level direction or ratification of that sequence. LAM, Damm, and O'Hara agreed through the specific platform, cash-and-credit, attempted-handoff, and confidential-information acts attributed to each above. Taylor agreed through the committee decisions and execution acts personally attributed to him, and Wieczorek through the solicitation, transmittal, and July 2024 transaction acts attributed to him. Each manifested agreement by conduct in furtherance rather than by mere status, and the communications, votes, access logs, approvals, and directions that record each agreement are controlled by Defendants. Goldman Sachs agreed through the reciprocal referral-and-pricing economics it settled with the platform, its receipt of Britannica's confidential portfolio information from Topwater before any Britannica relationship existed, its supply of the account data on which the enterprise's committees acted, and its collection of the enterprise's economics, each pleaded above; on information and belief, Goldman Sachs thereby agreed that members of the enterprise would commit the non-securities predicate acts, and the inter-firm communications, coverage records, and economic-flow records that fix that agreement are in Defendants' control.

874.    The conspiracy caused injury through the substantive predicate acts and independently wrongful overt conduct, not through the agreement alone. The transmissions and

340

uses of trade secrets, the deceptive cash-and-credit wires, and the retention of cash and credits caused the injuries pleaded in Count XXII. Plaintiffs seek the remedies available under 18 U.S.C. § 1964(c), without duplicate recovery.

875.    The agreement is shown by conduct no innocent coordination explains: reciprocal economics settled between the firms before Britannica was told anything; a division of roles in which each participant performed the step only it could perform, the referral, the lock, the pricing, the extraction, the trigger, the fabrication; and joint execution of the August 5 operation across two firms' systems in a single morning. Each conspirator agreed that a member would commit at least two predicate acts, and the predicates were committed.

## COUNT XXIV

**Misappropriation of Trade Secrets and Unfair Competition Under New York Common Law**

*(By Gupta and BCML Against LAM, Stonefly, Mayfly, Jefferies, Goldman Sachs, Borgia, Wieczorek, Damm, O'Hara, Taylor, Rubin, Daraviras, Handler, Friedman, Long, Rothe, Chen, and John and Jane Does 1-20)*

876.    Gupta and BCML reallege and incorporate the preceding trade-secret allegations.

877.    The Britannica Trade Secrets constitute formulas, models, methods, techniques, processes, procedures, compilations, and business information used in Plaintiffs' business that gave Plaintiffs an actual and potential advantage over competitors and other market participants who did not know or use them.

878.    The information was not generally known outside Britannica; substantive internal access was restricted to Gupta and Madej; Plaintiffs continuously protected the information through contractual, technological, physical, and operational secrecy measures; the information was highly valuable to Plaintiffs and sophisticated financial institutions; it required decades of

effort, expense, research, testing, and experience to develop; and it could not properly be duplicated without comparable resources, access, information, and expertise.

879. Defendants obtained the Britannica Trade Secrets only through agreements, confidential relationships, and duties requiring secrecy and limiting use. Defendants used and disclosed them in breach of those agreements, relationships, and duties.

880. Defendants acted in bad faith by representing that the information was required for account diligence, operation, monitoring, brokerage, financing, or risk management; repeatedly compelling further proprietary disclosures; acknowledging that the disclosures corrected Defendants' prior misunderstandings; and then applying the resulting knowledge beyond Britannica's accounts for Defendants' own platform, risk, contractual, commercial, and trading benefit.

881. Defendants misappropriated the fruits of Gupta's and BCML's skill, labor, research, expenditures, models, testing, and trading experience and used those fruits to obtain commercial advantages without authorization or compensation.

882. Defendants' conduct constitutes misappropriation of trade secrets and unfair competition under New York law.

883. Defendants' misconduct caused Plaintiffs' losses, including impairment of secrecy, exclusivity, competitive advantage, licensing opportunities, deployment opportunities, business value, and the ability to exploit the Britannica Trade Secrets through Plaintiffs' advisory and trading business.

884. Gupta and BCML seek compensatory damages measured by their losses, lost profits, loss and diminution of trade-secret value, impairment of licensing and deployment opportunities, a reasonable royalty or other permissible measure pleaded in the alternative,

injunctive and equitable relief, punitive damages for Defendants' willful and malicious conduct, and all other available relief, without duplicative recovery.

## COUNT XXV

**Negligent Misrepresentation, Pleaded in the Alternative to Counts IX and X**

*(By BCML, BC LLC, and Gupta Against LAM, Topwater Partners LLC, Stonefly, Mayfly, Goldman Sachs, Borgia, Wieczorek, Damm, O'Hara, Rubin, Eck, Tran, and Backer)*

885.    Plaintiffs reallege the allegations relevant to this Count, including the representations, half-truths, and omissions pleaded in Counts I, IX, and X with their speakers, dates, media, content, and falsity.

886.    Defendants possessed unique and specialized knowledge and occupied a special relationship of trust and confidence toward Plaintiffs beyond an ordinary arm's-length transaction. LAM acted as Manager and self-described Valuation Agent with exclusive control over the account data, marks, allocations, and calculations on which Britannica's capital and business depended; the Offering Memorandum repeatedly acknowledged the Manager's fiduciary duty and its valuation conflict; Defendants held exclusive access to the ledgers, feeds, committee decisions, and platform information Britannica could not independently verify; and Defendants solicited and received Britannica's proprietary strategy, live positions, capital, and reliance over a multi-year relationship in which Topwater warned, advised, and directed Britannica's conduct. The speaker Defendants made the identified representations in the course of that relationship, intending Plaintiffs to rely. Topwater's exercise of that special position is dated in this Complaint instance by instance: the April 2022 warning, the March 2023 ultimatum, the May 2023 trap writing, and the permission dictations, each an occasion on which Topwater directed Britannica's conduct and Britannica acted as directed.

343

887.     If, contrary to Counts IX and X, any speaker lacked fraudulent intent, each such representation was made negligently and without reasonable grounds for belief in its truth. Defendants failed to exercise reasonable care in ascertaining and communicating the true facts concerning, among the matters pleaded above, the monitoring architecture and its lag, the reliability of the data chains, the broker economics and conflicts, the credit and interest treatment, the character of the Investment Account Value, the stability of the agreed terms, and the operation of the termination machinery. Plaintiffs justifiably relied on those communications in committing and maintaining capital, systems, personnel, and proprietary information, in accepting amendments, and in continuing the relationship. Defendants lacked reasonable grounds for the incorrect information they supplied: the contradicting facts, the two-hour cadence, the pooled margin, the financing economics, the intervention practice, and the Valuation Agent conflict, were their own operations, recorded in their own documents at the time they spoke.

888.     As a direct and proximate result, Plaintiffs suffered the injuries pleaded in this Complaint, including BC LLC's capital and credit losses and BCML's reliance expenditures and business destruction, in amounts to be proved. This Count is pleaded in the alternative to Counts IX and X, and Plaintiffs will not recover twice for the same injury.

889.     The speakers held unique and specialized knowledge and occupied special positions of trust: a registered investment adviser controlling custody, valuation, and termination of the client's capital; officers who required Britannica to educate them on its own strategy while dictating its permissions; and a prime broker that courted Britannica for two years with institutional representations before any account opened, knowing precisely the use to which its statements would be put. Those relationships approached privity and carried the duty of care the law imposes on parties who invite reliance on their word.

344

890.    The same representations were made to Gupta personally. The speakers knew Gupta owned the strategies and systems they were soliciting into their structure, addressed their representations to him as Britannica's founder and Chief Investment Officer, and intended his reliance. If, contrary to Counts IX and X, any speaker lacked fraudulent intent, each such representation was made negligently toward Gupta as toward the entity Plaintiffs, and Gupta reasonably relied by authorizing and continuing BCML's deployment of his proprietary system inside Defendants' platform. Gupta's resulting injury includes the value of the use and retention of his property, measured at minimum by the reasonable royalty pleaded in Counts III and XXIV, without double recovery. This paragraph is pleaded in the alternative to Counts IX and X, and Gupta will not recover twice for the same injury.

891.    This Count rests on duties New York common law imposes by reason of the special relationship pleaded above, the speakers' unique and specialized knowledge, and their special position of confidence and trust, independent of any statute, and on representations and injuries particular to these Plaintiffs.

## COUNT XXVI

**Declaratory Judgment: Recharacterization and Voidness of Extracted Financing Terms Under New York Usury Law, Pleaded in the Alternative**

*(By BC LLC and BCML Against LAM, Topwater Partners LLC, Stonefly, and Mayfly)*

892.    Plaintiffs reallege the factual allegations above to the extent relevant to this Count, including the amendment, financing-charge allegations, loss-allocation, and waterfall allegations.

893.    An actual and justiciable controversy exists concerning the character and enforceability of the financing terms Defendants extracted after Britannica was committed. Defendants contend that the amendments, financing charges, cross-default, and loss allocations

were valid investment terms validly applied. Plaintiffs contend that, if Defendants' characterizations of the arrangement fail, the extracted terms are in substance the terms of a loan, and every classic indicium of a loan is present on Defendants' own documents. Defendants held an absolute right to repayment: BC LLC's capital bore one hundred percent of losses while the Regular Members' capital stood behind a one-percent termination trigger that made exhaustion of the first-loss layer, and therefore any loss to Defendants, structurally unreachable, an assurance O'Hara himself stated, as pleaded above, when he said the investors behind the Regular capital could never see a dollar of loss in their layer.

894. Defendants controlled the collateral: they held custody, Section 6(b)(iii)(E) made any withdrawal below ten percent of Investment Account Value a Termination for Cause event, and O'Hara confirmed in writing on May 26, 2023 that redemption below the high-water mark would itself cause an automatic termination. Defendants bore no risk of loss at any distance, and enforced the arrangement at 7.42 percent of Investment Account Value in April 2022 while the first-loss layer still held 15.8 percent of its capacity unspent. And Defendants advanced no principal: the AIAA's only funding obligation was to provide "an initial account value," and the March 2023 amendment charged Britannica "financing expense on long exposure over First-Loss Member's capital account balance," which Topwater explained meant Britannica "would pay for all long financing over your current balance of approximately $970,000," so the represented $10,000,000 of committed trading capital financed nothing and Britannica's own capital account was the only equity in the account.

895. On that principal of zero, Defendants took fifty percent of every dollar of adjusted gains, one hundred percent of the interest and credit income owed to Britannica on its cash and short balances under the amended Appendix C and Defendants' written confirmations, which

Defendants kept anyway, and the financing charges extracted in March 2023 against a threshold Defendants had just lowered from $10,000,000 to Britannica's own capital account. Compensation taken for the use of capital that Defendants never advanced exceeds by any measure the twenty-five percent criminal usury threshold of New York Penal Law § 190.40, rendering the offending terms void ab initio under New York law, and the precise computation will be made from Defendants' ledgers with expert analysis.

896. The arrangement was a loan in substance, whatever its labels: the capital said to stand at risk bore no loss by Defendants' own mandate and never once absorbed one; Plaintiffs' money was held as collateral, called against Defendants' own line, and liquidated on Defendants' own declaration; and Defendants charged financing on the exposure. On that substance, the charges Defendants extracted, computed from the administrator's own ledgers against the sums genuinely at risk, exceed New York's criminal usury ceiling of twenty-five percent per annum. Under New York law such terms are void from the beginning, incapable of ratification by any performance, and unenforceable in principal or interest, and Plaintiffs seek their recharacterization, a declaration of voidness, and restitution of every amount paid under them, in the alternative to and without duplication of the relief sought elsewhere.

897. Defendants' own tax filings record the substance of the arrangement. The 2024 New Jersey Schedule NJK-1 Topwater Partners LLC issued to BC LLC reports BC LLC's profit sharing, loss sharing, and capital ownership at 0.000000 percent, in both the before-termination and end-of-year columns, for the member whose capital was the only equity in the accounts and bore every dollar of first loss. On information and belief, that reporting reflects the arrangement's true character as Defendants themselves booked it: Britannica's money held as collateral behind Defendants' economics, not a member's participating equity.

898.     The usury numerator sits in two ledgers Defendants control: the administrator's monthly financing-charge entries and Goldman Sachs' actual financing invoices to the account, and the spread between what Goldman charged and what Defendants collected from Britannica is itself compensation for forbearance that the rate computation counts.

899.     The 2022 year states the arithmetic in Defendants' own books: the administrator allocated the year's entire $683,163 loss to the first-loss layer while Defendants collected their monthly economics in full, and the effective annual cost of the arrangement to the only capital at risk, computed from those same statements, is a number the ledgers fix and the usury ceiling measures.

900.     Pleaded strictly in the alternative and without prejudice to Plaintiffs' primary claims, Plaintiffs seek a declaration under 28 U.S.C. §§ 2201 and 2202 that, upon recharacterization, the financing-charge provisions, the amendments imposing them, and the cross-default machinery those amendments carried are criminally usurious and void from inception; that no termination, allocation, charge, or forfeiture resting on the void terms is enforceable; that the parties' rights are governed by the preceding valid terms; and awarding such further relief, including restitution of amounts collected under void terms, as is just. This Count seeks declaratory and restitutionary relief and asserts usury as a shield against enforcement of the extracted terms, not as an independent damages claim, and it will not duplicate any other recovery.

## COUNT XXVII

**Rescission and Restitution Under Section 215(b) of the Investment Advisers Act, 15 U.S.C. § 80b-15(b), Pleaded in the Alternative**

*(By BCML and BC LLC Against LAM, Stonefly, Mayfly, Topwater Partners LLC, and the Feeder Fund)*

901. Plaintiffs reallege the factual allegations above to the extent relevant to this Count, including the lender-characterization, fiduciary, conflict, disclosure, fee, financing-charge, and waterfall allegations.

902. LAM is an investment adviser registered with the Securities and Exchange Commission and at all relevant times was subject to the Investment Advisers Act, including the anti-fraud provisions of Section 206. Acting as the registered adviser of the fund complex holding BC LLC's capital and as manager and interested Valuation Agent under the AIAAs, LAM employed devices, schemes, and artifices to defraud and engaged in transactions, practices, and courses of business that operated as a fraud or deceit in connection with the arrangements pleaded here: it concealed the interested-valuation conflict, the affiliated-capital concentration, the broker reciprocity economics, and the true monitoring architecture; it withheld the governing documents until after execution; it extracted amendments through the coercion pleaded in Count XX; and it deployed the Section 11(b) hedge clause to immunize that self-dealing. And it administered its clients' accounts through false accounts engineered at the source: it retained, paid, and instructed the administrator, and either withheld from it the operative instruments or delivered superseded and incorrect ones, as pleaded in this Complaint, so that every statement rendered to Plaintiffs was computed on the adviser's chosen rules rather than on the instruments the parties executed, a continuing practice and course of business operating as a fraud or deceit within Section 206 and running through the making and performance of every instrument this Count voids.

903. This Count is timely, and the rescission election was prompt. The facts establishing that the contracts were made and their performance carried on in violation of the Advisers Act sat in Defendants' own operations and filings and behind their representations.

Plaintiffs discovered them through the post-seizure record beginning no earlier than August 5, 2024 and through the July 2026 analysis of Defendants' regulatory filings pleaded in this Complaint, elected rescission upon that discovery, and commenced this action promptly thereafter, in August 2026.

904.    Under Section 215(a) of the Advisers Act, any condition, stipulation, or provision binding any person to waive compliance with any provision of the Act or its rules is void, and Sections 11(b) and 13(f) are void to the extent they purport to waive LAM's compliance with its fiduciary and anti-fraud obligations under the Act. Under Section 215(b) of the Advisers Act, every contract whose making or performance involves the violation of the Act, or the continuance of any relationship or practice violating the Act, is void as regards the rights of the violator and of any non-party who acquired rights with actual knowledge of the facts constituting the violation. The AIAAs, the amendments, and the arrangements through which LAM and the fund parties took Britannica's fees, financing charges, and extracted economics were made and performed through the violations pleaded above, and as against Plaintiffs those parties acquire no rights under them, including no rights under Section 11(b) or Section 13(f). BCML invokes Section 215(b) as a direct party to each Advisory Agreement with LAM whose making and performance involved the violations; BC LLC invokes it as the purchaser whose subscription and first-loss interests were solicited, documented, and administered by LAM as the registered adviser operating the program, and whose Subscription Agreement and account instruments were instruments of the same violations. LAM's own Form ADV brochure, filed with the Securities and Exchange Commission in every year of the relationship from 2021 through 2025, further asserted that "[b]y acquiring interests/shares in the Funds, each investor will be deemed to have acknowledged the existence of any such actual and potential conflicts of interest, and to have

350

waived any claim with respect to any liability arising from the existence of any such conflicts of interest," a blanket deemed waiver of conflict claims asserted by a registered adviser in its own regulator filing, void as a condition and stipulation under Section 215(a), and itself among the conditions and provisions whose voidness this Count establishes.

905.    The filings that concealed the economics have signatories: LAM's Forms ADV for 2021 through 2026 each carry an executing signatory and a designated chief compliance officer on their face, and, on information and belief, the drafting and review of the fee, brokerage, conflicts, and deemed-waiver items ran through those signatories and the compliance personnel the filings name, whose identities the filed documents themselves state.

906.    LAM's own ADV fee disclosures omit the compensation this Complaint pleads it took: on information and belief, the brochures' fee and compensation items nowhere disclose the financing-rate spread, the retention of account credit and interest income, or the platform's revenue economics on the imposed broker, streams LAM collected while its filed disclosures described only the stated advisory economics.

907.    The brochures' brokerage item conceals the reciprocity: on information and belief, LAM's ADV brokerage-practices disclosures never disclosed that the platform conditioned the account on executing every trade through Goldman Sachs, or the revenue-factor economics of that mandate, while the mandate itself sat in Defendants' own July 22, 2021 writing.

908.    No offering or regulatory document disclosed the execution mandate: on information and belief, neither the offering materials delivered to BC LLC nor LAM's filed brochures disclosed that account approval was conditioned on every trade executing through Goldman Sachs, and the condition lived only in the July 22, 2021 correspondence until this Complaint pleaded it.

351

909.    LAM's ADV custody and affiliation answers will state the structure the counts recharacterize: on information and belief, the filed Part 1 responses on custody, related broker-dealers, and other business activities describe the very custody, control, and affiliation architecture whose unregistered operation Count XXVIII pleads, in LAM's own regulator answers.

910.    The administrator's own regulatory posture makes the instruction file a regulated record: UMB Fund Services operates under books-and-records obligations of its own, and, on information and belief, the instructions LAM delivered to it for the Britannica accounts, and any UMB compliance notes about them, are preserved in UMB's regulated files independent of Defendants' productions.

911.    Pleaded strictly in the alternative and with election of remedies reserved, Plaintiffs seek rescission of the tainted instruments and provisions to the extent of the violations and restitution of the consideration Defendants received under them, including management and performance economics, financing charges, and other extracted amounts, with prejudgment interest, without duplication of any other recovery and without surrendering the payment, crediting, confidentiality, accounting, and indemnification obligations Defendants separately undertook and breached. The violating practices continued through the final administration and closeout acts of 2024; the voidness of the instruments, of Sections 11(b) and 13(f), and of the deemed-waiver condition is asserted defensively as well, against every right and protection Defendants claim under them; and prejudgment interest runs on each restitution amount from the date Defendants received it.

## COUNT XXVIII

**Rescission and Restitution Under Section 29(b) of the Exchange Act, 15 U.S.C. § 78cc(b), Pleaded in the Alternative**

*(By BC LLC and BCML Against LAM, Stonefly, Mayfly, Topwater Partners LLC, and the Feeder Fund)*

912.    Plaintiffs reallege the factual allegations above and Counts I and IX to the extent relevant to this Count, including the amendment and coercion allegations.

913.    Under Section 29(b) of the Exchange Act, every contract made in violation of any provision of the Act or any rule thereunder, and every contract the performance of which involves such a violation, is void as regards the rights of the violator and of any person who acquired rights thereunder with actual knowledge of the facts by reason of which its making or performance was in violation.

914.    The Subscription Agreement, the AIAAs, and the amendments were made in violation of Section 10(b) and Rule 10b-5: each instrument was itself the object and product of the misrepresentations, half-truths, and deceptive acts pleaded in Count I, made to obtain BC LLC's purchases and Britannica's commitments, so that the making of each contract was inseparable from the violation. In the alternative, and only upon the recharacterization pleaded in Count XXVI, the performance of the contracts involved violations of Section 15(a): on the arrangement's substance, LAM engaged in the business of effecting securities transactions for the account of another and extending credit against securities positions, through custody and control of the entrusted property, imposition and intermediation of the executing broker, extension and pricing of the buying power, transaction-linked compensation through the monthly gains split, and unilateral margin, valuation, and liquidation authority, all without broker-dealer registration; and on the same substance LAM accepted money to margin commodity-interest trades that Britannica directed without futures-commission-merchant registration and without the segregation the Commodity Exchange Act requires, pooling the collateral with other managers'

353

positions. The registration, order-flow, credit, and account records confirming that conduct are controlled by Defendants and the regulators.

915.   This Count is timely, and the rescission election was prompt. The facts establishing that each instrument was made in violation of the Exchange Act and that its performance involved those violations, including the unregistered brokerage and lending business pleaded in this Complaint, were concealed within Defendants' internal economics, instructions, and records. Plaintiffs discovered them no earlier than August 5, 2024, through the seizure-era record, the administrator's autumn 2024 accounting, and the July 2026 analysis of Defendants' regulatory filings pleaded above, and elected rescission upon that discovery by their demands and by this action, commenced in August 2026.

916.   The contract parties named in this Count are the violators or acquired their rights with actual knowledge of the facts constituting the violations, through the LAM personnel whose knowledge and conduct are attributed to each as pleaded above.

917.   The 2022 sanctions negate good faith at the top: in September 2022, in the middle of the relationship, the Commission and the CFTC sanctioned Jefferies LLC $80 million in admitted recordkeeping actions within the $280 million pleaded family.

918.   The registered broker-dealer stood one door away: Jefferies LLC, the complex's own registered broker-dealer, performed none of the brokerage functions the unregistered entities performed on Plaintiffs' accounts, and, on information and belief, was never engaged for them, a structural choice that kept the regulated entity clean while the unregulated affiliates ran the regulated business.

919.   The regulators' own files identify the pool's trading: on information and belief, the funds' large-trader and position reports filed with the CFTC identify the commodity-interest

354

positions, venues, and clearing members for the periods at issue, filings Defendants made and control copies of.

920.    The buying power was the broker's, not Defendants': on information and belief, the margin capacity Defendants held out as their committed capital was, at Interactive Brokers, nothing but IB's own published portfolio-margin methodology applied to the positions, capacity any account of that size receives from the broker directly, for which Defendants charged as if it were their own advance.

921.    Pleaded strictly in the alternative and with election reserved, Plaintiffs seek a declaration of voidness as against Defendants, rescission of the tainted instruments and provisions to the extent of the violations, and restitution of the consideration Defendants received under them, with prejudgment interest, without duplication of any other recovery, and without surrendering the payment, crediting, confidentiality, accounting, and indemnification obligations Defendants separately undertook and breached. The performance violations pleaded in the alternative continued through the custody, liquidation, and closeout acts that ended September 26, 2024. The voidness this Count establishes is also asserted defensively, as a bar to any right, defense, or protection Defendants claim under the tainted instruments and provisions, in this action and elsewhere, and Plaintiffs are entitled to prejudgment interest on each restitution amount from the date Defendants received it.

922.    The contracts Plaintiffs elect to avoid were not incidentally connected to Defendants' unregistered brokerage and lending operation; their performance was that operation. The instruments established the interposition on every trade and the transaction-based economics; the custody of Plaintiffs' capital and the margin extended against it; the mandated execution venue; the instrument permissions; and the self-valued collateral and liquidation

355

regime. Each function is one the law reserves to registered broker-dealers and licensed lenders, and each was performed, continuously, by entities holding neither status. Contracts whose performance involves those violations are void as regards the rights of the violators, and Plaintiffs elect to avoid them and to recover what was taken under them.

## COUNT XXIX

**Fraudulent Accounting and Failure to Account**

*(By BC LLC and BCML Against LAM, Topwater Partners LLC, Stonefly, Mayfly, and the Cayman Master Fund, with the accounting misrepresentations attributed to LAM through Damm and Long)*

923.    Plaintiffs reallege the factual allegations above to the extent relevant to this Count, including the cash-credit, accounting, withholding, and termination allegations.

924.    Defendants held the entire accounting function for Plaintiffs' capital and accounts: the daily books, the Capital Account computations, the fee waterfall, the credit and financing calculations, and the engagement and supervision of the third-party administrator. Defendants represented, in the solicitation and throughout the relationship, that an independent third-party administrator performed the platform's valuation and accounting and that annual audited financial statements verified it.

925.    The represented accounting did not exist, and the accounting documents Defendants did supply were false accounts. The monthly administrator statements ran a few summary lines, contained no daily books, no per-trade commission or charge breakdown, no reconciled trade breaks, and no credit or interest computation, and were presented to Plaintiffs as true and complete accounts of their capital. They were not: they fell short of Britannica's own calculations month after month, by more than $70,000 in a single month per Britannica's January 26, 2024 written report to Long, and they omitted the credits and interest Defendants had

356

admitted owing, amounts far exceeding those shortfalls. When Britannica's Chief Compliance Officer requested a day-by-day profit-and-loss report in writing on January 26, 2024, Long refused it in writing on January 29, 2024: "After speaking with Dave, we are unfortunately unable to provide daily reports." In one sentence, Damm and Long together refused the most basic record any honest steward of other people's money keeps.

926.    The false accounts were engineered at the source. As pleaded in this Complaint, Defendants retained and paid the administrator, controlled the methods, inputs, instruments, and instructions it applied, and, on information and belief, either withheld the operative instruments from it, including Appendix C as amended, or delivered superseded or incorrect instructions in their place, so that every statement rendered to Plaintiffs was computed on Defendants' chosen rules rather than on the instruments the parties executed. A statement presented to the victim as an independent third party's true account, computed on instructions its presenters knew were false or incomplete, is a false account by the presenters, and Damm's April 16, 2024 recital of a superseded exclusion is the instruction caught in writing, in operation.

927.    The arithmetic of Defendants' own claimed loss convicts the accounting. For the same account, the same morning, and the same event, Defendants produced three irreconcilable Stonefly figures: $907,166 on the retrospective screenshot, approximately $683,000 in O'Hara's later writing, and $637,793 on the administrator's ordinary-course book. Federal law required LAM, a registered investment adviser and commodity pool operator, to make and keep true, accurate, and current books and records of exactly these determinations. Three unreconciled versions of one number are the signature of accounts constructed to justify a decision already made, and each version was used where it served: the largest to declare the termination, the ordinary-course book to close the year, and none to pay Britannica.

357

928.    The refusal to account is the accounting fraud's confession. Federal law and Defendants' own agreements obligated them to maintain and produce the records behind every determination they enforced: the native valuation files, the source calculations, the allocation bridge, the credit computations, and the rate, amount, and destination of every withheld dollar. Despite written demand after written demand, Defendants have produced none of it, for any period, in any form. A fiduciary that seizes its beneficiary's capital on numbers it refuses to show is not withholding paperwork; it is withholding the proof that the numbers were false, and the true records either never existed or condemn Defendants.

929.    Defendants made those false accounts and refusals knowingly, to conceal the extraction pleaded in this Complaint: the withheld interest and credits, the commission overcharges, the financing extractions, and the true state of the capital and margin actually held behind the accounts, including on August 5, 2024. Plaintiffs relied on the false accounts by continuing the relationship, executing amendments, accepting statements, and forbearing from the legal action they would have taken had the true accounting been shown.

930.    No accounting has ever been rendered. Not at termination, not with the September 26, 2024 partial return, not in response to the August and December 2024 written demands, and not since. The final accounting Defendants owe remains unperformed nearly two years after they seized the accounts.

931.    Plaintiffs seek damages for the amounts concealed and extracted through the false accounting, and, together with Count XIII, a full accounting, line by line and day by day, of both accounts for all years, including: the complete daily books; the per-trade electronic breakdown of every commission, fee, financing charge, borrow cost, and credit; the reconciliation of every trade break; the administrator's and auditors' underlying workpapers; and the custody, margin,

and cash records of the imposed custodian, Goldman Sachs, and of Interactive Brokers, sufficient to establish the capital and margin actually held on August 5, 2024. Punitive damages are sought for the knowing presentation of false accounts.

## COUNT XXX

**Promissory Estoppel: the Committed-Capital Promise**

*(By BC LLC and BCML Against LAM and Topwater Partners LLC; in the Alternative to Counts I, IV, V, VII, and IX)*

932.    BC LLC and BCML reallege the allegations relevant to this Count. This Count is pleaded strictly in the alternative to the contract and fraud claims and applies only if Defendants contend, or the Court determines, that the written agreements did not require Defendants to provide and maintain the actual usable committed capital Defendants represented would stand behind Britannica's accounts.

933.    Before BC LLC purchased its First-Loss Interest, Borgia, Wieczorek, and other Topwater and LAM personnel made a clear and repeated promise that Britannica would contribute approximately ten percent of the account capital, would bear the first-loss risk on that capital, and that Defendants would provide the remaining approximately ninety percent as real committed trading capital, without charging Britannica a cost of capital. Defendants contrasted their offering with competitors that charged for capital and represented that Topwater's provision of committed capital without such a charge was a defining advantage of its platform. The Account Adviser Overview, term sheet, solicitation communications, and AIAA Section 1(a), which stated that the Trading Master Fund "shall provide" the stated Investment Account Value, confirmed the promise in writing.

934.    Defendants repeatedly renewed the promise. They stated an initial Investment Account Value of $10 million, later increased the stated value to $25 million, and in July 2024

359

executed the Mayfly structure with a $15 million stated Investment Account Value while continuing the remaining Stonefly account. Those renewals represented actual usable trading capacity committed behind Britannica's strategy, not merely a notional exposure ceiling, internal bookkeeping designation, discretionary margin allowance, or revocable share of an undisclosed pooled facility.

935. Defendants intended and reasonably foresaw Plaintiffs' reliance. BC LLC invested and maintained its first-loss capital, contributed an additional $500,000 in April 2022, ultimately committed $2.5 million across the accounts, and accepted one hundred percent of the first-loss risk. BCML devoted years and millions of dollars to personnel, proprietary algorithms, Goldman Sachs and SpiderRock integration, Interactive Brokers integration, APIs, market data, portfolio and order-management systems, compliance infrastructure, testing, and strategy deployment. Plaintiffs disclosed proprietary strategies and positions, generated substantial trading flow for Defendants' selected brokers, and forewent the lengthy process of locating and onboarding with a replacement first-loss platform.

936. Defendants accepted every benefit of that reliance, including Plaintiffs' capital, trading strategies, personnel, infrastructure, order flow, commissions, and fifty percent of account gains, while failing to provide and maintain the real committed capital they had promised and later charging financing on the resulting borrowed exposure. If the written agreements are held not to require actual committed capital, injustice can be avoided only by enforcing the promise or awarding the losses caused by Plaintiffs' reliance. Plaintiffs seek their capital and infrastructure expenditures, incremental financing and execution costs, lost fee economics and deployment opportunities attributable to the promised capacity, impairment of their track record and enterprise value, and the value of the promised performance to the extent

permitted, without seeking payment of the stated Investment Account Value itself as principal and without duplicate recovery.

## COUNT XXXI

**Violation of the Connecticut Uniform Securities Act, Conn. Gen. Stat. § 36b-29**

*(By BC LLC Against LAM, Topwater Partners LLC, Goldman Sachs, Jefferies, Borgia, Wieczorek, Damm, O'Hara, Taylor, Rubin, Eck, Tran, Backer, Robinson, Richard Handler, Brian P. Friedman, and Daraviras)*

937.    BC LLC realleges the allegations relevant to this Count, including the statements, omissions, purchases, and control allegations pleaded in Counts I and II and the paragraphs on which they rest. This Count is pleaded in addition to Counts I and II, and overlapping recoveries are alternatives, with election reserved.

938.    Defendants offered and sold the First-Loss Interests from and into Connecticut. The Topwater division that solicited, structured, priced, papered, and administered the Interests ran its entire operation from a single office in Norwalk, Connecticut; Taylor directed that operation from Connecticut, where he resided; and Defendants' own final Schedule K-1 records BC LLC at its Connecticut offices. The solicitation calls, written negotiations, subscription communications, and account communications pleaded in this Complaint issued from and were directed to those places.

939.    Defendants sold the Interests, and materially assisted the persons who sold them, by means of the untrue statements of material fact and the omissions of material fact pleaded in Count I, each incorporated here with its speaker, its date, and the record that contradicts it. Each Defendant named in this Count either made those statements and omissions or materially assisted the persons who did, through the solicitation, steering, structuring, execution, and administration conduct personally pleaded as to that Defendant, and each knew or in the exercise of reasonable

361

care should have known of the untruths and omissions. BC LLC did not know of the untruths or omissions and in the exercise of reasonable care could not have known of them, because the concealed facts lived only in the books, ledgers, committee records, and communications Defendants controlled, as pleaded in Count I. Under Section 36b-29(i), every condition, stipulation, or provision that would bind BC LLC to waive compliance with the Act, including the integration, sole-reliance, exculpation, and limitation clauses in the instruments Defendants drafted, is void.

940.    The purchases this Count reaches are the purchases pleaded in Count I: BC LLC's initial purchase of the First-Loss Interest, accepted by Topwater's own written receipt of November 19, 2021 and fully executed on December 9, 2021; the September 22, 2023 increase; and the July 2024 Mayfly transaction, an exchange and material reconfiguration of the Interest on materially different account, risk, return, broker, and cross-default terms. Defendants obtained each purchase by means of the untrue statements and omissions then standing and then renewed, as pleaded in Count I.

941.    Section 36b-29(c) makes every person who directly or indirectly controls a person liable under subsection (a), every partner, officer, or director of such a person, every person occupying a similar status or performing similar functions, every employee who materially aids the acts constituting the violation, and every broker-dealer or agent who materially aids those acts, jointly and severally liable with and to the same extent as the liable person. Jefferies controlled LAM, Topwater Partners LLC, and the Division through the parent-level authority, committee machinery, and decision-making pleaded in Count II, including the August 5, 2024 decision O'Hara attributed to the parent company and its affiliates. Handler, Friedman, and Daraviras each held the committee seats, offices, and directive authority pleaded in Count II and

in their party paragraphs, and each occupied the status and performed the functions of an officer, director, or controlling person of the liable persons. Borgia, Wieczorek, Damm, O'Hara, Taylor, and Rubin were officers of the liable entities and materially aided the acts constituting the violations through the conduct personally pleaded as to each. Goldman Sachs, a broker-dealer, materially aided those acts through the steering, coverage, pricing, and execution conduct personally pleaded as to it. The statute places on each such person the burden of proving that the person did not know, and in the exercise of reasonable care could not have known, of the facts on which liability rests, and no Defendant can carry that burden on the facts pleaded in this Complaint.

942.    This Count arises out of intentional misrepresentation and fraud in the purchase and sale of securities. It is brought within the period Section 36b-29(f) fixes: within two years of the discovery pleaded in this Complaint, which occurred no earlier than August 5, 2024, and within five years of the misrepresentations and fraud on which it rests, including the renewed and continuing misrepresentations Defendants issued in writing through 2022, 2023, and 2024.

943.    BC LLC seeks every remedy Section 36b-29 provides, including recovery of the consideration paid for the Interests together with interest at eight per cent per year from the date of each payment, costs, and reasonable attorneys' fees, less the amount of any income received on the Interests. BC LLC no longer owns the Interest, because Defendants themselves extinguished it on August 5, 2024, so the damages measure applies; to the extent any Interest is deemed still held, BC LLC tenders it, and under Section 36b-29(d) that tender may be made at any time before entry of judgment. BC LLC seeks this recovery together with the further relief pleaded in the Prayer, without double recovery.

## DAMAGES

363

944.    Plaintiffs seek the following separate damages and remedy channels, in amounts to be proved, with all overlapping measures pleaded in the alternative and election reserved until judgment. Evidently, Britannica's strategy was highly successful. BCML had a profitable administrator-recorded 2023 record; Defendants barred operation of the strategy and forced positions closed.

945.    The theft can be stated as a ledger. Britannica Capital LLC purchased the First-Loss Interest under a subscription agreement executed and accepted in the United States, and what Defendants took, and what they owe, is this. They kept $1,967,289.05 of the $2,500,000 Britannica committed as its first-loss layer, after their own books forced them to disgorge $532,710.95 on September 26, 2024. They kept the income Britannica was owed on its cash and on the credit balances generated by its securities sold short, under Appendix C as amended and Defendants' written confirmations: for years the accounts carried balances reaching into the millions of dollars, Defendants confirmed in writing that the income on those balances would be calculated and credited, and they credited nothing and kept it all. They owe the returns on the trading capital they promised and never provided, at the rates pleaded in this Complaint. They must disgorge the improper and above-market commissions extracted through the broker they imposed. They owe the cost of everything Britannica built for their platform: the algorithms reprogrammed for Defendants' brokers, the portfolio and order management systems integrated at Britannica's expense, and the staff who built and ran the accounts for years. They owe the value of the business their conduct destroyed, a performing manager stopped at the point of institutional scale. And they hold the confidential trading strategies and systems Britannica spent more than two decades building, property whose market value is pleaded in the damages allegations below, property they keep without permission, license, or any right from its owner.

946.    Britannica's damages include, for each income stream Defendants took or destroyed, including the credit-interest and short-balance income, the fee amounts charged beyond the agreed fifty percent, and the earnings of the Accounts Defendants terminated, the present value of the difference between what Britannica's instruments and performance entitled it to receive and what Defendants' conduct left it, computed by standard present-value methods and established through expert analysis of Defendants' own records.

947.    Each period's unpaid amount carries its own date: the credits accrued month end by month end, the fees underpaid month by month, the capital seized August 5 through 7, the final fee due October 31, 2024, and interest runs from each date under the schedule Plaintiffs will maintain.

948.    No contractual limitation shields the recoveries sought in this section or anywhere in this Complaint.

949.    (a) **Retained or unreturned property.** BC LLC seeks return of the portion of its $2,500,000 first-loss capital that Defendants did not return. Defendants returned $532,710.95 on September 26, 2024, leaving $1,967,289.05 not returned. The return is powerful evidence that capital remained and supports Plaintiffs' primary allegation that no valid contractual stop-out occurred in either account at any time. To the extent Defendants contend that any part of the $1,967,289.05 was consumed by validly allocable trading loss, Plaintiffs plead the return-of-property and allocated-loss channels in the alternative, not cumulatively. The property, accounting, restitution, and fiduciary channels are asserted against an entity to the extent it received, controlled, allocated, retained, or directly benefited from the identified property. The Cayman Master Fund is reached for its own receipt, control, and retention of Plaintiffs' property, as pleaded above, not as a party to either AIAA or the Subscription Agreement.

365

950.    (a-1) **Withheld contractual capacity.** BCML and, to the extent of its distinct property interest, BC LLC seek the losses caused by Defendants' failure to provide and maintain the committed Investment Account Value as usable trading capacity throughout the contract relationship. The agreements committed a stated $10,000,000 and ultimately $25,000,000 Investment Account Value against Britannica's first-loss capital; Defendants instead supplied pooled shared margin that failed on July 15, 2024 in a newly executed $15,000,000 account, rationed capacity by undisclosed criteria, and denied the instruments that would have made the committed capacity usable at reasonable cost. The recoverable measures include lost fee economics on the capacity committed but not provided, lost deployment opportunity for the approved strategy, incremental execution and financing costs of operating without the promised support, reliance expenditures made on the strength of the commitment, and the resulting impairment of the track record and enterprise value, each proved from the contractual terms, the account and margin records, actual performance, and expert analysis. The loss pleaded is the loss the withholding caused, not the committed Investment Account Value itself as a direct cash payment, in the alternative to overlapping damages categories pleaded above and without double recovery. The foregone returns on the committed-but-undelivered $10,000,000 and $25,000,000 Investment Account Value are measured at the higher of New York's statutory nine percent or the rates Britannica's strategy demonstrably generated net of the inflated commissions and charges Defendants imposed.

951.    (b) **Allocated trading and liquidation losses.** BC LLC seeks losses wrongfully allocated through the invalid stop-out, the one-hour fire-sale schedule, the prohibition on protective trading, the refusal of capital and escalation, unreliable pricing, and self-interested valuation. Proof will compare actual fills and allocations with supported but-for liquidation,

366

hedging, and hold-to-expiry paths using native order, quote, position, and market data. This channel runs principally against Stonefly, Mayfly, LAM, and those who aided the fiduciary, fraud, contract, conversion, CEA, and interference violations. It is alternative to subparagraph (a) for the same dollars.

952.    (c) **Avoided losses and shifted risk.** Plaintiffs seek restitution or disgorgement of losses and capital exposure that Defendants, their affiliated Regular Members, or other beneficiaries avoided by placing losses against BC LLC's first-loss layer, forcing the liquidation, and withholding credits that would have increased account equity. This is a defendant-gain measure under the fiduciary, accounting, unjust-enrichment, and trade-secret counts, not a duplicate compensatory award.

953.    (d) **Withheld credit income, interest, rebates, and related cash.** BC LLC and, to the extent of its contractual or business entitlement, BCML seek all unpaid income generated by positive cash and short-sale balances, including the credit to be calculated on the $7,500,000 Mayfly balance confirmed on July 31, 2024, plus any Stonefly net-credit commitment, short-balance income, rebates, and statutory or contractual interest. The $7,500,000 is the balance on which the credit was to be calculated, not the credit amount. The amount, rate, payor, recipient, and destination are within LAM's, the funds', the administrator's, and Goldman Sachs' records. BCML also seeks the Account Adviser Fee shortfall caused in every month in which Defendants excluded the credits from the Investment Gains base, and the accrued unpaid fee that Section 7(b) of each Advisory Agreement made finally due no later than October 31, 2024, with interest from each underpayment.

954.    (e) **Excessive or undisclosed charges.** BC LLC seeks financing charges, commissions, give-up charges, stock-borrow charges, data or vendor charges, and other costs

that were unauthorized, excessive, undisclosed, misallocated, or imposed through duress or fraud. BCML seeks charges it paid as reliance expenditures where the same item was not borne by BC LLC. The principal carriers are the contract, fraud, promissory-estoppel, duress, accounting, unjust-enrichment, fiduciary, and aiding counts.

955.    (f) **Unjust enrichment and disgorgement.** Plaintiffs seek the net profits, fees, interest, revenue shares, commissions, avoided costs, and other benefits caused by fiduciary breach, unjust enrichment, unfair competition, or trade-secret use, to the extent not included in compensatory damages. Recipient-specific proof will be obtained from LAM, fund, Jefferies, Goldman Sachs, administrator, and affiliate ledgers.

956.    (g) **Reliance expenditures.** BCML seeks the team, systems, software, data, broker integration, legal, compliance, vendor, operating, and strategy-restructuring expenditures made in reasonable reliance on Defendants' platform, credit, capital-support, confidentiality, and continuation representations, less any amount already recovered through another measure. BC LLC seeks capital or transaction expenditures it made in reliance on the same conduct. The reliance expenditures include the documented, recurring six- to seven-figure annual technology and integration costs of building and operating the intraday reporting, broker integration, and required systems that Defendants had represented as already in place, costs charged in economic effect against Britannica's first-loss capital and imposing a burden of ten to twenty-five percent a year on that capital before Britannica earned its first dollar.

957.    (h) **Lost profits and enterprise value.** BCML seeks the lost management and performance economics and the lost going-concern or enterprise value proximately caused by the interference, fiduciary breaches, and wrongful destruction of the live track record and platform. The proof will use actual historical performance, the December 2023 UMB results, actual fee

terms, the documented expansion and broker pipeline, frozen strategy rules, instrument-level native data, capacity and cost evidence, and probability-adjusted expert analysis. Interim lost profits and terminal enterprise value will be presented as alternatives or with the interim period carved out to prevent overlap.

958.    (h-1) **Business opportunity and replacement value.** BCML seeks, as nonduplicative evidence of reliance, lost opportunity, and enterprise value, the reasonable cost of rebuilding the personnel, technology, data, broker integrations, compliance infrastructure, and operating continuity that Defendants disrupted. The measure will be based on invoices, payroll, contracts, historical expenditures, market compensation evidence, and expert analysis. Final quantification of each component will be established through Britannica's records, market evidence, and expert analysis.

959.    (h-2) **Market value of the misappropriated strategy.** The trade secrets Defendants took and kept are assets of a class the market values at extraordinary levels. A proven quantitative options strategy with a documented live record is among the scarcest and most valuable assets in the financial industry: it is the product of years of research and live refinement, it cannot be replicated from public information, and at institutional scale it generates recurring profits that dwarf its cost of creation. The point is not theoretical. In April 2024, Jane Street Group sued Millennium Management in this District to protect a single proprietary options trading strategy as a trade secret, and it emerged at a court hearing in that action that the one strategy had generated approximately $1,000,000,000 of profit for Jane Street in 2023 alone. Britannica's strategy is an asset of that class: an options strategy proven over more than two decades and through the accounts at issue, documented by Defendants' own third-party administrator at 88.02 percent net performance on the first-loss capital account in 2023, built for

the deepest and most liquid options markets in the world, and demonstrably scalable, as Britannica's written scaling proposals and Defendants' own expansion of the accounts from $10,000,000 to $25,000,000 of stated Investment Account Value confirm. Misappropriation of this class of asset destroys value in a second way as well: a trading strategy's worth lies in its exclusivity, and every use, disclosure, or retention outside its owner's control permanently dilutes the edge it embodies. The same Jane Street proceeding demonstrated that too: Jane Street represented to the court that its profits from the strategy fell approximately fifty percent once the departed traders ran it at a competitor. Plaintiffs accordingly seek, as an independent component of actual loss, the diminution in the value of Britannica's trade secrets caused by Defendants' unauthorized retention, use, and, on information and belief, dissemination within and beyond the Jefferies organization, including the loss of exclusivity, the erosion of the strategy's competitive edge in the markets it trades, and the impairment of Britannica's ability to license, deploy, or monetize the strategy at its undiluted value, measured through expert analysis and discovery of every recipient and use. On the basis of that market evidence, the strategy's demonstrated and administrator-documented economics and scalability, and Defendants' retention and, on information and belief, continued use of the strategy and systems pleaded above, Plaintiffs believe that the value of the misappropriated trade secrets, measured by Defendants' unjust enrichment or a reasonable royalty and established through expert analysis and discovery of Defendants' use, reaches or exceeds $1,000,000,000 before the statutory doubling available for willful and malicious misappropriation, and Plaintiffs plead damages in an amount to be established at trial.

960.     The Britannica Trade Secrets are assets of extraordinary commercial value. Proprietary quantitative and options strategies with demonstrated performance are among the

370

rarest and most valuable assets in the financial industry because they may be deployed repeatedly and at institutional scale across deep and liquid markets while their value depends substantially on continued secrecy and exclusivity.

961.    The Britannica Trade Secrets embody more than two decades of research, development, trading, testing, refinement, and investment; thousands of pages of models, calculations, and specifications; firsthand investigation across more than eighty-five countries; extensive technology, data, personnel, travel, and operating expenditures; and a distinctive combination of global-macro intelligence, quantitative methods, derivatives expertise, financing architecture, market-neutral construction, and dynamic risk management.

962.    The commercial value is demonstrated by Plaintiffs' actual record and Defendants' own conduct. Defendants' administrator recorded an approximately 88.02 percent net return on Britannica's first-loss risk capital in 2023 despite excessive constraints and commissions placed by Defendants. Defendants expanded the stated Investment Account Value from $10 million to $25 million. The strategies operated in highly liquid United States and global markets and were capable of further institutional scaling. Defendants recognized that Britannica was uniquely market-neutral on their platform and knew on August 5, 2024 that continued operation during the market dislocation was expected to generate substantial profits.

963.    Publicly litigated disputes involving individual proprietary quantitative options strategies confirm that successful strategies of this class may generate annual profits and enterprise value measured in hundreds of millions or billions of dollars. Plaintiffs' damages will be established from Britannica's own demonstrated performance, capacity, economic life, market opportunities, and the scope of Defendants' actual use, rather than from development cost alone.

964.    Plaintiffs' actual-loss measures include the loss and diminution of the secrets' value and exclusivity; impairment of Plaintiffs' competitive position; lost deployment, trading, licensing, capital-raising, and institutional-business opportunities; lost advisory and performance economics; lost profits over the appropriate economic-life and head-start periods; and loss of enterprise value caused by Defendants' destruction of the business through which the secrets were deployed.

965.    Defendants' unjust enrichment under the DTSA, to the extent not addressed in computing actual loss and causally attributable to actual misappropriation, includes profits, increased revenues, avoided losses, improved risk and valuation results, trading and counterparty benefits, platform-wide application, contract and constraint improvements, commercial head start, and research, testing, technology, staffing, and operating expenditures Defendants avoided through use of Plaintiffs' work.

966.    In the alternative, Plaintiffs seek a reasonable royalty based on a hypothetical arm's-length license negotiated before the first unauthorized disclosure or use. Relevant factors include the exceptional confidentiality and competitive sensitivity of the information; the duration and breadth of use; the number of recipients, systems, accounts, managers, contracts, and trades affected; the strategy's demonstrated performance and capacity; the absence of any voluntary license; Plaintiffs' need to preserve exclusivity; Defendants' anticipated profits, savings, and commercial benefits; and the competitive harm caused by disclosure.

967.    Based on the demonstrated performance, scalability, economic life, global market capacity, loss of exclusivity, impairment of Plaintiffs' business, potential platform-wide use, and the alternative damages and royalty measures pleaded above, Gupta and BCML presently believe that the value of the misappropriated Britannica Trade Secrets and the damages caused by their

unauthorized disclosure and use reach or exceed $1,000,000,000 before statutory enhancement. The precise amount will be established through expert analysis and discovery of Defendants' recipients, model changes, downstream uses, derivative materials, contracts, accounts, trades, revenues, profits, savings, avoided losses, and other benefits.

968.    Gupta and BCML seek actual damages and nonduplicative unjust enrichment or, in the alternative, a reasonable royalty under the DTSA, together with exemplary damages of up to twice the qualifying damages and reasonable attorneys' fees for willful and malicious misappropriation. Under the New York claims, Plaintiffs seek their own compensatory losses, diminution in value, lost profits and opportunities, punitive damages where permitted, and equitable relief, without duplicate recovery.

969.    (i) **Statutory multiplication.** Plaintiffs seek treble damages only for qualifying non-securities business-or-property injuries under 18 U.S.C. § 1964(c), and exemplary damages up to twice the qualifying trade-secret damages under 18 U.S.C. § 1836(b)(3)(C). BC LLC seeks actual damages only under the CEA count. No multiplied award will be stacked on the same injury twice.

970.     (j) **Punitive damages.** Plaintiffs seek punitive damages on the New York tort and unfair-competition claims because the pleaded conduct was willful, wanton, malicious, fraudulent, and undertaken in conscious disregard of Plaintiffs' rights, and, where required, formed part of platform practices affecting account advisers and investors beyond this single dispute. Any punitive award will be separated from and will not duplicate statutory exemplary damages.

971.    (k) **Contractual fees and indemnification.** BCML seeks the Losses, reasonable attorneys' fees, and court costs recoverable under AIAA § 11(a) after its final-judicial-

determination condition is met. Plaintiffs also seek fees and costs under the DTSA and RICO and any other applicable statute or contract.

972.    (l) **Interest and costs.** Plaintiffs seek prejudgment interest on contract, fraud, and property-deprivation awards from the earliest ascertainable date of each loss, including August 5 or September 26, 2024 as the proof establishes, at the New York statutory rate of nine percent per annum where CPLR §§ 5001 and 5004 apply; postjudgment interest under 28 U.S.C. § 1961; taxable costs; and all other recoverable litigation expenses. Nine percent on $1,967,289.05 is approximately $177,056 per year, but accrual date and entitlement are count- and loss-specific legal issues, and the Court should compute interest separately by loss date and category.

973.    Plaintiffs will maintain a category-by-category schedule identifying the claimant, defendant, count, causal act, source, and overlap. They seek no double recovery and reserve all elections until the Court determines liability and the available measures.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment:

A.    Awarding BC LLC direct and compensatory damages for retained or unreturned property, invalidly allocated trading and liquidation losses, withheld credits, interest and rebates, excessive or undisclosed charges, transaction and reliance expenditures, losses from withheld contractual capacity, and all other compensatory damages pleaded in this Complaint, in amounts determined at trial;

B.    Awarding BCML compensatory damages for reliance expenditures, accrued and unpaid Account Adviser Fees under Section 7 of each Advisory Agreement, including the fee due on every credit Defendants withheld from the Investment Gains computations, with interest from each fee's contractual due date, lost management and performance economics, lost profits

374

or enterprise value, lost broker and vendor value, loss of trade-secret value, and other business injury, with overlapping measures treated as alternatives, including, on the trade-secret misappropriation and business-destruction claims, damages in an amount to be proven at trial and believed to reach or exceed $1,000,000,000 before statutory enhancement, together with exemplary damages of two times that amount for willful and malicious misappropriation and attorneys' fees under the Defend Trade Secrets Act;

C.      Ordering return of identifiable property and imposing restitution, disgorgement, a constructive trust, or an equitable lien, as appropriate, over capital, credits, fees, interest, commissions, revenue shares, avoided losses, unjust enrichment, and other benefits wrongfully obtained by each Defendant, without duplicate recovery;

D.      Ordering the accounting demanded in Counts XIII and XXIX, including a transaction-level and recipient-level account of valuation, capital, allocations, liquidation, credits, charges, fees, rebates, interest, and all related benefits;

E.      Declaring that no valid contractual stop-out occurred in either account at any time; declaring voidable and unenforceable as products of economic duress the terms challenged in Count XX, including the financing-expense term, the cross-default provisions, the invented high-water redemption condition, and every further term, charge, or restriction obtained by the same pressure; and awarding restitution of all amounts paid or withheld under each voided term, with prejudgment interest from the date of each payment or withholding;

F.      Declaring that AIAA § 11(b) does not bar direct losses, return of property, an accounting, restitution, statutory relief, declaratory relief, or injunctive relief and, in the alternative, declaring the challenged limitations and waivers voidable or unenforceable against losses caused by the pleaded fraudulent procurement, concealment, duress, bad faith, and

375

intentional wrongdoing, and awarding appropriate severance, reformation, rescission, partial rescission, and restitution;

      G.     Declaring, in the alternative and upon recharacterization as pleaded in Count XXVI, that the extracted financing terms, the amendments imposing them, and the cross-default machinery they carried are criminally usurious and void ab initio under New York law, unenforceable as a predicate for any termination, allocation, charge, or forfeiture, and ordering restitution of amounts collected under the void terms;

      H.     Declaring that the jury waiver in Section 13(f) of each Advisory Agreement is unenforceable, or in the alternative that it does not extend to the claims and Defendants outside its scope, and that Plaintiffs are entitled to trial by jury on every issue so triable;

      I.     In the alternative and upon election, ordering rescission under Section 215(b) of the Investment Advisers Act of the tainted instruments and provisions to the extent of the pleaded violations, and restitution of the consideration received under them, with prejudgment interest and without duplicate recovery, as pleaded in Count XXVII;

      J.     In the alternative and upon election, declaring the tainted instruments and provisions void as against Defendants under Section 29(b) of the Exchange Act and ordering rescission and restitution of the consideration received under them, with prejudgment interest and without duplicate recovery, as pleaded in Count XXVIII;

      K.     Imposing a constructive trust upon the assets of the Funds and their feeder and master vehicles traceable to the capital, credits, interest income, financing charges, fees, and other economics extracted from Plaintiffs, including any portion allocated to Regular Members, and ordering an accounting and disgorgement of those traceable amounts;

L.      Enforcing the credit-interest commitment or implied agreement pleaded in Count XIX, or awarding promissory-estoppel reliance relief in the alternative, including all unpaid credits and interest, including statutory prejudgment interest at nine percent per annum under N.Y. C.P.L.R. §§ 5001 and 5004 from the end of each month in which each credit accrued and was withheld, and otherwise from August 5, 2024 or the applicable later loss date, on the converted funds and withheld credits;

M.      Declaring under 28 U.S.C. §§ 2201 and 2202 that, upon the final judicial determination required by AIAA § 11(a), BCML is entitled to indemnification from the responsible Trading Master Fund for resulting Losses, including reasonable attorneys' fees and court costs, and enforcing that entitlement when the condition is satisfied;

N.      Enjoining Defendants and all persons acting in concert with them from using, disclosing, transmitting, copying, incorporating, or deriving further benefit from the Britannica Trade Secrets, and requiring Defendants to identify every recipient, disclosure, copy, transmission, system, model, policy, contract, account, trade, communication, and derivative work containing, reflecting, incorporating, or resulting from the Britannica Trade Secrets;

O.      Ordering appropriate return, deletion, destruction, sequestration, or other protection of unauthorized copies and derivatives to the extent established and authorized by the Court; requiring preservation of all relevant native files, metadata, access logs, distribution lists, communications, model histories, policy revisions, contracts, trade blotters, proprietary and affiliated accounts, and employee-account surveillance records; and ordering appropriate verification of compliance;

P.      Awarding Gupta and BCML actual damages for trade-secret misappropriation, unjust enrichment not included in actual loss or, in the alternative, a reasonable royalty, in an

377

amount to be proved at trial and presently believed to reach or exceed $1,000,000,000 before statutory enhancement;

Q.      Awarding exemplary damages of up to twice the qualifying damages and reasonable attorneys' fees under 18 U.S.C. § 1836(b)(3) for Defendants' willful and malicious misappropriation;

R.      Awarding compensatory and punitive damages and appropriate equitable relief under New York law, without duplicate recovery; and

S.      Awarding threefold the qualifying non-securities RICO damages, costs of suit, and reasonable attorneys' fees under 18 U.S.C. § 1964(c);

T.      Awarding BC LLC actual damages under 7 U.S.C. § 25 for the CEA violations proved, without duplicate recovery;

U.      Awarding BC LLC the remedies provided by Conn. Gen. Stat. § 36b-29, including the consideration paid with interest at eight per cent per year from the date of each payment, costs, and reasonable attorneys' fees, without duplicate recovery;

V.      Awarding punitive damages on the New York tort and unfair-competition claims to the extent permitted by law, and holding each Defendant found to have conspired in, aided, or acted in concert regarding an underlying wrong jointly and severally liable for the full damages of that wrong;

W.      Awarding contractual indemnification, attorneys' fees, court costs, and other Losses under AIAA § 11(a) when its condition is satisfied, and fees and costs under every other applicable contract or statute;

X.      Awarding prejudgment interest under CPLR §§ 5001 and 5004 or other applicable law, post judgment interest under 28 U.S.C. § 1961, and taxable costs; and

378

Y.      Granting such other and further legal or equitable relief as the Court deems just

and proper.

## JURY DEMAND

Pursuant to the Seventh Amendment and Rule 38 of the Federal Rules of Civil Procedure,

Plaintiffs demand a trial by jury on every issue so triable.


Dated:  New York, New York
        August 5, 2026

HOGUET NEWMAN REGAL & KENNEY, LLP


By: _____

Helene R. Hechtkopf
One Grand Central Place
60 East 42nd Street, 48th Floor
New York, NY 10165
Phone: 212-689-8808
hhechtkopf@hnrklaw.com



Kevin Murphy
WUERSCH & GERING LLP
88 Pine Street
20th Floor
New York, NY 10005
Phone:  212-509-6311
kevin.murphy@wg-law.com

*Attorneys for Plaintiffs*

379